

New York City Law Department

# Corporation Counsel Report
# Pursuant to Executive Order 58 (June 20, 2020)
# Directing an Analysis of Factors Impacting the
# George Floyd Protests in New York City

James E. Johnson
Corporation Counsel

December 2020

# TABLE OF CONTENTS

Page

Executive Summary ..................................................................................................................... 1
I.   Introduction ...................................................................................................................... 5
II.  Methodology ..................................................................................................................... 7
III. Findings ............................................................................................................................ 9
     A.   The Context of the Protests and the Police Department's Response ................... 9
          1.   The COVID-19 Pandemic ............................................................................ 9
               a.   The Pandemic's Effect on the Public ............................................... 9
                    i.    The Impact on Public Health ..................................................... 9
                    ii.   The Economic Impact .............................................................. 11
                    iii.  The Impact on Mental Health ................................................. 13
               b.   The Pandemic's Impact on NYPD Officers ................................... 15
          2.   The Nature of the Protests ......................................................................... 17
               a.   The Content of the Protests ........................................................... 18
               b.   The Size, Number, and Location of the Protests .......................... 21
          3.   The Interplay Between the Pandemic and the Nature of the
               Protests ........................................................................................................ 23
               a.   The Interplay Between the Content of the Protests and the Pandemic
                    May Have Intensified Interactions at the Protests ........................ 23
               b.   The Interplay Between the Nature of the Protests and the Pandemic
                    May Have Impacted the NYPD's Performance at the Protests ..... 27
     B.   Interagency and Operational Development ......................................................... 28
          1.   Tools for Organizational Learning – After-Actions, Sentinel Event
               Reviews, and Tabletop Exercises ............................................................. 29
          2.   NYPD's Current Self-Assessment Practices ........................................... 30
               a.   Internal Assessment ...................................................................... 31
               b.   External Feedback ......................................................................... 33
          3.   Lack of Formal Self-Assessment as a Potential Factor in the George
               Floyd Protests ............................................................................................ 34
     C.   Assessment of NYPD's Training Regarding Protest Policing ............................ 35
          1.   Overview of NYPD Training Regarding Protest Policing ...................... 35
               a.   Academy Training for NYPD Recruits and Experienced Officers ... 35
               b.   Strategic Response Group Training ................................................ 36
               c.   Recent Updates to Training ........................................................... 36
          2.   The Impact of Limited Training in Protest Situations ........................... 36
          3.   The Content and Focus of the NYPD's Training for Protests ................ 38
               a.   Maintaining Emotional Control vs. Habitual Response to Take
                    Control ........................................................................................... 38
               b.   De-Escalation ................................................................................ 40
               c.   Crowd Psychology and Behavior .................................................. 40
               d.   Framing and The First Amendment .............................................. 42
          4.   Comparative Review ................................................................................. 43
IV.  Strategic Consideration Based on Practices Around the Nation .............................. 46
               a.   An Investment in Supervisors ....................................................... 46
               b.   Strategic Checklist for First Amendment Events .......................... 46
V.   Conclusion ...................................................................................................................... 50
VI.  Recommendations .......................................................................................................... 50

## Executive Summary

Before the nation's eyes, George Floyd was killed by a police officer who held his knee on Mr. Floyd's neck.  Statements of outrage were soon followed by protests across the nation, including in New York City. While most of the protests in the City came and went without incident, some involved intense verbal and physical conflict between protesters and police. Scores of protesters and police officers suffered injuries, with many requiring hospital treatment.[1]

To better understand the contributing factors to the protests of late May and early June, on June 20, 2020, Mayor de Blasio issued Executive Order Number 58 ("E.O. 58"), entitled "Independent Investigation into Enforcement Actions by the New York City Police Department in Connection with Protest Activities". In E.O. 58, the Mayor directed the Corporation Counsel to conduct an "analysis …of factors that may have impacted the events at protests" which would be released in a public report. Through E.O. 58, the Mayor also directed the New York City Department of Investigation ("DOI") to conduct a factual investigation of the events surrounding the protests and an evaluation of the response of the New York City Police Department ("NYPD" or "Department").  DOI issued its report on December 18, 2020 ("DOI Report").[2]

To conduct this analysis, the Corporation Counsel assembled a special Law Department review team – walled off from other Law Department attorneys who may work on litigation related to the George Floyd protests – to review a broad range of materials and resources, including government, academic, and advocacy group reports, records and data, as well as NYPD documents, policies, and other materials related to the policing of protests[3]. This documentary research was supplemented by conversations with NYPD officials, citywide data analysts, oversight professionals from other cities, and a variety of other groups and individuals. In addition, the Law Department engaged and consulted with third-party subject matter experts of national standing to provide input in four distinct areas: (a) policing protests; (b) management of high-impact events from the perspective of senior managers; (c) crisis response from the perspective of officers; and (d) organizational behavior.

Through this analysis, the Law Department identified several factors that may have contributed to the intensity of the protests.

- **The COVID-19 Pandemic**: The fact that the George Floyd protests occurred during a once-in-a-century pandemic cannot be understated. The pandemic significantly affected the physical health, the economic health, and the mental health of New Yorkers, falling hardest

---

[*] The Corporation Counsel extends his gratitude to the members of the review team:  Chief of Staff Asim Rehman, Senior Counsel Andrew Almonte, Senior Counsel Andrea Berger, Senior Counsel Rebecca Lipman, and Assistant Corporation Counsel Gavin Mackie.  The review team was supported by Chief Ethics Officer Karen Griffin, Deputy Executive Assistant Corporation Counsel for Juvenile Justice Policy Thomas Giovanni, Deputy Chief for Strategic Litigation Tonya Jenerette, Executive Secretary Nakisha Coulter-Guillory, and Paralegal Takia Chandler.

[1] Between May 28, 2020, and June 8, 2020, 386 New York City Police Department members of the service were injured and 253 were hospitalized as a result of the protests.  While the Law Department reviewed various anecdotal accounts of protestor injuries and hospitalizations, precise figures are not known at this time.

[2] *See* NEW YORK CITY DEPARTMENT OF INVESTIGATION, INVESTIGATION INTO NYPD RESPONSE TO THE GEORGE FLOYD PROTESTS 43-5 (2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf (hereinafter "DOI Report").

[3] Throughout this report, the protest events are referred to as the "George Floyd protests."

on the City's Black and Latinx residents. The report outlines the many ways in which the City was impacted, and how the pandemic brought both a tremendous amount of uncertainty along with an unprecedented form of isolation. At the same time, the pandemic placed officers under a significant amount of stress. Officers witnessed fellow officers fall ill, experienced uncertainty over their assignments, and were concerned about the health of their family members. As explained through the lens of behavioral science, such stress and fatigue can impact the decisions of officers who were called to the front line of protests and asked to work longer shifts without days off.

- **The Nature of the Protests**: The George Floyd protests were also taking place within the larger national discussion around policing and community. New York City residents engaged in protests were reacting not just to the video of one Black man being killed by police action, but to the deaths of other Black people by law enforcement. These protests, the volume and geographic spread of which were unprecedented, were sometimes accompanied by vitriol and violence against the NYPD. Such an environment can negatively impact police officers and can impair how police and protesters view each other.

- **Interagency and Operational Development:** NYPD does engage in informal internal reviews of protest policies and procedures, and regularly revises its policies and training as a result of such reviews. The Department does not, however, engage in structured, macro-level, after-action assessments or Sentinel Event reviews related to protests that include critical partners like prosecutors. Nor does the NYPD regularly engage in practice and planning exercises (such as tabletops) with critical partners, such as relevant City agencies and the five District Attorneys, regarding protest scenarios. Likewise, the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests. The NYPD's tactical approach to this Summer's protests may have been different had it engaged in a more systematic learning process.

- **Training:** Behavioral science informs us that if officers do not have recent and appropriate training on strategies and tactics for policing protests but are nonetheless placed into such highly stressful situations – as was the case here – there is a high likelihood that they will revert to basic human responses to perceived threats. In policing, such responses would include an instinct to assert physical control of a disorderly situation, which may in turn serve to escalate hostilities in protest situations. Moreover, for those officers who do receive specialized training regarding protests and crowds, the training does not sufficiently provide officers with instruction around crowd psychology, de-escalation, and First Amendment issues.

A close review of these factors, informed by the experience of other cities, should help form the basis of a strategy for preparing for, and responding to, high intensity protest events where First Amendment expression may be occurring at the same time as violent criminal behavior targeting others, including police officers, and property. To assist with that preparation and response, this report offers a proposed checklist for protest response planning, as well as the following recommendations.

1. **NYPD should conduct mass demonstration tabletop simulations with internal and external stakeholders.** To build institutional "muscle memory" regarding response protocols, to ensure that there is appropriate and swift coordination with prosecuting agencies, to identify gaps in policies and procedures, to foster and strengthen internal and external lines of communication, and to develop draft action plans and checklists for future use, the NYPD should regularly conduct tabletop exercises focuses on mass demonstration scenarios. Such exercises should include representatives from the five District Attorney offices, the Law Department, City Hall officials, including Community Affairs Unit representatives, and other necessary partners.

2. **NYPD should institutionalize a practice of conducting regular after-action reviews following major protest events**. The NYPD should examine how to institutionalize such reviews, including how to include officer perspectives in a non-punitive way. Studying how Sentinel Event reviews are carried out in other cities can also shed light on how to ensure confidentiality, reduce legal exposure, and encourage participation in these processes.

3. **NYPD should work to ensure that input from multiple stakeholders, including community groups, police industry groups, and civil rights and advocacy organizations, is considered in any post-action policy reviews.** In developing a plan to institutionalize a practice of after-action review, the NYPD should consider the value that input from members of the community, protest organizers, and external civil rights groups may be able to bring to such review. The inclusion of such community voices as part of a structured Sentinel Event review, or comparable process, can help to instill trust between the community and the police and can improve community-police relations.

4. **NYPD should develop processes for incorporating community sentiment into planning for protests.** Whether through the Community Affairs Bureau, precinct-level Community Affairs Officers, the Mayor's Community Affairs Unit, or all of the above, NYPD should develop a process to ensure that community sentiment – in its various forms – is made part of the planning process for protests. This process should include regular partners and channels (e.g., NYPD Precinct Community Councils and Chambers of Commerce) as well as less familiar voices that are not usually at the table. This work should be ongoing and should be part of every strategy plan for major protests and demonstrations.

5. **NYPD deployment protocols should have a heightened focus on officer readiness.** The NYPD should assess and identify ways to determine whether certain officers are appropriately prepared for protest policing work. This involves not only ensuring the officers have the appropriate equipment and have been recently trained, but also assessing the health and wellness of officers. In approaching this, NYPD should build upon existing strategies that are working well and should be mindful of the unique sensitivities around office health and wellness issues.

6. **NYPD training should be assessed according to current best practices**. The NYPD should, in consultation with experts, conduct a top-to-bottom assessment of its training materials and methods to ensure that the content, delivery, and frequency of training is: (a) properly calibrated according to the role of the particular members of service (e.g., patrol officer, field supervisors, etc.) and (b) comports with best practices and the current science on crowd psychology, the rights of protestors, behavioral science, etc.

7.  **NYPD should continue, and consider enhancing, efforts around health and wellness programs**. The NYPD has made important strides in the last two years regarding officer health, wellness, and safety. The Department should continue to promote such programs to ensure that officers are aware of the services available to them and feel comfortable taking advantage of them without repercussions. The NYPD should likewise continue to ensure that these programs receive the requisite resources.

8.  **NYPD reforms to protest policing should focus on investments in supervisors.** As the NYPD reviews its practices, policies, training, and strategy around policing protests, the Department should focus on supervisors. This includes providing regular and ongoing training to supervisors about tactics and leadership when policing protests, and developing policies that clearly specify the roles of various supervisory ranks at protests.

9.  **NYPD should work with the five District Attorneys to develop and implement a plan for coordination of high impact First Amendment events and set guidelines for activation of that plan.** The balance between the exercise of First Amendment rights and protecting public safety can leave Borough Commanders in the position of making decisions that affect the entire City, including the public's trust in the police, the effectiveness of the prosecution of opportunistic criminals who take advantage of large protest events and, ultimately, the City's civil liability. A coordinated plan for information sharing and case evaluation would minimize that risk, heighten effectiveness and ensure greater public perception of fairness. It would also provide greater consistency for officers called out to serve in different boroughs over the course of different days.

10. **NYPD should convene an implementation team for these and other recommendations.** To implement these recommendations and those in the Department of Investigation's Report, the NYPD should convene an implementation team. The team should include internal stakeholders from relevant bureaus as well as external partners (including representatives from the Law Department and City Hall). The team should be led by a senior NYPD official who has familiarity with the underlying issues, knowledge of the patrol experience, and the authority to ensure swift implementation.

## I.      Introduction

The First Amendment of the United States Constitution establishes a bedrock principle of democracy. Freedom of expression, particularly freedom to protest, is central to national progress and is a necessary shield against tyranny. The duty to keep citizens safe is also a primary function of any government. The goal of effective government is to keep in balance both the core value of democracy and the core function of safety.

All who have the privilege of serving in government have a duty to protect that balance. At times of conflict and protest, the burden of maintaining that balance falls heavily, but not exclusively, on the shoulders of police departments and the men and women sworn to protect and serve.

On June 20, 2020, Mayor de Blasio issued E.O. 58, entitled "Independent Investigation into Enforcement Actions by the New York City Police Department in Connection with Protest Activities". In E.O. 58, the Mayor directed the Corporation Counsel to conduct an "analysis … of factors that may have impacted the events at protests" that occurred during the period of May 28 through June 20, 2020, which would be released in a public report. Through E.O. 58, the Mayor also directed the New York City Department of Investigation ("DOI") to conduct a factual investigation of the events surrounding the protests and an evaluation of the response of the NYPD. On December 18, 2020, DOI issued a report ("DOI Report") that concluded that, in response to protests triggered by the death of George Floyd and coincident events of looting, that balance was lost and excessive enforcement was used against protesters exercising the very First Amendment rights that the NYPD has a duty to uphold.[4]

The George Floyd protests affected the City in myriad ways. The outpouring of residents into the City's open spaces illustrated the deeply held feelings and perspectives that New Yorkers were experiencing about issues that cut across the country. Alongside some of the expressive conduct at the protests, and sometimes intermingled, were individuals who committed acts of violence and property damage. Scores of protesters and police officers sustained a range of physical injuries, including wounds caused by violence which required hospitalization. Businesses found their wares looted and storefronts damaged.

Public safety requires a partnership between community and police, and the currency of that partnership is trust.  Trust is what provides police with legitimacy.  It is what motivates victims and witnesses to report crimes; it allows officers to gather information and investigate; and it gives juries a sense of confidence when sitting in judgement of a peer. As a currency, this trust can run at a surplus or a deficit, and how protests of this nature evolve – and how police respond – are often defined by that trust. Right now, more than ever, that trust must be restored.

This report, also issued pursuant to E.O. 58, reflects the results of a review of the factors that may have contributed to the intensity of the protests and the police response. After identifying the factors that were relevant to understanding the events of May 28 through early June, the report identifies how attention to those factors, plus the experience of other cities, should help form the basis of a strategy for preparing for and responding to high intensity protest events when First Amendment expression may be occurring at the same time as violent criminal behavior targeting others, including police officers, and property.

---

[4] *See* DOI Report at pp. 43-5.

This report is not a typical Law Department report.  First, as discussed more herein, the Law Department, as counsel to all City agencies, regularly represents NYPD employees in lawsuits and defends the City in challenges to NYPD policies and practices. While it is neither uncommon nor prohibited for attorneys representing an entity to engage in a written review of that entity's policies and practices – indeed it occurs frequently in the private corporate setting – a report of this nature is not a frequent occurrence in New York City.

Second, although the Law Department is counsel to the City, this report does not reach legal conclusions. Rather, per the Executive Order, this report is an "analysis … of factors that may have impacted the events at protests." As a result, this report is less focused on reaching specific factual determinations and more focused on understanding events, looking at the circumstances around those events, and developing recommendations going forward.[5]  In support of this task, we have enlisted the assistance of experts in policing and behavioral science.

Government policies are informed by laws and norms. To work effectively, they must also be informed by how human beings perceive the world, how they react to it and how even history may shape those reactions. This review is informed by the practical experience of our expert team and by behavioral science, and how such science can help shape strategies for responding to large protests going forward. In the spirit of the Sentinel Event reviews discussed below, this report does not affix individual responsibility. That will be left to ongoing disciplinary hearings, civil proceedings, and criminal investigations, as well as investigations by the Civilian Complaint Review Board.

Third, unlike most other documents released by the Law Department, some of the language in this report is graphic. Through a behavioral science lens, the Law Department sought to understand how the events of this summer impacted both police and members of the public, and a rigorous assessment of that question involves looking at challenging circumstances and conveying both the emotion and the messages at the heart of the protests and confrontation. While the report concludes with recommendations about changing strategies and processes going forward, a deeper goal is building a basis for restored trust and deeper understanding, both of which are fundamental to the pursuit of a just society.

Although some conclusions in this report are based on social science, this work is not the product of teams of sociologists armed with survey tools.  It advances potential contributing factors at work in connection with the George Floyd protests and the police response and makes recommendations to enhance performance going forward or, at the very least, reduce the risk of similar outcomes in the future.

---

[5] As noted above, E.O. 58 directed the New York City Department of Investigation, not the Law Department, to chronicle the protest events.

## II.      Methodology

The Law Department's review team utilized a broad range of materials and resources in its examination, ranging from government, academic and advocacy group reports and interviews to consultation with experts in policing and social science.  The materials reviewed include:

- NYPD Resources: NYPD training materials, current and previous provisions of the Patrol Guide, data about sick and bereavement leave, documents relating to the 2004 Republican National Convention protests and other protests, and a range of other materials.

- Other New York City Government Resources: Reports of the DOI Office of the Inspector General for the NYPD, data and reports from the Department of Health and Mental Hygiene ("DOHMH"), NYC Comptroller reports, Mayoral Emergency Executive Orders, and other materials.

- New York State Government Resources: Governor's Executive Orders, New York Attorney General's report on the NYPD's response to the George Floyd protests, and other materials.

- Other Government and Inter-governmental Resources: Reports and studies of the Department of Justice, U.S. Department of Labor, and the World Health Organization.

- Other Police Departments and Oversight Agencies: Materials from or regarding police departments and police oversight agencies from various U.S. cities. These include the Office of the Inspector General for Seattle, the Washington D.C. Office of Police Complaints, and the Baltimore Police Department.

- Law Enforcement Groups and Experts: Reports and studies of the Police Executive Research Forum ("PERF"), International Association of Chiefs of Police ("IACP"), National Police Foundation, and other related materials.

- Advocacy Organizations: Reports published by Human Rights Watch, Physicians for Human Rights, the New York Civil Liberties Union, the Protest Policing Project (a consortium of New York City law schools), and other materials.

- Academic Studies and Expert Reports: Including studies by the New School Center for New York City Affairs and materials published by the experts noted below.

- News and Journalism: Articles covering the period in question.

This documentary research was supplemented by conversations with NYPD officials, DOHMH data analysts, oversight professionals from other cities, and other groups and individuals. The Law Department review team also consulted with colleagues at the DOI regarding our respective reviews, although our work proceeded on separate tracks with different timelines. In this report, the Law Department refers to findings and recommendations made in the DOI Report. In keeping with the spirit of the Executive Order, and for purposes limited to this specific report, the Law Department relied on certain DOI factual findings to inform our conclusions. The Law Department also reviewed DOI's interviews with NYPD officials.  In this report, all references to

discussions with NYPD are references to DOI's interviews with NYPD except where specified that it was a Law Department interview.

In addition, the Law Department engaged and consulted with third-party subject matter experts of national standing to provide input in four distinct areas: (a) policing protests; (b) management of high-impact events from the perspective of senior managers; (c) crisis response from the perspective of officers; and (d) organizational behavior. Below is a list of our experts.

