

New York State Office
of the Attorney General

*Preliminary Report on the*

# New York City Police Department's Response to Demonstrations Following the Death of George Floyd

*July 2020*

# *Contents*

*Executive Summary*.............................................................................................................4

*Factual Overview of Protests*........................................................................................7

   The Immediate Lead-up to the Protests.........................................................................7

   May 28–May 31, First Days of Protest ..........................................................................9

      › Thursday, May 28 ...............................................................................................9

      › Friday, May 29.....................................................................................................10

      › Saturday, May 30 ...............................................................................................11

      › Sunday, May 31...................................................................................................12

   June 1–4, City Implements Curfew ...............................................................................15

      › Monday, June 1...................................................................................................15

      › Tuesday, June 2...................................................................................................16

      › Wednesday, June 3 ............................................................................................17

      › Thursday, June 4 ................................................................................................17

   Post-June 4, Protests Continue ....................................................................................20

   Overview of Protest-Related Arrest Data ................................................................... 21

*OAG's Investigation to Date*........................................................................................26

   Soliciting Information from the Public ......................................................................... 26

   Requesting Information from NYPD and Other City Agencies ................................... 27

   Attorney General James Conducts Public Hearings: June 17, 18, and 22 ................... 27

      › Eyewitness Testimony from Members of the Public ........................................28

      › Testimony from Elected Officials.......................................................................29

      › Testimony from Community-Based Organizations and Advocates.......................... 30

      › Testimony from National Latino Officers Association ...................................... 30

      › Testimony from New York City Police Commissioner Dermot Shea.......................31

      › Written Submission from Police Unions: Police Benevolent Association,
         Sergeants Benevolent Association, and Captains Endowment Association...........................34

# *Contents*

**Recommendations for Police Reform** ............................................................................. **35**

Recommendation 1: Create Public Participation
and Oversight of Department Policies and Leadership ............................................ 36

> Part 1: Restructure NYPD's Command to Ensure Front-End Accountability ........................... 36

> Part 2: Increase Officer Diversity in Leadership Ranks Through
  Public Oversight and Involvement ...................................................................................... 37

> Part 3: Democratize Policing by Treating NYPD like
  an Ordinary Municipal Government Agency ....................................................................... 37

Recommendation 2: Redesign Public Safety and the Role of Police in Society ....................... 38

> Part 1: Decriminalize Minor Offenses ................................................................................. 38

> Part 2: Redesign the Role of Police .................................................................................... 39

Recommendation 3: Ensure Real, Independent Oversight,
Accountability, and Transparency of Individual Officer Misconduct ....................... 40

> Part 1: Empower Independent Accountability and Discipline
  for Individual Misconduct by Increasing CCRB's Authority ............................................. 40

> Part 2: Enhance Accountability for Individual Officers Through
  a Statewide Certification Process ....................................................................................... 41

> Part 3: Make Officer Misconduct and Interactions Truly Transparent ............................... 42

Recommendation 4: Ensure Real, Independent Oversight, Accountability,
and Transparency of Systemic Misconduct ............................................................. 42

Recommendation 5: Establish a Codified Use of Force Standard
with Real Legal Consequences for Violations .......................................................... 43

> Part 1: Establish a Uniform Use of Force Law .................................................................... 43

> Part 2: Amend the Law Justifying Use of Deadly Physical Force ....................................... 44

**Conclusion** ...................................................................................................... **45**

**Acknowledgments** ............................................................................................ **45**

**Citations** ......................................................................................................... **46**

# *Executive Summary*

After the public release of a video showing a police officer killing George Floyd, an unarmed Black man, thousands of people gathered across New York City to protest police brutality and systemic racism in law enforcement. On May 30, after reports of violent clashes between the New York City Police Department (NYPD) and protesters, Governor Andrew Cuomo requested that the Office of the Attorney General (OAG) investigate NYPD's response to the protests.

Since that time, OAG has initiated a civil investigation into this issue. The OAG has solicited information from the public through a dedicated hotline, email address, and online portal. The OAG has requested information from NYPD and other New York City agencies and has spoken to numerous witnesses and community-based organizations. Attorney General James held a three-day public hearing with participation from protesters, community-based organizations, elected officials, and NYPD Commissioner Dermot Shea. Although OAG's investigation remains ongoing, this document serves as a preliminary report, which addresses both the status of the investigation and includes several proposed recommendations for systemic police reforms in light of the clear breakdown of trust between police and the public. At the conclusion of the investigation into NYPD's response to the protests, OAG will issue a final report with full factual findings and additional recommendations, specifically related to NYPD's conduct in policing the protests, as deemed necessary and appropriate.

The OAG will continue to investigate the following alleged protest-related practices and will recommend appropriate reforms or remedial measures to address any that violate the law and are contrary to policing best practices:

> ***Use of force during the protests:*** Most of the complaints OAG received were about allegations of NYPD officers using excessive force against protesters, including use of batons and indiscriminate use of pepper spray, brandishing firearms at protesters, and pushing vehicles or bikes into protesters.

> ***Use of "kettling" tactic:*** The OAG received complaints and heard extensive testimony at its public hearing about a tactic NYPD used whereby officers surrounded and blocked protesters, preventing them from leaving an area without making direct contact with police officers. According to witnesses, this practice often led to violent clashes between NYPD and protesters.

> ***Treatment of press, legal observers, and elected officials:*** The NYPD has been accused of arresting and using force against credentialed members of the press and engaging in "catch and release" tactics to prevent press from fully reporting on their observations. The OAG will also examine whether NYPD is the appropriate entity to be in charge of issuing press credentials. Similarly, OAG heard testimony about NYPD's alleged mistreatment of numerous elected officials and purported false arrests of legal observers.

> ***Treatment of essential workers:*** The OAG heard from witnesses alleging that on several occasions, NYPD arrested or mistreated essential workers, particularly during the period of the curfew.

> ***Arrest-related practices:*** The OAG received a significant number of complaints about troubling arrest-related practices, including, among others, using extremely tight zip ties to restrict hands, transporting protesters long distances to arrest processing centers, holding protesters for a significant amount of time after arrest, misgendering detainees, and holding protesters in cramped cells under unsafe conditions in light of the ongoing COVID-19 pandemic.

> ***Other alleged practices that impair community trust:*** The OAG heard from witnesses and received evidence related to NYPD officers failing to wear personal protective equipment (PPE) during the protests and covering their identification information found on their badges. The OAG also received numerous complaints regarding several instances of officers allegedly using racist hand gestures directed at protesters.

While OAG's investigation into NYPD's response to the protests remains ongoing, it is clear that too many New Yorkers no longer trust the police to do their jobs effectively and fairly. To rebuild this trust will take significant time and effort. The OAG has several recommended reforms to reimagine and rebuild this relationship. Many of these ideas have long been discussed and pushed by advocates for police reform.

As the top law enforcement officer in the state, Attorney General James will fight for these reforms to be adopted:

› **Create Public Participation and Oversight of Department Policies and Leadership:** It is imperative that the public has input and oversight into police policies and leadership. The NYPD must be overseen by a commission that has the authority to hire and fire NYPD leadership, including the Commissioner, has unfettered access to records, and approves NYPD's budget. The NYPD must also be required to seek public input on any rule it changes or implements that impacts the public. This model takes unilateral power away from the Police Commissioner and ensures that the police are accountable to the public.

› **Redesign Public Safety and the Role of Police in Society:** The role of police in New York must be examined to ensure that it is in line with what the public expects and in a way that fosters trust between law enforcement and the communities they serve. Minor offenses should be decriminalized with the goal of reducing negative contact with the police, particularly in communities of color. There must be a serious plan and timeline to remove police from certain settings, including in schools, in response to people experiencing mental health crises, and non-criminal traffic enforcement. This should not be done overnight, and must be done with an eye toward fairness, collective input, a smooth transition of responsibilities, and public safety.

› **Ensure Real, Independent Oversight, Accountability, and Transparency of Individual Officer Misconduct:** The system to hold individual officers accountable must be both independent of NYPD and transparent to the public. To achieve this, the authority of the Civilian Complaint Review Board (CCRB) must be expanded and strengthened to have final disciplinary authority. Additionally, all police officers in New York should be certified through a process that allows for "decertifying" officers engaged in misconduct, preventing them from remaining a police officer or being rehired by another department in the State. NYPD should create an open data portal, which would include access to body-camera footage, to ensure that individual officer misconduct is truly transparent.

› **Ensure Real, Independent Oversight, Accountability, and Transparency of Systemic Misconduct:** To achieve full oversight of systemic issues within NYPD, the authority of the Office of Inspector General should be expanded and the office should no longer report to the Commissioner of the Department of Investigation, but instead should report directly to the New York City Mayor and be a fully independent agency.

› **Establish a Codified Use of Force Standard with Real Legal Consequences for Violations:** Many of the standards related to officer use of force that are reflected in NYPD's Patrol Guide are not codified in law, meaning disciplinary actions for use of force are ultimately determined by the Police Commissioner. Police officers must be held to uniform standards on use of non-lethal and deadly force and face meaningful consequences for violations.

# *Factual Overview of Protests*

This section provides a brief summary of the protests, along with OAG's initial analysis of the data related to arrests made during the protests.

## *The Immediate Lead-Up to the Protests: Police Violence and COVID-19 Disproportionately Impacts Black Communities*

On May 25, a convenience store employee reported to the Minneapolis police that a man had bought cigarettes with an alleged counterfeit $20 bill. Two officers soon arrived at the scene and arrested George Floyd, a Black man. Floyd was unarmed. When the officers attempted to place Floyd into their car, Floyd told them he was claustrophobic and fell to the ground. Two additional officers, including Derek Chauvin, who is white, arrived at the scene. Floyd continued to refuse to get into the car. Eventually, Chauvin pinned Floyd down, putting his knee on Floyd's neck and choking him. Floyd repeatedly said he could not breathe, but Chauvin kept his knee on his neck for nearly nine minutes, even after Floyd lost consciousness. While this occurred, dozens of onlookers stood nearby pleading for Chauvin to stop. The other officers who responded with Chauvin held Floyd down and failed to intervene as Chauvin continued to choke Floyd with his knee, despite one of the officers calling for medical assistance during the encounter. Twenty minutes into the arrest, an ambulance arrived. Floyd was subsequently pronounced dead. The day after Floyd's death, the police department fired all four officers involved in his arrest. Chauvin was subsequently charged with second-degree murder, and each of the other three officers at the scene was charged with aiding and abetting second-degree murder.[1]

On March 13, Breonna Taylor, an unarmed Black woman, was shot by Louisville police at least eight times after they entered Taylor's home at night with a battering ram. One officer was shot in the leg by Taylor's boyfriend.[2] The officers entered Taylor's home using a no-knock warrant and "wantonly and blindly fired ten (10) rounds" of ammunition into the apartment, killing Taylor.[3]  Over two months after her death, the police department fired the shooting officer, describing the officer's actions as "display[ing] an extreme indifference to the value of human life[.]" [4]

Video footage of Floyd's death and news accounts of Taylor's death spread widely, sparking mass protests around the country and the world—including in New York City. People were protesting in reaction to Floyd's and Taylor's deaths, but also the larger pattern of unarmed Black people being killed by police,[5] including Eric Garner in New York City,[6] as well as decades of discriminatory policing.[7]

These protests occurred as the country was grappling with the dangerous threat posed by the COVID-19 virus and its devastating and disproportionate impact on communities of color. New York became the United States' first epicenter of the pandemic, with thousands of individuals dying and hundreds of thousands more contracting the virus. The State, among other things, mandated non-essential businesses to close in mid-March to contain the spread of the virus, resulting in at least 1.6 million New Yorkers filing for unemployment benefits as of May 1.[8] State and local officials also implemented social distancing restrictions on the public's ability to interact with others and mandated the use of face masks when social distancing was not possible.

Black and Latino communities are experiencing disproportionate and adverse effects of COVID-19. Black and Latino individuals have had higher rates of COVID-19 and are dying of the illness at significantly higher rates than other demographic groups.[9] People of color in New York City also have had disproportionately higher hospitalization rates and higher positive test results for COVID-19 antibodies (which indicate that a person likely had the virus at one point) compared to the City as a whole.[10]

The economic crisis the virus has created has also disproportionately impacted communities of color. A majority of those filing for unemployment benefits have been employees in low-wage industries predominantly staffed by people of color, who, on average, have less in savings to act as a buffer during economic downturns.[11] Essential workers also are predominantly people of color. Too often these jobs — grocery store clerks, food delivery workers, and warehouse staff — required workers to endure unsafe working conditions, while earning minimum wage and receiving inadequate benefits.[12] It has also had a disproportionate impact on businesses owned by people of color. According to the Center for Responsible Lending, funding designed to support small businesses, known as the Paycheck Protection Program, was administered in a way that was "disadvantageous to . . . businesses owned by people of color[.]" [13]

Allegations that police were enforcing social distancing rules in a discriminatory manner emerged shortly before the protests. News reports and accompanying photos and videos showed instances where NYPD engaged in lax enforcement and free mask distribution in white communities, in contrast to instances of aggressive enforcement in communities of color. In one video, for instance, plainclothes NYPD officers—who were themselves not wearing masks—arrested a Black man and his girlfriend in the East Village of Manhattan for allegedly disregarding a request to disperse. One of the officers then drew a taser and approached a Black bystander, tackling and repeatedly punching the bystander, dragging him onto the sidewalk, and then kneeling on his neck as he was handcuffed.[14] Another video showed NYPD officers arresting Black individuals who had congregated in front of their homes in Brownsville, Brooklyn in one instance forcefully body-slamming a man to the ground.[15] Another video showed NYPD officers arresting a Black woman with her child at the Atlantic Avenue/ Barclays Center subway station in Central Brooklyn after the officers alleged that the woman was not wearing her protective face mask properly.[16]

Recent data from the Legal Aid Society indicates that, although fewer than half of the 311 complaints related to social distancing concerned violations in majority Black or Latino precincts, nearly 80 percent of COVID-19 related summonses and nearly three-quarters of COVID-19 related arrests occurred in majority Black or Latino precincts.[17] The New York City Comptroller's office likewise concluded that NYPD took action on a larger share

of 311 complaints related to social distancing in lower-income communities, with higher populations of people of color, than complaints related to social distancing in higher-income neighborhoods with larger white populations.[18] As a result of these alarming disparities in data and incidents of aggressive enforcement against several Black New Yorkers, OAG initiated an investigation, which is ongoing.

It is against this backdrop that the protests in New York City and around the country occurred. They were triggered not only by the deaths of Floyd, Taylor, and countless others before them, but by the harm communities of color continue to face as a result of systemic and institutionalized racism.