- Edward Maguire is a professor of criminology and criminal justice at Arizona State University, where he also serves as director of the Public Safety Innovation Lab and associate director of the Center for Violence Prevention and Community Safety. Dr. Maguire's research focuses primarily on policing and violence. His recent research has focused on police response to protests, procedural justice and legitimacy, gangs and gang violence, officer safety and wellness, the effectiveness of violent crime control initiatives, and the influence of the COVID-19 pandemic on police practices. He has written or edited seven books and more than 90 journal articles and book chapters on various themes related to policing, violence, and crowds. Based on a national study of protest policing practices in the U.S., Dr. Maguire has co-authored a guidebook for police on handling protests entitled "Policing Protests:  Lessons from the Occupy Movement, Ferguson & Beyond:  A Guide for Police". He has also lectured and provided training on protest policing issues to law enforcement audiences in the U.S. and abroad. Dr. Maguire currently serves as chair of the research advisory board for the Police Executive Research Forum.

- Sean Smoot is a partner with 21CP Solutions and is Director and Chief Counsel for the Police Benevolent & Protective Association of Illinois and the Police Benevolent Labor Committee. A nationally recognized subject matter expert regarding police related topics, Mr. Smoot speaks regularly at state, national, and international forums regarding community policing, public safety, and public employee labor and pension issues and he has written several articles for police publications and newsletters. He co-authored "Police Leadership Challenges in a Changing World" and authored a contribution to the U.S. Department of Justice National Institute of Justice's Special Report titled "Mending Justice: Sentinel Event Reviews" published in September 2014. Smoot served as a police and public safety policy advisor to the Obama-Biden Presidential Transition Teams, and was appointed by the President of the United States to the Task Force on 21st Century Policing in 2014. He has served on the Advisory Committee for the National Law Enforcement Officers' Rights Center in Washington, D.C. since 1996. Mr. Smoot currently serves as the Vice-Chair of the Illinois Law Enforcement Training and Standards Board and on the consent decree monitoring teams in Cleveland and Baltimore.

- ideas42. Founded in 2008 by scholars from prominent economics departments in the United States, ideas42 is a non-profit that uses insights from human behavior -- why people do what they do -- to help improve lives, build better systems, and drive social change. For more than a decade, ideas42 has been working to reinvent the practices of institutions, and create better products and policies that can be scaled for maximum impact. Their efforts have so far extended to 40 countries as they have partnered with governments, foundations, NGOs, private enterprises, and a wide array of public institutions. The work of ideas42 focuses on identifying the subtle but important contextual details that can have a disproportionate impact on outcomes.

These experts provided their experienced assessments of NYPD's policies and practices. Through various discussions throughout the Fall, the experts advised the review team on issues including crowd psychology, best practices in policing protests, and behavioral science as they related to policing and protests. The experts also contributed to the content of this report. This includes providing specific content for questions raised, such as ideas42 providing expert opinion and academic grounding and analysis on issues relating to the behavior of protesters and officers in protest scenarios and Professor Maguire advised on the strategic checklist noted later in this report. Lastly, the experts have vetted and endorsed all of the recommendations in this report.

Finally, given the role that the Law Department plays in representing all City agencies and the employees – including the NYPD and NYPD officers – the Law Department professionals working on the E.O. 58 review team were recused from and walled off from discussions with other Law Department colleagues about the recent protest events, as well as any matters regarding Law Department representations relating to such events. The Corporation Counsel was similarly recused, and the First Assistant Corporation Counsel was accordingly designated to serve as Acting Corporation Counsel to oversee any such matters where the Law Department was representing the City or individual NYPD officers in connection with the protests.

## III.   Findings

### A.  The Context of the Protests and the Police Department's Response

#### 1.  The COVID-19 Pandemic

The George Floyd protests, and the criminal behavior that occurred at the same time as some of the protests, took place during a once-in-a-century global pandemic.[6] The effects of the COVID-19 pandemic touched every New Yorker and upended millions of lives. The following section explores how the pandemic may have affected both the public and police officers in ways that impacted their interactions at the George Floyd protests.

##### a.   The Pandemic's Effect on the Public

###### i.   The Impact on Public Health

As the COVID-19 pandemic began in the United States, New York City found itself at the epicenter of a nationwide crisis.[7] Mayor de Blasio issued an executive order on March 12, 2020 which declared a state of emergency, and directed all agency heads to take all necessary steps to preserve public safety.[8] Leaders at the City, State and Federal levels took steps to contain the virus, but by Memorial Day weekend, almost 200,000 New Yorkers had tested positive and over 20,000

---

[6] *Impact of coronavirus will be felt for decades to come, WHO says,* REUTERS (July 31, 2020), https://www.reuters.com/article/us-health-coronavirus-who/impact-of-coronavirus-will-be-felt-for-decades-to-come-who-says-idUSKCN24W27L.

[7] Chris Keeley, et al., *At The "Epicenter Of The Epicenter": NYC Health + Hospitals' Response To COVID-19* (June 1, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200611.510263/full/.

[8] MAYOR BILL DE BLASIO, EMERGENCY EXECUTIVE ORDER NO. 98 (March 12, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-98.pdf.

New Yorkers had died from COVID-19.[9] On a national level, almost 100,000 people had died by Memorial Day, which is almost twice the number of American battle deaths in the Vietnam War.[10] It was an extraordinary amount of illness and death for the City and nation to face in such a short period.[11] As of December 2020, more than 80% of all COVID-19 deaths the City has suffered occurred prior to Memorial Day weekend.[12] The City's system for handling deaths had to adapt quickly; crematories began running all day long, and refrigerated trucks to hold the dead became a common sight outside hospitals.[13]

The health effects of COVID-19 itself were not the only physical effects felt by the public. The volume of COVID-19 hospitalizations threatened to overwhelm hospitals, so elective surgeries were cancelled.[14] Local hospital units that would normally have heart attack and stroke patients were unusually empty, leading doctors to fear that New Yorkers in need of emergency medical care were either not seeking care or delaying getting the help they needed for serious conditions where time is of the essence.[15] COVID-19 did not hit all areas of the City with equal force. DOHMH published a report that described how the highest rates of COVID-19 cases, hospitalizations, and deaths in the first three months of the pandemic were in communities of color and communities of high poverty.[16] Wealthier, whiter areas such as Battery Park City, Tribeca, Park Slope, and the Brooklyn

---

[9] *See* NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, CONFIRMED AND PROBABLE COVID-19 DEATHS, DAILY REPORT (May 16, 2020), https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary-05172020-1.pdf.

[10] Centers for Disease Control and Prevention, *United States Coronavirus (COVID-19) Death Toll Surpasses 100,000* (May 28, 2020), https://www.cdc.gov/media/releases/2020/s0528-coronavirus-death-toll.html; *See* Department of Veterans Affairs, *America's Wars*, https://www.va.gov/opa/publications/factsheets/fs_americas_wars.pdf.

[11] As of December 20, 2020, the Department of Health and Mental Hygiene estimated that there have been more than 350,000 total COVID-19 cases since the start of the pandemic, and more than 24,000 deaths. *See* NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, COVID-19: DATA, https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page#summary (last visited Dec. 24, 2020).

[12] MATTHEW MONTESANO, ET AL., NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, CORONAVIRUS-DATA, https://github.com/nychealth/coronavirus-data/blob/master/trends/data-by-day.csv (last visited Dec. 24, 2020).

[13] *See* Dave Davies, *Reckoning With The Dead: Journalist Goes Inside An NYC COVID-19 Disaster Morgue,* NPR (May 28, 2020), https://www.npr.org/sections/health-shots/2020/05/28/863710050/reckoning-with-the-dead-journalist-goes-inside-an-nyc-covid-19-disaster-morgue.

[14] NEW YORK DEPARTMENT OF HEALTH AND MENTAL HYGIENE, COVID-19 DIRECTIVE TO INCREASE AVAILABILITY OF BEDS BY A MINIMUM OF 50% AND PROVIDE NECESSARY STAFFING AND EQUIPMENT (March 23, 2020), http://www.mssnyenews.org/wp-content/uploads/2020/03/Facility-Directive-3.23-FINAL.pdf. "Elective" surgeries included a number of vital surgeries, such as some cancer surgeries, and routine appendectomies. *See* Lydia Hu, *NYC Hospitals Obtain Waivers to Resume Elective Surgeries,* SPECTRUM NEWS NY1 (June 6, 2020), https://www.ny1.com/nyc/all-boroughs/news/2020/06/06/nyc-hospitals-obtain-waivers-to-resume-elective-surgeries.

[15] *See* New York City Department of Health and Mental Hygiene COVID-19 Response Team, *Preliminary Estimate of Excess Mortality During the COVID-19 Outbreak — New York City, March 11–May 2, 2020,* 69(19) CENTERS FOR DISEASE CONTROL AND PREVENTION MORBIDITY AND MORTALITY WEEKLY REPORT 603-605 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e5.htm (noting "public fear related to COVID-19 might lead to delays in seeking or obtaining lifesaving care."); Gina Kolata, *Amid the Coronavirus Crisis, Heart and Stroke Patients Go Missing,* N.Y. TIMES (April 25, 2020), https://www.nytimes.com/2020/04/25/health/coronavirus-heart-stroke.html.

[16] Corinne N. Thompson, et al., *COVID-19 Outbreak – New York City, February 29–June 1, 2020,* 69(46) CENTERS FOR DISEASE CONTROL AND PREVENTION MORBIDITY AND MORTALITY WEEKLY REPORT 1725-1729 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6946a2-H.pdf.

Heights are among the areas that have seen the lowest test percent positivity rates.[17] The disparities have been both obvious and tragic.

Various factors have fueled these disparities. As the DOHMH report noted, Black and Latinx individuals are disproportionately employed in relatively low-paid, frontline occupations, with limited ability to social distance, and are less likely to have employer-based health insurance.[18, 19] Additionally, Black and Latinx New Yorkers have a higher prevalence of chronic health conditions compared with white New Yorkers.[20] These conditions include diabetes, high blood pressure, and obesity – all of which are thought to increase the risk of serious COVID-19 illness.[21] Lastly, household crowding is known to be a risk factor for COVID-19 exposure, and is often more common in neighborhoods of higher poverty, meaning lower income individuals who share an apartment with multiple people can face a greater risk of contracting COVID-19 in the first place.[22]

By the time the George Floyd protests began in late May, the physical health of the City had suffered a significant blow, which fell hardest on its Black and Latinx residents.

    ii.  *The Economic Impact*

Additionally, there were a slew of economic effects the City was grappling with, which once again disproportionately affected our communities of color. In May 2020, the City's unemployment rate was 18.3%.[23] Between February and May, the City had lost an astounding 937,000 jobs, 20% of the City's previous total number of jobs.[24] These job losses were most acutely felt by the City's communities of color.[25] According to the New York City Comptroller, the unemployment rate for

---

[17] DEPARTMENT OF HEALTH AND MENTAL HYGIENE, COVID-19: DATA, https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page (last visited Dec. 24, 2020).

[18] Corinne N. Thompson, et al., COVID-19 Outbreak – New York City, February 29-June 1, 2020, 69(46) CENTERS FOR DISEASE CONTROL AND PREVENTION MORBIDITY AND MORTALITY WEEKLY REPORT 1725-1729 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6946a2-H.pdf.

[19] All NYC residents are eligible for health insurance regardless of income, employment, or immigration status. In addition to options available through the New York State marketplace, the City operates NYC Care, a program that guarantees low-cost and no-cost services to New Yorkers who do not qualify for or cannot afford health insurance. All NYC Care services are provided through NYC Health + Hospitals. *See* NY STATE OF HEALTH, https://info.nystateofhealth.ny.gov/essentialplan (last visited December 28, 2020); NYC Care, https://www.nyccare.nyc/ (last visited December 28, 2020).

[20] NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE ANALYSIS OF THE NEW YORK CITY COMMUNITY HEALTH SURVEY, 2009-2013.

[21] Takahisa Makami, et al., *Risk Factors for Mortality in Patients with COVID-19 in New York City*, JOURNAL OF GENERAL INTERNAL MEDICINE (2020), https://doi.org/10.1007/s11606-020-05983-z.

[22] *See* Ukachi N. Emeruwa, et al., *Associations Between Built Environment, Neighborhood Socioeconomic Status, and SARS-CoV-2 Infection Among Pregnant Women in New York City*, 324(4) JAMA 390–392 (2020), https://jamanetwork.com/journals/jama/fullarticle/2767631; K. C. Madhay, et al., *The effect of area deprivation on COVID-19 risk in Louisiana*, 15(12)PLOS ONE 2020 e0243028 (2020), https://doi.org/10.1371/journal.pone.0243028; J.A. Patel, et al., *Poverty, inequality and COVID-19: the forgotten vulnerable*, 183 PUBLIC HEALTH 110-111 (2020) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7221360/.

[23] *See* NEW YORK STATE DEPARTMENT OF LABOR, NYC SEASONALLY ADJUSTED UNEMPLOYMENT RATE HISTORY (2020), https://labor.ny.gov/stats/nyc/.

[24] NEW YORK STATE COMPTROLLER THOMAS P. DINAPOLI, NEW YORK'S ECONOMY AND FINANCES IN THE COVID-19 ERA (July 19, 2020), https://www.osc.state.ny.us/reports/covid-19-july-9-2020.

[25] *See* NEW YORK CITY COMPTROLLER SCOTT M. STRINGER, THE NEW YORK CITY EMPLOYMENT SITUATION IN MAY: CONTINUED DETERIORATION (June 2020), https://comptroller.nyc.gov/wp-content/uploads/documents/NYC_Employment_May2020.pdf.

Asian New Yorkers skyrocketed from 3.4% in February to 25.6% in May.[26] The rates for Latinx and Black New Yorkers rose to 25.1% and 23.5%, respectively.[27] Meanwhile the unemployment rate for white New Yorkers increased much more modestly, from 2.0% in February to 11.8% in May.[28]

A similar racial disparity is reflected in the numbers capturing workforce participation. The workforce participation rate reflects individuals who have dropped out of the labor force for reasons other than retirement, disability, school, or home care responsibilities.[29] The City's rate had been slowly but steadily rising for the past ten years.[30] Between February and May, however, that trend was sharply reversed. Per the Comptroller, the City's labor force participation rate dropped an unprecedented 7.6 percentage points in those first few months of the pandemic, from 61.5% to 53.8%. Black New Yorkers were hardest hit.[31] Their workforce participation rate fell 12.6%, while white New Yorkers experienced a 7.1% drop.[32] Asian New Yorkers suffered a 10.6% drop, and Latinx New Yorkers appeared to drop just 2.7%.[33]

The jobs the City lost were unsurprisingly concentrated in what the State Department of Labor has termed "face-to-face" industries.[34] These industries include businesses like bars, restaurants, and entertainment venues.[35] Based on a study of New York State Department of Labor statistics, two-thirds of the City's workers in face-to-face industries earn less than $40,000 each year.[36] As a result, the City's job losses were concentrated among lower-income New Yorkers. And with the pandemic continuing from the winter into the Spring, these New Yorkers were grappling with the loss of their own jobs. Entire swaths of the economy suddenly had little or nothing to offer the people who had staked their livelihoods on them.

Government actors stepped in to address the situation, but so many people seeking assistance at the same time quickly strained the system. Many New Yorkers had to wait weeks for their unemployment benefits to come through.[37] According to one study, undocumented immigrants are not eligible for unemployment benefits, meaning approximately 192,000 New Yorkers lost their

---

[26] *Id.* at 2.

[27] *Id.*

[28] *Id.*

[29] *Id.* at 3.

[30] *Id.* at 4.

[31] *Id.*

[32] *Id.*

[33] *Id.* The number for Latinx individuals may be artificially low due to not capturing the effects on the undocumented community.

[34] James A. Parrott and Lina Moe, *The Covid-19 New York City Economy Three Months In: Reopening, and a Continuing Low-Wage Worker Recession,* 6 (June 2020), https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/5efa0f3ae6f525590ab1bb68/1593446207224/CNYCA_Covid-19Economy_June29Report.pdf.

[35] *Id.*

[36] *Id.* at 7.

[37] *See* Cara Eisenpress, *Unemployed New Yorkers Cling to Fragile Pandemic Safety,* THE CITY (June 10, 2020), https://www.thecity.nyc/coronavirus/2020/5/10/21257914/unemployed-new-yorkers-cling-to-fragile-pandemic-safety-net; Jessy Edwards, *'No Money to Feed My Kids:' NYers Still Waiting on Unemployment Despite New System,* NBC NEW YORK (May 15, 2020), https://www.nbcnewyork.com/news/local/no-money-to-feed-my-kids-nyers-still-waiting-on-unemployment-despite-new-system/2375100/.

jobs without the prospect of ever receiving unemployment benefits.[38] Lines at food pantries extended for blocks, often requiring a 2-3 hour wait.[39]

The federal government offered some assistance, providing an extra $600 a week in unemployment benefits through the CARES Act,[40] and offering billions of dollars in small business loans.[41] And the State created an eviction moratorium for tenants who could no longer afford their rent.[42] But the durability of these programs was in doubt at the time of the George Floyd protests, with the $600 benefit due to end in July,[43] and the eviction protections only extended until August.[44] The pandemic seemed to stretch out indefinitely, but the government's support appeared to be of a much more limited duration.

iii.    *The Impact on Mental Health*

By the time of the George Floyd protests, New Yorkers were contending with a great deal of uncertainty that took several forms. First, as discussed above, there was uncertainty regarding the economy and personal financial security.

There was also the uncertainty about the duration of the pandemic and the likelihood of future lockdowns, uncertainty about their health and the health of their loved ones, uncertainty about how to care for their children with schools and daycares closed, and uncertainty about when they could hope to resume some semblance of their normal lives.

All this uncertainty took a toll on their mental health. As Aoife O'Donovan, an associate professor of psychiatry at the UCSF Weill Institute for Neurosciences noted: "Uncertainty means ambiguity, which means that we have to expend effort in trying to predict what will happen in addition to preparing to deal with all of the different outcomes."[45] While grappling with uncertainty is a necessary part of life, and allows us to prepare for multiple potential outcomes, Professor

---

[38] James A. Parrot, et al., *The New Strain of Inequality: The Economic Impact of Covid-19 in New York City*, THE NEW SCHOOL (April 15, 2020), https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/5e974be17687ca34b7517c08/1586973668757/N NewStrainofInequality_April152020.pdf.

[39] George Joseph, *A Third Of NYC Food Pantries Have Closed, Swelling Bread Lines During Coronavirus Lockdown*, GOTHAMIST (April 27, 2020), https://gothamist.com/food/third-nyc-food-pantries-have-closed-swelling-bread-lines-during-coronavirus-lockdown; CBS New York City, *Thousands Line Up Outside Queens Food Pantry Hours Before Opening*, PATCH (May 15, 2020), https://patch.com/new-york/queens/thousands-line-outside-queens-food-pantry-hours-opening.

[40] *U.S Department of Labor Publishes Guidance on Federal Pandemic Unemployment Compensation* (April 4, 2020), https://www.dol.gov/newsroom/releases/eta/eta20200404.

[41] EMPIRE STATE DEVELOPMENT, SBA PAYCHECK PROTECTION PROGRAM (PPP), https://esd.ny.gov/sba-paycheck-protection-program-ppp (last visited Dec. 24, 2020).

[42] GOVERNOR ANDREW CUOMO, EXECUTIVE ORDER NO. 202.9 (March 31, 2020), https://www.governor.ny.gov/news/no-2029-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

[43] *See* Cara Eisenpress, *Unemployed New Yorkers Cling to Fragile Pandemic Safety Net*, THE CITY (May 10, 2020), https://www.thecity.nyc/coronavirus/2020/5/10/21257914/unemployed-new-yorkers-cling-to-fragile-pandemic-safety-net.