## May 28–May 31, First Days of Protest: Violent Conflicts, Mass Arrests Across the City

### Thursday, May 28

On May 28, two days after Floyd's death, protests began in New York City. Hundreds of people gathered initially at Union Square Park in Manhattan.[19] Tensions quickly rose as protesters were met with hundreds of NYPD officers, and by late afternoon police had made several arrests.[20] After the police broke up the large crowd at Union Square, a smaller contingent marched down Lafayette Street towards City Hall. There, approximately 100 demonstrators filled the steps and sidewalk in front of the Tweed Courthouse in Lower Manhattan. They were met by dozens of officers, who kettled in the marchers, trapping them between the façade of the courthouse and a line of officers who created a barricade with their bicycles. With no means for the protesters to disperse, tensions quickly rose at this location, and a few people in the crowd allegedly threw plastic water bottles and traffic drums at officers.[21] The police responded by arresting protesters.[22] According to public statements by NYPD, two officers were hospitalized for concussions, one after he was struck by a garbage can and another who was thrown to the ground. Another officer reportedly was punched in the face but not seriously injured.[23] On this day, a total of 76 people were arrested; seven percent of those arrested were charged with felonies.[24]

*Friday, May 29*

On May 29, protests were scheduled for 4:00 p.m. in Foley Square in Lower Manhattan and 6:00 p.m. at the Barclays Center in Central Brooklyn. According to reports, during the protests in Manhattan police cars and public buildings were vandalized, but there were few arrests or violent encounters.[25] Protesters at Foley Square marched across the Brooklyn Bridge to the Barclays Center to join the planned evening demonstration there. Tensions escalated as thousands of protesters gathered. Several individuals testified that water bottles and other objects were thrown towards a group of police officers, and that officers retaliated against peaceful protesters directly in front of them with indiscriminate use of pepper spray and baton lashings.[26]

At approximately 8:00 p.m., officers began ordering protesters to clear the area in front of the Barclays Center. A significant number of protesters headed towards Clinton Hill and Fort Greene in Central Brooklyn. At approximately 8:45 p.m., near the Barclays Center, NYPD Officer Vincent D'Andraia pushed Dounya Zayer, a protester standing in the street, onto the ground and cursed at her, as she filmed him with her cellphone. Zayer began to have a seizure in the street and sustained a concussion. D'Andraia was later arrested and charged with assault, and his commanding officer Deputy Inspector Craig Edelman,[27] who witnessed the alleged assault without intervening, was transferred to a different precinct.[28]

After leaving the Barclays Center, one group of protesters reconvened outside NYPD's 88th Precinct stationhouse in Clinton Hill. Some in the crowd smashed a police car and spray-painted an exterior wall of the stationhouse. At approximately 10:00 p.m., hundreds of officers dispersed the crowd and then turned their attention to another large group of protesters walking west on Dekalb Avenue.[29] Officers in riot gear pepper sprayed into the crowd and arrested dozens of people. As the group proceeded to the edge of the Pratt Campus at Hall Street, some protesters tossed bottles towards officers and lit fire to a barricade. Officers responded by again charging at the group and swinging their batons at fleeing protesters.[30]

Similar scenes were reported at Fort Greene Park in Central Brooklyn. One protester smashed the back window of an occupied police van. Another police van was attacked and lit on fire, and several police officers had water bottles thrown at them.[31] At Fifth Avenue and Saint Marks Place in Park Slope in Brooklyn, hundreds of protesters gathered, and some smashed a brick through the window of a police car and dropped flower pots off building rooftops.[32]

At about midnight, near the 88th Precinct stationhouse, Colinford Mattis and Urooj Rahman allegedly approached an unoccupied police car and threw a Molotov cocktail through a window that had been broken open earlier in the night by other protesters.[33] About ten minutes later, in Crown Heights in Central Brooklyn, Samantha Shader was accused of throwing a Molotov cocktail into a marked police car occupied by four officers.[34] The fuse was lit but the gasoline did not ignite, and no officers were injured.[35]

On this day, a total of 230 people were arrested; ten percent of those arrested were charged with felonies.

## Saturday, May 30

Saturday started with peaceful protests in Union Square, the East Village, Times Square, Columbus Circle, and Harlem, in Manhattan; in Jackson Heights in Queens; in Flatbush and Park Slope in Brooklyn; and in portions of the Bronx and Staten Island. Thousands gathered in front of the Adam Clayton Powell Jr. State Office Building in Harlem at about 1:00 p.m. and encountered a light police presence. The crowd then marched on the FDR Drive, blocking several lanes of traffic. Multiple people were arrested.[36] The remaining protesters largely dispersed onto the adjacent streets on the Upper East Side without incident. Afternoon protests in Union Square and near Prospect Park in Brooklyn were also largely peaceful.[37]

By late afternoon and into the evening, there were widespread reports of violence by protesters and police officers. In the late afternoon at Bedford and Tilden Avenues in Flatbush, a protester, Andrew Smith, was standing in the street with his hands up. NYPD Officer Michael Sher pushed Smith backwards, pulled down his face mask, and sprayed him in the face with pepper spray. Sher was later suspended without pay pending an NYPD disciplinary hearing.[38]

A protest that began peacefully by Prospect Park in Brooklyn proceeded down Flatbush Avenue, where marchers were met with a growing police response. An NYPD helicopter flew directly above a group of protesters, creating loud noise and a gust of wind that kicked up trash and dust into protesters' faces. Some marchers threw bottles at the police, who responded with widespread use of pepper spray, batons, and arrests.[39]

At about 5:30 p.m., in the area around Bedford Avenue in Flatbush, a series of street fights broke out between police officers and protesters. Some protesters threw plastic water bottles at police officers in riot gear, and officers responded with force against protesters, including baton strikes and pepper spray.[40] Later in the evening, some protesters reportedly switched from tossing plastic water bottles to throwing glass bottles, fireworks, rocks, and bricks. One officer collapsed after being struck in the neck by a grapefruit-sized piece of brick and concrete thrown from about 50 feet away.[41] The violence between protesters and police continued late into the night with some protesters continuing to throw objects at the police, climbing traffic signs, and lighting police cars on fire. The police responded by pepper spraying and striking protesters with batons to get through the crowd and arrest suspected hurlers.[42]

At about 8:00 p.m., protesters in Park Slope used a barricade to block a police car that was driving down Flatbush Avenue near Saint Marks Place. As protesters converged in front of the car, some in the crowd threw objects, including water bottles, traffic cones, and garbage, at the car. Another police car approached and slowly started driving into protesters who stood in front of it. The first police car also then accelerated into the crowd, knocking over several protesters.[43] Several protesters testified that this incident was terrifying and generated a lot of fear amongst the crowd.

By late afternoon, protests at Union Square that had been largely peaceful turned confrontational and then violent. Crowds started to block all lanes of traffic on East 14th Street and Broadway so no vehicle traffic could get through.[44]  Shortly before nightfall, officers started pepper spraying the crowd. Blocks away, a group of protesters smashed the windows of a police car and jumped on top of it.[45] A second police car and a third vehicle were lit on fire and the window of a bank was smashed.[46] As the night continued, dozens of stores in Lower Manhattan were burglarized and plundered.[47]

On this day, NYPD reported that 33 police officers were injured, and 47 police cars were damaged.[48] A total of 332 people were arrested; five percent of those arrested were charged with felonies. The number of injuries to protesters is not known.

## Sunday, May 31

Sunday followed a similar pattern as the prior day, with widespread and mostly peaceful protests during the day throughout Brooklyn, Manhattan, Queens, and on Staten Island. It was followed by pockets of violence in the evening. In Manhattan, hundreds of protesters marched peacefully from Bryant Park to Times Square. In the early afternoon in Jamaica, Queens, hundreds gathered at Sean Bell Way.[49] Four police officers kneeled with protesters in solidarity.[50] Later at a large rally in Foley Square, another group of four officers were cheered loudly as they kneeled with protesters.[51] A few hundred people gathered outside the Barclays Center in the early afternoon without incident.[52]

As night fell, however, violence and confrontation once again erupted between police and protesters. Thousands of protesters shut down the Manhattan and Brooklyn Bridges. In Lower Manhattan, dumpsters were set on fire and store windows were bashed in. Outside the Strand Bookstore on Broadway and East 12th Street, some onlookers threw objects at officers as they were arresting someone. The officers responded by pushing people and swinging batons. After a protester forcefully struck an officer in the head with an unknown object, another officer responded several seconds later by taking out his gun and waving it at large groups of protesters, who fled in fear.[53]

By about 10:30 p.m., the peace at the Barclays Center ended and police officers chased after protesters, pepper spraying and striking people with batons while making numerous arrests.[54] Thousands of protesters crossed the Manhattan Bridge into Lower Manhattan where officers pushed them onto side streets. Some people threw trash cans and plastic barriers onto the ground and shattered store windows, bus kiosks, and CitiBike terminals between SoHo and Union Square.[55] Violence erupted around Union Square when protesters threw bottles and other objects at police officers, who pushed people in the crowds away.[56]  Several large fires burned from trash cans and piles of trash set out for pickup.[57]

Throughout the late night and early morning in Soho, the East Village, and the Flatiron District, groups of people were seen smashing store windows and sprinting through the streets carrying sneakers and luxury items.[58] By 3:00 a.m., Bloomingdales, Chanel, Gucci, Coach, Supreme, and Louis Vuitton retail locations were emptied out.[59] Some observers of the plundering on Sunday and Monday nights noted that the people responsible for the burglaries appeared to be a different group from those observed earlier protesting peacefully.[60] A high-ranking police official told a reporter that those responsible for the plundering and vandalism were "gangs" from across the City already known to the police, not protesters.[61]

On this day, a total of 317 people were arrested; 24 percent of those arrested were charged with felonies, a sharp increase from the previous night.

### Table 1: Arrests and Summons *(May 28–May 31)*

| Date | Day | Arrest Count | Percent Change from Previous Day |
|------|-----|--------------|----------------------------------|
| 5/28 | Thursday | 76 | — |
| 5/29 | Friday | 230 | ▲ 202.63% |
| 5/30 | Saturday | 332 | ▲ 44.35% |
| 5/31 | Sunday | 317 | ▼ -4.52% |

### Chart 1: Arrests and Summons by Top Charge Type *(May 28–May 31)*



**Map 1: Arrests and Summons** *(May 28–May 31)*[62]



Central Park

Midtown

Chelsea

Union Square

SoHo

Lower Manhattan

Williamsburg

Downtown Brooklyn

88th Precinct

Barclays Center

Crown Heights

Prospect Park

Prospect Lefferts Gardens

● 5/28
● 5/29
● 5/30
● 5/31

The vast majority of arrests happened in Brooklyn and Manhattan on these days, which is why other boroughs are not shown.

# *June 1–4, City Implements Curfew: Increasingly Peaceful Protests Met with Reportedly Aggressive Policing*

## *Monday, June 1*

On June 1, after the unrest of the weekend, Governor Andrew Cuomo and New York City Mayor Bill de Blasio announced they were imposing an 11:00 p.m. curfew. This was the City's first curfew since 1943, when there was unrest following the shooting of a Black soldier by a white police officer.[63] Under the curfew order, essential workers were to be exempt, but all others were ordered to be off the streets from 11:00 p.m. to 5:00 a.m. or face arrest for a misdemeanor. The number of police officers on patrol was doubled from 4,000 to 8,000 in order to enforce the curfew and prevent further burglaries.[64] Despite these added measures, some of the highest incidents of violence, plundering, and arrests occurred on Monday night.

Protests were planned for the late afternoon and early evening in Manhattan at Times Square and in the East Village; in Brooklyn at the Barclays Center, Nostrand Avenue, and Bay Ridge; and in Flushing, Queens. Into the afternoon and early evening, the protests were largely peaceful. At 6:00 p.m. in Washington Square Park in Manhattan, a few protesters threw plastic water bottles at officers, but an organizer approached NYPD Chief of Department Terence Monahan in an attempt to de-escalate tensions. Chief Monahan held hands and kneeled in solidarity with protesters.[65] A large gathering in the East Village continued peacefully, culminating in a moment of silence just before 7:30 p.m. After 8:00 p.m., an estimated 2,000 people marched across the Brooklyn Bridge and a smaller group continued onto the FDR Drive, stopping traffic in the process but without violence or police intervention.[66]

At about 7:00 p.m., as protesters were marching westward on West 14th Street from Union Square, an Aldo and Nike store on Fifth Avenue, a few blocks north of the primary march, were burglarized.[67] Just before 8:00 p.m., when some teenagers tried to enter the already-broken window of Aldo's on Fifth Avenue and East 17th Street, several protesters grabbed the teenagers and blocked them from entering the store.[68]

By 10:00 p.m., there was widespread plundering in Midtown, including at Macy's Herald Square, Duane Reade, Foot Locker, Nordstrom, Urban Outfitters, and retail outlets for Rolex, Verizon, North Face, and Microsoft.[69] As was the case the prior night, observers noted that those responsible for the thefts did not appear to be protesters.[70]

Many of the protesters dispersed before the 11:00 p.m. curfew, but some remained out intentionally to defy the curfew as an act of civil disobedience. A large gathering outside the Barclays Center dispersed by 11:00 p.m. with some continuing to march down Flatbush and Atlantic Avenues. In Midtown Manhattan, police started arresting protesters for violating the curfew and some protesters reported being pushed, pepper sprayed, and struck with police batons.[71] Near Union Square, a reporter for the Wall Street Journal said that officers hit him in the face with riot shields and pushed him to the ground as he held his hands up and displayed his press credentials.[72]

After widespread images of people plundering stores in Manhattan and the Bronx with minimal police intervention, the Mayor announced that the curfew would be moved up to 8 p.m. and would last for a week.[73]

On this day, a total of 335 people were arrested; 16 percent of those arrested were charged with felonies.

## Tuesday, June 2

On June 2, the first night of the 8:00 p.m. curfew, there were peaceful protests throughout the day in Brooklyn and Manhattan. By 8:00 p.m. many peaceful protesters remained outside. The police response was uneven. In some instances, police permitted protests to continue. For example, just after 8:00 p.m., peaceful protesters were allowed to march near Columbus Circle. Meanwhile, hundreds of protesters marched from the Barclays Center onto the Manhattan Bridge in an attempt to continue protesting across the bridge in Manhattan. For two hours, police officers blocked both sides of the bridge, preventing protesters from proceeding to Manhattan or going back into Brooklyn.[74] Eventually marchers were permitted to walk back into Brooklyn.[75] At about 8:30 p.m., several young Black protesters holding a dance party on West 53rd Street in Manhattan were arrested, allegedly without warning.[76] Protesters who had peacefully gathered near the Stonewall Inn in the West Village of Manhattan earlier in the evening were met with a heavy police presence at 8:00 p.m. after they marched to the Westside Highway. Individuals in this group of protesters were arrested after being set on by police with batons and thrown to the ground. Others reported encountering similarly aggressive police presence near Union Square around 10:00 p.m.[77]

Elsewhere in several areas of Manhattan, protesters were met with violence and confrontation. On the Upper West Side, around 9:30 p.m., officers charged.[78] After 11:00 p.m., at Astor Place, hundreds of heavily equipped officers confronted protesters. After someone threw a bottle at the officers, the police charged into the crowd and arrested dozens.[79] In Chelsea, kneeling protesters reported being widely pepper sprayed. In Midtown and Lower Manhattan, several members of the media reported being beaten, harassed, and arrested despite clearly displaying their press credentials.[80]

Vandalism and plundering of businesses in Lower and Midtown Manhattan and Downtown Brooklyn continued, but there were significantly fewer reports than the prior night. In the Fordham neighborhood of the Bronx, stores were broken into and burglarized, and fires were set.[81] In several instances, protesters confronted groups of plunderers and urged them to not undermine the protests with vandalism and theft.[82] In some instances, protest organizers directed the peaceful protesters away from the vandals to deprive them of cover.[83]

On this day, a total of 291 people were arrested; three percent of those arrested were charged with felonies.