[44] *Governor Andrew Cuomo, Amid Ongoing COVID-19 Pandemic, Governor Cuomo Announces Moratorium on COVID-Related Evictions Will Be Extended Until August 20th* (June 17, 2020), https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-announces-moratorium-covid-related-evictions-will.

[45] Brandon R. Reynolds, *There's A Lot of Uncertainty Right Now – This is What Science Says That Does to Our Minds, Bodies*, UNIVERSITY OF CALIFORNIA SAN FRANCISCO (Nov. 1, 2020), https://www.ucsf.edu/news/2020/11/418951/theres-lot-uncertainty-right-now-what-science-says-does-our-minds-bodies.

O'Donovan says, "the problem is that imagining and predicting and preparing for bad outcomes can take a toll on us psychologically and biologically."[46] Furthermore, "[i]n the short-term, these responses prepare us for positive action and protect us against the potential for injury and infection that came with stressors in our evolutionary past. In the long-term, prolonged activation of the biological stress response can have toxic effects on the brain and the rest of the body, increasing risk for both psychiatric disorders and chronic physical diseases."[47]

In addition to uncertainty, the pandemic also brought an unprecedented form of isolation. While modern technology helped many people cope with the loss of in-person interactions, it was often a poor substitute.[48] By the time Memorial Day weekend arrived, national studies had found significant increases in anxiety, depression, and other negative mental health indicators.[49] One survey conducted during the last two weeks of May concluded: "It can be stated with certainty based on the survey findings that at least a quarter of all U.S. adults is presently in a condition of high emotional distress directly attributable to the pandemic."[50] Perhaps unsurprisingly, given the disproportionate physical and economic toll on persons of color and low-income communities, the negative mental health effects hit these communities hardest.[51]

*   *   *   *   *

The COVID-19 pandemic harmed New Yorkers in three significant ways: physically, economically, and mentally. This range of effects may well have been a factor at the George Floyd protests, and called out for greater compassion. Patricia Newton, chief executive and medical director of the Black Psychiatrists of America observed in reference to the impact of the pandemic on the George Floyd protests around the country: "People are so pent-up with frustration from being inside for so long. That was the kindling, and the police brutality lit the fire."[52]

---

[46] *Id.*

[47] *Id.*

[48] *See* Julia Sklar, *'Zoom fatigue' is taxing the brain. Here's why that happens.*, NATIONAL GEOGRAPHIC (April 24, 2020), https://www.nationalgeographic.com/science/2020/04/coronavirus-zoom-fatigue-is-taxing-the-brain-here-is-why-that-happens/.

[49] Alyssa Fowers, et al., *A third of Americans now show signs of clinical anxiety or depression, Census Bureau finds amid coronavirus pandemic*, WASH. POST (May 26, 2020), https://www.washingtonpost.com/health/2020/05/26/americans-with-depression-anxiety-pandemic/?arc404=true; Kimberly Holland, *What COVID-19 Is Doing to Our Mental Health*, HEALTHLINE (May 8, 2020), https://www.healthline.com/health-news/what-covid-19-is-doing-to-our-mental-health.

[50] Olafur S. Palsson, PSY.D, et al., THE U.S. NATIONAL PANDEMIC EMOTIONAL IMPACT REPORT, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL 35 (June 2020), https://www.pandemicimpactreport.com/report/PalssonBallouGray_2020_PandemicImpactReport.pdf.

[51] *See Id;* NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, IMPACT OF COVID-19 ON MENTAL HEALTH IN NEW YORK CITY (September 2020), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-mental-health-impacts-hop.pdf.

[52] Marc Fisher, et al., *The nexus between coronavirus and protests: The virus 'was the kindling, and the police brutality lit the fire'*, WASH. POST (June 7, 2020), https://www.washingtonpost.com/politics/protests-coronavirus-risk-choice/2020/06/07/06721ec4-a50e-11ea-bb20-ebf0921f3bbd_story.html.

b.   The Pandemic's Impact on NYPD Officers

Most NYPD officers live in and around New York City.[53] They were therefore exposed to many of the same effects described above. An analysis of the pandemic's impact on the protests grounded in behavioral science therefore must take into account the pandemic's impact on the Department's officers.

Approximately just one month into the pandemic, more than 1,400 NYPD employees, including more than 1,000 officers, had contracted COVID-19.[54] By the Sunday prior to the George Floyd protests, 5,739 Department employees had tested positive for COVID-19, and 43 employees had died.[55] According to NYPD, between March 1, 2020 and June 1, 2020, 10,717 NYPD officers called in sick for three or more days with COVID-like symptoms, with as many as 20% of officers out sick at one time.[56] The toll COVID-19 took on the Department in the Spring meant that going into the George Floyd protests, NYPD officers had already been under a substantial physical strain.

In addition, the impact of COVID-19 on the mental health of officers cannot be overlooked. From Law Department discussions held with NYPD officials, the Law Department learned that due to the reduced number of officers available during the pandemic, officers experienced a greater degree of uncertainty about where they would be assigned on a given day and how long their shift might be. Additionally, because of the frontline nature of policing, members feared bringing COVID home to their families. According to our discussions with NYPD officials, officers had to make difficult choices between attempting to isolate themselves to protect their families, versus being there as much as possible for their families to support remote learning or other familial responsibilities. Some of these mental health impacts are common to many other frontline workers, while other uncertainties were exacerbated for NYPD members. Consistent with this, officers sought out mental health and wellness resources to a greater degree as the pandemic took hold in the City. Fortunately, in the last two years NYPD has made important strides in enhancing health and wellness resources for officers and working to break the stigma associated with mental health issues.[57]

These stressors related to COVID-19 added to the existing stressors that come with working in law enforcement. Police officers endure particular rigors and are exposed to a significant number of traumatic events in their work. Reports indicate that 10-15% of police officers suffer from Post-Traumatic Stress Disorder, as compared to 3.5% of the general public, and officers likewise suffer a

---

[53] *See* David Cruz, *A Majority Of NYPD Officers Don't Live In New York City, New Figures Show*, GOTHAMIST (August 8, 2020), https://gothamist.com/news/majority-nypd-officers-dont-live-new-york-city-new-figures-show.

[54] Will Feuer, *More than 1,000 New York City police officers have the coronavirus as 911 calls hit records*, CNBC (April 1, 2020), https://www.cnbc.com/2020/04/01/more-than-1000-new-york-city-police-officers-are-infected-with-coronavirus.html.

[55] *Coronavirus NYC Update: NYPD announces 43rd COVID-19 death in department,* ABC NEW YORK (May 24, 2020), https://abc7ny.com/nypd-death-doris-kirkland-covid-deaths-coronavirus-in-the/6208730/.

[56] The NYPD reported to the Law Department that it did not track sick leave for COVID specifically, but the closest approximation was to identify when a member needed to take multiple days of sick leave due to cold or flu-like symptoms. By way of comparison, the number of officers who had to take three or more days of sick leave for cold or flu-like symptoms in the same three-month span was 740 in 2018, and 905 in 2019.

[57] For a general discussion, *see* NEW YORK CITY DEPARTMENT OF INVESTIGATION, AN INVESTIGATION OF NYPD'S OFFICER WELLNESS AND SAFETY SERVICES (2019) (hereinafter "OFFICER WELLNESS"), https://www1.nyc.gov/assets/doi/reports/pdf/2019/sep/REVISED_FINAL_DOIOIGNYPD_OfficerWellnessandSafety_9242019.pdf

higher rate of depression than the general population.[58] These stressors are further compounded by the particular experience of being an NYPD officer. Based on information learned by members of the review, including conversations with current and former NYPD employees of various rank, NYPD officers have raised concerns about the stress and frustration of having to work extra jobs to make ends meet, struggling with childcare and eldercare planning because of unpredictable work schedules, and being physically taxed by the long work hours.  All of this can have a detrimental effect on officer morale.

Taken collectively, as the Department began calling in officers to engage in the demanding and stressful work of policing the George Floyd protests – which, as detailed below, included longer than usual shifts and the cancellation of days off – NYPD officers were already under a substantial physical strain and exposed to various forms of mental duress. These mental and physical health impacts likely created a greater than usual amount of stress for many officers.

As noted, ideas42 is a non-profit that specializes in behavioral science. When we began reviewing the potential effects of the stresses NYPD officers were facing at the time of the George Floyd protests, ideas42 advised us that stresses can suppress the executive functions that support more deliberative decision-making.[59] While a certain degree of stress can increase vigilance, and thereby help a person respond more effectively in some situations, a high degree of stress can make it more difficult to assess risks and make decisions in ambiguous situations.[60] ideas42 reports that lab studies on the effects of acute stress[61] have found that people under acute stress may narrow the options they consider; abandon a systematic approach to scanning for options and instead consider options in a disorganized manner, closing off generation and consideration of alternatives earlier than usual.[62] They may also be more likely to avoid the problem altogether.[63] Lastly, ideas42 advised that people under stress may also be more likely to use habitual decisions and actions, rather than engage in more cognitively-taxing decision-making.[64] Specifically with respect to policing, chronic stress has particularly detrimental effects on the health of police officers and their performance in critical situations.[65]

Given the high degree of stress that officers and members of the public were experiencing at the time of the George Floyd protests, it is possible that some of the above effects impacted interactions at the protests. Specifically, as observed by ideas42, individuals undergoing significant stress often revert to certain habitual actions instead of carefully considering different options for how to respond, or relying on their prior training.

---

[58] *See id.* at p. 10.

[59] For this proposition, ideas42 has relied on Anthony J. Porcelli and Mauricio R. Delgado, *Stress and Decision-Making: Effects on Valuation, Learning, and Risk-Taking*, 14 CURRENT OPINION IN BEHAVIORAL SCIENCES, 33-39 (2017).

[60] For this proposition, ideas42 has relied on Modupe Akinola and Wendy Berry Mendes, *Stress-Induced Cortisol Facilitates Threat-Related Decision Making Among Police Officers*, 126(1) BEHAVIORAL NEUROSCIENCE, 167 (2012).

[61] ideas42 is defining acute stress as stress triggered by short-lived stressful events.

[62] For this proposition, ideas42 has relied on Katrin Starcke and Matthias Brand, *Decision-Making Under Stress: A Selective Review,* 36(4) NEUROSCIENCE & BIOBEHAVIORAL REVIEWS, 1228-1248 (2012).

[63] For this proposition, ideas42 has relied on Kubilay Gok and Nuray Atsan, *Decision-Making Under Stress and Its Implications for Managerial Decision-Making: A Review of Literature,* 6(3) INTERNATIONAL JOURNAL OF BUSINESS AND SOCIAL RESEARCH, 38-47 (2016).

[64] For this proposition, ideas42 has relied on Lars Schwabe and Oliver T. Wolf, *Stress Prompts Habit Behavior in Humans*, JOURNAL OF NEUROSCIENCE, 29(22), 7191-7198 (2009).

[65] Laura Geissing, et al., *Acute and Chronic Stress in Daily Police Service: A Three-Week N-of-1 Study,* 122 PSYCHONEUROENDOCRINOLOGY 104865 (2020) https://doi.org/10.1016/j.psyneuen.2020.104865.

One of our experts, Professor Edward Maguire, posits that officers are taught (in the classroom and out in the field) to take control of situations that appear to be out of control. Expert consultant ideas42 adds that police officers have therefore likely created a habitual response to take control when they encounter specific cues, such as uncontrolled situations or citizens acting unruly. When citizens act disrespectfully, confrontationally, or illegally, ideas42 believes the officer habitual response to control likely includes behavior required to assert their authority verbally or physically, which then may serve to escalate the situation. The protest atmosphere itself may additionally include internal cues that could trigger the officer habit to control. Lastly, ideas42 suggests that actions the police engage in during protests, such as the donning of helmets and facemasks, lining up in formation or even the brandishing of nightsticks, can also serve as cues to take control.

In addition to stress, fatigue and sleep deprivation can also impact decision making. ideas42 has advised us that sleep deprivation is associated with decreases in basic cognitive functions such as alertness, attention, reaction time, and vigilance.[66] In one study researchers found that being awake for twenty-four hours decreased subjects' performance on hand-eye coordination tests to the same extent as having a blood alcohol concentration of .10 percent.[67] Another study that specifically looked at police officers found that: "Forty-one percent of the 298 officers who took the Pittsburgh Sleep Quality Index (PSQI)—a well-validated questionnaire used to diagnose sleep disorders— scored at levels that would lead clinicians to recommend that they seek medical attention."[68] ideas42 and others have observed that general fatigue makes people more irritable, interferes with formation of sound judgments, constrains choice sets people consider, and increases anxiety and fearfulness.[69] Overall, therefore, fatigue can "lower a person's ability to handle complex stressful situations appropriately and increase the likelihood of stress-related illness."[70]

To be clear, we are not suggesting that every NYPD officer experienced the same physical and mental impact of the pandemic, or that it was qualitatively different from what some members of the public experienced. We are also not suggesting that the pandemic and its impact either caused or justified the actions of either protesters or the police at the George Floyd protests. Such conclusions would require a more searching, personalized review by a multidisciplinary team.

Rather, we are observing that any "analysis of factors that may have impacted the events at protests" this past Spring address the pandemic and the significant impact that it was having on both the behavior of members of the public generally and the police specifically.

## 2.   The Nature of the Protests

Numerous interactions at the George Floyd protests may have been impacted by the very nature of the protests themselves. The "nature" of the protests includes both the content and the logistics of the protests. Each element is explored in turn below.

---

[66] For this proposition, ideas42 has relied on William D.S. Killgore, et al., *Impaired Decision Making Following 49 h of Sleep Deprivation.* 15(1) JOURNAL OF SLEEP RESEARCH, 7-13 (2006).

[67] For this proposition, ideas42 has relied on Drew Dawson and Kathryn Reid, *Fatigue, Alcohol and Performance Impairment.* NATURE, 388(6639), 235-235 (1997).

[68] For this proposition, ideas42 has relied on Bryan Vila, et al., *Improving Shift Schedule and Work-Hour Policies and Practices To Increase Police Officer Performance, Health, and Safety*, 5(1) POLICE QUARTERLY, 4-24 (2002).

[69] For this proposition, ideas42 has relied on Bryan Vila, et al., *Evaluating the Effects of Fatigue on Police Patrol Officers*, WASHINGTON, D.C.: POLICE EXECUTIVE RESEARCH FORUM (February 2000)

[70] *Id.*

a.    The Content of the Protests

George Floyd was murdered on May 25, 2020. According to the allegations in the subsequent criminal complaint, police at the scene had responded to a call about a possible counterfeit $20 bill.[71] They placed Mr. Floyd under arrest, handcuffing him.[72] When the officers tried to place Mr. Floyd in the back of a squad car, he is alleged to have resisted, and Officer Derek Chauvin pinned Mr. Floyd to the ground. Officer Chauvin placed his knee on George Floyd's neck, and held it there for approximately 8 minutes,[73] ignoring Mr. Floyd's pleas, ignoring his statements that he could not breathe. Officer Chauvin continued to kneel on Mr. Floyd's neck as Mr. Floyd lost consciousness.[74] Three other officers made occasional inquiries, but otherwise maintained their positions.[75] Eventually, an ambulance took Mr. Floyd to the hospital[76] where he was pronounced dead.[77]

George Floyd died on video.[78] The most visceral video may be the cellphone video taken by a teenager. She and other bystanders can be heard asking the officers to let Mr. Floyd off the ground, exclaiming "look at him, look at him!" as Mr. Floyd appears to lose consciousness.[79] One man reminds the officers, "he is human, bro."[80]

This was not the first cell phone video depicting a Black man being killed by police. Philando Castile was pulled over in July 2016, purportedly for a broken taillight.[81] During a brief conversation with Officer Jeronimo Yanez, captured on video, Mr. Castile says: "Sir, I have to tell you, I do have a firearm on me."[82] Officer Yanez repeatedly tells Mr. Castile, "don't pull it out;" Mr. Castile repeatedly assures him he is not pulling it out.[83] Officer Yanez then shoots Mr. Castile seven times, apparently believing Mr. Castile was reaching for his gun.[84] Mr. Castile's girlfriend, sitting beside him

---

[71]  Criminal Complaint, Minnesota vs. Derek Michael Chauvin, 27-CR-20-12646, (Minn. S.C. May 25, 2020) https://www.ag.state.mn.us/Office/Communications/2020/docs/Complaint_Chauvin.pdf.

[72] *Id.*

[73] The length of time Derek Chauvin knelt on George Floyd's neck is slightly disputed. Initial reports were 8 minutes, 46 seconds. Later reports put the number at 7 minutes, 46 seconds, or 8 minutes, 15 seconds. Multiple reports agree that Officer Chauvin continued to kneel on George Floyd's neck for over a minute after he lost consciousness. *See Prosecutors say officer had knee on George Floyd's neck for 7:46 rather than 8:46*, L.A. TIMES (June 18, 2020), https://www.latimes.com/world-nation/story/2020-06-18/derek-chauvin-had-knee-george-floyd-neck-746-rather-than-846; Nicholas Bogel-Burroughs, *8 Minutes, 46 Seconds Became a Symbol in George Floyd's Death. The Exact Time Is Less Clear*, N.Y. TIMES (June 6, 2020), https://www.nytimes.com/2020/06/18/us/george-floyd-timing.html.

[74]  Criminal Complaint, Minnesota vs. Derek Michael Chauvin, 27-CR-20-12646, (Minn. S.C. May 25, 2020) https://www.ag.state.mn.us/Office/Communications/2020/docs/Complaint_Chauvin.pdf.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78]  *Video shows Minneapolis officer kneeling on black man's neck*, CNN (May 26, 2020), https://www.cnn.com/videos/us/2020/05/26/george-floyd-police-minneapolis-minnesota-dead-protests.cnn-darnella-frazier-ben-crump-wcco.

[79]  *I Can't Breathe!: video of fatal arrest shows U.S police kneeling on a man for seven minutes,* NEWSVIA (May 27, 2020), https://www.youtube.com/watch?v=ylVldP98wlE.

[80]  *Video shows Minneapolis officer kneeling on black man's neck*, CNN (May 26, 2020), https://www.cnn.com/videos/us/2020/05/26/george-floyd-police-minneapolis-minnesota-dead-protests.cnn-darnella-frazier-ben-crump-wcco.

[81]  *See* Julie Bosman and Mitch Smith, *Experts Weigh In on Video of Philando Castile Shooting*, N.Y. TIMES (June 21, 2017), https://www.nytimes.com/2017/06/21/us/video-police-shooting-philando-castile-trial.html.

[82] *Id.*

[83] *Id.*

[84] *Id.*

in the passenger seat, livestreams the immediate aftermath of the shooting on Facebook.[85] Mr. Castile's shirt is covered in blood, and he lies back, gasping for breath.[86] Mr. Castile died shortly thereafter.[87]

Walter Scott was also stopped for a broken taillight, in April 2015.[88] Officer Michael Slager reported that Mr. Scott ran away, that he attempted to use a stun gun on Mr. Scott, that they then physically struggled and he believed Mr. Scott got ahold of his taser.[89] Mr. Scott once again ran away, and Officer Slager fired multiple shots, striking him in the back and killing him.[90] A bystander captured the moment on his cell phone.[91] The video showed a white police officer shooting a Black man in the back.[92]

Videos of Philando Castile's and Walter Scott's shootings were circulated widely online and on television.[93] Their killings were part of a series of videos and stories of police violence against Black people. Sometimes, as in the case of Walter Scott, the officer received a prison sentence for his actions.[94] Oftentimes, as in the case of Philando Castile, the officer did not.[95] The perception of a justice system that says "black lives don't matter"[96] has an effect on many members of the public. Psychology Professor Monnica Williams has noted that for Black viewers, these videos can communicate a message about the "cheapness of black life," adding, "you carry that horror around with you."[97]

---

[85] *Id.*

[86] *Id.*

[87] Hennepin County Medical Examiner, *Press Release Report* (July 7, 2016), https://content.govdelivery.com/attachments/MNHENNE/2016/07/07/file_attachments/582665/2016-3828%2BCastile%252C%2BPhilando.pdf.