## Wednesday, June 3

On the evening of June 3, there was both an increased number of protesters peacefully defying the 8:00 p.m. curfew and stricter police enforcement.[84] Shortly after 8:00 p.m., large groups of peaceful protesters were arrested in Downtown Brooklyn, Midtown East, and the Upper East Side coming from Gracie Mansion (the Mayor's residence).[85] There were reports that officers used aggressive tactics, including kettling protesters and then striking them with batons.[86] There were no reports of businesses being burglarized or vandalized this night.[87]

In the Flatbush neighborhood in Brooklyn, two NYPD officers were on anti-looting patrol, when, at approximately 11:45 p.m., Dzenan Camovic approached them and allegedly stabbed one of the officers in the neck with a knife. After shots were fired, a nearby sergeant responded to the scene and found the suspect with one of the officer's guns. Two officers were shot in the hand, and all three were taken to the hospital, with serious, but non-life-threatening injuries. [88]

On this day, a total of 186 people were arrested; less than one percent of those arrested were charged were charged with felonies.

## Thursday, June 4

On June 4, there were fewer violent confrontations between police and protesters, but the police reportedly continued to aggressively enforce the curfew and arrested 278 people, a significant increase from the prior day.[89] In the Mott Haven neighborhood in the Bronx, just before the 8:00 p.m. curfew took effect, officers wearing heavy armor used bicycles to block the path of a group of peaceful protesters.[90] The officers shouted at protesters to move. At almost exactly 8:00 p.m., a second group of officers arrived and pinned in the protesters from behind. A recorded message played over a loudspeaker advised the group to clear the streets now that curfew was in effect, but there was no means for them to do so with officers kettling them in. Officers then charged into the group, arresting dozens of people, striking them with batons, and shoving them onto sidewalks.[91]

There were also reports of essential workers, medics, photographers, and legal observers[92] being arrested in the Bronx.[93] In a letter to NYPD Commissioner Shea, the National Lawyers Guild (NLG) contended that nine of its trained legal observers were wrongly arrested during the Bronx protest despite showing documentation that they were exempt from the Mayor's curfew order. According to NLG, officers told the legal observers that they would release them only on the condition that they leave the area immediately and stop documenting police conduct. The legal observers refused this demand and ultimately were released. However, they were forced to stand a block away from the police activity they sought to observe.[94]

Outside of the Bronx, protesters were allowed to continue protesting well past the curfew before the police intervened.[95] Protests continued through 9:00 p.m. in Crown Heights, Park Slope, Prospect Heights, Downtown Brooklyn, and Midtown Manhattan.[96] At around 9:15 p.m. in Williamsburg in Brooklyn, police charged into a group of protesters and made several arrests.[97] At about 10:30 p.m., in Fort Greene, officers kettled protesters onto Washington Avenue, but then eventually agreed to allow people to slowly leave and go home.[98]

Commissioner Shea later acknowledged the aggressive response to the Bronx protests. He stated that this response was necessary because the protest had been infiltrated by "outside agitators," who were looking to use the event as cover to "loot" the neighborhood.[99] He claimed that protest organizers advertised that "they were going to burn things down," and that officers recovered hammers, wrenches, gas masks, a gun, gasoline, and "additional items that could be used to cause injuries." [100]  The gun supposedly recovered from the protest was actually the result of an arrest of an alleged gang member made nearly a half-mile away and three hours prior to the protest being broken up. Police officials later admitted that no gasoline or weapons were actually recovered from the protesters.[101]

On this day, a total of 278 people were arrested; none of those arrested were charged with felonies.

**Table 2: Arrests and Summons** *(June 1–June 4)*

| Date | Day | Arrest Count | Percent Change from Previous Day |
|------|-----|--------------|----------------------------------|
| 6/1 | Monday | 335 | ▲ 5.68% |
| 6/2 | Tuesday | 291 | ▼ -13.13% |
| 6/3 | Wednesday | 186 | ▼ -36.08% |
| 6/4 | Thursday | 278 | ▲ 49.46% |

**Chart 2: Arrests and Summons by Top Charge Type** *(June 1–June 4)*



**Map 2: Arrests and Summons** *(June 1–June 4)*



# Post-June 4, Protests Continue: Confrontations Between Police and Protesters Decline Significantly

By June 5, violence had abated significantly, although protesters continued to stay out well past the curfew. On June 5, the police strictly enforced the curfew in some locations. Forty-one people were arrested, mainly at gatherings in Crown Heights and near Gracie Mansion.[102] On June 6, large peaceful protests continued, but there were few confrontations between protesters and NYPD and just one protest-related arrest.[103] None of the people arrested on Friday or Saturday were charged with felonies.[104]

On June 7, the Mayor ended the curfew a day early, stating that the prior two days of peaceful protests showed "the very best of our city." [105]  Large peaceful gatherings were held all day, but largely ended by 11:00 p.m. There were no reports of major confrontations or mass arrests.[106] Between June 8 and June 27, the protests continued, but largely without violence or mass arrests.[107]

Beginning around June 24, dozens of protesters took over a portion of City Hall Park, demanding that the City cut $1 billion from NYPD's budget. During the Queer Liberation March for Black Lives & Against Police Brutality[108] on Sunday, June 28, there were reports of police officers shoving and pepper spraying crowds of protesters.[109]  The Queer Liberation March drew several thousand protesters against police violence and racism in a procession from Foley Square to the Stonewall Inn and ended with a rally in Washington Square Park.[110]  The march was generally peaceful, but reportedly a group of 2,000 protesters, who broke away from the main event, ended up in a confrontation with police officers.[111]

An NYPD spokesperson acknowledged that the march was largely peaceful but said that an altercation began when three people were arrested for trying to graffiti a police car and others in the crowd tried to interfere with the arrest.[112]  Witnesses confirmed that some protesters attempted to intervene when people were arrested for graffiti, but contended that the police responded with indiscriminate use of pepper spray into the crowd, spraying protesters, a food vendor, and another police officer in uniform.[113]  At about the same time, news footage showed officers on motorcycles pushing through a crowd of protesters in the streets[114] and shoving protesters off the street.[115]  According to witnesses, at least four people were arrested, but an official number from NYPD has not yet been released.[116]

The protesters have remained in the park for over a week. This protest sparked additional arrests and violent confrontations between police and protesters.[117]

# Overview of Protest-Related Arrest Data

This section provides a brief, initial analysis of the arrest data OAG has received to date. The OAG will continue to investigate any emerging patterns in arrests and charging decisions related to protests.

During the period of intense protests, May 28 to June 7, there were 2,087 protest-related arrests, an average of 190 per day. The vast majority of arrests, nearly 1,500, were in Manhattan compared with under 350 in Brooklyn and about 250 in the Bronx. [118]

**Table 3: Overall Arrests and Summons** *(May 28–June 7)*[119]

| Date | Day | Arrest Count | Percent of Total | Percent Change from Previous Day |
|------|-----|--------------|------------------|----------------------------------|
| 5/28 | Thursday | 76 | 3.64% | |
| 5/29 | Friday | 230 | 11.02% | ▲ 202.63% |
| 5/30 | Saturday | 332 | 15.91% | ▲ 44.35% |
| 5/31 | Sunday | 317 | 15.19% | ▼ -4.52% |
| 6/01 | Monday | 335 | 16.05% | ▲ 5.68% |
| 6/02 | Tuesday | 291 | 13.94% | ▼ -13.13% |
| 6/03 | Wednesday | 186 | 8.91% | ▼ -36.08% |
| 6/04 | Thursday | 278 | 13.32% | ▲ 49.46% |
| 6/05 | Friday | 41 | 1.96% | ▼ -85.25% |
| 6/06 | Saturday | 1 | 0.05% | ▼ -97.56% |
| 6/07 | Sunday | 0 | 0% | ▼ -100% |
| Total | | 2,087 | 100% | |

**Chart 3: Arrests and Summons** *(May 28– June 7)*



Arrests sharply increased in the initial days of the protest and remained steadily high from May 30 through June 2 before starting to sharply decline on June 5.

**Map 3: Arrests and Summons** *(May 28– June 7)*



There were zero arrests on June 7.

The OAG also analyzed the demographics of those arrested. NYPD arrest data shows that 39 percent of people arrested during the protests were Black and 44 percent were white. While both Black and white protesters were overrepresented in arrests as compared to citywide demographics, the overall demographics of the people who attended protests on a given day during this time has not yet been determined.

**Table 4: Overall Race/Ethnicity Demographics of Arrests & Summons** *(May 28–June 7)*

| Race/Ethnicity | Arrest Count | Percent of Total Arrests | Percent of City Population |
|---|---|---|---|
| White | 927 | 44.4% | 32.1% |
| Black | 808 | 38.7% | 24.3% |
| Latino | 272 | 13.0% | 26.8% |
| Asian | 59 | 2.8% | 13.8% |
| Other | 21 | 1.0% | 3.0% |

**Chart 4: Protest Related Arrests by Race/Ethnicity vs. City Demographics** *(May 28–June 7)*



In terms of charging decisions, 16 percent of Black protesters were charged with a felony, eight percent of Latino protesters were charged with a felony, and less than four percent of white protesters and Asian protesters were charged with a felony.[120]

*Table 5: Percent Top Charge by Race/Ethnicity (May 28–June 7)*

| Race/Ethnicity | Felony (Percent within race) | Misdemeanor (Percent within race) | Violation (Percent within race) |
|---|---|---|---|
| White | 3.47% | 52.77% | 43.76% |
| Black | 15.66% | 44.82% | 39.52% |
| Latino | 7.75% | 51.29% | 40.96% |
| Asian | 3.39% | 62.71% | 33.90% |
| Other | 10.00% | 60.00% | 30.00% |

The severity of the charges for those arrested dropped precipitously by June 2, suggesting that the majority of arrests were for violating the curfew and peacefully protesting, as opposed to violence and plundering businesses. Nearly a quarter of all arrests on May 31 were for felonies, but by June 2 that figure was only three percent. On June 4, none of the 278 people arrested were charged with felonies. The vast majority of arrests between June 2 and June 6, the days of the 8 p.m. curfew, were made after 8 p.m., suggesting the curfew was a significant driver of arrests.

**Chart 5: Protest Related Arrests by Time of Arrest** *(June 2–June 7, 8 p.m.–5 a.m. Curfew)*



**Chart 6: Protest Related Arrests by Top Charge Type and Date** *(May 28–June 7)*



As the number of arrests increased in the early days of the protests, the proportion of arrests charged as felonies also sharply increased from just under seven percent of all arrests on the first day of the protest to nearly 24 percent on May 31, when there was widespread plundering of businesses.

# OAG's Investigation to Date

On May 30, Governor Cuomo directed that OAG investigate interactions between NYPD and the public in New York City during the protests. The OAG immediately launched a civil investigation and subsequently announced the selection of two special advisors to the investigation: former United States Attorney General Loretta Lynch and Barry Friedman, the Jacob D. Fuchsberg Professor of Law and the Founder and Faculty Director of the Policing Project at New York University (NYU) School of Law.

## Soliciting Information from the Public

The OAG immediately requested that anyone with information about police response to protests contact the office. The OAG began to receive and review hundreds of submissions, including photos, videos, and descriptions of incidents that had occurred during the first few days of the protests.

The OAG took several additional steps to ensure members of the public had multiple channels through which they could submit information. The OAG established a hotline, an electronic portal, and an e-mail address to receive information relating to NYPD's protest response from members of the public. The OAG also took into account complaints from social media. As of July 5, OAG has received more than 100 calls to the hotline, and 1,223 written submissions.[2]

From the outset of the investigation, OAG also prioritized reaching out to dozens of community-based organizations and advocacy groups throughout New York City. Many of these organizations' members participated in the protests, and the organizations have provided and continue to provide information regarding their members' experiences.

The OAG has also monitored publicly shared social media posts, which have proved to be a rich source of information. Users widely shared videos and photographs of many incidents that occurred during the protests. To the extent that OAG has identified public social media posts of photographs, videos, or descriptions of incidents occurring at the protests warranting further review, OAG staff have endeavored to identify and speak with persons appearing in the videos or photographs, individuals who took the video or photographs, or other eyewitnesses to the occurrence.

The OAG staff continue to receive and review information, videos, and photographs submitted by members of the public through these various channels and welcomes members of the public to submit additional information as OAG's investigation continues.

## Requesting Information from NYPD and Other City Agencies

The OAG has also requested data, photographs, videos, audio transmissions, and other documentary evidence from NYPD. The OAG's request for information includes broader policies, procedures, and practices regarding NYPD's approach to responding to the protests, as well as specific information pertaining to dozens of specific protest incidents. To date, NYPD has produced a large volume of materials, and, while certain requests remain pending, NYPD has been cooperative in producing materials on an expedited basis and has agreed to continue this cooperation as OAG's investigation proceeds. The OAG also intends to interview NYPD leadership and relevant officers.

The OAG has also requested information from other government agencies, including the New York City Civilian Complaint Review Board; Brooklyn, Bronx, and Manhattan District Attorneys' Offices; the New York City Department of Investigation; and the New York City Commission on Human Rights.

Several of these agencies have initiated separate, but related investigations. Mayor de Blasio announced that the City, through Corporation Counsel James Johnson and the Department of Investigation (DOI), would conduct an "independent review." It was explained that "all factual investigation is being done by the DOI pursuant to its authority under the [City] Charter."[122] The CCRB is also investigating individual instances of alleged misconduct by NYPD during the protests.[123] The CCRB has the authority to investigate allegations of excessive force, abuse of authority, discourtesy, and offensive language. If the CCRB sustains the allegations, it will recommend discipline to NYPD or, for more serious allegations, will initiate an administrative trial. District Attorneys' Offices have the authority to bring criminal charges against officers, and charges have been brought in at least one related instance.[124] NYPD's Internal Affairs Bureau, which investigates allegations of officer misconduct, has opened a number of protest-related investigations.[125]

## Attorney General James Conducts Public Hearings: June 17, 18, and 22

On June 17, 18, and 22, Attorney General James conducted public hearings about the interactions between police officers and the public during the protests. Attorney General James heard live testimony from more than 100 individuals, including participants in various protests that occurred in New York City and other parts of the State, 10 elected officials, a representative from the National Latino Officers Association, representatives from community-based and other advocacy organizations, and NYPD Commissioner Shea. The OAG received more than 300 submissions of written testimony. Several witnesses also produced videos and photos along with their testimony.

The hearings, conducted via video given the ongoing COVID-19 pandemic, lasted more than 18 hours and included questioning from Attorney General James as well as special advisors to OAG's investigation, former Attorney General Lynch and Professor Friedman.

## *Eyewitness Testimony from Members of the Public*

Dozens of eyewitnesses testified about their experiences at protests around New York City in the days and weeks following the death of George Floyd. This testimony included witness accounts of peaceful protests across the City to which the police responded with indiscriminate use of pepper spray, batons, and other force.

Matt Binder, a journalist who focuses on the spread of misinformation on the internet, testified that he attended a protest in Queens on June 6. At the protest, he witnessed an NYPD officer make, what he perceived to be, a hand gesture associated with white nationalism and white supremacy. The officer was eventually asked by his commanding officer to leave the protest but did not appear to have been reprimanded at the scene, according to Binder.

Attorney General James also heard testimony from Diane Morales, an educator and social justice advocate. Morales and her two adult children participated in the May 29 protest at the Barclays Center. While the protest began peacefully, Morales said that at a certain point NYPD officers became aggressive and began to use force on the protesters, including pepper spraying her children without provocation. After flushing her children's eyes out, Morales said the family continued marching with protesters into the Fort Greene neighborhood in Brooklyn. The NYPD officers surrounded her group of demonstrators and advanced on her son, pushing him repeatedly and aggressively in the chest.