[88] *Judge allows lesser charge of manslaughter in former South Carolina cop's murder trial*, CHICAGO TRIBUNE (Nov. 30, 2016), https://www.chicagotribune.com/nation-world/ct-michael-slager-walter-scott-police-shooting-20161130-story.html.

[89] *Id.*

[90] *Id.*

[91] Phil Helsel, *Walter Scott Death: Bystander Who Recorded Cop Shooting Speaks Out*, NBC NEWS (April 8, 2015), https://www.nbcnews.com/storyline/walter-scott-shooting/man-who-recorded-walter-scott-being-shot-speaks-out-n338126.

[92] *Id.*

[93] *See* Kia Gregory, *How Videos of Police Brutality Traumatize African Americans and Undermine the Search for Justice*, NEW REPUBLIC (Feb. 13, 2019), https://newrepublic.com/article/153103/videos-police-brutality-traumatize-african-americans-undermine-search-justice.

[94] Matthew Vann and Erik Ortiz, *Walter Scott shooting: Michael Slager, ex-officer, sentenced to 20 years in prison*, NBC NEWS (Dec. 7, 2017), https://www.nbcnews.com/storyline/walter-scott-shooting/walter-scott-shooting-michael-slager-ex-officer-sentenced-20-years-n825006.

[95] Ralph Ellis and Bill Kirkos, *Officer who shot Philando Castile found not guilty on all counts*, CNN (June 16, 2017), https://www.cnn.com/2017/06/16/us/philando-castile-trial-verdict/index.html.

[96] Eliott C. McLaughlin, *'Black lives don't matter,' lawyer says after jury awards $4 in police killing*, CNN (June 1, 2018), https://www.cnn.com/2018/05/31/us/florida-police-shooting-four-dollar-jury-award-gregory-hill/index.html (Statement of an attorney whose clients were awarded $4 for the death of their father at the hands of a law enforcement officer).

[97] Kia Gregory, *How Videos of Police Brutality Traumatize African Americans and Undermine the Search for Justice*, NEW REPUBLIC (Feb. 13, 2019), https://newrepublic.com/article/153103/videos-police-brutality-traumatize-african-americans-undermine-search-justice.

The George Floyd protests happened within this context, and in the shadow of our nation's history. Members of the public were not reacting to just one video of one Black man being killed by police action. They were reacting to a killing that had happened after the deaths of other Black people, and a death that happened despite numerous other public outcries.[98] The depth and breadth of the public's reaction was evident at the protests, with signs that referenced Black people who had been killed across the country in recent years.[99] Crowds referenced Michael Brown of Ferguson, Missouri with chants of, "hands up, don't shoot!"[100] They honored multiple victims with silent vigils.[101] And they chanted "I can't breathe!" in honor of Eric Garner.[102]

In reacting to this history of violence, some people at the George Floyd protests turned their anger towards the NYPD officers policing the protests. Some crowds chanted: "How do you spell racist? N-Y-P-D!" at white and black officers,[103] while others yelled: "F*ck the police!"[104] Many signs read: "Black Lives Matter" and "No Justice, No Peace," but others read, "Oink Oink"[105] and "Konvict Killer Kops" with the KKK highlighted.[106] Black officers were sometimes singled out for verbal abuse with shouts of "Uncle Tom!" and "You're a traitor."[107]

---

[98]  *See, e.g.,* Annys Shin, *Recalling the protests, riots after fatal police shooting of Michael Brown,* WASH. POST (Aug. 3, 2017), https://www.washingtonpost.com/lifestyle/magazine/recalling-the-protests-riots-after-fatal-police-shooting-of-michael-brown/2017/08/01/9992f044-5a8d-11e7-a9f6-7c3296387341_story.html; Merrit Kennedy, *Hundreds Protest After Minnesota Officer Found Not Guilty In Philando Castile Death,* NPR (June 16, 2017), https://www.npr.org/sections/thetwo-way/2017/06/16/532783821/minnesota-police-officer-found-not-guilty-in-shooting-death-of-philando-castile; Ari Melber and Phil Helsel, *Protesters Ask Feds to Get Involved in Sandra Bland Case,* NBC NEWS (Dec. 22, 2015), https://www.nbcnews.com/news/us-news/protesters-ask-feds-get-involved-sandra-bland-case-n484721.

[99]  *See, e.g.,* Spencer Kimball, *'We're built up with frustration': Scenes and sounds in NYC during 3 days of protest against police brutality,* CNBC (June 6, 2020), https://www.cnbc.com/2020/06/06/new-york-george-floyd-protest-photos-video.html.

[100]  *Id.*

[101]  *Id*; Hannah Hagemann and Scott Neuman, *'I Can't Breathe': Peaceful Demonstrators Continue To Rally Over George Floyd's Death,* NPR (June 3, 2020), https://www.npr.org/2020/06/03/869186653/demonstrations-over-george-floyds-death-and-police-brutality-carry-on.

[102]  *'I Can't Breathe:' New Yorkers Rally at Foley Square Protest for George Floyd,* BLOOMBERG QUICKTAKE: NOW (May 29, 2020), https://www.youtube.com/watch?v=oNvz8NNNwsw.

[103]  Spencer Kimball, *'We're built up with frustration': Scenes and sounds in NYC during 3 days of protest against police brutality,* CNBC (June 6, 2020), https://www.cnbc.com/2020/06/06/new-york-george-floyd-protest-photos-video.html; *Watch: 'How Do You Spell Racist?',* N.Y. TIMES (June 4, 2020), https://www.nytimes.com/video/homepage/100000007175356/nyc-protests-racist-nypd.html.

[104]  Kerry Burke and John Annese, *At least 50 arrested, several cops hospitalized in rolling lower Manhattan demonstration over George Floyd's death,* N.Y. DAILY NEWS (May 28, 2020), https://www.nydailynews.com/new-york/nyc-crime/ny-protest-union-square-george-floyd-20200528-t5wka5syncjhu5kqxusu7zzy6ju-story.html.

[105]  Jonathan Bandler, *Thousands march in lower Manhattan to protest George Floyd's death,* ROCKLAND/WESTCHESTER JOURNAL NEWS (June 2, 2020), https://www.lohud.com/story/news/local/new-york/2020/06/02/protest-death-george-floyd-new-york-city/3127017001/.

[106]  The Associated Press, *Protests over George Floyd's death break out in NYC, all over country,* NJ.COM (May 29, 2020), https://www.nj.com/crime/2020/05/protests-over-george-floyds-death-break-out-in-nyc-all-over-country.html.

[107]  Ashley Southall and Edgar Sandoval, *How Black N.Y.P.D. Officers Really Feel About the Floyd Protesters,* N.Y. TIMES (June 17, 2020), https://www.nytimes.com/2020/06/17/nyregion/black-hispanic-officers-nypd-protests.html; Emily Kassie, *Masks On, Fists Up: Scenes from New York City's Protests Against Police Violence,* MARSHALL PROJECT (June 3, 2020),

These types of statements were capable of having a significant effect on NYPD patrol officers. ideas42 has advised that as humans, how we are perceived by others and how we think others perceive us greatly influences us.[108] When we conclude that someone disapproves of us, this affects how we perceive both the critic and how we perceive ourselves. Since we conflate the way in which people perceive us with how much they value us, the degrading of our social image creates psychological pain. ideas42 states that when we feel psychological pain, we react similarly to the way we react to physical pain in that we become triggered to protect ourselves, to retaliate and to fend off the attack. This reaction serves to minimize the psychological blow to preserve our self-esteem.

Such defensive strategies can exacerbate existing ingroup/outgroup dynamics. ideas42 observes that when groups feel threatened, their identities become more solidified, intergroup forces becomes more polarized, and intergroup bias intensifies.[109] Intergroup confrontations work to accentuate the positive bias toward one's own group and the negative bias toward the other group.[110] If such dynamics exist at a protest, they can impair how police and protesters view each other's actions. Ideas42 concludes that with regard to public order policing, police actions aimed at public safety can be misinterpreted as acts against the public when ingroup/outgroup dynamics are in play. For example, protesters may see police actions – such as cordoning off streets with high traffic or diverting protesters from streets that need to remain open for emergency vehicles – as intentionally disrupting their unity or seeking to control and disempower them.[111] Similarly, protester gathering and coordination aimed at creating solidarity, public expression and a national movement can be misinterpreted as a show of force to police.

Therefore, the language used at the protests may have affected both NYPD officer behavior and the behavior of those attending the protests. To the extent that protesters' justifiable anger and grief was sometimes translated into hostility and disgust towards the officers around them, this may have ratcheted up tension between the two groups, and negatively impacted the events at protests.

      b.    The Size, Number, and Location of the Protests

The George Floyd protests started on May 28th and tapered off in late June.[112] Particularly over the weekend of May 30–May 31, as described in the DOI Report, there were numerous protests that grew in size and became mobile.[113] Sunday, May 31st may have been the most dramatic example of the large and fluid nature of the protests. On Sunday afternoon, there were hundreds of protesters at Fort Tryon Park, Bryant Park, Flushing Meadows-Corona Park, and Prospect Park.[114] There were additional groups of protesters marching near Washington Square Park and crossing the

---

https://www.themarshallproject.org/2020/06/03/masks-on-fists-up-scenes-from-new-york-city-s-protests-against-police-violence.

[108] For this proposition, ideas42 has relied on Aaron T. Beck, PRISONERS OF HATE: THE COGNITIVE BASIS OF ANGER, HOSTILITY, AND VIOLENCE (1999).

[109] For this proposition, ideas42 has relied on Omar Shahabudin McDoom, *The Psychology of Threat in Intergroup Conflict: Emotions, Rationality, and Opportunity in the Rwandan Genocide,* 37(2) INTERNATIONAL SECURITY, 119–155 (2012).

[110] For this proposition, ideas42 has relied on Aaron T. Beck, PRISONERS OF HATE: THE COGNITIVE BASIS OF ANGER, HOSTILITY, AND VIOLENCE (1999).

[111] For this proposition, ideas42 has relied on Stephen D. Reicher, et al., *An Integrated Approach to Crowd Psychology and Public Order Policing,* 27(4) POLICING: AN INTERNATIONAL JOURNAL OF POLICE STRATEGIES AND MANAGEMENT, 561-562 (2004).

[112] *See* DOI Report at pp. 5-10.

[113] *See* DOI Report at pp. 6-10.

[114] *See* DOI Report at p. 9.

Williamsburg Bridge, blocking traffic.[115] Around 7:00 pm, there were approximately 3,000 protesters outside the Barclays Center, approximately 3,000 protesters at Times Square marching South, another similarly-sized group marching North in Lower Manhattan, and yet another group of approximately 3,000 people crossing the Manhattan Bridge.[116] In addition to the protests, as the night wore on, there were reports of looting and multiple Department vehicles were vandalized.[117] Over three hundred individuals were arrested that night.[118]

In interviews, Police Department officials reiterated similar themes. They noted that the large, unpredictable nature of the protests, particularly in how they were spread out across the City, posed a serious challenge to the Department. Staffing these protests while simultaneously addressing looting and other criminal activity also taxed Department resources. One senior official characterized the protests as akin to responding to multiple incidents from the City's past, such as the Crown Heights riots, the protests at the 2004 Republican National Convention, and Occupy Wall Street, all at the same time. The experience was "overwhelming."

The large numbers of protests, spread out across the boroughs, affected the Department's response. The Department has a specially trained Strategic Response Group ("SRG") which it often utilizes to respond to protests.[119] SRG is comprised, however, of approximately 700 officers. As one senior official noted, even if SRG were twice as large it would not have been sufficient to staff all of the George Floyd protests. Instead, in addition to mobilizing SRG, the Department relied heavily on patrol officers. The Department held over officers for additional shifts on the weekend of May 30–May 31, significantly lengthened their time on duty, and generally took an "all hands on deck" approach to staffing the protests, cancelling all regular days off on June 2nd.[120]

Ultimately, the Department was staffing multiple large protests, with a force that was fatigued and largely without recent training in policing protests. The Department also had to contend with criminal activity,[121] attacks on police property,[122] and a large number of officer injuries[123] that arose at the same time as the protests, though not connected to the majority of protestors demonstrating across the City. These different logistical elements of the protests posed a significant challenge for the Department, and therefore were likely a factor that impacted some of the events at protests.

---

[115] *Id.*

[116] *Id.*

[117] *See* DOI Report at pp. 13-14.

[118] *Id.*

[119] *See* NYPD SPECIAL OPERATIONS, https://www1.nyc.gov/site/nypd/bureaus/patrol/citywide-operations.page (last visited Dec. 24, 2020); J. David Goodman, *Bratton Says Terrorism and Protests Will Be Handled by Separate Police Units*, N.Y. TIMES (Feb. 2, 2015), https://www.nytimes.com/2015/02/03/nyregion/bratton-says-terrorism-and-protests-will-be-handled-by-separate-police-units.html.

[120] *See* DOI Report at p. 23.

[121] *See NYC stores destroyed by looters, riots during George Floyd protests*, ABC NEWS, (May 31, 2020) https://abc7ny.com/looting-nyc-was-there-in-soho/6223350/.

[122] *See* Azi Paybarah and Nikita Stewart, *Symbol of N.Y.C. Unrest: A Burning Police Car*, N.Y. TIMES (June 2, 2020), https://www.nytimes.com/2020/05/31/nyregion/police-cars-nyc-protests.html; Elizabeth Keogh, et al., *Violent protesters charge Brooklyn police precinct in day of demonstrations over police killing of black man in Minneapolis*, N.Y. DAILY NEWS (May 29, 2020), https://www.nydailynews.com/new-york/ny-protest-police-brutality-george-floyd-20200529-vvmrqd2bqbh67lo4tdgouijqwi-story.html.

[123] DOI Report at p. 20, noting 386 officer injuries from May 28-June 11.

### 3.   The Interplay Between the Pandemic and the Nature of the Protests

The nature of the George Floyd protests and the COVID-19 pandemic each individually had the potential to have a profound impact on how the protests unfolded. Each factor also had the potential to act as an intensifier for the other, making the issues created by each factor more intense than they would have been standing alone. This section explores to what extent this interplay may have itself been a factor that impacted certain aspects of the George Floyd protests.

> a.   The Interplay Between the Content of the Protests and the Pandemic May Have Intensified Interactions at the Protests

As described above, the murder of George Floyd came as part of a series of widely publicized killings of Black people. In the months before George Floyd's murder, the country heard about Ahmaud Arbery, a young Black man who was killed by two white civilians while jogging near his home in Georgia.[124] In March, Louisville police officers rammed Breonna Taylor's door down and shot her multiple times, killing her.[125] Both cases were still in the headlines in May.[126]

The City had its own racially charged incidents in May. In March, the Mayor had asked the NYPD to enforce social distancing rules.[127] In May, it was reported that of the social distancing arrests made from March 16-May 7, 68% of those arrested were Black, 24% were Latinx, and 7% were white.[128] Around that time, concerns were raised over whether NYPD's enforcement of social distancing rules was racially disproportionate.[129] Advocacy groups began to complain that COVID-

---

[124] *See* Richard Fausset, *What We Know About the Shooting Death of Ahmaud Arbery*, N.Y. TIMES (Dec. 17, 2020), https://www.nytimes.com/article/ahmaud-arbery-shooting-georgia.html.

[125] Richard A. Oppel, Jr., et al., *What to Know About Breonna Taylor's Death*, N.Y. TIMES (Oct. 30, 2020), https://www.nytimes.com/article/breonna-taylor-police.html.

[126] *See, e.g.*, Nicholas Bogel-Burroughs, *Months After Louisville Police Kill Woman in Her Home, Governor Calls for Review*, N.Y. TIMES (May 14, 2020, updated Oct. 30, 2020), https://www.nytimes.com/2020/05/14/us/breonna-taylor-louisville-shooting.html; Dakin Andone et al., *A suspect in the killing of Ahmaud Arbery was involved in a previous investigation of him, recused prosecutor says*, CNN (May 9, 2020), https://www.cnn.com/2020/05/08/us/ahmaud-arbery-mcmichael-arrests-friday/index.html.

[127] MAYOR BILL DE BLASIO, EMERGENCY EXECUTIVE ORDER NO. 98,  (March 15, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-99.pdf

[128] Ashley Southall, *Scrutiny of Social-Distance Policing as 35 of 40 Arrested Are Black*, N.Y. TIMES (May 7, 2020, updated Nov. 30, 2020), https://www.nytimes.com/2020/05/07/nyregion/nypd-social-distancing-race-coronavirus.html.

[129] *See Mayor de Blasio Holds Media Availability*, (May 6, 2020), https://www1.nyc.gov/office-of-the-mayor/news/324-20/transcript-mayor-de-blasio-holds-media-availability; *see also Mom Arrested After Confrontation With NYPD Officers Over Face Mask*, NBC NEWS (May 14, 2020, updated May 15, 2020), https://www.nbcnewyork.com/news/local/mom-arrested-after-confrontation-with-nypd-officers-over-face-mask/2416440/; Ashley Southall, *Scrutiny of Social-Distance Policing as 35 of 40 Arrested Are Black*, N.Y. TIMES (May 7, 2020, updated Nov. 30, 2020), https://www.nytimes.com/2020/05/07/nyregion/nypd-social-distancing-race-coronavirus.html;  Christopher  Brito, *Video shows NYPD officer tackling and punching a man who approached during a social distancing arrest,* CBS NEWS (May 4, 2020), https://www.cbsnews.com/news/nypd-social-distancing-arrest-video-lower-east-side/.

19-related enforcement was not being conducted in a fair manner.[130]  The Mayor connected with the concerned elected officials and publicly underscored the need for fair and equal policing.[131]

On May 25th, just a few days before the George Floyd protests began, a woman called the police on a Black man in Central Park.[132] He had been bird watching in the Ramble, and after a brief argument about the woman failing to leash her dog, she called 911.[133] Despite the man making no move to threaten her, she told 911: "I'm in the Ramble, there is a man, African-American, he has a bicycle helmet and he is recording me and threatening me and my dog," adding, "I am being threatened by a man in the Ramble, please send the cops immediately!"[134] Video of the incident circulated widely online.[135] As Sapna V. Raj, deputy commissioner at the City Commission on Human Rights noted regarding the incident: "Efforts to intimidate Black people by threatening to call law enforcement draw on a long, violent and painful history, and they are unacceptable."[136]

There is a pain associated with living through our current racially-charged moment in history. William C. Gipson is a faculty director at the University of Pennsylvania, and formerly the University's chaplain. He had the following reflections on the relationship between racism and grief, in relation to the murder of George Floyd:

> Black people know that the country is racist from its very foundation, but there can be long stretches where we don't have particular incidents where it rises up and totally disorients our days, our months, and, in some cases, our jobs. That's how I've been feeling about this whole situation, that we were ambushed once again by the ugliness of our history as a racist nation.
>
> It's wearing. Many people I've talked to—colleagues, friends, family—find it very difficult to sleep. It's difficult to focus. Sometimes it has a paralyzing effect and it's difficult to pull oneself out of bed, or to start or complete projects. Overall, it has been a devastating blow, and I believe that we're all trying to figure out how we go forward from here.[137]

While Gipson spoke from his perspective, there is much in his view that finds its echo in the words of the protestors. As of late May 2020, New Yorkers had been grappling with the pandemic for

---

[130] *See* Martin Kaste, *Police Back Off From Social Distancing Enforcement*, NPR (May 15, 2020), https://www.npr.org/2020/05/15/857144397/police-back-off-from-social-distancing-enforcement.

[131] *See Mayor de Blasio Holds Media Availability (May 6, 2020)*, https://www1.nyc.gov/office-of-the-mayor/news/324-20/transcript-mayor-de-blasio-holds-media-availability.

[132] Madeleine Aggeler, *A Black Man Asked a White Woman to Leash Her Dog. She Called the Cops.*, THE CUT (May 28, 2020), https://www.thecut.com/2020/05/amy-cooper-central-park-dog-video.html.