In addition to physical harm, many protesters testified that they suffered ongoing emotional and mental trauma as a result of their encounters with the police. Witnesses testified that they had trouble sleeping and eating and were afraid to leave their homes because they thought that NYPD would attack them in the street. Many demonstrators testified that they had lost all faith in NYPD given the conduct of officers at the protests.

Numerous witnesses also testified about NYPD's kettling practice. At least nine witnesses testified about their personal experiences being kettled in by NYPD on June 4 during a protest in the Mott Haven neighborhood of the Bronx. According to witnesses, protesters were kettled shortly before the 8:00 p.m. curfew. The NYPD played a dispersal order over a loud speaker, directing individuals to leave the area, but because NYPD had surrounded the crowd on all sides, witnesses claimed dispersal was impossible. Witnesses testified that when the curfew went into effect at 8:00 p.m., officers rushed the crowd, indiscriminately pepper spraying protesters, assaulting them with batons, throwing them to the ground, and arresting people en masse. Members of NYPD's Strategic Response Group's Bicycle Unit also allegedly turned their bicycles into weapons, using them to push into protesters prior to arrest. One witness, Chante'l Johnson, described being struck on her lip with a baton and having her face mask fill with blood. She further testified that she heard, during the melee, a white NYPD officer say to a white protester "well, you wanted to be in the hood; welcome to it."

The hearing also included testimony about several concerning arrest practices that NYPD allegedly used. Several witnesses testified that officers zip tied their wrists so tightly that they lost feeling in their arms and hands and that officers ignored or refused their requests for assistance. Many testified that during the course of their arrests, the masks worn to protect against COVID-19 transmission fell down from their faces or were removed and, when they sought assistance to adjust their masks or obtain new masks while in custody, their requests were ignored or refused. Witnesses also testified that, after being arrested, they were transported by NYPD to a different borough for holding and processing.[126]

Arrested protesters spoke of the conditions of their detention. They described that officers divided protesters into cells based on the officers' assumption of the protesters' gender, as opposed to asking. Once separated, witnesses described overcrowded cells without proper PPE or the ability to socially distance and that those detained were not provided water or food. They also testified that officers kept the zip ties on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.

Finally, witnesses testified that large numbers of NYPD officers failed to wear face masks or other forms of PPE during the protests. Dozens of witnesses also testified that NYPD officers had covered their identification during the protests with black mourning bands used to commemorate the loss of officers to COVID-19. When worn properly, they do not obstruct view of an officer's identifying information, which is located at the bottom of an officer's shield/badge. The witnesses testified that officers purposefully used the bands to cover their badges to avoid identification.

## *Testimony from Elected Officials*

Nearly 20 elected officials at the city, state, and federal levels testified about their experiences at the protests, the experiences of their staff and constituents at the protests, and perceived wrongdoing by NYPD. They also testified about the ongoing need for large-scale, immediate, and systemic reform of NYPD and policing practices generally.

The elected officials who participated in the protests and spoke about their experiences and observations included New York City Public Advocate Jumaane Williams, New York State Senator John Liu, and New York State Senator Zellnor Myrie. Senator Myrie testified that he attended the May 29 protest at the Barclays Center, during which he intentionally wore a neon shirt with his name and his title so he would be easily identifiable. Notwithstanding the peaceful nature of the protest and his clear identification as a New York State Senator, Senator Myrie testified that NYPD officers pepper sprayed him without justification and temporarily detained him without providing prompt medical attention to address his injuries.

Senator Liu, who is Asian, testified about a protest he attended on May 31 that began in Brooklyn and crossed over into Manhattan, then proceeded south along Canal Street towards Foley Square. Senator Liu testified that eventually NYPD blocked the protesters from proceeding further. A line of officers formed and,

immediately thereafter, officers ran into the crowd and began knocking protesters to the ground. Senator Liu explained that the protest eventually continued along Broadway towards Union Square but was again stopped at 11th Street. The NYPD officers played a recording that included an announcement that the protest had been violent, which Senator Liu denied. The announcement ordered protesters to disperse or they would be arrested. In response, many protesters sat down in the middle of the pavement. Senator Liu testified that thereafter, and without warning, officers charged the crowd and started hitting protesters with batons. Senator Liu himself was hit with a baton, though not seriously injured. He further testified that he witnessed an individual break a window on Broadway on the night of May 31, and nearby protesters told the man to stop and formed a line in front of the store until NYPD officers arrived.

Public Advocate Williams also testified at the public hearings. He testified about his participation in the protests, starting on May 28, and his observations of a "militarized" police presence. He testified that on May 28 near the Barclays Center, he observed police wearing riot gear and using metal barricades to surround nonviolent protesters. He also testified that on June 2 in Hell's Kitchen, he saw peaceful protesters who were holding signs and chanting when police officers, screaming "Mayor's curfew," struck protesters with batons and arrested them with no apparent warning that the curfew had gone into effect.

## Testimony from Community–Based Organizations and Advocates

Representatives from nearly 20 community-based organizations on the local and national level testified at the hearings, including the National Association for the Advancement of Colored People (NAACP), the National Action Network (NAN), public defenders' offices across New York City, and the National Lawyers Guild (NLG). They testified that NYPD's response to the protests was emblematic of the very reasons people were protesting to begin with: police were overly aggressive, were outfitted in military-type gear, and did not de-escalate when tensions rose. The advocacy groups also testified that immediate, serious reforms are needed, including a full reimagining of how and when police are utilized and that there is a need for published guidelines governing police interaction with protesters.

## Testimony from National Latino Officers Association

Sergeant Angel Ramos testified as a representative of the National Latino Officers Association. Sergeant Ramos, an active member of NYPD, testified about the importance of building and maintaining trust between NYPD and the communities it patrols, particularly communities of color. Sergeant Ramos stated that the protests had been challenging for both NYPD and the public. Sergeant Ramos testified about a specific incident in which he temporarily detained a member of the press who was not displaying his credentials, but, upon verifying the journalist's credentials, Sergeant Ramos released him. He also testified that while he had observed a protest involving kettling (which he testified was not a practice with which he was familiar or had ever employed at NYPD), no mass arrests had occurred as a result. Instead, NYPD spoke to the protest's organizers and permitted the orderly dispersal of demonstrators.

Sergeant Ramos then discussed the May 30 incident in which two police vehicles drove into a crowd of protesters and testified that he believed, after his review of the videos, the actions of the officers were justified given the circumstances. He testified that, as a general matter, uses of force always required an evaluation of the circumstances. He further testified that he told members of his organization that the priority during the protests was life first, and then property, and that the protests he observed were all peaceful. Sergeant Ramos concluded by testifying about the need for NYPD to ensure that the psychologists used during the interview process for prospective officers are those who can relate to and recognize the specific circumstances of applicants who grow up in the City. He remarked that the current process may unfairly disqualify applicants of color. He noted that more officers of color needed to "be present at the table" within NYPD and that they needed more respect from NYPD leadership. Such a change, he testified, would benefit all members of NYPD and the public.

## *Testimony from New York City Police Commissioner Dermot Shea*

On June 22, NYPD Commissioner Dermot Shea testified for approximately one hour in a continuation of the Attorney General's public hearings.[127] The Commissioner began his testimony by focusing on violence by protesters against NYPD officers, rioting and looting that took place during the early nights of the protests, and injuries to nearly 400 NYPD officers. Commissioner Shea testified that NYPD had shown "incredible restraint" during the protests and stated that he considered NYPD a progressive police department whose officers are dedicated "to serving New Yorkers in every neighborhood and to working around the clock to keep families and individuals safe from the trauma of crime and violence." Commissioner Shea testified that as a general matter, he considered the initial three days of the protests "violent" and "different" from past protests, because "outside agitators" took advantage of the demonstrations, and demonstrators immediately threw "bottles, bricks, and things of that nature" at NYPD officers. When Attorney General James reviewed a list of incidents caught on video involving police misconduct, Commissioner Shea testified that many of the videos were missing context, and that while some officers had been disciplined for the noted conduct, he believed most of the incidents in the videos involved appropriate and compliant behavior on the part of NYPD officers.

In response to questioning regarding whether officers received commands for policing protests after the curfew, the Commissioner did not identify any specific directive given to officers, though noted that NYPD officers were advised to be "as flexible as possible in allowing people to demonstrate, respecting their First Amendment rights, but also trying to balance that against the rights of individuals in New York City that want to go about their daily lives."

Commissioner Shea's testimony largely contradicted witnesses who testified that NYPD officers used pepper spray in an indiscriminate and excessive manner on numerous occasions over the course of the protests. Commissioner Shea testified that he did not agree with allegations that there was widespread, inappropriate use of pepper spray on protesters and that officers exercised "incredible restraint" throughout the protests. However, he stated that there were several distinct instances in which officers had used pepper spray in violation of NYPD's Patrol Guide and were disciplined accordingly.

Commissioner Shea agreed that the level of force utilized by NYPD officers against individuals must be proportionate to the threat of force displayed by an individual, but he did not believe disproportionate use of force was used widely. The Commissioner confirmed that the use of physical force is not an acceptable response to "verbal taunts" unless the officer believes that the taunt represents an "imminent danger." He also agreed to continue working with OAG to provide relevant body-worn camera footage recorded during the protests to help resolve these factual disputes.

Commissioner Shea also testified about the incident from May 30 during which two NYPD vehicles drove into a crowd of protesters. According to the Commissioner, the incident did not violate NYPD's use of force policy because the officers' vehicles were "penned in by protesters," and "set upon and attacked" and therefore, the response from the officers did not constitute an inappropriate use of force.

The Commissioner testified that in isolated cases, NYPD had taken disciplinary action against officers, but that broadly speaking, NYPD officers behaved appropriately and professionally given the circumstances surrounding the protests. He stated that all relevant disciplinary action has been publicized on NYPD social media.

Commissioner Shea testified that he had never heard of the term kettling until after the protests began, but that in certain instances, kettling of protesters would be appropriate. Commissioner Shea did not specifically address whether the kettling described by witnesses at the hearing was appropriate or justified.

Commissioner Shea testified that he was aware of reports that legal observers had been arrested at the protests. The Commissioner explained, however, that merely identifying oneself as a legal observer was insufficient to render an individual exempt from the curfew, and that officers proceeded based on the "facts and circumstances" in front of them. The Commissioner's testimony conflicted with NLG's testimony, which maintained that a number of its representatives were arrested despite being identifiable as legal observers prior to and during their arrests.

Commissioner Shea testified that Officer Vincent D'Andraia, who pushed Dounya Zayer to the concrete, had used an inappropriate degree of force, that he was "disturbed" by the video, and that he had disciplined the officer promptly.

Commissioner Shea also testified about NYPD's policies allowing individuals to record police interactions. He noted that members of the public are allowed to record police interactions up until they "cross a line," whereby their filming constitutes obstruction of government administration and that NYPD's evaluation of when a person crosses that line is "subjective." When Attorney General James questioned why the standard was not objective so as to provide adequate notice to the public, Commissioner Shea testified that each instance of an individual recording needed to be evaluated on its own to determine whether the person filming had actually interfered with police activity, rendering the recording impermissible.

When questioned about the practice of placing a mourning band on one's badge, Commissioner Shea testified that officers are permitted to wear the band, but that under no circumstances should mourning bands cover identifying information on badges, and that to do so would violate NYPD policy.

Commissioner Shea testified that he was aware of some officers not wearing face masks, but he did not believe the issue was widespread, and noted that some politicians and protesters likewise failed to wear face masks. The Commissioner explained that although in certain instances officers were likely justified in not wearing masks, in others the failure to wear proper PPE was inappropriate and should not have occurred. He testified that no officer had received discipline for failure to wear a mask during his or her patrol of the protests.

Attorney General James finished her questioning by asking the Commissioner whether he believed any possible reforms to NYPD's policing activities were warranted, and whether the Commissioner had considered ways for NYPD to regain the public's trust. Commissioner Shea responded that NYPD had implemented significant and wide-ranging reforms over the past six years. He also testified that recent reforms passed by the New York State Legislature "would not have an impact on [NYPD's] day-to-day operations" as NYPD had already implemented many of those reforms into its policies and procedures. Commissioner Shea noted that he had publicly advocated to redirect money from NYPD to programs that invest in young people.

Commissioner Shea and Attorney General James agreed that NYPD and its legal office would continue to work with OAG to provide additional and relevant evidence related to the investigation.

## Written Submission from Police Unions: Police Benevolent Association, Sergeants Benevolent Association, and Captains Endowment Association

The Police Benevolent Association (PBA), the Sergeants Benevolent Association (SBA), and the Captains Endowment Association (CEA)[128] each submitted written testimony to OAG that describe alleged failures by NYPD leadership that have impacted the protests.

Patrick Lynch, President of PBA, submitted a 12-page letter outlining various topics he felt OAG should include as part of its investigation and identified a number of concerns relating to the response to the protests by NYPD leadership and elected officials. Lynch characterized these concerns in three broad subject areas:

1. Police officers were deployed without a clear plan for managing demonstrations that had a clear likelihood of escalating into violence, and that neither Mayor de Blasio nor NYPD developed a defined strategy to deal with the citywide demonstrations.

2. The NYPD did not devote sufficient resources to the early stages of its disorder control effort, nor did it employ clearly established disorder control protocols. This failure was particularly glaring in the face of the complex, coordinated demonstrations that intermingled peaceful protesters with agitators bent on inciting violence.

3. New York City and New York State elected leaders did not provide a clear message of support for the police officers who were carrying out their directives.

SBA suggested that OAG look "into the [New York City Police] Department's preparedness, whether and at what point it implemented a tactical response plan, and whether that plan was coherent, consistent and effective" with respect to the protests. SBA explained that "due to apparently shifting priorities," NYPD officers were unclear of their goals and directives for protest management across precincts. According to SBA, the Mayor's Office shifted its response to policing the protest "on a near-daily basis" and interfered with NYPD's command strategies.[129]

Chris Monahan, President of CEA, sent OAG a copy of a letter he sent to NYPD and the Mayor calling for the termination of CompStat, NYPD's system for tracking crime data and arrest. According to CEA, CompStat causes NYPD officers to unnecessarily target and arrest individuals in communities of color to satisfy implied arrest and ticket quotas. Monahan wrote that NYPD's continued reliance on CompStat "inherently creates tension between black and brown communities and the police..." and has been used primarily as a means of "coercing commanders into more proactive policing" that undermines the relationship between NYPD and minority communities. The letter also sought immediate clarity from the Mayor de Blasio and Commissioner Shea as to any new policy changes that may now be in effect as a result of the protests, explaining that the current "lack of instruction and clarity is dangerous, both for the public and for our officers."

# *Recommendations for Police Reform*

While OAG's investigation into NYPD's response to the protests is ongoing, it is clear that real, meaningful reform cannot wait. This section provides an overview of proposed systemic changes that should be considered to address the concerns of the public and to start building community trust.

***These proposed reforms are as follows.***

> > The general public must be given oversight over NYPD policies, structure, and leadership.

> > Public safety must be redesigned. Police have become the default response to nearly every issue in society. Police officers should no longer fill roles that are wholly unrelated to their core purpose of combating serious crime.

> > The disciplinary and accountability structure for individual officers must be reformed and strengthened.

> > Oversight bodies must be given true statutory powers to address systemic police misconduct.

> > There must be clear, carefully calibrated standards for the use of force with real consequences for violations.