[133] Jan Ransom, *Amy Cooper Faces Charges After Calling Police on Black Bird-Watcher*, N.Y. TIMES (July 6, 2020, updated Oct. 14, 2020), https://www.nytimes.com/2020/07/06/nyregion/amy-cooper-false-report-charge.html.

[134] *Id.*

[135] *Id.* The article notes that as of early July, the video had been viewed over 40 million times.

[136] Aaron Katersky, *Investigation launched into Central Park incident involving white woman and black man*, ABC NEWS (May 27, 2020), https://abcnews.go.com/US/investigation-launched-central-park-incident-involving-white-woman/story?id=70902898.

[137] Greg Johnson, *Police killings and Black mental health*, PENN TODAY (June 23, 2020), https://penntoday.upenn.edu/news/police-killings-and-black-mental-health.

almost three months.[138] The City had essentially been locked down for over two months.[139] As described above, by late May, the pandemic had resulted in significant mental health consequences.

The pain of being "ambushed once again by the ugliness of our history as a racist nation"[140] and the pain wrought by the pandemic may have intensified each other. Both are caused by large-scale problems that can cause grievous personal harms. As of late May, little had been found to effectively combat either problem,[141] while a significant portion of the population denied that there was a serious problem that needed to be actively addressed.[142] And despite both problems' potential to directly harm us and our families, they are both beyond the power of any one individual to control.

One way to try to exert control over a large-scale phenomenon is by protesting. The power of many voices coming together has a proud history in our country, from the civil rights protests of the 1960s[143] to local fast food workers' recent successful fight for a $15 minimum wage.[144] And while the George Floyd protests did not speak to the pandemic directly, the urge to take some type of action against the pandemic may have contributed towards the public's desire to go out and protest. Kitaw Demissie, a physician who is dean of the School of Public Health at the State University of New York Downstate, stated that his daughter was aware that protesting presented a risk of catching COVID-19, but the anger about police brutality "and the isolation from the stay-at-home order combined to make her and other young people feel the need to go out. The isolation of the past three months increases anxiety, depression and also symptoms of indignation. Demonstrating peacefully helps people do something with their anger."[145]

---

[138] Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y. TIMES (Aug. 6, 2020), https://www.nytimes.com/article/coronavirus-timeline.html.

[139] *See* Andy Newman, *10 Weeks Into New York Area's Lockdown, Who Is Still Getting Sick?*, N.Y. TIMES (May 28, 2020), https://www.nytimes.com/2020/05/28/nyregion/ny-coronavirus-new-cases.html.

[140] https://penntoday.upenn.edu/news/police-killings-and-black-mental-health   Greg Johnson, *Police killings and Black mental health*, PENN TODAY (June 23, 2020), https://penntoday.upenn.edu/news/police-killings-and-black-mental-health.

[141] *See, e.g.*, Lynne Peeples, *What the Data Say About Police Brutality and Racial Bias — And Which Reforms Might Work*, NATURE (June 19, 2020), https://www.nature.com/articles/d41586-020-01846-z; Justin Worland, *America's Long Overdue Awakening to Systemic Racism*, TIME (June 11, 2020), https://time.com/5851855/systemic-racism-america/; Erika Edwards, *Coronavirus vaccine: This week's updates from Oxford and the NIH*, NBC NEWS (May 15, 2020), https://www.nbcnews.com/health/health-news/coronavirus-vaccine-week-s-updates-oxford-nih-n1207141.

[142] *See* Aaron Blake, *Trump says coronavirus will disappear without a vaccine. Fauci has said the opposite*, WASH. POST (May 8, 2020), https://www.washingtonpost.com/politics/2020/05/08/trump-says-coronavirus-will-disappear-without-vaccine-fauci-has-said-opposite/; Michael D. Shear and Sarah Mervosh, *Trump Encourages Protest Against Governors Who Have Imposed Virus Restrictions*, N.Y. TIMES (April 17, 2020, updated April 29, 2020), https://www.nytimes.com/2020/04/17/us/politics/trump-coronavirus-governors.html; John Gramlich, *From police to parole, black and white Americans differ widely in their views of criminal justice system*, PEW RESEARCH CENTER (May 21, 2019), https://www.pewresearch.org/fact-tank/2019/05/21/from-police-to-parole-black-and-white-americans-differ-widely-in-their-views-of-criminal-justice-system/.

[143] *See Civil Rights Movement*, HISTORY (Nov. 20, 2020), https://www.history.com/topics/black-history/civil-rights-movement.

[144] *See* Ginger Adams Otis, *New York's 'Fight for $15' crusaders see tough work pay off*, N.Y. DAILY NEWS (Sept. 1, 2017), https://www.nydailynews.com/new-york/new-york-fight-15-crusaders-tough-work-pay-article-1.3458914.

[145] Marc Fisher, et al., *The nexus between coronavirus and protests: The virus 'was the kindling, and the police brutality lit the fire'*, WASH. POST (June 7, 2020), https://www.washingtonpost.com/politics/protests-coronavirus-risk-choice/2020/06/07/06721ec4-a50e-11ea-bb20-ebf0921f3bbd_story.html.

At the time of the George Floyd protests, New Yorkers had been without their usual emotional and social outlets and supports for months.[146] Protests drew a variety of people, including people who had been cautious up until that point, isolating at home.[147] As one protester said, "I have all these health issues, but I don't care. I don't want a virus to take me, but if I'm going to be fighting for what's right, I'll go out like that."[148]

The intensity of protesters' feelings about violence against Black people, and the intensity of their message and actions, may have been heightened for some protesters by a sense that they were potentially literally putting their lives on the line to deliver this message. For other protesters, they may have been drawn to the protests because of the pandemic, swelling crowd sizes beyond what they might have been otherwise.[149] In addition to being an opportunity to stand up against the murder of George Floyd, the protests were an opportunity to go out in public and share an emotional experience together, after weeks of isolation.[150] As one protester observed: "Going from being at home, sheltered in, and immersing myself in people. There was some anxiety in that, but just being around people, seeing different faces and being outside on a balmy night with others felt good."[151] Nodding to her fellow protesters, she added: "This is their way of getting the control back."[152]

There were thousands of protesters at the George Floyd protests, each with their own motivations for attending, so there is no single explanation for the number and intensity of the protests. However, the fact that the pandemic and the killing of George Floyd may have triggered similar emotions for some individuals, combined with the protests providing a unique in-person outlet for such emotions after weeks of lockdown, suggests that the interplay between these factors may have intensified some of the protesters' emotions and their interactions with police officers at the protests.

---

[146] *See* J. David Goodman, *After 3 Months of Outbreak and Hardship, N.Y.C. Is Set to Reopen*, N.Y. TIMES (June 7, 2020, updated June 29, 2020),
https://www.nytimes.com/2020/06/07/nyregion/new-york-reopening-coronavirus.html; *Crowds Caught Gathering Outside New York City Bars Push Social Distancing Boundaries*, NBC NEWS (May 17, 2020),
https://www.nbcnewyork.com/news/local/crowds-caught-gathering-outside-new-york-city-bars-push-social-distancing-boundaries/2420617/.
[147] *See* Phil McCausland, *New York protesters say they are facing two deadly pandemics: racism and coronavirus*, NBC NEWS (June 4, 2020),
https://www.nbcnews.com/news/us-news/new-york-protesters-say-they-are-facing-two-deadly-pandemics-n1225241.
[148] Marc Fisher, et al., *The nexus between coronavirus and protests: The virus 'was the kindling, and the police brutality lit the fire'*, WASH. POST (June 7, 2020),
https://www.washingtonpost.com/politics/protests-coronavirus-risk-choice/2020/06/07/06721ec4-a50e-11ea-bb20-ebf0921f3bbd_story.html.
[149] *See* Michael Wilson and Sandra E. Garcia, *How a City Besieged by the Virus Turned Out to Be Heard*, N.Y. TIMES (June 4, 2020, updated July 10, 2020),
https://www.nytimes.com/2020/06/04/nyregion/floyd-nyc-protests.html.
[150] *Id.*; *See id.*; Allan Smith and Lauren Egan, *'Perfect storm': Coronavirus lockdown, joblessness fuel longstanding grievances*, NBC NEWS (June 5, 2020),
https://www.nbcnews.com/politics/politics-news/perfect-storm-coronavirus-lockdown-joblessness-fuel-longstanding-grievances-n1222546.
[151] Michael Wilson and Sandra E. Garcia, *How a City Besieged by the Virus Turned Out to Be Heard*, N.Y. TIMES (June 4, 2020, updated July 10, 2020),
https://www.nytimes.com/2020/06/04/nyregion/floyd-nyc-protests.html.
[152] *Id.*

b.      The Interplay Between the Nature of the Protests and the Pandemic
May Have Impacted the NYPD's Performance at the Protests

In interviews with the Department of Investigation, senior NYPD officials indicated that they expected some protests over the weekend of May 30–May 31. However, they consistently expressed surprise at the size of the protests, and at the level of aggression and hatred they felt from the protesters.

While the Department had previously policed protests spurred by violence against Black people,[153] they had not previously done so in the middle of a global pandemic. Some Department officials stated in hindsight that the pandemic may have heightened protesters' emotions and caused "built up frustration." However, there was no suggestion that Department leaders thoughtfully and strategically considered the potential emotional interplay between the pandemic and the racial justice issues described above, or that the Department anticipated what effect it may have on protesters' behavior. Rather, discussions with NYPD leadership suggested that the strategy for these protests was similar to that of prior protests, but simply scaled up to account for the number of protests and the degree of violence and criminal activity reported.

Community sentiment appeared to play a very limited role at the command level in the development of the NYPD's strategic response planning for the George Floyd protests. The Department's Community Affairs Bureau is responsible for the NYPD's partnerships with community leaders and clergy leaders, civil associations, community-based organizations, and more. Through their outreach, they have the opportunity to understand the sentiment of New Yorkers. They also have the opportunity to build trust in the communities they serve. Professor Edward Maguire and Megan Oakley, who study policing practices at police departments worldwide, have made the following observations about the importance of building trust between police departments and local communities:

> When relationships with communities reach a crisis point, police and communities can rely on existing communication networks to resolve crises and prevent conflict. In the absence of ongoing proactive and positive communication between police and communities, crises can escalate quickly. Regular communication between police and communities is akin to making regular deposits into a savings account. Those investments can establish a positive balance of trust and goodwill that one hopes will be sufficient to cover the inevitable moments when a controversial arrest or use-of-force incident results in a withdrawal from the account.[154]

We are not in a position to comment on whether the NYPD had established such a positive balance of trust and goodwill at the time of the George Floyd protests. It was, however, confirmed

---

[153]  *See, e.g., Thousands Protest in Manhattan, on NYC Bridges After Ferguson Grand Jury Decision,* NBC NEWS (Nov. 24, 2014, updated Jan. 29, 2015),
https://www.nbcnewyork.com/news/local/new-york-city-protests-michael-brown-decision-no-indictment-police-officer-darren-wilson-ferguson/2014504/; Nicole Fuller, et al., '*Millions March NYC,' protesting grand jury decision in Eric Garner death, ends in Manhattan,* NEWSDAY (Dec. 13, 2014),
https://www.newsday.com/news/new-york/millions-march-nyc-protesting-grand-jury-decision-in-eric-garner-death-begins-in-manhattan-1.9711149.
[154] Edward R. Maguire and Megan Oakley, POLICING PROTESTS: LESSONS FROM THE OCCUPY MOVEMENT, FERGUSON & BEYOND: A GUIDE FOR POLICE 68 (2020).

by several NYPD officials, and documented in the DOI Report, that the Community Affairs Bureau (as distinguished from the community affairs officers at local precincts) was not a meaningful participant in strategic discussions. While NYPD did hear from local businesses and elected leaders, and while NYPD learns about the broad range of community sentiment through channels other than the Community Affairs Bureau, there is little evidence that NYPD had a formal process or structure for taking the broader community sentiment into account when devising the response strategy, which might have alerted them to the ways in which communities were responding to the murder of George Floyd. The level of surprise displayed by NYPD leadership regarding the scope of the protests suggests that the Department could do more to ensure that is engaged with all sectors of society. Given how the protests unfolded, it would be beneficial for the Department to explore more expansively what they may have missed in regards to community sentiment and trust, and how these factors could be more effectively accounted for in the future. As they embark on more assertive community outreach efforts, the NYPD should also reflect on whether they should have been more attuned to the experience of communities of color and, if so, how they might develop a better sense of the communities they serve.

We similarly saw little evidence of the Department taking significant steps to mitigate the combined effect of the pandemic and the protests on its officers. As described above, at the time of the George Floyd protests, the pandemic had already taken a toll on the Department, with nearly a third of its officers calling in sick with COVID-like symptoms in the first few months of the pandemic. NYPD officers were simultaneously grappling with many of the same mental health effects of the pandemic as the general public, as well as additional stressors linked to being frontline workers. Sending these officers out for extended tours to police large, fluid protests, where emotions in the crowds could run high, without any specialized training or substantial preparation for the situation, was bound to create a risk that some officers would perform poorly under the circumstances.

Given the "all hands on deck" nature of their response, there may have been little the Department could do once the protests were underway. Senior leadership noted that they always take officer health and wellness into account, but at the same time this was a situation where all officers were needed to police the protests. Although the NYPD Employee Assistance Unit and peer support professionals were actively providing services and support to fellow officers at the time of the protests, this does not change the fact that officers undergoing stress and fatigue were in the field during the protests.

### B. Interagency and Operational Development

When analyzing factors that may have impacted events at the George Floyd protests, the Law Department sought to understand NYPD's policies and practices from prior protests, including whether NYPD took the opportunity, based on internal reviews and external advice, to revisit and change its policies and operations. In other words, has NYPD regularly engaged in systemic, rigorous self-assessment of its own policies and actions as they relate to policing protests? In addition, were NYPD's organizational learning and self-assessment practices – or lack thereof – a contributing factor in the intense nature of the clashes throughout the City during protests this summer?

1.      **Tools for Organizational Learning – After-Actions, Sentinel Event Reviews, and Tabletop Exercises**

It is well established that organizations that engage in continuous learning processes are in better positions to replicate successes and avoid repeating mistakes than those that do not. According to John R. Firman, the director of the Research Division of the IACP, "minimizing future errors demands a willingness to learn."[155] While self-reflection may take place in many ways, it is most effective when it is conducted through an established, rigorous process that includes input from all relevant stakeholders.[156] Such a process ensures that any lessons learned are a result of a thorough, systems-level analysis of underlying causes that led to an event or outcome.[157] A "well-structured, substantive, research-based and nonpolitical review" of meaningful events can both identify errors or flaws in a system and, if undertaken by the NYPD, could also help build trust with those that interact with the organization, both internally and externally.[158]

Such reviews carry various names – after-action reviews, post-mortem reviews, project debriefs, etc. They can be conducted at the micro-level, such as a personnel, team, or project evaluation, or on a macro-level, such as an organization-wide post-event review.

One method for conducting this kind of rigorous self-assessment at the macro-level is through Sentinel Event reviews. These have historically been used in industrial, aviation, and medical environments, but criminal justice organizations around the country have begun conducting them as well.[159] Sentinel Event reviews are structured to involve a variety of stakeholders and are intended to be "nonblaming."[160] Part of the Sentinel Event review process is a "root cause analysis," an "empirical approach that involves data collection to understand the systems-level causes of organizational events."[161] The goal is "to identify and remedy vulnerabilities in *systems* (and not individuals), to *prevent* the occurrence of harm in the future."[162] The approach is rooted in the idea that organizational accidents are not the result of individual errors, but that "the errors of many individuals … converge and interact with system weaknesses … increasing the likelihood that individual errors will do harm."[163]

The Final Report of the President's Task Force on 21st Century Policing recommended that law enforcement agencies adopt a practice of conducing Sentinel Event reviews.[164] Following up on that recommendation, the National Institute of Justice's "21st Century Policing: Cross-Site, Multi-Stakeholder Sentinel Event Review Project" seeks to promote awareness and adoption of the

---

[155] JOHN R. FURMAN, *Building a Learning-From-Error Culture in Policing,* in MENDING JUSTICE: SENTINEL EVENT REVIEWS 46 (2014), https://www.ncjrs.gov/pdffiles1/nij/247141.pdf.

[156] *Id.*

[157] Karen B. Friend, et. al., *Sentinel event reviews in the criminal justice system: a review of the literature*, 33:4 CRIMINAL JUSTICE STUDIES 337(March 2020).

[158] MICHAEL P. JACOBSON, *To Learn Something, Do Something*, in MENDING JUSTICE: SENTINEL EVENT REVIEWS 22 (2014).

[159] *See, e.g.,* Friend, *supra* n. 157.

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] JAMES M. DOYLE, *Learning From Error in the Criminal Justice System: Sentinel Event Reviews*, in MENDING JUSTICE: SENTINEL EVENT REVIEWS 4 (2014).

[164] *See* PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING 23 (2015), https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

Sentinel Event review process throughout the country.[165] Other police departments in the United States have begun to adopt the model. For example, the Seattle Office of Inspector General is currently conducting a Sentinel Event review along with the Seattle Police Department and community stakeholders to assess the protest events of this past summer.[166]

Another important tool for learning and building organizational "muscle memory" is the tabletop exercise. As opposed to an after-action or Sentinel Event review – which dissect an actual event after the fact – a tabletop exercise involves bringing together various individuals from inside and outside of an organization to work through a hypothetical but realistic problem. Stakeholder participants have the opportunity to bring their particular expertise and vantage points to the table, and the group will walk through, step-by-step, how to address the scenario. Such an exercise offers a "low-risk environment where [participants] can discuss difficult topics and make come course corrections" to plans and protocols, as necessary.[167] As with Sentinel Event reviews, tabletops are used in a variety of industries, and the practice has been adopted by law enforcement agencies around the country to help plan agency responses to a variety of situations, including active-shooter scenarios[168] and mass demonstration events.[169] The IACP model policy on Incident Command recommends that preparation for critical incidents, including mass demonstrations, includes annual tabletop or field exercises that include multiple agency stakeholders.[170] Because of the spontaneous nature of certain protests and the various stakeholders involved in protest response (central command, local precincts, community affairs, riot response, arrest processing, legal, etc.), tabletop exercises have the potential to be useful tools for ensuring agency readiness when advance planning is not an option.

## 2.   NYPD's Current Self-Assessment Practices

Our review of the NYPD's current practices regarding protest-related self-assessment is discussed below in terms of two distinct aspects of review: (1) internal self-assessment, and (2) review of external assessments of both NYPD actions and police industry best practices. Both forms of review are important to facilitate organizational learning and growth. We conclude that NYPD officials conduct informal internal reviews, and the Department regularly revises its policies and training as a result of such reviews. NYPD records do not show any protest-related after action-reviews undertaken between the 2004 Republican National Convention and until the events of the George Floyd protests. NYPD is currently completing an after-action review of the George Floyd protests. We also conclude that while individuals within the Department occasionally participate in

---

[165] *See* 21ST CENTURY POLICING: CROSS-SITE, MULTI-STAKEHOLDER SENTINEL EVENT REVIEW PROJECT, SENTINEL EVENT REVIEW #1 FINAL REPORT (2020).

[166] *See* SEATTLE OFFICE OF INSPECTOR GENERAL, https://www.seattle.gov/oig/sentinel-event-review (last visited Dec. 23, 2020).

[167] POLICE EXECUTIVE RESEARCH FORUM, MANAGING MAJOR EVENTS: BEST PRACTICES FROM THE FIELD 48 (2011) (hereinafter MANAGING MAJOR EVENTS), https://www.policeforum.org/assets/docs/Critical_Issues_Series/managing%20major%20events%20-%20best%20practices%20from%20the%20field%202011.pdf.

[168] *See, e.g.,* INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE LAW ENFORCEMENT POLICY CENTER, ACTIVE SHOOTER MODEL POLICY CONCEPTS & ISSUES PAPER NEED TO KNOW... 8 (2018), https://www.theiacp.org/sites/default/files/2018-08/ActiveShooterBinder2018.pdf.