Each of these recommendations could be accomplished through one or more of the following avenues: State legislation, City legislation, charter revision, or administrative action.

These recommendations should not be considered either OAG's assessment of NYPD's response to the protests, nor an exhaustive set of proposed police reforms. The OAG's investigation of the protests remains ongoing. Factual findings and potential recommendations related to the protests will be made at the conclusion of the investigation. The reforms proposed in this report are meant to address long-standing shortcomings in the current criminal justice system that operate in a way that undermines public trust in police. The OAG also recognizes that implementing the proposed reforms detailed below will require the input, expertise, and experience of law enforcement experts, community groups, NYPD, and the public at large, particularly communities of color, who have been most impacted by policing policies.

## Recommendation 1: Create Public Participation and Oversight of Departmental Policies and Leadership

Robust accountability requires public participation in shaping department policies and involvement in selecting department leadership.

### Part 1: Restructure NYPD's Command to Ensure Front-End Accountability

There should be an entirely new accountability structure for NYPD. Under New York City's current police command structure, the Mayor appoints the Commissioner and the Commissioner then has full "cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department."[130] This model means that the public lacks a way to have meaningful input on the policies and major decisions that NYPD chooses to make.

There must be a commission that oversees NYPD. This commission should include representatives appointed by the City Council, Public Advocate, Comptroller, and the Mayor, with no one party getting a majority of representatives. The commission should be empowered to approve the NYPD's budget and hear and decide final disciplinary appeals. The commission should also hire and, if necessary, terminate the NYPD Commissioner as well as approve all promotions above the rank of captain. In order to ensure its efficacy, the commission must have a guaranteed budget, permanent staff, and unfettered access to NYPD records and personnel.

In Detroit, the Board of Police Commissioners exercises "supervisory control and oversight of the Police Department," and has the authority to establish the Department's policies, rules and regulations, approve its budget, appoint a non-officer as Director of Police Personnel, and approve all promotions made by the Chief.[131] The San Francisco Police Commission sets department policy, approves the department's budget, and hears and decides disciplinary cases.[132]

To promote ongoing transparency and public accountability, the commission should be required to hold weekly public meetings, as well as monthly community meetings throughout the City. Furthermore, the Mayor and Police Commissioner should be required to attend an oversight hearing convened by the New York City Council and the commission at least biannually.

## Part 2: Increase Officer Diversity in Leadership Ranks Through Public Oversight and Involvement

A police force that reflects the community it serves can help to establish trust and rapport between officers and residents[133] and has been linked to lower crime rates.[134]

Although NYPD is diverse when compared to other law enforcement agencies, Black officers are underrepresented in leadership positions and among patrol officers.[135] White officers comprise about 45 percent of the department but receive 80 percent of the executive promotions.[136] The NYPD has fewer Black patrol officers than it did in 1998, and the percentage of Black detectives has remained at approximately 16 percent for the last 30 years.[137]

Similarly, NYPD's leadership also lacks gender diversity. Although NYPD's gender diversity is better than the national average,[138] women only make up 18 percent of the police force, just eight percent of officers holding rank above captain are women, and only nine of the City's 77 precincts are run by women.[139] Research demonstrates that increasing the number of women in a police force is beneficial for a number of reasons. Women are less likely to use excessive force[140] and less likely to fire their weapons while on duty.[141]

A critical part of addressing this dearth of diversity among NYPD's higher ranks is to address the current system for promotions: promotional decisions beyond the rank of captain are made at the complete discretion of existing leadership, most of whom are white and male.[142]  Once the commission is established, it should be charged with approving all promotions and hires beyond the rank of captain.

Additionally, the residency requirement for NYPD should be amended. Officers should live within the five boroughs of New York City, so that they better reflect the communities they are required to serve and protect.

## Part 3: Democratize Policing by Treating NYPD like an Ordinary Municipal Government Agency

The NYPD must be treated like other government agencies, subject to the kind of front-end administrative checks that govern the use of authority by the Department of Health or Department of Education.

When an ordinary New York City agency wants to create a new rule, it has to go through a long, thorough, and public process to explain, justify, defend, and potentially reconsider that rule. Under New York City's Administrative Procedure Act, such rulemaking takes an absolute minimum of 60 days, includes publishing a draft rule, a public notice-and-comment period, at least one public hearing, a review and revision period, and then the publishing of a clear, final publicly available rule.[143] Before publication, these rules are also reviewed by the Law Department and the Mayor to determine, among other things, whether they are narrowly drawn to achieve their purpose and whether the agency has conducted a thorough analysis to ensure that the regulation is minimally burdensome.[144]  This process helps ensure that agencies thoroughly

and fully consider and justify the impacts their decisions have on the public they serve and then hear directly from that public and incorporate that input.

Yet, the rules that govern NYPD—an agency granted far more power over the public than any other government entity—are generally created without public input or even explanation,[145] nor any required analysis of their community impact. The public often only learns about NYPD policies, written and unwritten, through litigation,[146] investigative reporting,[147] or the Office of Inspector General for the New York City Police Department (OIG-NYPD) reports.[148]

In order to build trust between the police and the public, NYPD must create clear rules, in public view, with public input. Any rule that NYPD drafts governing interactions with the public, including those impacting arrests and use of force, should follow the City's Administrative Procedure Act with a full notice-and-comment period. As part of this process, NYPD should be required to conduct a racial equity impact assessment to determine how the proposed rule is likely to impact different racial and ethnic groups.

## Recommendation 2: Redesign Public Safety and the Role of Police in Society

The recent protests and nationwide uproar over the current state of policing presents a new opportunity to redesign public safety. This effort should include finding ways to develop trust between law enforcement and the communities they are sworn to serve and delineating appropriate roles and boundaries for police. In New York City, the scope and future of policing was the central issue of the City's recent budget debate.[149] While the budget agreement that was passed on June 30 did not represent a fundamental change in the role of NYPD,[150] it does mark the beginning of a reevaluation of the role of police in the City and beyond. That work must continue so that there is a full, public-driven reexamination with what it is that police currently do, and what role society wants them to play.

### Part 1: Decriminalize Minor Offenses

In New York City, trust in the police has eroded over decades due to the over-policing of communities of color, particularly when it comes to minor offenses. Policies like stop-and-frisk and broken-windows policing have contributed to the sense of distrust and victimization. Though some reforms have been made – in 2016, the New York City Council passed the Criminal Justice Reform Act (CJRA), which directed certain low-level offenses like public drinking and defying park rules to be sent to civil court rather than criminal court[151] – more must be done to reduce unnecessary contact with police and the criminal justice system. New York City should decriminalize or legalize more low-level, "quality of life" offenses, many of which are already not greatly enforced in predominately white neighborhoods.[152] In particular, laws with a history of alleged disparate and discriminatory enforcement, such as bicycle operation on the sidewalk,[153] "jaywalking," [154] loitering,[155] and fare evasion,[156] should be repealed or removed from police enforcement. Other offenses that represent a disproportionate number of New York's total criminal summons, including marijuana possession, disorderly conduct, alcohol consumption, and trespassing, should also be examined.[157]

In decriminalizing minor offenses, there must also be a regular, biannual review of the scale and use of fines and fees. Without any such mechanism, decriminalization efforts will have the opposite of the intended effect, as failure to pay civil fines and fees can lead to arrest warrants and jail time.[158] These consequences are most acutely felt by people in poverty. This biannual review should be transparent to the public and ensure the outcome of decriminalization is aligned with the goal of reducing negative and disproportionate contact with the police and the criminal justice system.

## Part 2: Redesign the Role of Police

Protesters across the country are questioning the role of police in society. This is a vital question, as police have become the de facto response to many of society's problems, including mental illness, homelessness, and school safety.

New York City has made some effort to establish non-law enforcement professionals as first responders to mental health crises, for example through mobile crisis teams comprised of social workers and through Health Engagement and Assessment Teams with clinicians and peers (someone who has previously experienced a mental health challenge).[159] The NYPD has instituted crisis intervention training for its officers to better respond to a person experiencing a mental health crisis but has been criticized for being slow to roll-out such training across the Department.[160]  Yes despite these efforts, armed officers continue to have an outsized role in responding to mental health emergencies. The standard response to mental health emergencies should be with unarmed, trained mental health professionals.

Another area that must continue to be scrutinized is law enforcement involvement in schools. Although the recently passed City budget transferred funding for 5,100 school safety agents from NYPD to the Department of Education, it is not clear what that will mean in practice.[161]  As it stands, these officers are too often asked to respond to situations among children that may be better handled by a counselor or mental health professional. The presence of police in schools has been linked to an increased number of student arrests and suspensions.[162] Studies show that Black students are far more likely to be arrested in school than students from other demographics.[163] School disciplinary actions are one component of the school-to-prison pipeline, in which students, usually disadvantaged or of color, who face punishment in school are funneled to the juvenile or criminal justice system.[164] School safety agents should be given special training on managing young people in crisis.

Traffic enforcement is another area that should be reevaluated. The vast majority of traffic stops do not involve criminal conduct, yet as a nation we have seen how routine traffic stops conducted by armed officers can go awry. The Stanford Open Policing Project found that police generally stop Black drivers at higher rates than other drivers across the country.[165] Research shows that police use of force rates resulting from traffic stops are highest against Black and Latino men.[166] White and Latina women report experiencing use of force by police at about the same rate, but the rate of force experienced by Black women during traffic stops is much higher, about the same as white men.[167] Armed police officers are not needed for traffic enforcement, particularly when the underlying conduct in question is not criminal, such as a broken tail light, speeding, or not wearing a seatbelt.

Reevaluating police–involvement in crisis intervention, schools, and traffic enforcement represent only a fraction of the work that must be done as we move forward. The reliance on police to conduct homeless outreach, for example, has been another area of long-standing concern.[168] Everything must be on the table.

This effort should be led by a transparent commission with full-time staff and resources to determine how to remove armed officers from these scenarios and replace them with dedicated professionals with specialized training. This process will take time, but bureaucracy cannot stand in the way of progress. The Commission should have no more than 12 months to prepare a roadmap, and the goal should be to transition these areas by 2023.

## Recommendation 3: Ensure Real, Independent Oversight, Accountability, and Transparency of Individual Officer Misconduct

To build and earn community trust, it is essential that there be real, transparent accountability and oversight for officers who abuse their power, fail to uphold their constitutional or legal obligations, or otherwise violate public trust. Individuals whose rights have been violated by police must have direct recourse to meaningful justice that is transparently and independently administered. This must include a more effective mechanism for delivering discipline and a more robust public review process. Also, it is crucial that victims of misconduct are able to exact meaningful renumeration. Legislators should place limits on long-held doctrines that protect the police from liability, like qualified immunity. Qualified immunity, a court-created doctrine that interprets federal law as shielding police officers from being held personally liable for constitutional violations in most cases, can and should be curtailed by legislation. There must be more mechanisms available for the public to hold the police accountable.

### Part 1: Empower Independent Accountability and Discipline for Individual Misconduct by Increasing CCRB's Authority

The modern CCRB—composed entirely of members of the public and structurally independent from NYPD—was created in 1993 and empowered to "receive, investigate, hear, make findings, and recommend action upon complaints by members of the public against members of the police department that allege misconduct involving excessive use of force, abuse of authority, discourtesy, or use of offensive language."[169] Amendments to the City Charter designed to further bolster the Board's independence and efficacy were approved by a 2019 ballot initiative.[170]

As of 2020, CCRB has many of the powers and features of a strong oversight entity: subpoena power, structural independence, the power to conduct administrative prosecutions, a substantial budget, and excellent professional staff. The CCRB can, and does, fully investigate, mediate, adjudicate, and seek to resolve complex allegations of police misconduct. It also provides an invaluable trove of information and data that sheds light on the scope of the public's belief that police are abusing their authority.

Yet CCRB lacks the power to ensure that police who commit misconduct are truly held accountable. By law, the police commissioner has ultimate, unreviewable authority to decide what discipline to impose and, in fact, whether to impose discipline at all.[171] The fact that CCRB is not the ultimate decision-maker on issues of discipline seriously undermines its ability to ensure true accountability. Additionally, certain violations are not subject to CCRB because of existing law.

Over the five-year period between 2014 and 2018 (the last year for which full data is available), CCRB received more than 55,000 complaints from the public, including nearly 20,000 individual misconduct allegations for excessive force.[172] The CCRB fully investigated and substantiated more than 4,000 individual allegations of misconduct, and recommended discipline for nearly 2,500 officers, including recommending more than 600 officers be suspended or terminated. Yet, not once in those five years did the NYPD Commissioner fire an officer following CCRB's recommendation. In only eight cases over those five years did the NYPD Commissioner determine that the next most serious penalty—a suspension of longer than one month and/or dismissal probation—was merited. Even suspensions of more than ten days only happened a handful of times a year, on average.[173]

The CCRB's authority must be expanded to ensure that it has final disciplinary authority.

The CCRB's jurisdiction must also be expanded, both in terms of what complaints it is authorized to hear and what portions of the City's workforce it is authorized to hear them against. For instance, CCRB currently does not have the authority to investigate misconduct complaints against NYPD's 19,000 non-uniformed employees, such as School Safety Agents and Traffic Enforcement Agents, City Peace Officers working for City entities like the Department of Homeless Services, and volunteer auxiliary police.[174] Many of these workers interact directly and regularly with the public—including vulnerable populations—and complaints against them should get a full and thorough hearing. Even more critically, CCRB's jurisdiction should be explicitly expanded to include investigating allegations of biased policing and racial profiling.

## *Part 2: Enhance Accountability for Individual Officers Through a Statewide Certification Process*

Police officers who are fired or disciplined are often re-hired by a new department. A recent *New York Times* article highlights the case of an officer in New Jersey who cycled through nine police departments, and left several of the jobs because of accusations of excessive use of force, yet the officer continued to get hired at new departments.[175] Not only are there risks that such officers will continue to engage in misconduct, but evidence shows that officers with records of misconduct who transition to other law enforcement positions consistently increased the likelihood that the officers around them would also be accused of bad behavior.[176]

In order to limit the potential for officers who engage in serious misconduct from moving from one police department to the next, there should be a publicly appointed board to certify all police officers within the State. That board should have the authority to revoke an officer's certification for misconduct, thus preventing bad officers from simply being passed from one agency to another.

## Part 3: Make Officer Misconduct and Interactions Truly Transparent

The Legislature recently repealed Civil Rights Law 50-a,[177] which shielded the public from accessing information about police disciplinary records. However, these records are still only accessible through a public records request. These records should be immediately made available through New York City's OpenData portal and include footage from body-worn cameras that is accessible to the public. To ensure statewide uniformity, however, the New York State Department of Criminal Justice Services could serve as a central repository for disciplinary records from across New York. Additionally, all existing records must be maintained and made available. Any individual or department that refuses to disclose or destroys such records should be subject to sanctions.