[169] *See, e.g.,* MANAGING MAJOR EVENTS *supra* n. 167 at 1, 22, 48; POLICE EXECUTIVE RESEARCH FORUM, THE POLICE RESPONSE TO MASS DEMONSTRATIONS: PROMISING PRACTICES AND LESSONS LEARNED 33 (2018), https://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf.

[170] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, MODEL POLICY: INCIDENT COMMAND 9 (2009), https://www.theiacp.org/sites/default/files/2018-08/IncidentCommandPolicy.pdf.

external conversations, the NYPD as an organization does not regularly engage with external criticism and reviews of modern best practices in the area of protest policing.

a.    Internal Assessment

To understand the NYPD's internal assessment practices, the Law Department requested copies of any internal reviews, after-action reports, or related documents which examined the Department's actions at large-scale events and protests. In addition to requesting all such records from 2004 through January 2020, the Law Department specifically requested records concerning protests at the 2004 Republican National Convention ("RNC"), Occupy Wall Street (from October 2011-September 2012), protests relating to the death of Eric Garner (July-December 2014), Black Lives Matter protests (2014-2019), and protests relating to the investigation of Officer Daniel Pantaleo (July-December 2019).

There is a general practice throughout the NYPD of informal verbal debriefing that can lead to changes in strategy, policy, and training. Interviews with top officials across multiple bureaus revealed that many of them participate in informal discussions within their teams, and occasionally across teams, after large events. These officials said that such conversations are taken on their own initiative rather than as part of any official policy or recommendation. Training officials, both in the general training bureau and within SRG, described a process of using informal discussions with their own team members and other officials who were present at protests to assess the adequacy of training and make changes accordingly. Officials from the Intelligence Bureau and Special Operations similarly described informal reviews conducted within their teams and occasionally with other units they worked with during specific protests. Top level leadership indicated that they regularly have conversations with the leadership of various patrol boroughs and other bureaus which inform their decision-making, but again indicated that these are informal conversations rather than structured reviews or assessments. For a highly visible public agency of this size, the fact that NYPD leaders at various levels regularly engage in such discussions is not surprising, even if they are not documented in formal after-action reports.

Our review of training materials and historic revisions to the relevant portions of the Patrol Guide corroborated discussions with NYPD officials regarding an informal review process. The training and policies do change over time. For example, the disorder control training that recruits receive in the Academy was changed incidental to the appointment of a new commanding officer of SRG's Disorder Control Unit. Revisions to the patrol guide reveal internal reorganization over time, including the movement of "patrol borough task forces" into the centralized "Strategic Response Group,"[171] as well as changes in how arrests are processed in a mass-arrest setting,[172] and one substantive change to tactics.[173] Our review of these documents is consistent with representations by NYPD officials that such review and self-assessment takes place on an individual, as-needed basis.

---

[171] *See* New York City Police Department, Patrol Guide, § 213-03 "Rapid Mobilization," § 213-05 "Duties at an Unusual Disorder," and § 213-08 "Unusual Disorder Plan – Formulating Plan" (Jul. 19, 2016 revisions).

[172] *See* New York City Police Department, Patrol Guide, § 213-06 "Large Scale Arrest Processing Procedure" (various revisions).

[173] *See* New York City Police Department, Patrol Guide, § 213-11 "Policing Special Events/Crowd Control" (Mar. 26, 2009 revision requiring that crowds be given multiple warnings and a clear route to disperse prior to the deployment of Mounted Officers (i.e., horses)).

Recent changes made in the wake of the George Floyd protests also evidence a willingness to revise policies and training in response to events. Beginning in July and August 2020, all officers were required to take in-service disorder control trainings led by SRG's Disorder Control Unit. Top leadership indicated this Fall that they are currently conducting a formal after-action review of the events of this Summer, though at the time of publication of this report it was not clear what form that review will take or if it will lead to policy, strategy, and/or training recommendations.

With respect to formal after-action reports, NYPD produced records relating to the 2004 RNC which demonstrate the Department's ability to conduct extensive after-action reviews in response to large-scale events.  NYPD provided the Law Department with several thousand pages of documents reflecting a series of internal after-action assessments conducted in the wake of the 2004 RNC protests. This included individual after-action analyses from various patrol boroughs and precincts, as well as all department bureaus and findings from the internal review team. The NYPD's RNC files also included, as reference materials, prior after-action reports conducted in the wake of similar events dating back to the 1970s. The fact that NYPD in 2004-2005 devoted so many resources to this review suggests that NYPD itself considered such reviews an important exercise.

In other contexts, NYPD routinely uses data and information from prior experiences to inform law enforcement strategies and tactics. For example, for serious use-of-force incidents, NYPD has a Use of Force Review Board, chaired by the First Deputy Commissioner, that reviews the events to determine if the conduct was within police policy.[174] CompStat, NYPD's system for using data and statistics to drive down crime and local and Citywide levels, is another example. The CompStat process is highly demonstrative of NYPD's ingenuity with using information and past experiences to inform law enforcement strategies and tactics. That mindset should be applied here.

With respect to policing protests, however, NYPD has no record of similar after-action reviews between the 2004 RNC convention through January 2020. Discussions with NYPD leadership and the Law Department's review of materials indicate that NYPD does not have a regular practice or policy of conducting and documenting rigorous, macro-level self-assessments regarding the policing of protests. Consistent with this, NYPD officials advised that, when planning the response to this summer's protests, they did not review prior after-action reports.

With respect to tabletop exercises, the records and discussions that we reviewed similarly revealed no indication that NYPD conducted a tabletop exercise during or in the lead-up to the George Floyd protests. While there may not have been time to conduct tabletop exercises in advance of the George Floyd protests, the Law Department did not find any evidence that the NYPD conducted any protest-related tabletops in the last five years. When asked whether any such exercises were conducted and if they included outside partners, NYPD informed the Law Department that the Department does not track this information. None of the written procedures, policies, or training materials provided included any indication that NYPD regularly conducts tabletop exercises – internally or with other agencies – regarding protests, although the Law Department has learned of NYPD tabletops where protests were a component of a larger exercise. These tabletops, however, were internal. The Law Department conferred with the five District Attorneys – who would be critical participants in a protest-related tabletop that contemplates

---

[174] NEW YORK CITY POLICE DEPARTMENT, USE OF FORCE REPORT (2019),
https://www1.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2019-2020-11-03.pdf.

possible arrest and prosecution – and they confirmed that they have not participated in any protest-oriented tabletops with the NYPD in recent years.

Ultimately, while NYPD has demonstrated the various ways in which it continuously reviews and updates policies, practices, and training regarding the policing of protests, there is a gap in institutional learning: the absence of structured, macro-level, post-event after-action reviews and the absence of protest-related tabletop planning exercises that include external partners.

b.    External Feedback

External studies and reviews can provide valuable perspectives to police organizations, and independent third-party assessments can likewise provide an important justification for a law enforcement agency's decision to pursue or change a particular policy. In the law enforcement industry, organizations like PERF[175] and leadership groups like the IACP[176] are well-regarded resources for issue reports and best practice guides. Similarly, civil rights organizations, advocacy groups, and academic centers can provide valuable studies and critiques of policing issues.

In recent years, the NYPD has sought external guidance with respect to its disciplinary system and its body worn camera policy.[177] The Department also receives reports and recommendations from the Department of Investigation's Office of the Inspector General for the NYPD, to which NYPD must publicly respond.[178] The NYPD is also the frequent subject of outside studies, reports, and recommendations. In certain areas, NYPD embraces external feedback. For example, NYPD has publicly embraced PERF's de-escalation training program (known as "ICAT") and is a national thought leader in this area. Additionally, when NYPD first began using Body-Worn Cameras, the Department conducted outreach to other police departments to learn about their experiences with the equipment.

With respect to the policing of protests and demonstrations, we found little evidence that NYPD incorporates outside reports and recommendations into the evaluation and development of its protest policing policies and practices. The Law Department's records review found no documents regarding industry best-practices, or any documents from other police departments related to protest policing that NYPD may have considered in establishing or reviewing its own strategy, tactics, and/or policies. While NYPD officials have participated in forums examining law enforcement and protests – like a 2016 PERF forum on policing at mass demonstrations – NYPD identified no changes in policy that resulted from such participation.[179] This lack of documented response to external advice was corroborated by interviews with top NYPD officials, who clarified that their strategy, tactics, and policies are fundamentally based on what they have personally

---

[175] POLICE EXECUTIVE RESOURCE FORUM, https://www.policeforum.org/ (last visited Dec. 23, 2020).

[176] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, https://www.theiacp.org/ (last visited Dec. 23, 2020).

[177] See, e.g., MARY JO WHITE, ET. AL., THE REPORT OF THE INDEPENDENT PANEL ON THE DISCIPLINARY SYSTEM OF THE NEW YORK CITY POLICE DEPARTMENT (2019), https://www.independentpanelreportnypd.net ; POLICING PROJECT AT NEW YORK UNIVERSITY SCHOOL OF LAW, REPORT TO THE NYPD SUMMARIZING PUBLIC FEEDBACK ON ITS PROPOSED BODY-WORN CAMERA POLICY, https://www.policingproject.org/nypd-bodycam-report .

[178] See NEW YORK CITY DEPARTMENT OF INVESTIGATION OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD, https://www1.nyc.gov/site/doi/oignypd/reports.page (last visited Dec. 23, 2020).

[179] The report that was produced following the 2016 PERF forum indicates that it included discussion of response planning & preparation and training, among other topics. See POLICE EXECUTIVE RESEARCH FORUM, THE POLICE RESPONSE TO MASS DEMONSTRATIONS (2018), https://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf.

experienced in New York City over years of protests. Several senior NYPD officials advised that they were at best selective in their review of advocacy reports and expressed the view that they could learn little from other departments because NYPD is on a different level.

Certain officials within NYPD leadership do describe coordinating with other agencies and participating in groups like PERF. All members of SRG's Disorder Control Unit ("DCU") attend training at the Federal Emergency Management Agency's ("FEMA") Center for Domestic Preparedness in preparation for their role in training other SRG units. Aside from this FEMA training, however, interviews with officials revealed that coordination with other departments is generally an information gathering endeavor. Training officials described discussing tactics, such as new de-arrest tactics, that protesters are using in other cities with those departments in preparing situational training for NYPD. This, however, does not reveal a large-scale practice of incorporating lessons from other police departments or industry groups on an ongoing basis.

### 3. Lack of Formal Self-Assessment as a Potential Factor in the George Floyd Protests

In considering whether a lack of formal after-action process for prior large-scale protests was a factor that contributed to the intensity of clashes throughout the City during the George Floyd protests, one indicator is whether or not NYPD continued to engage in tactics and behavior that have been a source of external criticism in the past. In considering practices that may have been the subject of criticism, the Law Department reviewed external reports of prior incidents produced by advocacy groups and media accounts of prior NYPD protest responses. For our understanding of NYPD tactics at the Floyd Protests, the Law Department relied on our independent review of NYPD documents and interviews, public media reports, and the findings of the independent DOI investigation.[180] The Law Department review team observed certain trends that a rigorous, formal review process may have been able to address.

From the perspective of NYPD leadership, the George Floyd protests were unprecedented in size, scope, and in the tactics used by protesters. While the combination of these factors, plus the pandemic, indeed created a unique circumstance, certain underlying elements were not unprecedented. A pivotal aspect of mass demonstrations is the dynamic interplay between police and protesters. This interplay has been the subject of study worldwide, is not new to the NYPD, and is something that NYPD has received feedback on.

While prior external recommendations may not have been able to prepare the NYPD for the specific nature and size of this summer's protests, these recommendations could have impacted the NYPD's response to certain encounters in these protests. Intense protests involving conflict and violence on a large scale are outside the experience of most officers. A process of reviewing previous events, as well as tactics used in other cities, would no doubt help the Department develop strategies and equip officers to respond to protests.

Review processes involve not only a reflection on what went wrong but an assessment of what was done properly and what successes can be duplicated. For example, there were many protest marches in Staten Island but few arrests. One of the elements identified was the established

---

[180] We do not comment here on the veracity of any statements made in public media reports or independent assessments. We simply note that these reports highlight repeated public criticism that warrants internal review and assessment.

relationships between the officers, the police community affairs bureau, and advocacy groups like Black Lives Matter and the NAACP. Queens also had a much lower level of conflict. While each borough is unique, an inquiry into what worked may nevertheless be productive.

* * * * *

NYPD should build on the current work to establish a routine of rigorous self-assessment and review of protest policing. We cannot say for certain that an internal review or consideration of external assessments would have resulted in different behavior during the George Floyd protests. What we can say, however, is that the apparent recurrence of certain issues, in the face of recurring third-party critique, suggests that the NYPD can and should do more to actively engage in serious and structured after-action reviews following large scale protest events, including the review and assessment of third-party critiques.

### C. Assessment of NYPD's Training Regarding Protest Policing

Based on a review of available training materials and of interviews with NYPD officials, the Law Department sought to examine how training can be developed to ensure that First Amendment rights are appropriately protected at future protests. That necessarily involves a review of available evidence, including information produced by DOI in its recent report. This work starts from the perspective of behavioral science and relies heavily on nationally-regarded experts in policing.

As outlined below, behavioral science informs us that if officers do not have recent and appropriate training on strategies and tactics for policing protests but are nonetheless placed into such highly stressful situations – as was the case here – there is a high likelihood that they will revert to basic human responses to perceived threats. In policing, such responses would include an instinct to assert physical control of a disorderly situation, which may in turn serve to escalate hostilities in protest situations. Moreover, the existing training has an insufficient focus on crowd psychology, de-escalation, and protecting the constitutional rights of protesters. As NYPD develops a plan to update its training materials and practices, it should take these factors into account and should actively engage with experts and the police departments of other cities to identify best practices.

#### 1. Overview of NYPD Training Regarding Protest Policing

##### a. Academy Training for NYPD Recruits and Experienced Officers

Newly hired NYPD recruits undergo a broad range of training at the NYPD Police Academy. Specific to the policing of protests, the NYPD training protocols provided all NYPD officers with a four hour "disorder control training" module at the Academy. This instruction consisted of tactical training, such as the use of Long Range Acoustic Devices ("LRAD"), techniques such as "Flex Cuffing", various Line Formations, and relevant Legal Considerations. The Academy also provided supervisors – sergeants, lieutenants and captains – with a one hour refresher training on disorder control at the time these officers were promoted to their new rank.

The Department's training program for new recruits also includes sixteen-and-a-half  hours of training on topics related to the policing of protests, including modules on "Maintaining Public

Order," "Discretion" and "Civil Disorder Offenses."[181] Additionally, in connection with training regarding general police duties, recruits receive instruction on "Use of Force" and "De-escalation Tactics." These are applicable to protest policing but not specifically intended or designed for crowd management.

Notably, at the time of the George Floyd protests, NYPD patrol officers who were not in specialized units did not receive disorder control training subsequent to graduating the Academy. As a result, once newly-minted officers left the Academy and were assigned to commands, they were not required to undergo any special training in policing protests or crowd management until they were promoted to supervisor positions.

b.    Strategic Response Group Training

The NYPD Strategic Response Group is charged with "[r]espond[ing] to citywide mobilizations, civil disorders and major events with highly trained personnel and specialized equipment to maintain public order."[182] SRG consists of approximately 700 officers who receive twenty-seven days of specialized training upon joining the unit. This training includes five days dedicated to disorder control topics. SRG also has a bicycle unit that is routinely assigned to cover protests and which receives additional specialized training. The disorder control training within SRG is developed and provided by a specialized Disorder Control Unit ("DCU") of approximately 40 officers. DCU officers receive extended specialized training through programs provided by the Federal Emergency Management Agency's ("FEMA") Center for Domestic Preparedness ("CDP"). DCU also provides the disorder control training for all recruits during their time in the Academy.

Unlike officers assigned to other commands, SRG members are provided annual refresher trainings in protest related policing. SRG also conducts regular practice drills related to their various specialized functions, including disorder control.

c.    Recent Updates to Training

In the months following the George Floyd protests in New York City, specifically starting in July and August 2020, the NYPD updated its training protocols. These updates include a four-hour training course on disorder control for Department ranks of captain and above. For ranks of lieutenant and below, which include the majority of the 35,000 plus members who hold the rank of police officer, an expanded two-day disorder control training with practice in scenario-based skills is being implemented.[183]

2.    **The Impact of Limited Training in Protest Situations**

In the course of the Law Department's investigation, a number of NYPD officials characterized the George Floyd protests as "unprecedented," referencing both the number of protesters and the geographically varied locations where demonstrations occurred. In response to the size and scope of the protests, the NYPD elected to mobilize officers from multiple commands

---

[181] *See* DOI Report at pp. 57-60, for descriptions of selected NYPD training materials.
[182] NEW YORK CITY POLICE DEPARTMENT, MARCH 2020 STRATEGIC RESPONSE GROUP GUIDE (2020) at p.10.
[183] According to the NYPD, this two day expanded course for Police Officers, Sergeants, and Lieutenants "includes hands on training culminating in scenario based skills."

for re-assignment to protest-related duties. The events required an NYPD "all out" such that all available officers – not just the more extensively trained and regularly drilled SRG personnel – were subject to be deployed to the protests.  Further, during the peak of the protests, officers' regular days off were cancelled and shifts were extended in many cases to twelve-hour tours during the height of the demonstrations.

As noted above, for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy. In discussing NYPD's training programs, a senior NYPD official described that disorder control training as "perishable" – i.e., it is the type of training that is lost if it is not used. Conversely, those officers who recently joined the force would have recent Academy training but less general field experience.

Research in behavioral science illustrates the consequences of deploying officers into stressful, non-routine situations where their training is not current. As discussed above, individuals undergoing significant stress are not likely to call upon past classroom training but will instead revert to certain habitual actions. In support of this report, our behavioral science experts from ideas42 have advised us that habits are a form of automaticity, developing as we repeat actions in response to a specific circumstance or cue.  While actions are typically the product of our intentions, habits are different because as we repeat actions that then create habits, our actions become cued by our environment.[184] According to ideas42, time-pressured and potentially volatile environments such as protests are likely to trigger habitual responses by officers. Thus, ideas42 recommends that the NYPD identify the typical cues associated with protest events and actively and deliberately train officers to form certain habits so that those habits can be summoned and executed when cued by the relevant circumstances.

Classroom learning is generally found *not* effective in producing appropriate habitual responses to environmental triggers.[185] Desired habitual behaviors need to be practiced in conditions that present the cues that officers will experience during protests. As noted, this is more crucial in circumstances that are emotionally charged and where officers are faced with verbal and even physical aggression. Indeed, it is a widely held opinion that "scenarios, exercises and drills can prepare officers to remain unprovoked in encounters intended to bait negative behaviors."[186] Unsurprisingly, leading voices in police research maintain that having rehearsal exercises on a regular basis is "important for personnel who will come into direct contact with demonstrators/protesters to build their capacity regarding interpersonal interactions and equipment deployment."[187]

NYPD officials report that the Department's training philosophy does include the precept of creating "muscle memory" or thoughts and responses that officers come to rely on as second nature.[188] This is a prominent component for training in the use of firearms, but it is also employed

---

[184] For this proposition, ideas42 relied on Jeffrey M. Quinn, et al., *Can't Control Yourself? Monitor those Bad Habits*, 36(4) PERSONALITY AND SOCIAL PSYCHOLOGY BULLETIN, 499-511 (2018).

[185] For this proposition, ideas42 relied on Bas Verplanken and Wendy Wood, *Interventions to Break and Create Consumer Habits*, 25(1) JOURNAL OF PUBLIC POLICY & MARKETING, 90-103 (2006).