## Recommendation 4: Ensure Real, Independent Oversight, Accountability, and Transparency of Systemic Misconduct

In addition to an enhanced system to address individual wrongdoing, it is also imperative that there is oversight and accountability for systemic wrongdoing. In 2013, the New York City Council took an important step toward systemic change when it created the Office of Inspector General for the New York City Police Department (OIG-NYPD).[178]  The OIG-NYPD was given subpoena power and a mission to "investigate, review, study, audit and make recommendations relating to the operations, policies, programs and practices, including ongoing partnerships with other law enforcement agencies, of the New York City Police Department with the goal of enhancing the effectiveness of the department, increasing public safety, protecting civil liberties and civil rights, and increasing the public's confidence in the police force, thus building stronger police-community relations." [179]

Since January 2015, the OIG-NYPD has issued 16 investigative reports on subjects from chokeholds, to "quality of life" policing, to use of force policy and tracking, to using litigation data to inform NYPD policy.[180] These reports have provided critical insight into previously opaque procedures, policies, and practices. They have also catalyzed meaningful changes to NYPD policy, particularly when it comes to tracking and using litigation data to inform policing and adopting official policies for use of force.[181] However, much like CCRB, OIG-NYPD's recommendations are only advisory and NYPD is free to ignore them without substantive consequence.[182]

Although NYPD has fully implemented half of OIG-NYPD's recommendations and partially implemented or accepted in principle another 26 percent, many of the recommendations that NYPD has rejected directly relate to issues central to the public's mistrust.[183]  These rejected recommendations include several directed at addressing biased policing and creating further transparency around police misconduct lawsuits, data, trends, and potential disparities around officer use of force and quality of life enforcement.[184]

The OIG-NYPD's work identifying these systemic problems and providing evidence-based suggestions and remedies is a vital part of practical reform. To ensure its independence and authority, OIG-NYPD should be made a fully independent agency—rather than a branch of DOI—and its commissioner should report directly to the Mayor. Additionally, OIG-NYPD's recommendations should be binding, either directly or through a newly created police commission.

## Recommendation 5: Establish a Codified Use of Force Standard with Real Legal Consequences for Violations

There is perhaps no factor that has contributed more to the deterioration of trust between communities and police than high-profile instances of police use of excessive and, in particular, deadly force. In addition to new protocols and protections, it is equally important that officers are held accountable if they fail to follow rules regarding use of force.

### Part 1: Establish a Uniform Use of Force Law

Under current law, a police officer or peace officer is authorized to use non-lethal force when that officer reasonably believes it is necessary to make an arrest, or prevent an escape from custody, of an individual he or she believes to have committed an offense.[185] Non-lethal use of force is also authorized for self-defense or in defense of a third person when an officer reasonably believes there is an imminent use of physical force. [186]

There are a number of reforms related to police use of non-lethal force that are considered vital to ensuring that police force is dispensed fairly, which are not clearly set out in the New York State law. They include the following:

> requiring officers to use de-escalation tactics;

> requiring officers to provide a warning before using physical force; [187]

> limiting officer force to the minimum force needed to apprehend a suspect; [188]

> limiting officer force to what is proportional to the circumstance or objective; [189]

> prohibiting chokeholds, or any other maneuver that limits a person's oxygen; [190]

> requiring other officers to intervene where they believe a fellow officer is using excessive force;

> providing whistleblower protections for officers who report excessive force or misconduct by fellow  officers; and

> requiring officers to request or provide medical treatment immediately where necessary.

There should be a statewide standard that incorporates these, and other reforms, so that police departments throughout the State, including NYPD, are bound by the same rules for the use of force. These standards should be regularly reviewed and, where necessary, updated to ensure they keep pace with any changes to best practices. Finally, these reforms must be accompanied by a sustained and meaningful commitment to de-escalation training by police departments. Guidance and funding must be provided to ensure that training is effective and that officers in under-resourced jurisdictions still have consistent access to trainings.

## Part 2: Amend the Law Justifying Use of Deadly Physical Force

Current law authorizes a police officer or peace officer to use deadly physical force where it is necessary to defend the officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force.[191] Officers are also allowed to employ deadly physical force in arresting a person or preventing a person's escape based solely on whether the officer reasonably believes that this person committed a certain crime.[192]  These crimes include any felony where an individual attempted or threatened imminent use of physical (non-lethal) force against a person.[193]

Police should be prohibited from employing such a disproportionate response and be prohibited from using deadly physical force where there is no use or imminent use of severe physical force or deadly force.

Reforms should also be established to ensure officers follow appropriate protocols leading up to, and immediately following, the use of deadly physical force similar to those referenced above regarding non-lethal use of force. These include, but are not limited to, giving verbal warnings wherever possible before using force, exhausting all other reasonable alternatives before using deadly physical force, and requiring officers to request or provide medical treatment immediately where necessary.

New York's justification for lethal force law also fails to account for whether an officer's own conduct may have created the circumstances that is then invoked to justify the use of deadly physical force. Where such conduct is willfully provocative or unduly reckless, the officer should not be entitled to the full protection of the justification defense, and the statute should accordingly be modified to limit its reach.

# Conclusion

This preliminary report provides an overview of OAG's investigation into NYPD's response to the protests to date. It also outlines the areas of continued investigation, which OAG anticipates addressing in its final report. The OAG continues to encourage all of those with relevant information to the investigation to contact OAG through the online portal or by calling the hotline, (800) 771-7755.

This report also addresses proposed police reforms that should be enacted quickly after further consultation with appropriate stakeholders, including communities of color most impacted by policing policies. These measures are aimed at improving transparency and accountability, ensuring public participation in major decisions by NYPD, redefining appropriate roles for the police, and codifying when officers can use force against the public. Adopting these reforms would go a long way toward mending the relationship between the police and community and solidifying the appropriate role of police in New York.

# Acknowledgments

Attorney General James would like to thank former United States Attorney General Loretta Lynch and Barry Friedman, the Jacob D. Fuchsberg Professor of Law and the Founder and Faculty Director of the Policing Project at NYU Law for their support and guidance in this ongoing investigation.

The OAG's investigation and report is being handled by: Stacy Aronowitz, Kristen Bitetto, Steven Broomer, Anna Brower, Rachel Castro, Anushua Choudhury, Jessica Clarke, Harry Czosnykowski, Kelly Donnelly, Travis England, Morenike Fajana, Meghan Faux, William Fitzgerald, Jason Fuhrman, Erica Gilles, Elena Goldstein, Joe Graham, Jaclyn Grodin, Akram Hasanov, Kiran Heer, Ismael Hernandez, Bridget Holohan-Scally, Jarret Hova, Melissa Kaplan, Delaney Kempner, Ibrahim Khan, Michael Leahy, Jennifer Levy, Jose Maldonado, Lillian Marquez, Christopher Marshall, Sharon Martin, Jasmine McAllister, John McManus, Brian Metz, Francisca Montana, Greg Morril, Brianna Parks, John Petro, Kate Powers, Meagan Powers, Steve Pratt, Oliver Pu-Folkes, Larry Riccio, Karon Richardson, Sylvia Rivera, Aaron Sherer, Barbara Sherman, Chansoo Song, Megan Thorsfeldt, Brooke Tucker, Nick Viorst, Casandra Walker, Peter Washburn, Melanie Weniger, Jonathan Werberg, and John Wood.

# Citations

[1] Evan Hill, et al., *8 Minutes and 46 Seconds: How George Floyd Was Killed in Police Custody*, New York Times (May 31, 2020), nytimes.com/2020/05/31/us/george-floyd-investigation.html

[2] See Richard A. Oppel, Jr. & Derrick Bryson Taylor, *Here's What You Need to Know About Breonna Taylor's Death*, New York Times (Jun. 28, 2020), nytimes.com/article/breonna-taylor-police.html

[3] Louisville Metro Police Department (@LMPD), Twitter  (Jun. 23, 2020, 6:41 p.m.) Letter of termination of Detective B. Hankinson from LMPD Chief of Police Robert J. Schroeder, twitter.com/LMPD/status/1275559612410888193/photo/1, and twitter.com/LMPD/status/1275559612410888193/photo/2

[4] *Id.*

[5]  Deidre McPhillips, *Data Shows Deaths from Police Violence Disproportionately Affect People of Color, U.S. News* (Jun. 3, 2020, 4:07 p.m.), usnews.com/news/articles/2020-06-03/data-show-deaths-from-police-violence-disproportionately-affect-people-of-color

[6] The officer who engaged in the chokehold, Daniel Pantaleo, was not charged with a crime, but was ultimately fired in 2019 after an NYPD investigation. Ashley Southall, *Daniel Pantaleo, Officer Who Held Eric Garner in Chokehold, Is Fired*, New York Times (Aug. 19, 2019), nytimes.com/2019/08/19/nyregion/daniel-pantaleo-fired.html

[7] New York State Office of the Attorney General, Civil Rights Bureau, A Report on Arrests Arising From the New York City Police Department's Stop-and-Frisk Practices, Nov. 2013, ag.ny.gov/pdfs/OAG_REPORT_ON_SQF_PRACTICES_NOV_2013.pdf; New York State Office of the Attorney General, Civil Rights Bureau, The New York City Police Department's 'Stop and Frisk' Practices: A Report to the People of the State of New York from the Office of the Attorney General, Dec. 1, 1999, ag.ny.gov/sites/default/files/pdfs/bureaus/civil_rights/stp_frsk.pdf.

[8] Press Release, New York State Department of Labor, NYS Department of Labor Announces Over $4.6 Billion in Unemployment Benefits Distributed to New Yorkers Since Beginning of COVID-19 Crisis (May 1, 2020), labor.ny.gov/pressreleases/2020/may-01-2020-1.shtm

[9] Maria Godoy & Daniel Wood, *What Do Coronavirus Racial Disparities Look Like State by State?*, National Public Radio (May 30, 2020, 6:00 a.m.), npr.org/sections/health-shots/2020/05/30/865413079/what-do-coronavirus-racial-disparities-look-like-state-by-state

[10] Rajesh Kumar Singh & Nathan Layne, *New York City's low-income, minority areas hit hardest by COVID-19, Cuomo says*, Reuters, (May 20, 2020, 12:12 p.m.), reuters.com/article/us-health-coronavirus-usa-new-york/new-york-citys-low-income-minority-areas-hit-hardest-by-covid-19-cuomo-says-idUSKBN22W2IG

[11] Lauren Aratani & Dominic Rush, *African Americans Bear the Brunt of COVID-19's Economic Impact*, The Guardian (Apr. 28, 2020, 7:00 a.m.), theguardian.com/us-news/2020/apr/28/african-americans-unemployment-covid-19-economic-impact

[12] See Patricia Cohen & Ben Casselman, *Minority Workers who Lagged in a Boom Are Hit Hard in a Bust*, New York Times (Jun. 6, 2020), nytimes.com/2020/06/06/business/economy/jobs-report-minorities.html

[13] Center for Responsible Lending, *The Paycheck Protection Program Continues to be Disadvantageous to Smaller Businesses, Especially Businesses Owned by People of Color and the Self-Employed* (last updated May 27, 2020) responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-cares-act2-smallbusiness-2020.pdf

[14] Kim Bellware, *Violent arrest in New York raises questions about police enforcement of social distancing orders*, Washington Post (May 5, 2020), washingtonpost.com/nation/2020/05/05/donni-wright-nyc-arrest

[15] Press Release, New York State Office of the Attorney General, *AG James Calls on NYPD to Ensure Equal Social Distancing Enforcement in NYC Communities* (May 13, 2020),

ag.ny.gov/press-release/2020/ag-james-calls-nypd-ensure-equal-social-distancing-enforcement-nyc-communities

[16] Mark Sundstrom, *Video: Controversial arrest of mom in Brooklyn subway station after face-mask confrontation*, PIX11 (May 14, 2020, 9:43 a.m.),

pix11.com/news/local-news/brooklyn/video-controversial-arrest-of-mom-in-brooklyn-subway-station-after-face-mask-confrontation

[17] The Legal Aid Society, *Racial Disparities in NYPD's COVID-19 Policing: Unequal Enforcement of 311 Social Distancing Calls* (last updated May 2020),

legalaidnyc.org/wp-content/uploads/2020/05/LAS_Racial-Disparities-in-NYPDs-COVID-19-Policing_5.20.20_5PM_FINAL.pdf
The COVID-19 related summons and arrest data produced by NYPD included any offense the NYPD deemed at all related to the COVID-19 crisis.

[18] Press Release, Office of the New York City Comptroller, *Comptroller Stringer: 311 Data Spotlights the City's Discriminatory Enforcement of Social Distancing Amid the COVID-19 Pandemic* (May 22, 2020),

comptroller.nyc.gov/newsroom/comptroller-stringer-311-data-spotlights-the-citys-discriminatory-enforcement-of-social-distancing-amid-the-covid-19-pandemic

[19] *Protests Continue to Rage After Death of George Floyd*, New York Times,  (May 28, 2020),

nytimes.com/2020/05/28/us/george-floyd-national-guard.html#link-450cda0c [hereinafter "New York Times 5/28"]

[20] NYT 5/28; Jake Offenhartz, *George Floyd Protest In Union Square Met With 'Aggressive' NYPD Response, Multiple Arrests*, *Gothamist* (May 28, 2020, 6:39 p.m.),

gothamist.com/news/george-floyd-protest-union-square-aggressive-nypd-response-multiple-arrests

[21] Gwynne Hogan, et al. *72 Arrested At George Floyd Protests In Lower Manhattan*, Gothamist, (May 29, 2020, 10:19 a.m.),
gothamist.com/news/photos-george-floyd-protests-lower-manhattan-arrests [hereinafter "Gothamist 5/29"];
*At Least 40 Arrests Made At Union Square Protest Over George Floyd's Death*, CBS New York, (May 28, 2020, 11:53 p.m.),
newyork.cbslocal.com/2020/05/28/several-arrests-made-at-union-square-protest-over-george-floyds-death

[22] Gothamist 5/29

[23] *Protests in George Floyd's death turn violent in Brooklyn; cops injured, hundreds arrested*, WABC, (May 29, 2020),
abc7ny.com/6218834 [hereinafter "WABC 5/29"]

[24] Here, and unless otherwise specified, "arrest" includes felonies, misdemeanors as well as violations where only a summons was issued. All records related to juveniles have been excluded from any analysis. NYPD provided OAG initial data of arrests identified as protest-related arrests for May 28th through June 5th. They later provided documents related to all felony and misdemeanor arrests (but not summons) citywide for May 28 to June 7, which OAG used to include additional protest-related arrests that were not captured in the previous data. This arrest data includes certain arrests for thefts from stores that occurred near protest activity or were in the initial protest related data the NYPD provided. The data includes around 50 arrests that were later voided. To best capture the nature of protest activity that often ran past midnight, OAG's analysis assigns arrests to each date beginning at 5am that date until 5am the next day.

[25] WABC 5/29.; *Dozens Arrested, Officers Injured As Another Round Of Protests Over George Floyd's Death Takes Place In Manhattan, Brooklyn*, CBS New York (May 29, 2020, 11:46 PM), newyork.cbslocal.com/2020/05/29/george-floyd-protest; Edgar Sandoval, *Protests Flare in Brooklyn Over Floyd Death as de Blasio Appeals for Calm*, New York Times (May 30, 2020), nytimes.com/2020/05/30/nyregion/nyc-protests-george-floyd.html [hereinafter "New York Times 5/30"]

[26] Gothamist 5/30

[27] Individuals who have been publicly identified are named here.