[186] POLICE FOUNDATION, MANAGING LARGE SCALE SECURITY EVENTS: A PLANNING PRIMER FOR LOCAL LAW ENFORCEMENT AGENCIES (April 2018) at p. 8. The Police Foundation's Planning Primer also advises that trainings "be spread across multiple platforms including online, classroom, scenario-based tabletop exercises and in-person drills."

[187] *Id.* at p. 25.

[188] As discussed above, this accords with research showing that training regimes should seek to ingrain desired responses when circumstances require immediate and critical action. Such training may succeed in creating an "auto-pilot" mode of

in training officers to reflexively identify street intersections so that their location is immediately at hand for communications. NYPD also reports that their training is increasingly scenario-based.

This summer, however, apart from officers within the specialized SRG deployment, NYPD did not, at the time of the protests in May 2020, have in-service refresher trainings for officers that were specific to crowd management and control. NYPD was similarly not able to carry out its crowd management and crowd control functions during the protests relying solely on SRG personnel. The "all out" required non-specialized patrol officers to be deployed and thus put their one-time disorder control training from the Academy to the test in severely stressful and volatile conditions. This report does not identify specific officers and attribute certain conduct to them. As mentioned above, such findings fall within the purview of other reports and proceedings. Rather, it highlights the importance of scenario-based training and recommends that the NYPD expand its application of the principles of scenario-based training to protests.

NYPD appears to recognize the benefits of this approach. The additional scenario-based training that has since been ordered by the NYPD for all officers, as well as further training for supervisory ranks, is a significant step on the part of the Department. Going forward, NYPD's strategy for policing large scale protests should include an institutional plan for ensuring that all officers and supervisors called upon to police protests have sufficient and current training for the circumstances.

### 3.   The Content and Focus of the NYPD's Training for Protests

A central question for analysis is whether the training provided by the NYPD had an impact on the events that occurred at the George Floyd protests. Officer performance is often tied to training, including in-service training, "on-the-job" training, classroom instruction and course materials.

As discussed earlier in this report, the George Floyd protests occurred in the midst of the nation's difficult days of dealing with COVID-19 and its disruptive, and in some cases devastating effects, on mental, social and economic life, effects touching the lives of protesters, other civilians and officers. Given the nature of the protests and the sentiments of outrage over George Floyd, it was unquestionably a stressful situation for protesters and police officers.  It was also a pressure test of some of the concepts embedded in NYPD training.

a.   Maintaining Emotional Control vs. Habitual Response to Take Control

The training offered to officers when they first attend the NYPD Academy as recruits is predicated heavily on officers maintaining emotional control so that critical decision making can be used to reach appropriate judgments regarding the use of force and the existence of probable cause for making arrests. This training is no doubt of crucial significance during the volatile and inherently confrontational circumstances of policing protests. NYPD's lecture section on "Discretion" under

---

thinking, perceiving and acting under stress. For this proposition, ideas42 has relied on Gary Klein, et al., *Rapid Decision Making on the Fire Ground,* 30(6) PROCEEDINGS OF THE HUMAN FACTORS SOCIETY ANNUAL MEETING, 576–580 (1986). For an interesting application of the underlying behavioral science in another context, see Maxim Dsouza, *The Habit Loop -- The Science Behind Forming or Breaking Habits*, https://productiveclub.com/the-habit-loop/#habitloopheading  (last visited Dec. 26, 2020).

the caption of "The Role of Police at Demonstrations" emphasizes the emotional restraint an officer needs in such situations:

> **We, as police officers, must recognize this intensity, treat it objectively and professionally, and not allow ourselves to be "hooked" into the emotion of the moment** … We, as police officers, must be aware of these feelings. Our demeanor, our bearing, our conduct, must be completely appropriate and in tune with the sensitive nature of our assignment.[189]

The goal of officers remaining "neutral" in order to protect the rights of protesters and the rights of the general public is highlighted in various parts of the NYPD training materials.[190] Clearly, NYPD training materials recognize the fact of emotional responses under stressful conditions and the need to control them.[191]

That said, lecture-based training on the importance of being aware of one's emotions during volatile conditions, such as policing protests, will have limited effect. Our behavioral science experts note that absent the *practice* of appropriate habitual responses that will be activated in those circumstances, individuals are likely to revert to reflexive responses that may be subject to biases that undermine objectivity and the NYPD's ideal of neutrality.

Regarding such "reflexive responses," researchers in the field of police behavior argue that police officers develop a reflexive response to "take control" of circumstances that seem out of control, a behavior that is called upon and reinforced in daily police duties but that takes on a different significance in the context of mass crowds marching in the streets.[192] For example, ideas42 has advised that the donning of gear such as helmets and shields are cues that may summon – in advance of realities on the ground – the instinct to take control. Protective gear of course serves a purpose for the officer. At the same time, our experts advise that dressing for physical combat frames the situation as one needing combative tactics and can predispose the mind to interpret experience through that lens, readying officers for associated behaviors. Training on disorder control measures that does not account for this effect on officers may be doing a disservice to all involved since the proposed objectives of the training – emotional control, neutrality – are undercut by cues that frustrate those intentions.

Accordingly, it does not suffice to have training for officers, even recurring training, if the method and substance of the training does not ultimately translate into effective responses in the

---

[189] New York City Police Department, Police Academy, Chapter 2 Discretion. (Emphasis in original)

[190] New York City Police Department, Police Academy, Chapter 11 Maintaining Public Order. This training section provides that "Remaining neutral and attempting to act objectively is a sign of a professional, effective law enforcement officer. Once police officers lose this objectivity, or even appear to do so, their very presence may increase tensions, and their work and the work of fellow officers becomes more difficult." Of course, neutrality regarding the substance of protests and the attitude taken toward protesters is acutely salient when the target of the protests is policing itself.

[191] New York City Police Department, Police Academy, Chapter 14 Civil Disorder Offenses: "It is imperative that we maintain a balance between citizen's constitutional rights and our responsibility to protect persons and property. As part of effective policing, you must be able to effectively utilize good communication and judgment skills in order to ensure that order is maintained."

[192] *See* the discussion above at section III.A.1.b; *see also* David H. Bayley and Egon Bittner, *Learning the Skills of Policing*, LAW AND CONTEMPORARY PROBLEMS, Vol .47, No.4 (August 1984). For this proposition, Professor Edward Maguire also relied on VERN N. REDEKOP AND SHIRLEY PARÉ, BEYOND CONTROL: A MUTUAL RESPECT APPROACH TO PROTEST CROWD-POLICE RELATIONS (2010).

field. In order to achieve NYPD's goal of training officer to remain neutral in protest situations, a greater emphasis must be placed on training that helps officers internalize and create habitual responses consistent with such neutrality in protest scenarios.

### b. De-Escalation

NYPD provides all officers with use-of-force and de-escalation training. NYPD also provides all officers with training on issues relating to procedural fairness and how perceptions of fairness during encounters with police officers influence broader judgments about police legitimacy. Nevertheless, from our review of NYPD's trainings specific to protests – both the NYPD Academy training for recruits and the SRG officer training – the Department's trainings regarding protest policing have a limited emphasis on de-escalation.[193]

Research indicates that training for de-escalation in the context of protests has to be acutely sensitive to the particular dynamics that affect group encounters as "the quality of interpersonal interactions between individual officers and protesters can change outcomes."[194] Developing a policing strategy focused on non-confrontational tactics, as advised by varying research organizations, has many components, and depends "not only on what police do, but also on *what they are seen to do* both by their peers as well as those within the crowd."[195] A model in which a heavily equipped officer, even if emotionally grounded and neutral, remains ready to spring into action if and when laws are violated may not result in a better outcome than a model involving an officer in a "soft" uniform (e.g., blue polo shirt with police insignia) who proactively offers to uphold First Amendment rights and acts in a fair manner.

### c. Crowd Psychology and Behavior

The materials provided by NYPD related to disorder control training are notably spare in training techniques that incorporate the current research on the dynamics of crowd psychology that affect protests. The instruction on crowd psychology in the DCU curriculum for SRG officers – those most routinely required to consider crowd psychology – is focused primarily if not solely on the "mob mentality" thesis that a "contagion" of emotion occurs when individuals join in a group, potentially experiencing an adrenalin rush and influencing what behaviors occur:

> That with the right kind of social circumstances, anonymity, submersion in a large crowd, emotional arousal created through contagion, individuals become so caught up in the group experience that their individuality is temporarily minimized.[196]

According to researchers who specialize in the study of crowds, this perspective is now widely considered outdated and scientifically unsound. It reflects a misconceived understanding of crowds that may lead to overly forceful police responses that trigger or escalate confrontation by prejudicially ascribing irrational and violent behavior as imminent.

---

[193] *See also* DOI Report at p. 62.
[194] POLICE EXECUTIVE RESEARCH FORUM, THE POLICE RESPONSE TO MASS DEMONSTRATIONS: PROMISING PRACTICES AND LESSONS LEARNED (2018) at pp. 37-38.
[195] POLICE FOUNDATION, MANAGING LARGE SCALE SECURITY EVENTS: A PLANNING PRIMER FOR LOCAL LAW ENFORCEMENT AGENCIES (APRIL 2018) at p. 45. (Emphasis added)
[196] New York City Police Department, Police SRG Training Module 2 Crowd Management and Crowd Control.

The experts at ideas42 suggest that NYPD's training practices could make gains by incorporating more recent research that looks at how both protesters and officers are subject to biases in thought and action in such situations.  This is particularly relevant when the subject of the protests is the police itself.   When protests are about police, the social identities at work are inherently oppositional. After conducting a review of the academic literature on this point, ideas42 summarized its guidance as follows:

> Social psychology recognizes that people define themselves in terms of groupings, with those sharing our commonalities defined as the "ingroup," and those not sharing our commonalities defined as the "outgroup." Groupings work to increase ingroup identification, loyalty, pride, and sense of safety. As a result, ingroup association produces outgroup derogation, prejudice and stereotyping. This stereotyping of the other group then distorts both the perception of each individual within that group as well as how their actions will be construed.[197]

In the often chaotic context of mass demonstrations, the possibility of distorted perceptions of behaviors is obviously of immense concern. Groups formed in opposition to one another are subject to a biased and stereotyped perception of the "out-group" members that ignores individual characteristics and behaviors in favor of a whole-sale, indiscriminate typing. This can lead to overreactions and escalations to violence as the groups in conflict will increasingly attach to the group's social identity the more that the group feels unfairly treated.

In light of the outdated "mob mentality" understanding of crowd psychology informing the Department's training of SRG officers, the manner in which that training further characterizes and frames the "types of protests" and the "types of protesters" is also concerning. The NYPD training materials categorize protests as either peaceful or violent, and protesters as belonging to three kinds: (1) "everyday", (2) "professional" and (3) "anarchist". The shorthand understanding is that "everyday" protesters are citizens who are there to make their "voices heard", "professional protesters" may violate minor laws as a tactic for a perceived social good, and "anarchists" are there to challenge authority and destroy property.[198] Beyond the accuracy of these typologies, the social science shows that crowd/protester behavior is dynamic and sensitive to the interactions that unfold.  Categorizing an entire crowd as now "violent" or a group as "anarchists" or "professionals" due to a particular act can be a driver of the social group identification process that escalates conflict and leads to questionable judgment when effectuating arrests or determining tactics.

A mindset that is informed by a supposition of "contagion" of emotion and behavior in a group setting is primed to see disorderly or hostile actions at a demonstration as the instigation that may turn the varied individual behaviors into a violent mass action. This "herd mentality" framing works against the ideal of differentiated policing.  Through a "differentiated" approach, which focuses on individual behaviors and targeted measures (even within a crowd setting), police continue

---

[197] For this proposition, ideas42 relied on Susan Krauss Whitbourne Ph.D., *In-Groups, Out-Groups, and the Psychology of Crowds*, PSYCHOLOGY TODAY (December 2010).
[198] New York City Police Department, Police SRG Training Module 2 Crowd Management and Crowd Control.

to facilitate the legitimate rights of lawful protesters while taking actions against particular parties engaging in violence or serious criminal acts.[199]

Although NYPD training programs do incorporate relevant social science regarding protest-policing, and although the NYPD is very much aware of the responsibility to distinguish between those engaged in protected acts of protest and those committing criminal acts, the NYPD can do more to strengthen its training programs. Further, the NYPD's new training, rolled out this summer, refers to the "Elaborated Social Identity Model" ("ESIM") and thus draws on more up-to-date research and scientific understanding. It is a positive sign that insights from the social science community are already in use to some extent and continue to be re-evaluated in the Department's training programs. However, it is important that the Department's evaluation process of training materials include consultation with experts in the behavioral sciences. Notably, one of our social science experts has expressed strong concerns that the "contagion" or "herd mentality" understanding of crowd behavior continues to play a role in the updated curriculum.[200]

### d. Framing and The First Amendment

Behavioral science teaches us that how we are introduced to an issue can impact how we respond. "Framing" can thus be a factor that affects our actions and needs to be an important consideration in officer training. This includes how the NYPD framed the protests to officers and leadership when developing a response and a strategy. While leaders within the NYPD did make public statements about the importance of letting people protest peacefully, an alternative frame from the NYPD was through the lens of controlling disorder and preventing violence. At times, this alternative message acquired much greater salience. During interviews, NYPD officials in various positions consistently referred to the violence and vandalism associated with the protests. Publicly, the top leadership discussed the presence of outside agitators. Internally, various NYPD materials regarding the protests focused heavily on actual and possible security threats.

Such a focus is not unwarranted for an agency charged with enforcing the law and maintaining public order, and particularly one whose officers were themselves the subject of physical attacks. This focus, however, should be coupled with a frame that highlights the rights of protesters and the affirmative responsibility that officers have to protect the rights of the citizens who take part. We found very few references in the training materials regarding policing protests that reinforced to officers that historically, in protest situations, the majority of protesters are peaceful. Training materials for protest policing should begin with this frame, while also advising officers that the protest situations are fluid and that police response should be calibrated according to changed circumstances on the ground and actionable intelligence.

For Strategic Response Group officers who regularly police demonstrations and receive specialized training, the NYPD "Strategic Response Group Guide" is "a comprehensive text that contains detailed discussion and explanation of SRG management theory, nomenclature, and field applications." Included in the guide's mission statement is that SRG will "[r]espond to citywide mobilizations, civil disorders, and major events with highly trained personnel and specialized

---

[199] EDWARD R. MAGUIRE & MEGAN OAKLEY, POLICING PROTESTS: LESSONS FROM THE OCCUPY MOVEMENT, FERGUSON & BEYOND: A GUIDE FOR POLICE (2020) at p. 13.

[200] It is not clear how NYPD intends to reference the "herd mentality" concept in its updated module. However, Professor Edward Maguire argues that this perspective on crowds is associated with police responses that escalate conflict and increase the likelihood of violence.

equipment to maintain public order." There is no reference in the mission statement regarding the First Amendment or the rights of protesters. Likewise, while SRG training does include modules that train SRG officers on the First Amendment, the overwhelming focus of the training is on tactics and strategies to control crowds, maintain order, and address violations of the law. As stated above, it is a fundamental responsibility of government officials to support and defend the Constitution, including the First Amendment. Going forward training materials should more comprehensively reflect that duty.

For non-SRG officers, their first exposure to policing protests is in the Police Academy. The recruit curriculum that the NYPD supplied to the Law Department does include a module on "Maintaining Public Order" which notes that:

> The role of the Police Department includes protecting the right of protesters to peaceably express their views, while at the same time protecting the right of non-protesters to go about their daily life unaffected by public disorder. Most protests and demonstrations are conducted in a peaceful manner. However, acts of civil disobedience may sometimes evolve into disruptive and/or violent conduct requiring immediate police action.[201]

The question is how strongly this message is reinforced to officers "on the job."

NYPD Patrol Guide provisions relating to special events and emergency mobilization (e.g., P.G. §213-02 through §213-19) make only one passing reference to the NYPD's role of protecting the rights of speech and assembly – "[The] incident commander will cooperate with persons in charge to the extent possible, balancing their right to free expression with the need to maintain public safety."[202]

As discussed further below, the limited framing of the First Amendment and the rights of protesters in NYPD's policies, training, and actions stands in contrast to other police department practices and expert recommendations.

In making observations about how the NYPD frames its role and conduct in policing protests, we are not reaching a conclusion on the commitment of the Department or its leadership to the principles of the First Amendment and the free speech and free assembly rights of New Yorkers. Rather, we are observing how this commitment is framed in its training and policies, and identifying the risk that current framing can pose to police responses to protest events. Going forward, the NYPD should consult with experts in behavioral psychology, civil rights, and other fields, in the evaluation of its offerings to ensure that they are consistent with the current state of the science and appropriately balance the needs of security with the rights of protesters.

### 4.    Comparative Review

As discussed above, the NYPD's training units have informal relationships with their counter-parts in other police forces and are willing to share ideas and incorporate things they learn. They also take part in police forums such as PERF. For example, the NYPD's training program has adopted PERF model practices such as the Critical Decision Making Model (CDMM) for officer

---

[201] New York City Police Department, Police Academy, Chapter 11 Maintaining Public Order.
[202] See City of New York Police Department, Patrol Guide, § 213-11, "Policing Special Events/Crowd Control.".

guidance.[203] SRG also undergoes training in connection with FEMA's Center for Domestic Preparedness which identifies, develops, tests and delivers training on a variety of law enforcement situations, including mass demonstrations.[204] The NYPD's trainings have evolved over time, particularly with the increasing use of scenario-based trainings.

That said, there likely is more that the NYPD can learn about protest policing by looking to other law enforcement agencies and experts. For example, de-escalation tactics have significantly developed in the United Kingdom as well as other U.S. cities.[205] The Baltimore Police Department ("BPD") has generated new training courses, including courses for de-escalation according to the PERF Integrating Communications, Assessments and Tactics ("ICAT") use of force procedures, which incorporate the PERF Critical Decision Making Model (already used by the NYPD).[206] The newly developed Baltimore trainings employ "adult-learning" precepts, such as "mind mapping,"[207] in an attempt to improve retention.[208] In coordination and consultation with the Baltimore Consent Decree, BPD has created a new detailed section of their Patrol Guide explaining and listing de-escalation precepts and techniques (Section #1107).

In 2015, Baltimore was the scene of intense and, at times, violent protests over policing following the death of Freddie Gray in police custody. There is little question that police-community relations in Baltimore had been at a low point for some time. Nevertheless, the George Floyd protests were different in Baltimore. The BPD was widely credited in their handling of the George Floyd protests as they managed, for the most part, to avoid violent incidents between police and protesters.[209] It is important to consider if there are lessons to be learned to NYC's advantage. For instance, the Baltimore Consent Decree Monitoring Team cited the de-escalation of BPD commanders who "lowered the temperature" by, among other things, deploying officers in their regular uniforms and encouraging officers to calmly engage in discussion with protesters.[210] While the new BPD trainings were not in effect officially when the George Floyd protests occurred, the Baltimore Consent Decree Monitoring report noted that the new training and protocols were used as a guide for the agency's approach.[211]

---

[203] However, it was not until this summer, in the aftermath of the George Floyd protests, that NYPD decided to institute mandatory refresher training for all officers, something which aligns with the best practices recommendations of PERF and is also found in other jurisdictions.

[204] UNITED STATES DEPARTMENT OF HOMELAND SECURITY, FEDERAL EMERGENCY MANAGEMENT AGENCY'S CENTER FOR DOMESTIC PREPAREDNESS, https://cdp.dhs.gov/news-media/article/cdp-offers-critical-mass-protest-training (last visited Dec. 23, 2020).

[205] CRAIG PATTERSON, POLICING POLITICAL PROTESTS IN THE UNITED KINGDOM (2014); EDWARD R. MAGUIRE & MEGAN OAKLEY, POLICING PROTESTS: LESSONS FROM THE OCCUPY MOVEMENT, FERGUSON & BEYOND: A GUIDE FOR POLICE (2020).