[28] Ashley Southall, *Officer Who Violently Shoved Protester in Brooklyn Is Charged With Assault*,  New York Times (Jun. 15, 2020), nytimes.com/2020/06/09/nyregion/nypd-officer-vincent-dandraia-arrest.html [hereinafter "New York Times 6/15"]

[29] Gothamist 5/30; New York Times 5/30

[30] Gothamist 5/30

[31] Ron Lee, Lindsay Tuchman, & Michael Herzenberg, *We Were Out Covering Protests in NYC This Weekend. This Is What We Saw*, Spectrum News NY1 (Jun. 2, 2020, 7:07 p.m.), ny1.com/nyc/all-boroughs/news/2020/06/01/reporter-ron-lee-on-protest-coverage-in-new-york-city [hereinafter "NY1 6/2"]

[32] Gothamist 5/30

[33] Nicole Hong & William K. Rashbaum, *The 2 Lawyers, the Anti-Police Protests and the Molotov Cocktail Attack*, New York Times (Jun. 7, 2020), nytimes.com/2020/06/07/nyregion/molotov-cocktail-lawyers-nyc.html

[34] Tom Winter, *2 Lawyers, Upstate Woman With Criminal History Charged in NYPD Firebombings*, NBC  New York, (May 31, 2020), nbcnewyork.com/news/local/upstate-ny-woman-behind-molotov-cocktail-attack-on-nypd-officers-2-others-federally-charged/2440200

[35] William K. Rashbaum & Andrea Salcedo, Two Lawyers Arrested in Molotov Cocktail Attack on Police in Brooklyn, New York Times (May 31, 2020), nytimes.com/2020/05/31/nyregion/nyc-protests-lawyer-molotov-cocktail.html

[36] Nick Pinto, *Over 300 Arrested In Third Day Of Explosive George Floyd Protests In NYC*, Gothamist, (May 31, 2020, 1:44 p.m.), gothamist.com/news/over-300-arrested-third-day-explosive-george-floyd-protests-nyc [hereinafter "Gothamist 5/31"].

[37] *Id.*

[38] Caterina Gioino & Leonard Greene, *Pepper-sprayed Brooklyn protester says cop was trying to incite violence*, New York Daily News, (Jun. 5, 2020), nydailynews.com/new-york/ny-pepper-spray-protest-brooklyn-20200605-4wjnsh5vsrdhdh7jubxmg5wpdi-story.html

[39] Gothamist 5/31.

[40] Id.; Alan Feuer & Azi Paybarah, *Thousands Protest in N.Y.C., Clashing With Police Across All 5 Boroughs*, New York Times (last updated Jun. 11, 2020), nytimes.com/2020/05/30/nyregion/protests-nyc-george-floyd.html [hereinafter "New York Times 5/30"].

[41] Gothamist 5/31.

[42] Gothamist 5/31.

[43] New York Times 5/30.

[44] NY1 6/2.

[45] New York Times 5/30.

[46] NY1 6/2.

[47] New York Times 5/30.

[48] Gothamist 5/31.

[49] In 2006, Sean Bell was an unarmed Black man shot in 2006 by NYPD officers, on the morning of his wedding. Five officers were involved in the shooting: one was ultimately fired by the NYPD, one left of his own accord, and three were forced to resign. Three officers were acquitted of manslaughter charges.

[50] Sydney Pereira, Gwynne Hogan, & Jake Offenhartz, *As Night Falls, NYC Protests Against Police Violence Grow Chaotic*, Gothamist (May 31, 2020, 4:19 p.m.), gothamist.com/news/live-updates-hundreds-demonstrators-protest-police-violence-fourth-day-action-nyc [hereinafter "Gothamist Day 4"]

[51] Jake Offenhartz (@jangelooff), Twitter (May 31, 2020, 8:27 p.m.), twitter.com/jangelooff/status/1267251471982215169

[52] Gothamist Day 4

[53] Jake Offenhartz & Gwynne Hogan, *SoHo 'Gutted' By Looting As NYPD Continues Aggressive Crackdown On Protests*, Gothamist (Jun. 1, 2020, 9:51 a.m.), gothamist.com/news/soho-gutted-looting-nypd-continues-aggressive-crackdown-protests [hereinafter "Gothamist 6/1-I"]

[54] Gothamist Day 4

[55] *N.Y.C. Protests Turn Violent*, New York Times (May 31, 2020), nytimes.com/2020/05/31/nyregion/nyc-protests-george-floyd.html

[56] Id.

[57] Id.

[58] Id.

[59] Gothamist 6/1-I.

[60] Wes Parnell & John Annese, *As protest rages in Brooklyn, looters strike in SoHo*, N.Y. Daily News (Jun. 1, 2020), nydailynews.com/new-york/nyc-crime/ny-looters-strike-in-soho-as-protesters-gather-in-brooklyn-20200601-wvyof3rdibeezhjh2zfnesm2lq-story.html; Rachel Olding (@rachelolding), Twitter (Jun. 1, 2020, 8:49 p.m.), twitter.com/rachelolding/status/1267619316326895616; Liam Stack (@liamstack), Twitter (Jun. 1, 2020, 7:57 p.m.), twitter.com/liamstack/status/1267606156920455171

[61] Elizabeth Rosner, Joe Marino & Kenneth Garger, *Looters clash with protesters as another night of chaos erupts in NYC*, New York Post (Jun. 1, 2020), nypost.com/2020/06/01/nyc-looters-clash-with-protesters-as-another-night-of-chaos-erupts

[62] Points in this map are slightly offset from their true locations for visibility purposes.

[63] Sydney Pereira & Jake Offenhartz, *Protesters March During NYC's First Curfew In Decades, Looting Continues Despite Police Increase,*  Gothamist, (Jun. 2, 2020, 11:49 a.m.), gothamist.com/news/protesters-march-during-nycs-first-curfew-decades-looting-continues-despite-police-increase; *CURFEW IN HARLEM RELAXED TO 11:30; But Ban on Liquor Sales Will Stay Until Further Notice*, New York Times, (Aug. 4, 1943), nytimes.com/1943/08/04/archives/curfew-in-harlem-relaxed-to-1130-but-ban-on-liquor-sales-will-stay.html; NYC Exec. Order No. 117. (Jun. 1, 2020), nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf

[64] Elizabeth Kim, *Citywide Curfew Will Go Into Effect At 11 P.M. Tonight*, Gothamist (Jun. 1, 2020, 4:46 p.m.), gothamist.com/news/citywide-curfew-will-go-effect-11-pm-tonight

[65] Christopher Robbins et al., *Protester Says Curfew Makes It Legal For Cops 'To Brutalize Us Now'*, Gothamist (Jun. 1, 2020, 6:45 p.m.), gothamist.com/news/live-protest-updates-nyc-faces-prospect-curfew-wake-soho-looting [hereinafter "Gothamist 6/1-II"].

[66] *Id.*

[67] *Id.*; Liam Stack (@liamstack), Twitter (Jun. 1, 2020, 7:52 p.m.), twitter.com/liamstack/status/1267604972285431808

[68] Liam Stack (@liamstack), Twitter (Jun. 1, 2020, 7:57 p.m.), twitter.com/liamstack/status/1267606156920455171

[69] Gothamist 6/1-II

[70] Id.; Rachel Olding (@rachelolding), Twitter (Jun. 1, 2020, 8:49 p.m.), twitter.com/rachelolding/status/1267619316326895616; Liam Stack (@liamstack), Twitter (Jun. 1, 2020, 7:57 p.m.), twitter.com/liamstack/status/1267606156920455171

[71] Gothamist 6/1-II

[72] *After Widespread Looting, Curfew Is Moved Up to 8 P.M.*, New York Times, (Jun. 1, 2020), nytimes.com/2020/06/01/nyregion/nyc-protests-george-floyd.html [hereinafter "New York Times 6/1"]; Tyler Blint-Welsh (@tylergabriel_), Twitter (May 31, 2020, 10:51 p.m.), twitter.com/tylergabriel_/status/1267287516345925632

[73] Debora Fougere, *NYC Officially Under Curfew; Second Set for Tuesday Night, de Blasio Says*, Spectrum News NY1 (Jun. 2, 2020, 1:33 a.m.), ny1.com/nyc/all-boroughs/news/2020/06/01/new-york-city-curfew-protests; Shant Shahrigian, *After Night of Chaos, Mayor de Blasio Extends NYC Curfew for Rest of Week* (Jun. 2, 2020), msn.com/en-us/news/us/after-night-of-chaos-mayor-de-blasio-extends-nyc-curfew-for-rest-of-week/ar-BB14VoXC.

[74] *Demonstrators Linger After Curfew and Some Are Arrested in New York City*, New York Times (Jun. 2, 2020), nytimes.com/2020/06/02/nyregion/nyc-protests-george-floyd.html [hereinafter "New York Times 6/2"].

[75] Jake Offenhartz, et al., *Despite More Violent Arrests Of Peaceful Protesters, De Blasio Sees 'A Very Different Picture'*, Gothamist (Jun. 3, 2020, 2:10 p.m.), gothamist.com/news/george-floyd-protests-nyc-nypd-police-arrests-curfew-photos [hereinafter "Gothamist 6/3"].

[76] *Id.*

[77] Matt Tracy, *Cops Turn Violent on Queer Protesters in Manhattan*, Gay City News, (Jun. 3, 2020), gaycitynews.com/cops-turn-violent-on-queer-protesters-in-manhattan

[78] NYT 6/2

[79] NYT 6/2; Gothamist 6/3

[80] NYT 6/2; Gothamist 6/3; *Police shove, make AP journalists stop covering protest*, Associated Press (Jun. 3, 2020), apnews.com/1d2d9e4afdd822b27bfcce570e0cbdb5; Akela Lacy (@akela_lacy), Twitter (Jun. 2, 2020, 10:49 p.m.), twitter.com/akela_lacy/status/1268011940057661441

[81] *Looters hit Fordham Road stores following another day of protests*, Bronx News (June 2, 2020), bronx.news12.com/story/42199253/looters-hit-fordham-road-stores-following-another-day-of-protests; Winnie Hu & Nate Schweber, *The Virus Closed His Bronx Jewelry Store, The Looters Broke In*, New York Times (June 3, 2020), nytimes.com/2020/06/03/nyregion/george-floyd-bronx-protests-looting.html

[82] New York Times 6/2; Elizabeth Rosner, et al., *Looters strike several NYC stores — but curfew appears to curb chaos*,  New York Post (Jun. 3, 2020, 12:30 a.m.), nypost.com/2020/06/03/looters-strike-several-stores-in-nyc-but-curfew-appears-to-curb-chaos

[83] New York Times 6/2

[84] *After Curfew, Police Arrest Dozens of Protesters in New York City*, New York Times (Jun. 3, 2020), nytimes.com/2020/06/03/nyregion/nyc-protests-george-floyd.html [hereinafter"NYT 6/3"]; *'No more tolerance': NYPD breaks up peaceful protests after curfew*, WABC (Jun. 4, 2020), abc7ny.com/6231451/ [hereinafter "WABC 6/4"]

[85] New York Times 6/3; Elizabeth Kim, et al., *Peaceful Demonstrations Met With Aggressive Policing & Many Arrests After Curfew*, Gothamist (Jun. 3, 2020, 11:45 a.m.), gothamist.com/news/live-protest-updates-after-earlier-curfew-arrests-and-looting-decline

[86] *Id.*; Ali Watkins, *'Kettling' of Peaceful Protesters Shows Aggressive Shift by N.Y. Police*, New York Times (Jun. 5, 2020), nytimes.com/2020/06/05/nyregion/police-kettling-protests-nyc.html [hereinafter "New York Times 6/5"]; New York Times 6/3

[87] New York Times 6/3; WABC 6/4

[88] Edward Sandoval & Sean Piccoli, *Police Shoot Brooklyn Man After He Stabs Officer, Officials Say*, New York Times (June 4, 2020), nytimes.com/2020/06/04/nyregion/nypd-officers-shot-brooklyn.html

[89] New York Times 6/5; Elizabeth Kim, et al, *Cops Kettle Protesters Then Begin Aggressively Arresting Them At Bronx March*, Gothamist (Jun. 4, 2020, 10:10 p.m.), gothamist.com/news/live-protest-updates-june-4 [hereinafter "Gothamist 6/4"].

[90] Gothamist 6/4; *After Curfew, Protesters Are Again Met With Strong Police Response in New York City,* New York Times, (Jun. 4, 2020), nytimes.com/2020/06/04/nyregion/nyc-protests-george-floyd.html#link-5f1d02d0 [hereinafter "New York Times 6/4"].

[91] Gothamist 6/4; New York Times 6/4

[92] Legal observers attend protests and monitor and document police conduct.

[93] Gothamist 6/4

[94] Jake Offenhartz, *'Round Up The Green Hats': NYPD Accused Of Deliberately Targeting Legal Observers In Brutal Bronx Mass Arrest*, Gothamist (Jun. 8, 2020, 5:13 p.m.), gothamist.com/news/round-green-hats-nypd-accused-deliberately-targeting-legal-observers-brutal-bronx-mass-arrest; Letter from Andy Izenson to Commissioner Dermot Shea (Jun. 7, 2020), scribd.com/document/464875743/2020-6-7-Nlgnyc-Lo-Letter-Final-Ocr-730pm-1#from_embed

[95] *Id.*

96 *Id.*; *George Floyd protests updates: NYC demonstrations largely peaceful, some arrests on Friday*, WABC (Jun. 5, 2020),
abc7ny.com/nyc-protests-largely-peaceful-some-arrests-on-friday/6232618

97 New York Times 6/4

98 Gothamist 6/4

99 Graham Rayman, *George Floyd protest in Bronx started peacefully but ended with NYPD officers swinging batons,*
*witnesses say,* New York Daily News (Jun. 5, 2020),
nydailynews.com/new-york/nyc-crime/ny-bronx-protest-nypd-outside-agitators-20200605-uvgm5vj4rjd6vmnnz2aleljree-story.html

100 Id.

101 Craig McCarthy, *NYPD Commissioner Dermot Shea ignores his own 'misinformation' warnings*, New York Post (Jun. 8, 2020, 2:52 p.m.),
nypost.com/2020/06/08/nypd-commissioner-ignores-his-own-misinformation-warnings

102 *Some N.Y.C. Protests Ended Quietly. Others Ended in Arrests*, New York Times (Jun. 5, 2020),
nytimes.com/2020/06/05/nyregion/nyc-protests-george-floyd.html; Christopher Robbins, et al., *Brooklyn Protests End With Dozens*
*Of Arrests In Crown Heights*, Gothamist (Jun. 5, 2020, 11:30 p.m.), gothamist.com/news/live-protest-updates-june-5-2020

103 David Cruz, et al., *Protesters Take One Final Knee At Barclays Center To Cap Night Of Peaceful Protests*, Gothamist
(Jun. 6, 2020, 6:59 p.m.), gothamist.com/news/live-protest-updates-june-6-2020; *N.Y. Protesters Defy Curfew, but 10th Night of*
*Marches Ends Peacefully,* New York Times (Jun. 6, 2020), nytimes.com/2020/06/06/nyregion/nyc-protests-george-floyd.html;
*Mayor De Blasio Lifts Curfew In New York City 1 Day Ahead Of Schedule*, CBS New York (Jun. 7, 2020, 12:41 p.m.),
newyork.cbslocal.com/2020/06/07/mayor-de-blasio-lifts-curfew-in-new-york-city

104 The NYPD provided data for arrests and summons from May 28 through June 5, as well as misdemeanor and arrests citywide
for May 28 to June 7. As such there may be protest related violations that resulted in summons between June 5 and June 7
that are not captured in this report.