[206] BALTIMORE POLICE DEPARTMENT, FIRST AMENDMENT PROTECTED ACTIVITY ASSESSMENT (FEB 2020); BALTIMORE CONSENT DECREE MONITORING TEAM, FIRST COMPREHENSIVE RE-ASSESSMENT (SEPT 2020).

[207] A "mind map" is a diagram for representing tasks, words, concepts, or items linked to and arranged around a central concept or subject using a non-linear graphical layout that allows the user to build an intuitive framework around a central concept; https://www.mindmapping.com/mind-map (last visited Dec. 23, 2020).

[208] Baltimore Police Department, 2019 Draft Use of Force Policy Training Curriculum (2019).

[209] BALTIMORE CONSENT DECREE MONITORING TEAM, FIRST COMPREHENSIVE RE-ASSESSMENT (SEPT 2020); see also Ron Cassie, Why Baltimore's Protests Are So Peaceful, (June 4, 2020), BLOOMBERG CITYLAB, https://www.bloomberg.com/news/articles/2020-06-04/why-baltimore-s-george-floyd-protest-is-different (last visited Dec. 23, 2020).

[210] BALTIMORE CONSENT DECREE MONITORING TEAM, "FIRST COMPREHENSIVE RE-ASSESSMENT" (SEPT 2020) at p. 16.

[211] Id.

With respect to framing in training and policies, the Washington D.C. Metropolitan Police Department's ("MPD") approach to protests may also be instructive. The MPD is the District's local police force and, given the daily events in the nation's capital, has significant experience with policing protests. Their work at protests is monitored by the District's civilian Office of Police Complaints. While attention has been drawn to some of MPD's own tactics in response to this year's protests, it is not to be confused with the conduct of other law enforcement agencies that operate in the District, such as the U.S. Park Police and other Federal agencies who were recently criticized for their treatment of protesters near the White House.

The MPD categorizes protest events as "First Amendment Assemblies" and has a policy the focuses on the rights of protesters. The policy, "Handling First Amendment Assemblies and Mass Demonstrations," contains an introduction that emphasizes the centrality of protecting rights when policing such events:

> The purpose of this standard operating procedure (SOP) is to ensure that the Metropolitan Police Department (MPD) is prepared to respond effectively and efficiently in accordance with applicable law and District of Columbia policy to any unlawful conduct occurring in the context of First Amendment assemblies. The Department has become the national model for protecting the First Amendment rights and safety of demonstrators, while safeguarding persons and property in the District of Columbia. This SOP incorporates revisions to the manner in which the MPD responds to demonstrations and other assemblies on District of Columbia public space that the District has implemented in resolving litigation. This manual also reflects measures mandated by the *First Amendment Rights and Police Standards Act of 2004*.

> This SOP sets forth the policy and procedures for all members carrying out the mission of the MPD when interacting with demonstrations, rallies, marches, picket lines, or other similar gatherings conducted for the purpose of persons expressing their political, social, or religious views. This policy is intended to exceed constitutional requirements and satisfy the heightened requirements of local statutory law and best practices.[212]

Similarly, the International Association of Chiefs of Police, a trade organization for police leadership and a respected voice on policing issues, issued a "Model Policy" on crowd management in 2019.[213] The policy opens with a "purpose" stating that "[t]he purpose of this policy is to establish guidelines for managing crowds, protecting individual rights, and preserving the peace during demonstrations and civil disturbances," and a "policy" stating that "[i]t is the policy of this agency to protect individual rights related to assembly and free speech; effectively manage crowds to prevent loss of life, injury, or property damage; and minimize disruption to persons who are not involved." By putting the rights of protesters front and center, IACP is setting a frame which underscores the role of officers vis-à-vis protesters.

---

[212] Metropolitan Police Department of the District of Columbia, Standard Operating Procedures: Handing First Amendment Assemblies and Mass Demonstrations, https://go.mpdconline.com/GO/SOP_16_01.pdf.

[213] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE LAW ENFORCEMENT POLICY CENTER, CROWD MANAGEMENT (APRIL 2019), https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf

NYPD could benefit from regular and formal efforts to assess and benchmark against training models and techniques from other cities and expert organizations. Particularly, where other police departments do have fewer physical confrontations, injuries and arrests, those departments should be formally assessed for potential lessons to be learned.[214]

## IV.     Strategic Consideration Based on Practices Around the Nation

### a.   An Investment in Supervisors

Supervisors play a critical role in police departments. They guide officers in the field and set the tone for how officers should conduct themselves. Officers look to their supervisors for guidance, leadership, permission, and intervention.

This is just as important in protests, where front-line supervisors play a vital role in instructing officers on what actions to take, rotating officers in and out of assignments, setting the tone, and modeling behavior.

As the NYPD reviews its practices, policies, training, and strategies around policing protests, the Department should focus on supervisors. Compared to patrol officers, there are fewer supervisors to train, and the decisions that they make in the field may have greater ramifications than those made by individual officers.

### b.   Strategic Checklist for First Amendment Events

Our expert Professor Edward Maguire has noted that research from several fields, particularly aviation and medicine, indicates that checklists can serve as a potent tool for implementing evidence-based practices and improving performance.[215] Well-designed checklists can "help workers perform a task by reducing ambiguity about what to do."[216] While checklists have a long history of improving performance outcomes in certain fields, they are not used as often in policing. Nevertheless, recent research suggests that checklists can improve different aspects of police performance.[217]

---

[214] *See* PERF recommendations in POLICE EXECUTIVE RESEARCH FORUM, THE POLICE RESPONSE TO MASS DEMONSTRATIONS: PROMISING PRACTICES AND LESSONS LEARNED (2018) at p. 37: "Constantly re-evaluate training in the context of events of other jurisdictions, taking lessons from those events and modifying training accordingly".

[215] For this proposition, Professor Edward Maguire has relied on O. Thomassen, et al., *Effects of Safety Checklists in Medicine*, 58 ACTA ANAESTHESIOL SCAND, 5-18 (2014); Robyn Clay-Williams and Lacey. Colligan, *Back to Basics: Checklists in Aviation and Healthcare*, 24 BMJ QUALITY & SAFETY, 428-431 (2015); Charles L. Bosk, et al., *The Art of Medicine: Reality Check for Checklists*, 374(9688), THE LANCET, 444–45 (2009).

[216] For this proposition, Professor Edward Maguire has relied on Charles L. Bosk, et al., *The Art of Medicine: Reality Check for Checklists*, *supra* n. 215.

[217] For this proposition, Professor Edward Maguire has relied on Henrik Belfrage and Susanne Strand, *Validation of the Stalking Assessment and Management Checklist (SAM) in Law Enforcement: A prospective study of 153 cases of stalking in two Swedish police counties*, INTERNATIONAL JOURNAL OF POLICE SCIENCE & MANAGEMENT, 11(1): 67–76 (2009); Brandon Langley, et al., *A Simple Checklist, That Is All It Takes: a cluster randomized controlled field trial on improving the treatment of suspected terrorists by the police*, JOURNAL OF EXPERIMENTAL CRIMINOLOGY (2020).

The NYPD should consider the use of a checklist for planning and responding to First Amendment events. With guidance from our experts, below is a preliminary checklist that the NYPD could use when it becomes aware that a protest will be occurring. It does not replace the ongoing work that the NYPD should be doing in advance of a protest to ensure preparedness, including revising and delivering training, establishing relationships with community leaders and organizers (through a community policing plan and other avenues), establishing a communication plan that can be quickly activated, and strengthening lines of engagement with prosecutors, the Law Department, City Hall, and other governmental partners, and developing a graduated response plan (discussed further below).

Further, this checklist is not exhaustive. The checklist below contains tasks that NYPD already does and enhances upon what they can do going forward. Similarly, the checklist below does not purport to capture everything that NYPD currently does to prepare for protests. Rather, the checklist below is a tool that NYPD should build upon to develop a more comprehensive document.

Lastly, this proposed checklist is a reference – not a list of requirements. Given the wide variety of First Amendment events and the fluid nature of demonstrations, there is no "one-size-fits-all" checklist that can cover every such event. Accordingly, although we encourage NYPD to use the following content to develop its own checklist, we understand that there will be scenarios where the use of checklists may not be applicable or practical.

### FIRST AMENDMENT EVENTS– RESPONSE PLANNING CHECKLIST

#### *Before The Event*

- Information and Intelligence

  o Has the NYPD gathered intelligence about the nature of the event, its participants, and their goals?
  o Does the event involve people protesting about the police?
    ▪ If yes, is there a de-escalation plan in place to ensure that the police response to the event does not escalate tensions?
  o Are counter-protesters expected to be present at this event?
    ▪ If yes, is there a plan in place to minimize conflict between protesters and counter-protesters?
    ▪ If yes, is there a plan in place to ensure that both sides view the police as neutral and not demonstrating favoritism toward one group over the other?

- Planning

  o In preparing to respond to this event, has the NYPD taken into account relevant public health concerns, including precautions associated with the pandemic?[218]

---

[218] Professor Edward Maguire notes that, for example, the American Thoracic Society has called for a moratorium on the use of tear gas during the pandemic because it may increase the likelihood of Covid-19 transmission. *See Tear Gas Use During COVID-19 Pandemic Irresponsible; Moratorium Needed, Says American Thoracic Society* (June 11, 2020),

- - o Has the NYPD developed a deployment plan to ensure that sufficient staff are available to address whatever contingencies may arise?
- Outreach

  - o Has an effort been made to meet with event organizers?
    - If yes, have clear steps been taken to express the NYPD's support for lawful First Amendment expression?
    - If yes, has the NYPD engaged in dialogue with event organizers about what activities will be permitted and what activities will result in arrest or use of force?
- Inter-Agency Coordination

  - o If other law enforcement agencies will be present at the event, has the NYPD coordinated with them to ensure a coordinated joint response?
  - o Has the NYPD begun coordinating with critical government partners, including prosecutors, the Community Affairs Unit within the Mayor's Office, the Law Department, etc.?

- Enforcement

  - o Is there any indication that certain individuals or groups plan to use the event to commit crimes, including property damage or violence?
    - If yes, have steps been taken to ensure that the NYPD will only take enforcement action against those individuals who are committing criminal acts and not against those who are engaged in lawful behavior?
    - If yes, has the NYPD developed a clear plan for responding to acts of property damage or violence in a manner that does not escalate conflict with peaceful, lawful protesters?
- Communications

  - o Has the NYPD developed a strategic communications plan for messaging about this event?
    - If yes, is there a plan in place to ensure that the messaging reinforces key ideas like the NYPD's support for free speech and the importance of protesters remaining peaceful?

### *During the Event*

- Deployment and Field Coordination

  - o Has the NYPD deployed officers in regular soft uniforms to engage in dialogue with protesters and engage in active de-escalation?

---

https://www.thoracic.org/about/newsroom/press-releases/journal/2020/tear-gas-use-during-covid-19-pandemic-irresponsible-moratorium-needed,-says-american-thoracic-society.php

- o Is property damage or violence expected at this event?

    - ▪ If yes, are officers staged nearby in protective gear, out of the sight of protesters?
    - ▪ If yes, is the NYPD prepared to deploy a "graduated response plan" in which officers can gear up quickly to protect themselves as needed?
    - ▪ If yes, are emergency medical staff present at the event to treat injuries and transport people to the hospital if needed? Does the strategy establish how officers and emergency medical staff interact?

- **Officer Health and Wellness**

    - o Is there a process in place to ensure that officers' emotional health and wellness needs are being met? This will involve the use of procedures through which emotionally exhausted officers can rotate out to regain their composure to minimize the risk of an adverse incident.
    - o Is a peer intervention approach available by which officers can keep an eye on one another and encourage their peers who may be losing their cool to rotate out briefly?
    - o Is there a process in place to ensure that officers' physical health and wellness needs are being met, including the need to eat, hydrate, and take bathroom breaks?

- **Third Parties**

    - o Are there processes in place to ensure that journalists, legal observers, and medics will not be inadvertently arrested or have force used against them?

- **Enforcement**

    - o If the NYPD issues a lawful order to disperse, are protesters who are not engaged in property damage or violence:

        - ▪ Able to hear the order?
        - ▪ Given enough time to exit the area?
        - ▪ Given sufficient avenues of egress to be able to exit the area?
        - ▪ Given warnings that arrests and use of force are imminent?

    - o If the NYPD plans to use mass arrest methods against protesters, have police taken steps to ensure that vulnerable people (children, the elderly, pregnant women, etc.) are able to exit?

- **Inter-Agency Coordination**

    - o Is there a designated liaison between the NYPD and the relevant District Attorney's office (on-site or on call) for information-sharing and real-time decision-making regarding arrests, etc.?

- o Is there a designated liaison between the NYPD and the Law Department (on-site or on call) for information-sharing and real-time decision-making on civil liability issues?
- o Is there a plan for how information will be relayed to City Hall and relevant elected officials?

### *After the Event*

- Has the NYPD followed up with protest organizers in an effort to learn about their experience with police before and during the event?
- Has the NYPD done an after-action review (or Sentinel Event review) that is intended to provide opportunities for organizational learning?
- Has the NYPD taken active steps to improve its response to future events based on lessons learned from its response to this event?
- Has NYPD updated its policies, strategies, training materials, checklists, and related documents based on lessons learned from the after-action/Sentinel Event review?

## V.    Conclusion

Throughout this report we have identified a variety of factors that may have impacted the events at the George Floyd protests.  These include factors internal and external to the Department, as well as factors regarding the agency as a whole and factors involving individual officers.  While these factors may help us better understand the events of this Summer, the more important question is where the City should go from here. Given the impact that the pandemic and conflict over the nature of policing have taken on the health and economic well-being of the City, it is essential to commit to a strong and effective path forward.

To assist with that work, we offer the following recommendations. These recommendations were the product of discussions with our experts, who reviewed, advised on, vetted, and ultimately approved these recommendations.  In doing so, they bring years of experience on policing, protests, and behavioral science to these recommendations.

## VI.    Recommendations

### Department Readiness

1. **NYPD should conduct mass demonstration tabletop simulations with internal and external stakeholders.**    To build institutional "muscle memory" regarding response protocols, to ensure that there is appropriate and swift coordination with prosecuting agencies, to identify gaps in policies and procedures, to foster and strengthen internal and external lines of communication, and to develop draft action plans and checklists for future use, NYPD should regularly conduct tabletop exercises focused on mass demonstration scenarios.  Such exercises should include representatives from the five District Attorney offices, the Law Department, City Hall officials, including Community Affairs Unit

representatives, and other necessary partners.  The exercises and plans should address the strategic considerations identified above.

2.  **NYPD should institutionalize a practice of conducting regular after-action reviews following major protest events**.  The lack of a formalized review process may have been a contributing factor in the way that events played out at protests.  It is an important step that a formal review was commenced in the wake of the George Floyd protests. NYPD has demonstrated a culture of informal learning, but the lack of a macro-level review that incorporates broad feedback may hinder the Department's ability to perceive the need for certain structural or policy changes. NYPD should examine how to institutionalize such reviews, including how to include officer perspectives in a non-punitive way.  Looking to the practices of other police departments and police oversight entities, including the National Institute of Justice's "21st Century Policing: Cross-Site, Multi-Stakeholder Sentinel Event Review Project," may assist in this process.  Studying how Sentinel Event reviews are carried out in other industries can also shed light on how to ensure confidentiality, reduce legal exposure, and encourage participation.

3.  **NYPD should work to ensure that input from multiple stakeholders, including community groups, police industry groups, and civil rights and advocacy organizations, is considered in any post-action policy reviews.** The Law Department found that the lack of consideration of third-party criticism and assessment may have been a contributing factor in the way that events played out at protests. In developing a plan to institutionalize a practice of after-action review, NYPD should consider the value that input from members of the community, protest organizers, and external civil rights groups may be able to bring to such review. The inclusion of such community voices as part of a structured Sentinel Event review, or comparable process, can help to instill trust between the community and the police and can improve community-police relations. At a minimum, such community input could inform the content of strategic communications to the public. The NYPD should develop a specific process for including such perspectives (e.g., including outside parties are part of a section of the Sentinel Event review, or including such parties in the full review but subject to confidentiality rules, or other alternatives).

4.  **NYPD should develop processes for incorporating community sentiment into planning for protests.** Whether through the Community Affairs Bureau, precinct-level Community Affairs Officers, the Mayor's Community Affairs Unit, or all of the above, NYPD should develop a process to ensure that community sentiment – in its various forms – is made part of the planning process for protests.  This process should include regular partners and channels (e.g., NYPD Precinct Community Councils and Chambers of Commerce) as well as less familiar voices that are not usually at the table.  Outside of NYPD's existing bureaus, precincts, and processes, there are multiple tools and approaches for gathering community sentiment, including perspectives collected by various organizations that practice restorative justice and deliberative democracy. We encourage NYPD, in conjunction with City stakeholders, to explore new approaches that will increase the likelihood of broadly inclusive and productive interactions with the public. There is no question that New York City has become a different and difficult environment in which to build trust and enhance communication. Efforts that continue to use tools crafted for different times and circumstances are likely to yield disappointing and frustrating results.

**Officer Preparedness**

5. **NYPD deployment protocols should have a heightened focus on officer readiness.**
Recognizing that the all-hands-on-deck nature of this summer's protest response strategy
and the volume of the protests may not have allowed the NYPD the opportunity to be
selective about which officers to send into the field, the NYPD should assess and identify
ways to determine whether certain officers are appropriately prepared for protest policing
work. This involves not only ensuring the officers have the appropriate equipment and have
been recently trained, but also that officers are physically and mentally ready for this type of
work. In approaching this, the NYPD should build upon existing strategies that are working
well and should be mindful of the unique sensitivities around officer health and wellness
issues.

6. **NYPD training should be assessed according to current best practices**. NYPD should,
in consultation with experts, conduct a top-to-bottom assessment of its protest-related
training materials and methods to ensure that the content, delivery, and frequency of training
is (a) properly calibrated according to the role of the particular members of service (e.g.,
patrol officer, field supervisors, etc.) and (b) comports with best practices and the current
science on crowd psychology, the rights of protestors, behavioral science, etc. In doing so,
NYPD should be open to the experience and strategies of other cities – in the U.S. and
abroad – for models.

7. **NYPD should continue, and consider enhancing, efforts around health and wellness
programs**. NYPD has made important in the last two years regarding officer health,
wellness, and safety. The Department should continue to promote such programs to ensure
that officers are aware of the services available to them and feel comfortable taking
advantage of them without repercussions. NYPD should likewise continue to ensure that
these programs receive the requisite resources, including both internal services and external
services (e.g., FINEST Care).

8. **NYPD reforms to protest policing should focus on investments in supervisors.** As
NYPD reviews its practices, policies, training, and strategy around policing protests, the
Department should focus on supervisors. This includes providing regular and ongoing
training to supervisors about tactics and leadership when policing protests, and developing
policies that clearly specify the roles of various supervisory ranks at protests.

**Interagency Coordination**

9. **NYPD should work with the five District Attorneys to develop and implement a plan
for coordination of high impact First Amendment events and set guidelines for
activation of that plan.** The balance between the exercise of First Amendment rights and
protecting public safety can leave Borough Commanders in the position of making decisions
that affect the entire city, including public trust of the police, effectiveness of the
prosecution of opportunistic criminals who take advantage of large protest events and,
ultimately, civil liability. New York is the rare city in which multiple, independent state
prosecutors operate within City limits. What happens should not depend upon what
borough one protests in. A coordinated plan for information sharing and case evaluation
would minimize that risk, heighten effectiveness and ensure greater public perception of

fairness.  It would also provide greater consistency for members of service called out to serve in different boroughs over the course of different days.

### **Implementation**

10. **NYPD should convene an implementation team for these and other recommendations.**  To implement these recommendations and those in the DOI Report, NYPD should convene an implementation team.  The team should include internal stakeholders from relevant bureaus and borough commands as well as external partners (including representatives from the Law Department and City Hall).  The team should be led by a senior NYPD official who has familiarity with the underlying issues, knowledge of the patrol experience, and the authority to ensure swift implementation.