105 Sydney Pereira, *De Blasio Ends Curfew One Day Early As NYC Prepares To Reopen*, Gothamist (Jun. 7, 2020, 9:54 a.m.),
gothamist.com/news/new-york-city-lifts-8-pm-curfew

106 *In New York Protests, a Night Without Curfew or Conflict*, New York Times (Jun. 11, 2020),
nytimes.com/2020/06/07/nyregion/nyc-protests-george-floyd.html

107 David Cruz, et al., *Peaceful Marches Continue In NYC, Including Rockaway Beach*, Gothamist (Jun. 13, 2020, 5:00 p.m.),
gothamist.com/news/live-protest-updates-june-13-2020

108 The Queer Liberation March occurred for the first time 2019, in protest of the corporatization of the official New York City Pride March.
While the Pride March was canceled this year due to COVID-19, the Queer Liberation March continued, this time in honor of black lives.

109 Sydney Pereira & Aviva Stahl, *NYPD Officers Arrest And Pepper Spray Queer Liberation March Protesters*, Gothamist
(Jun. 28, 2020, 6:04 p.m.), gothamist.com/news/nypd-officers-arrest-and-pepper-spray-queer-liberation-march-protesters
[hereinafter "Gothamist 6/28"]

[110] Id., Mihir Zaveri & Michael Gold, *How the Virus and Protests Changed a 50-Year Celebration of Pride*, New York Times (Jun. 28, 2020), nytimes.com/2020/06/28/nyregion/nyc-pride-events-2020.html [hereinafter "New York Times 6/28"]

[111] New York Times 6/28

[112] Matthew Chayes, *LGBTQ march goes forward live, with anti-police demands*, Newsday (Jun. 29, 2020, 3:06 p.m.), newsday.com/news/new-york/lgbtq-march-manhattan-1.46201652 [hereinafter "Newsday 6/29"]

[113] Gothamist 6/28, Newsday 6/29

[114] New York Times 6/28

[115] Newsday 6/29; Matthew Chayes (@chayesmatthew), Twitter (Jun. 28, 2020, 4:21 p.m.), twitter.com/chayesmatthew/status/1277336251239145473

[116] Gothamist 6/28.

[117] Jake Offenhartz and Gwynne Hogan, *NYPD Officers Rough Up Protesters Occupying City Hall In Show of Force Before Budget Vote*, Gothamist, (June 30, 2020), gothamist.com/news/nypd-officers-rough-protesters-occupying-city-hall-show-force-budget-vote

[118] Arrests that took place on bridges without borough specific location or indicator were not included in individual borough counts.

[119] NYPD provided data for arrests and summons from May 28 through June 5, as well as misdemeanor and arrests citywide for May 28 to June 7. As such there may be protest related violations that resulted in summons between June 5 and June 7 that are not captured in this report.

[120] The primary felony charges included burglary, assault, rioting, criminal possession of stolen property and criminal mischief. The primary misdemeanor charges included violating curfew, unlawful assembly, obstructing government administration, criminal possession of stolen property, resisting arrest, rioting, and trespassing.

[121] Many of these submissions concerned the same incidents that were witnessed by multiple individuals, shared on social media and/or reported in the press.

[122] Yasmeen Khan, *Who Is Investigating The NYPD For Misconduct During The Protests? (And Will It Matter?)*, Gothamist (June 12, 2020, 9:25 a.m.), gothamist.com/news/investigating-nypd-misconduct-during-protests-and-will-it-matter [hereinafter "Gothamist 6/12"]

[123] See description of testimony of John Darche from the CCRB, infra.

[124] New York Times 6/15

[125] Gothamist 6/12

[126] This practice is generally used by NYPD when processing mass arrests. Witnesses described that this process made it more difficult to locate arrestees or for arrestees to travel home.

[127] Hearing Testimony of Commissioner Dermot Shea Before N.Y. State Office of the Attorney General (Jun. 22, 2020), ag.ny.gov/NYPDtestimony.

[128] The PBA represents police officers, the SBA represents sergeants and the CEA represents all uniformed ranks of captain, deputy inspector and, inspector, deputy chief, and surgeon. The Detectives Endowment Association, who represents all detectives, and the Lieutenants Benevolent Association, who represents lieutenants, did not submit any written testimony.

[129] *Letter from Edward Mullins to Attorney General James* (Jun. 23, 2020), private.sbanypd.nyc/content/ag-letitia-james.pdf

[130] N.Y. City Charter § 434(a)

[131] Detroit, Mich. City Charter Sec. 7-803. The San Francisco Police Commission sets department policy, approves the department's budget, and hears and decides disciplinary cases. CITE TO San Francisco, Cal., Charter Sec. 4. 136

[132] The San Francisco Police Commission sets department policy, approves the department's budget, and hears and decides disciplinary cases. CITE TO San Francisco, Cal., Charter Sec. 4. 136.

[134] *Dan Keating and Kevin Uhrmacher In urban areas, police are consistently much whiter than the people they serve*, Washington Post, (June 4, 2020), washingtonpost.com/nation/2020/06/04/urban-areas-police-are-consistently-much-whiter-than-people-they-serve

[135] Andy Mannix, *Killing of George Floyd shows that years of police reform fall far short*, Star Tribune, (June 20, 2020), startribune.com/killing-of-george-floyd-shows-that-years-of-police-reform-fall-far-short/571373582

[136] Greg B. Smith, *Despite diversity gains, top NYPD ranks fall short of reflecting communities*, The City, (September 3, 2019), brooklyneagle.com/articles/2019/09/03/nypd-diversity-top-ranks

[137] *Id.*

[138] Renee Stepler, *Female Police Officers On-the-Job Experiences Diverge from Those of Male Officers*, FactTank Pew Research Center, (January 17, 2017), pewresearch.org/fact-tank/2017/01/17/female-police-officers-on-the-job-experiences-diverg

[139] Greg B. Smith, *Despite diversity gains, top NYPD ranks fall short of reflecting communities*, The City, (September 3, 2019), brooklyneagle.com/articles/2019/09/03/nypd-diversity-top-ranks

[140] Christina Asquith, *Why Aren't U.S. Police Departments Recruiting More Women?*, The Atlantic, (August 30, 2016), theatlantic.com/politics/archive/2016/08/police-departments-women-officers/497963

[141] Renee Stepler, *Female Police Officers On-the-Job Experiences Diverge from Those of Male Officers*, FactTank Pew Research Center, (January 17, 2017), pewresearch.org/fact-tank/2017/01/17/female-police-officers-on-the-job-experiences-diverg

[142] Benjamin Mueller, *Black Detectives in New York Were Bypassed for Promotions, Panel Finds*, New York Times, (September 21, 2017), nytimes.com/2017/09/21/nyregion/black-detectives-in-new-york-were-bypassed-for-promotions-panel-finds.html

[143] N.Y. City Charter §§ 1041-1047

[144] N.Y. City Charter § 1043(d)(1)

[145] One notable exception is the creation of the a new Body-worn Camera Policy in 2016 and 2017, where the NYPD worked with the Policing Project at New York University School of Law to survey more 25,000 members of the public and 50 community groups and the Marron Institute of Urban Management at New York University to survey more than 5,000 uniformed officers. N.Y.P.D., NYPD Response to Public and Officer Input on the Department's Proposed Body-Worn Camera Policy (Apr. 2017).

[146] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 591–602 (S.D.N.Y. 2013) (describing a range of ways that officials communicated priorities to officers).

[147] Adam Goldman & Matt Apuzzo, *With CIA Help, NYPD Moves Covertly in Muslim Areas*, Associated Press (Aug. 23, 2011), nbcnewyork.com/news/local/with-cia-help-nypd-moves-covertly-in-muslim-areas/1926933

[148] N.Y. City Dept. of Investigation, Off. of the Inspector Gen., Sixth Annual Report (Apr. 9, 2020).

[149] David Cruz, *Council Unveils Proposal to Cut $1 Billion From NYPD Budget, Identifying "Inefficiencies,"* Gothamist, (Jun. 13, 2020 at 1:05 p.m.) gothamist.com/news/council-unveils-proposal-to-cut-1-billion-from-nypd-budget-identifying-inefficiencies

[150] Dana Rubinstein and Jeffery C. Mays, *Nearly $1 Billion Is Shifted From Police in Budget That Pleases No One*, New York Times, (Jun. 30, 2020), nytimes.com/2020/06/30/nyregion/nypd-budget.html

[151] New York City Council *The Criminal Justice Reform Act: One Year Later*, council.nyc.gov/the-criminal-justice-reform-act-one-year-later

[152] According to a 2016 NYPD Inspector General report, an analysis of quality of life enforcement in 2015 found a positive correlation between the rate of summonses and misdemeanor arrests and the proportion of Black and Hispanic residents, NYCHA residents, and men aged 15 to 20. Areas with more white residents had less quality-of-life enforcement. New York City Department of Investigation Office of the Inspector General for the NYPD, *An Analysis of Quality of Life Summonses, Quality-of-Life Misdemeanor Arrests, and Felony Crime in New York City, 2010-2015*, nyc.gov/assets/oignypd/downloads/pdf/Quality-of-Life-Report-2010-2015.pdf

[153] N.Y. City Admin. Code § 19-176; Julianne Cuba, *NYPD Targets Black and Brown Cyclists For Biking On The Sidewalk*, StreetsBlog NYC, (Jun. 22, 2020), nyc.streetsblog.org/2020/06/22/nypd-targets-black-and-brown-cyclists-for-biking-on-the-sidewalk ("Police issued 440 tickets for biking on the sidewalk in 2018 and 2019, and 374 of those where race was listed — or 86.4 percent — went to Black and Hispanic New Yorkers").

[154] Gersh Kuntzman, *'Jaywalking While Black': Final 2019 Numbers Show Race-Based NYPD Crackdown Continues*, (Jan. 27, 2020), StreetsBlog NYC, nyc.streetsblog.org/2020/01/27/jaywalking-while-black-final-2019-numbers-show-race-based-nypd-crackdown-continues ("Over the entire year, cops issued 90 percent of illegal walking tickets citywide to blacks and Hispanics, mirroring Streetsblog's findings for the first three-quarters of 2019").

[155] NYCLU, Legislative Memo: L*oitering Repeal*, (Jun. 18, 2019), nyclu.org/en/legislation/legislative-memo-loitering-repeal

[156] Ashley Southall, *Subway Arrests Investigated Over Claims People of Color Are Targeted*, New York Times, (Jan. 13, 2020), nytimes.com/2020/01/13/nyregion/letitia-james-fare-beating-nypd.html

[157] NYPD, H*istoric Criminal Court Summons Report 2007-2019*, www1.nyc.gov/site/nypd/stats/reports-analysis/c-summons.page

[158] Leon Neyfakh, *Does Decriminalization Work?*, Slate, (February 17, 2015),
slate.com/news-and-politics/2015/02/decriminalization-why-reducing-the-punishments-for-misdemeanors-doesnt-necessarily-make-the-criminal-justice-system-fairer.html

[159] Kay Dervishi, *What Role Should Police Play in New York's Mental Health Response,* City & State New York, (June 2, 2020),
cityandstateny.com/articles/policy/health-care/what-role-should-police-play-new-yorks-mental-health-response.html

[160] Amanda Eisenberg, *NYPD Slow to Roll Out Crisis Intervention Training*, Politico, (October 19, 2018),
subscriber.politicopro.com/article/2018/10/10/nypd-slow-to-roll-out-crisis-intervention-training-642503

[161] Annie Todd, *"They're Sort Of Giving Us Crumbs": Disappointment Over Failure To Get Cops Out of Schools,* Gothamist,
(Jul. 1, 2020 3:37 p.m.), gothamist.com/news/theyre-sort-of-giving-us-crumbs-disappointment-over-failure-to-get-cops-out-of-schools

[162] Matt Barnum, *Do Police Keep Schools Safe? Fuel the School-to-Prison Pipeline? Here's What Research Says*, Chalkbeat, (June 23, 2020),
chalkbeat.org/2020/6/23/21299743/police-schools-research

[163] *Id.*

[164] Libby Nelson and Dara Lind, *The School to Prison Pipeline Explained*, Justice Policy Institute, (February 24, 2015),
justicepolicy.org/news/8775

[165] *The Stanford Open Policing Project, The Results of Our Nationwide Analysis of Traffic Stops and Searches,* Findings,
openpolicing.stanford.edu/findings

[166] Prison Police Initiative, *Policing Women: Race and Gender Disparities in Police Stops, Searches, and Use of Force,* (May 14, 2019),
prisonpolicy.org/blog/2019/05/14/policingwomen.

[167] *Id.*

[168] Filter Staff, *NYPD to Grow Its Homeless Outreach, Amid Social Service Agency Cuts*, FilterMag, (Jun. 11, 2020),
filtermag.org/nypd-homeless-budget

[169] N.Y. City Charter § 440 as added by N.Y. City L.L. 1 of 1993

[170] Samar Khurshid, *Charter Review Commission Gives Final Approval to 19 Proposals in 5 Questions to Appear on Fall Ballot*,
Gotham Gazette, (July 25, 2019),
gothamgazette.com/city/8696-charter-revision-commission-final-approval-19-proposals-5-questions-november-ballot

[171] N.Y L. 1940, ch. 834; N.Y. City Charter § 434

[172] N.Y. City Civilian Complaint Review Bd., 2018 Annual Report, Appendix,
www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018_annual-appendix.pdf

[173] N.Y. City Civilian Complaint Review Bd., 2014-2018 Annual Reports, (2015-2020) ("Discipline Imposed for Adjudicated APU Cases")

[174] N.Y. City Charter § 440; Liena Zagare, *Not All Cops: Thousands of Officers are Immune From Civilian Complaints*,
BKLYNER.COM, (Jan. 21, 2020) bklyner.com/not-all-cops-thousands-of-officers-are-immune-from-civilian-complaints

[175] Rukmini Callimachi, *9 Departments and Multiple Infractions for One New Jersey Police Officer*, New York Times, (June 24, 2020),
nytimes.com/2020/06/24/nyregion/new-jersey-police.html

[176] Katherine J. Wu, *Study Finds Misconduct Spreads Among Police Officers Like Contagion*, Nova, (May 27, 2019), pbs.org/wgbh/nova/article/police-misconduct-peer-effects

[177] N.Y. L. 2020, ch. 96

[178] N.Y. City L.L. 70 of 2013.

[179] N.Y. City L.L. 70 of 2013

[180] N.Y. City Dept. of Investigation, Off. of the Inspector Gen., Sixth Annual Report (Apr. 9, 2020)

[181] N.Y. City Dept. of Investigation, Off. of the Inspector Gen., Sixth Annual Report (Apr. 9, 2020)

[182] N.Y. City L.L. 70 of 2013

[183] N.Y. City Dept. of Investigation, Off. of the Inspector Gen., Sixth Annual Report (Apr. 9, 2020)

[184] N.Y. City Dept. of Investigation, Off. of the Inspector Gen., Sixth Annual Report (Apr. 9, 2020)

[185] NY CPL § 35.30

[186] *Id.*

[187] American Law Institute, *Principles of the Law: Policing, Part III Chapter 5, § 5.06*, (2017), ali.org/media/filer_public/f2/80/f2804962-6431-4535-9649-34c5f872140e/policing-uof-online.pdf

[188] *Id.*

[189] *Id.*

[190] The New York City Council and New York State Legislature both passed laws in June 2020 that establish criminal liability for officers that engage in chokeholds or otherwise prevent breathing; however, the State law only applies if the action causes serious physical injury or death, meaning that officers may still engage in the conduct provided they do not cause serious physical injury or death. N.Y. City Int. No. 536-B of 2018; N.Y L. 2020, ch. 94

[191] NY CPL § 35.30

[192] *Id.*

[193] *Id.*