UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| BENJAMIN CASE, ELIZABETH CATLIN, JENNIFER KLEIN, and MARK KUSHNEIR, | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| -v- | **Index No. 14-cv-9148 (AT)** |
| THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT ("NYPD") CHIEF OF DEPARTMENT JOSEPH ESPOSITO, NYPD DEPUTY CHIEF BRIAN MCCARTHY, NYPD LIEUTENANT DAVID GROHT, NYPD SERGEANT LAWRENCE PAPOLA, SHIELD NO. 03646, NYPD OFFFICER BENJAMIN ALMONTE, SHIELD NO. 29182, NYPD OFFICER DANIEL CONFORTI, SHIELD NO. 26403, NYPD OFFICER FIRST NAME UNKNOWN ("FNU") DOWNES, SHIELD NO. UNKNOWN, NYPD OFFICER DMITRY TVERDOKHLEB, SHIELD NO. 27018, and NYPD OFFICER MICHAEL MALDONADO, SHIELD 23573, | **ECF CASE** |
| Defendants. | |

---

Plaintiffs, by their counsel, GIDEON ORION OLIVER, as and for their Second

Amended Complaint against Defendants, hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil

rights, as secured by said statutes and the Constitution of the United States and the Constitution

and laws of the State of New York.

2.      On November 17, 2011, plaintiffs participated in peaceful activities protected by,

*inter alia,* the First Amendment to the United States Constitution and Article I, Section 8 of the

New York State Constitution, namely, peacefully assembling and demonstrating with others in

association with Occupy Wall Street ("OWS") – a political movement dedicated to addressing interconnected grievances of the 99% *vis a vis* the 1%, including income inequality - in the Wall Street area.

3.      Beginning at around 9:00AM, without lawful authority or justification, and acting pursuant to the policies, practices, and customs complained of elsewhere herein, defendants unlawfully detained and arrested plaintiffs, using excessive force against them, subjected plaintiffs to unnecessarily lengthy mass arrest processing and detentions, maliciously abused process against, created and forwarded false evidence against plaintiffs to prosecutors as a result of which they were prosecuted, and otherwise injured plaintiffs, as set forth more fully below.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

5.      This Court has subject matter jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

6.      Venue is proper pursuant to 28 U.S.C. §1391(b) in that plaintiffs' claims arose in the Southern District of New York.

## PARTIES

7.      Plaintiff BENJAMIN CASE is a Caucasian male, and at all times relevant to this action was a resident of the State of New Jersey.

8.      Plaintiff ELIZABETH CATLIN is a Caucasian female, and at all times relevant to this action was a resident of New York State.

9.      Plaintiff JENNIFER KLEIN is a Caucasian female, and at all times relevant to this action was a resident of the State of Connecticut.

10. Plaintiff MARK KUSHNEIR is a Caucasian male, and at all times relevant to this action was a resident of New York State.

11. Defendant THE CITY OF NEW YORK ("NYC" or "City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

12. Defendant City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and Defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

13. At all times relevant herein, Defendant JOSEPH ESPOSITO was the NYPD Chief of Department, Defendant BRIAN MCCARTHY was a NYPD Deputy Chief, Defendant DAVID GROHT was a NYPD Lieutenant, and Defendant LAWRENCE PAPOLA was a NYPD Sergeant, and these Defendants were each and all supervisors, and defendants ESPOSITO, MCCARTHY, GROHT, and PAPOLA were high-level NYPD policymaking officials with respect to the acts and omissions complained of herein, who were personally involved in depriving plaintiffs of their rights and/or in developing and/or implementing the unconstitutional policies, practices, and/or customs complained of herein.

14. Defendants were personally involved in designing and/or implementing the policies and practices complained of herein, and were personally involved in or responsible for directing, supervising, and/or assisting in plaintiffs' arrests and/or arrest processing, and/or failed to intervene to prevent injuries to plaintiffs.

15. Defendants NYPD OFFFICER BENJAMIN ALMONTE, SHIELD NO. 29182, OFFICER DANIEL CONFORTI, SHIELD NO. 26403, NYPD OFFICER FIRST NAME

3

UNKNOWN ("FNU") DOWNES, SHIELD NO. UNKNOWN, NYPD OFFICER DMITRY

TVERDOKHLEB, SHIELD NO. 27018, and NYPD OFFICER MICHAEL MALDONADO,

SHIELD 23573, were at all times herein officers, employees, and agents of the NYPD and who

were personally involved in depriving plaintiffs of their rights and in implementing the

unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth

more fully below.

16.     At all times hereinafter mentioned, defendants, either personally or through their

employees, were acting under color of state law and/or in compliance with the official rules,

regulations, laws, statutes, customs, usages and/or practices of defendant City.

17.     Each and all of the acts of the defendants alleged herein were done by said

Defendants while acting within the scope of their employment by defendant City.

18.     Each and all of the acts of the defendants alleged herein were done by said

defendants while acting in furtherance of their employment by defendant City.

19.     Defendants were each and all responsible, in whole and/or in part, for the

planning for and/or creation, promulgation, implementation, and/or enforcement of the

unconstitutional policies, practices and/or customs complained of herein, and/or condoned,

acquiesced in, adopted, and/or approved of the same, and/or failed to intervene to prevent or

remedy the harms caused to plaintiffs as a result of the same, through their acts and/or failures to

act, as set forth more fully below.

20.     At all times relevant herein, as set forth more fully below, defendants' actions

and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference

to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

21.     Each individual defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

22.     NYPD Chief of Department is the highest-ranking uniformed police officer.

23.     Defendant Esposito was promoted to the rank of NYPD Chief of Department in around 2000 and served in that capacity until 2013.

24.     As set forth more fully below, at all times relevant herein, Defendants Esposito, McCarthy, Groht, and Papola (the "Supervisory Defendants") were each supervisors ranging in rank from Sergeant to Chief of Department who directed and/or supervised and/or participated in the mass arrests in which plaintiffs were swept up and as the result of which plaintiffs were seized, forcefully arrested, subjected to excessive force, including through the application of plastic flex-cuffs that were excessively tight and/or kept on for unreasonably long periods of time, subjected to unreasonably lengthy and punitive mass arrest processing and detentions, prosecuted based on false information, and otherwise injured, and/or failed to intervene to prevent or remedy injuries to plaintiffs.

25.     The remaining defendants – Defendants Almonte, Conforti, Downes, Tverdokhleb, and Maldonado - were each either personally involved in detaining and/or arresting plaintiffs, including in using force on them, and/or in processing plaintiffs' arrests, including in the creation of false statements related to plaintiffs that were forwarded to prosecutors, and/or failed to intervene to prevent or remedy injuries to plaintiffs.

26.     Defendants' mass arrest-related policies and practices applied in connection with plaintiffs' arrests, arrest processing, and prosecutions employed tactics developed and modified over the course of many years by defendant Esposito and other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the date of the incident and including events related to OWS in 2011-2012,

such as, but not limited to, the policies, practices, and customs complained of herein, and also
described and litigated in the following cases:

    a.   *Mandal, et al. v. City of New York, et al.,* 02 Civ. 1234 (SDNY) (WHP)(FM) and the
related cases challenging NYPD written and unwritten policies and practices enacted
after the police shooting of Amadou Diallo in 1999 and formalized in writing as early
as 2001 as a result of which the NYPD began detaining and fully processing through
the system persons arrested for non-criminal violations who were otherwise eligible
to be processed and released with Desk Appearance Tickets ("DATs") (*see, e.g.,*
*"Mandal I,"* 2006 WL 2950235 (Oct. 17, 2006) (denying summary judgment to
defendants on plaintiffs' First Amendment-based claims (that the policies
"constituted facial violations of [Plaintiffs'] First Amendment rights because they
were denied DATs or summonses based on the fact that they participated in
demonstrations" at *4-6) and Fourteenth Amendment – Equal Protection-based
claims (at *6-7); 2007 WL 3376897 (Nov. 13, 2007) ("*Mandal II*") (noting that
approximately 38 *Mandel* plaintiffs prevailed at trial on claims that "the City had an
unconstitutional written policy of denying persons arrested at demonstrations
individual consideration for summonses and DATs" at *2);

    b.   *Burley, et al. v. City of New York, et al.*, 03 Civ. 2915 (SDNY) (WHP)(FM) (class
action arising from mass arrests of over 200 demonstrators made during 2002 World
Economic Forum in New York City ("WEF") challenging, *inter alia*, (1) NYPD
police of detaining perceived protesters who were otherwise eligible to be released
earlier with DATs for excessive periods of time and denying them for consideration
for DAT release on the grounds of their perceived participation in protests; and (2)

policy and practice of using plastic flex cuffs "was unreasonable and excessive because of the 'manner in which the handcuffs were applied and the length of time in which'" they were handcuffed, *quoting Burley*, 2005 WL 668789 at *8 (March 23, 2005));

c. *Allen v. City of Ne York,* 03 Civ. 2829 (SDNY) (JMW)(GWG) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that "the police deliberately held them in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court," *quoting* 466 F.Supp.2d 545 (Dec. 22, 2006);

d. *Haus, et al. v. City of New York, et al.,* 03 Civ. 4915 (SDNY) (RWS)(MHD) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests involving contentions "that the arrests were made without probable cause and pursuant to a Police Department directive to engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing" involving detentions and "systemic delays", according to plaintiffs, "on the basis of identically worded allegations and [where] the charging documents were signed by officers or supervisors who had no knowledge of the facts pertinent to the charges" - "tactics . . . designed to discourage protesters from vigorously expressing their political views," 2006 WL 1148680, *1 (April 24, 2006)) and *Larsen, et al. v. City of New York, et al.*, 04 Civ. 0665 (RWS);

e. *Kunstler, et al. v. City of New York*, 04 Civ. 1145 (SDNY) (RWS)(MHD), and other related cases brought in the United States District Court for the Southern District of New York arising from purportedly false and retaliatory arrests in connection with

police responses to protests on April 7, 2003 containing *Monell* and other claims similar and related to the policies and practices complained of herein;

f. *MacNamara, et al. v. City of New York*, 04 Civ. 9216 (SDNY) (RJS) (JCF) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell, et al. v. City of New York*, 05-CV-8453 (SDNY) (RJS) (JCF), *Schiller, et al. v. City of New York, et al.*, 04 Civ. 7922 (SDNY) (RJS) (JCF), *Dinler, et al. v. City of New York, et al.*, 04 Civ. 7921 (SDNY) (RJS)(JCS), *Kyne, et al. v. Wolfowitz, et al.*, 06-CV-2041 (SDNY)(RJS)(JCF) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the Southern District of New York arising from arrests made, and policies related to, the Republican National Convention in New York City in 2004 (the "RNC") (individual and class actions brought on behalf of over 1,800 RNC-related arrestees in which the plaintiffs raised *Monell* and other claims similar and related to the policies and practices complained of herein) (*see, e.g., MacNamara*, 2007 WL 755401, at *8 (S.D.N.Y. Mar. 14, 2007) (plaintiffs sought discovery of communications they asserted were "made in furtherance of a scheme in which Legal Bureau attorneys 'aid[ed] in the systematic falsification of affidavits by arresting officers' when they met with them as part of RNC mass arrest processing, citing "evidence that the articulated probable cause was not, in many cases, a true account of the officer's observations"); (considering deposition testimony developed in the RNC cases, the Court's holdings that "one reasonable interpretation of Officer Cai's testimony is that he included false information in the narrative section of his booking report because he was instructed to do so by a Lieutenant in the NYPD Legal Bureau. More disturbing

still, Officer Cai's testimony appears to indicate that this unlawful act was not an

isolated incident," *MacNamara*, 2007 WL 3196295, at *1 (S.D.N.Y. Oct. 30, 2007);

that Cai's testimony "can be construed as indicating that Sergeant Cai recorded events

that he did not witness as if he had personally observed them. That could well

constitute a fraud, since subsequent participants in the arrest procedure-and ultimately

the criminal court-would be expected to rely on the accuracy and reliability of the

arresting officer's narrative," and that if plaintiffs could make a "showing that an

arresting officer recorded false information and did so in response to instructions that

he or she received. Those instructions would then be discoverable, even if they would

otherwise have been protected by the attorney-client privilege, *id*. at *2); *Schiller*,

2008 WL 200021 at *2-5 (January 23, 2008) (noting the City's consent to amendment

of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the City's

alleged policy of creating false sworn statements supporting the arrests" and various

members of the NYPD Legal Bureau alleged to be responsible for the systematic

creation of perjured sworn statements" as well as "constitutional challenges to the

defendants' alleged practice of detaining . . . all persons in connection with the RNC .

. . no matter how minor the infraction, rather than issuing summonses on the street");

*MacNamara,* 275 F.R.D. 125, 154 (May 19, 2011) (certifying six "mass arrest

subclasses" as well as an "Excessive Detention Class, comprising of all RNC

arrestees who were processed pursuant to the" RNC Mass Arrest Processing Plan and

a "Conditions of Confinement Class, comprising all RNC arrestees who were

handcuffed with plastic flex cuffs…."); *Dinler*, 2012 WL 4513352 (SDNY Sept. 30,

2012) at *3-12 (grating plaintiffs' motions for summary judgment on their false arrest

claims related to hundreds of persons mass arrested on August 31, 2004 RNC in

connection with a War Resisters League march) and at *12-15 (denying defendants'

motion for summary judgment on false arrest claims related to August 31, 2004 mass

arrests at East 16th Street);

g. *Callaghan, et al. v. City of New York, et al.,* 07-CV-9611 (SDNY) (PKC)(JLC)

(including the Third Amended Complaint therein, Dkt. No. 14 (*"Callaghan* TAC*"*)

(multi-plaintiff litigation challenging mass arrest policies, practices, and incidents

related to post-2004 RNC Critical Mass crackdown spanning several years, pleading

*Monell* claims virtually identical to those pleaded herein, *see, e.g., Callaghan* TAC at

Paragraph 143);

h. *People v. Pogan,* 06416-2008 (Sup. Ct., N.Y. Co.) (NYPD officer Patrick Pogan, who

purposefully swore out a false complaint and used excessive force against

Christopher Long, a peaceful participant in a Critical Mass bicycle ride, was

convicted of falsifying police records by saying that he had observed Mr. Long

commit violations when he had not in fact done so, and Pogan was prosecuted for

recklessly using physical force; his defense with respect to falsifying the police

records was that his supervisor instructed him to fill out the paperwork to create the

impression that he had observed Mr. Long engage in unlawful conduct when in fact

he had not);

i. *Long v. City of New York*, 09-CV-6099 (SDNY) (AKH) (related civil litigation);

j. *R.J. Osterhoudt v. City of New York, et al.*, NO. 10 CV 3173 (EDNY) (RJC)(RML)

(including the Second Amended Complaint and Demand for Jury Trial therein, Dkt.

No. 22) (in which a plaintiff arrested on election night in November 2008 in

Williamsburg, New York and who observed "NYPD officers picking fights and indiscriminately arresting bystanders" was "swept up in the mass arrests, . . . charged with obstructing governmental administration, resisting arrest, and disorderly conduct and detained for 17 hours before his charges were adjourned in contemplation of dismissal" alleged that "he was unlawfully arrested as part of the NYPD's custom of sweeping up arrestees at demonstrations without making individualized determinations of probable cause" and that "[t]o prop up these bad arrests, the NYPD . . . customarily encourages officers to swear false criminal complaints and discourages honest officers from reporting misconduct" and the Court denied defendants' bid to dismiss his *Monell* claims, which Osterhoudt supported "by citing other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 Republican National Convention, and the World Economic Forum" including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis . . . [that] Osterhoudt alleges . . . caused his own arrest on November 5, 2008" and that "the NYPD failure to train officers how to determine individual probable cause, instead of sweeping up arrestees *en masse*, is the same failure that led to his own unlawful arrest," 2012 WL 4481927, at *1-2 (E.D.N.Y. Sept. 27, 2012);

k. The at least sixty 1983 actions filed in the SDNY arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-Civ-5253 (SDNY) (LTS) (Dkt. No. 13) at Paragraph 89

(listing by caption and docket number many OWS-related cases as of March 13,

2015), and including those OWS cases in which the *Marom* defendants are named as

defendants or have testified as a witness;

l. The incidents discussed in the research compiled by The Global Justice Clinic at the

New York University School of Law and the Walter Leitner International Human

Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law

School in their publication entitled Suppressing Protest: Human Rights Violations in

the U.S. Response to Occupy Wall Street, published July 25, 2015, available online at

http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf

(last checked September 9, 2015); and

m. Other litigation in which the defendant City and/or the named defendants in this case

were also named as defendants or testified as witnesses, relevant to plaintiffs' *Monell*

claims.

27.     Beginning as early as he was appointed as Chief of Department, defendant

Esposito has played a central role in the NYPD's responses to perceived protest activities, and in

designing and implementing the policies, practices, and procedures complained of herein, to wit:

a. The use of police resources to corral and trap perceived participants in First

Amendment assemblies;

b. The policy and practice of failing to ensure that constitutionally meaningful

and adequate dispersal orders and opportunities to disperse are given prior to

effecting arrests in connection with First Amendment assemblies;

c. The policy and practice of treating perceived "groups" of people as a "unit"

for "mass arrest" probable cause determination purposes without ensuring that

lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived "group" as a "unit";

d.  The policy and practice of applying PL § 240.20 (5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic) in in connection with actual or perceived protest activity in circumstances where the person arrested neither created nor recklessly risked substantial disruption of vehicular or pedestrian traffic or other criminally significant public ramifications;

e.  The policy and practice of applying PL § 240.20 (6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order) in connection with actual or perceived protest activity in circumstances where neither lawful dispersal orders, nor meaningful opportunities to disperse, were in fact given;

f.  The use of arrests in lieu of individualized determinations related to arrestees' eligibility for releases with summonses for summons-eligible offenses in connection with perceived OWS demonstrations (the "No-Summons Policy");

g.  The policy and practice of assigning "arrest teams" of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to "process" the arrests of multiple arrestees, including by filling out NYPD paperwork and swearing out accusatory instruments containing false information;

h.  The policy and practice of inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the

fact designed to give the impression that assigned arresting officers witnessed or knew things they had not, in fact, witnessed or known of; and

i.    Failing to train and/or supervise NYPD officers in connection with the above.

28.    For example, on May 1, 2001, the NYPD adopted a written policy of denying arrested protesters individualized consideration for Universal Summons ("summons") or Desk Appearance Ticket ("DAT") release, which stated, in pertinent part: "Effective immediately, a Universal Summons returnable to Criminal Court or a Desk Appearance Ticket may not be issued for any offense committed at or in connection with a demonstration or similar event at which more than twenty people are participating. All persons arrested at such events must be processed on-line." *Mandal I* at *1, *3.

29.    Then, as now, a DAT was legal process consisting of "'an appearance ticket issued in lieu of [more prolonged] detention, at the direction of a [NYPD] desk officer, for misdemeanors, violations, and certain Class 'E' felonies for hospitalized prisoners,'" *Mandal I* at *1 (internal citations omitted).

30.    Similarly, a Universal Summons was and remains legal process issued in lieu of more prolonged detention by NYPD officers for certain violations and misdemeanors.

31.    In defending the written policy, the defendants argued that defendant Esposito had adopted the written policy and defendant Esposito testified related to the policy and its adoption in depositions on October 14, 2003 and July 20, 2004. *Mandal I* at *3.

32.    Approximately 38 *Mandel* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs." *Mandal II* at *2.

33. As demonstrated in the discovery developed in the cases cited above and discussed above, the NYPD enacted similar policies and practices in connection with policing the 2002 WEF and 2003 anti-war protests in the run-up to the 2004 RNC.

34. In the period before the 2004 RNC beginning in early 2003, defendant Esposito was among the high-level NYPD policymaking officials on the NYPD's Executive Committee who were personally involved in planning for aspects of the NYPD's response to the 2004 RNC and other protest activities, including the NYPD's responses to anticipated mass protests, mass arrests, and mass arrest processing and prosecution in connection with the RNC.

35. In the period before the 2004 RNC beginning in early 2003, defendant Esposito attended meetings at which planning for anticipated mass protests, mass arrests, and mass arrest processing were discussed, and/or sent representatives to such meetings, who reported back to him, including such meetings with then-NYPD Commissioner Raymond Kelly, and other high-level NYPD policymaking officials.

36. The NYPD's final RNC mass arrest processing plans included an additional arrest processing procedure, not usually followed in other arrest situations, during which each "arresting officer" would meet with a supervisor from the NYPD's Legal Bureau.

37. The NYPD's final mass arrest processing plan (the "RNC MAPP") included an additional arrest processing procedure, not usually followed in other arrest situations, during which each "arresting officer" would meet with a supervisor from the NYPD's CJB.

38. The City adopted a "no-summons" policy with respect to RNC-related arrestees.

39. Defendant Esposito was personally involved in the NYPD's decisions to enact the RNC MAPP with respect to RNC-related arrestees.

40.     Defendant Esposito was personally involved in the NYPD's decision to enact a "no-summons" policy with respect to RNC-related arrestees.

41.     As a result of the City's and the NYPD's crowd and disorder control planning, the NYPD engaged in mass arrests during the 2004 RNC.

42.     Between August 27, 2004 and September 2, 2004, there were over 1,800 RNC-related arrests.

43.     As a result of the City's and the NYPD's crowd and disorder control planning, the NYPD failed to make individualized determinations of probable cause in connection with many RNC-related arrests.

44.     As a result of the City's and the NYPD's mass arrest and mass arrest processing plans with respect to RNC-related arrestees, excessive force was used against many arrestees without any meaningful NYPD documentation.

45.     As a result of the City's and the NYPD's mass arrest policies and practices, the no-summons policy, and the RNC MAPP, RNC-related arrestees' arrest-to-release time vastly exceeded the time it would have taken them to be released with a summons, and in many cases doubled and otherwise far exceeded non-RNC-related arrestees' arrest-to-arraignment times.

46.     As a result of the City's and the NYPD's mass arrest policies and practices, the no-summons policy, and the RNC MAPP, the New York State Supreme Court held Defendant City in contempt of court for failing to release hundreds of arrestees who had been detained in excess of 24 hours without justification for the delay, some of whom had been detained for more than 72 hours.

47.     As a result of the City's and the NYPD's mass arrest plans and the RNC MAPP, NYPD officers who had not in fact witnessed the conduct leading up to a person's arrest filled

out NYPD paperwork and in a significant number of cases swore out criminal court complaints

swearing that they had seen conduct they had not in fact seen.

48.     As a result of the NYPD's RNC-related conduct, the defendant City and

defendant Esposito were defendants in dozens of lawsuits challenging, among other things, the

City's disorder control, mass arrest, use of force, and mass arrest processing and prosecution

polices, procedures, customs, and practices.

49.     After around a decade of discovery and litigation, during the course of which

defendant Esposito himself gave several days of deposition testimony, much of which is relevant

to Plaintiffs' *Monell* claims herein, the bulk of the RNC cases settled for approximately $18

million, and all of the RNC-related cases have since been resolved.

50.     After the RNC and before OWS, defendants City and Esposito continued to

employ the policies, practices, and customs complained of in the RNC cases and in the other pre-

2004 cases discussed above in connection with a years-long crackdown on Critical Mass bicycle

rides, litigation over which also occurred in the *Callaghan* case, as well as other cases such as

*Long v. NYC. See, e.g., Callaghan* TAC at Paragraph 143 (listing *Monell* claims).

51.     The vast majority of the arrests made in connection with the 2004 RNC resulted

in dismissals.

52.     The vast majority of the arrests made in connection with the Critical Mass arrests

that were the subject of *Callaghan* resulted in dismissals.

53.     Prior to OWS, the *Callaghan* litigation settled for approximately $1 million.

54.     Between 2004 and November 17, 2011, the NYPD's mass arrest, crowd control,

and mass arrest processing and prosecution policies, practices, and customs complained of herein

were the subjects of unfavorable coverage in the media, including coverage explicitly showing

video evidence of NYPD officers engaging in uses of excessive force in connection with crowd control while policing protests, and complaints to the Civilian Complaint Review Board, as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

55.      Despite those complaints, defendants City and Esposito failed to modify the NYPD's mass arrest, crowd control, and mass arrest and prosecution policies, practices, and customs complained of herein, and failed to train and/or supervise NYPD officers in connection with properly policing First Amendment assemblies and processing arrests in connection therewith.

56.      Additionally, defendants City and Esposito failed to discipline NYPD supervisors and officers in connection with whom such complaints were made.

57.      Upon information and belief, at all times relevant herein, defendant Esposito, the Police Commissioner, and other defendant City policymakers, routinely received reports regarding mass or large-scale arrests made in connection with perceived First Amendment assemblies, including Unusual Occurrence Reports, Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases, and internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event, including arrests, mass arrest processing, and/or prosecutions.

58.      Beginning in around at least September of 2011, defendant City became aware of OWS.

59.     Beginning in around at least September of 2011, Defendant Esposito became aware of OWS.

60.     Beginning on or shortly after September 17, 2011, defendant Esposito was personally involved in planning for the NYPD's police responses to OWS.

61.     Between September 17, 2011 and November 17, 2011, Defendant Esposito routinely received information related to OWS, including related to OWS-related incidents and police responses to them, from the NYPD's Intelligence Division, its CJB, and other NYPD sources.

62.     Between September 17, 2011 and November 17, 2011, Defendant Esposito was personally involved in planning for policing and/or policing OWS, and for designing and implementing the NYPD's police responses to OWS, on a near-daily basis.

63.     During the relevant time period, Defendant Esposito would routinely stop by the OWS encampment at Zuccotti Park on his way home from work.

64.     During the relevant time period, Defendant Esposito met with the NYPD Commissioner at least three times a week and regularly discussed OWS at those meetings as well as during extra meetings specifically related to OWS.

65.     During those meetings, defendant City refined and adopted an unconstitutional policy and practice related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses (the "No-Summons Policy") based on their perceived association with OWS.

66.     During the relevant time period, defendant City refined and ultimately adopted an unconstitutional policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal

Justice Bureau agents in the creation of boilerplate NYPD documents containing false information, all as part of an unreasonably lengthy and punitive mass arrest processing plan (the "MAPP").

67. The No-Summons Policy and the MAPP were directed at and targeted political demonstrations perceived to be associated with OWS.

68. Plaintiffs were ultimately subjected to the No-Summons Policy and the MAPP because the NYPD believed they had participated in political protest related to OWS.

69. According to NYPD procedures codified in the NYPD's Patrol Guide in effect at the time of the incident, which reflected the NYPD's official policies and practices, persons detained or arrested for non-criminal violations such as those for which plaintiffs were presumably detained, as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, are normally eligible for individualized determinations of eligibility for release with a Universal Summons or DAT rather than being held in custody for arraignment.

70. At all times relevant herein, detainees released with a summons were typically in NYPD custody for an average of between around two to four hours.

71. At all times relevant herein, detainees released with a DAT were typically in NYPD custody for an average of between around four and twelve hours.

72. At all times relevant herein, detainees held for arraignment were typically in custody for an average of between twenty and twenty-four hours.

73. In sum and substance, as a result of the No-Summons Policy, plaintiffs did not received individualized consideration for summonses, but instead were held in custody for longer

based on the police perception that they had participated in a demonstration associated with OWS.

74.    As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs were handcuffed and held in custody for longer than similarly situated "non-OWS related" arrestees would have been.

75.    The No-Summons policy and the MAPP were adopted and applied to plaintiffs, based on malicious, bad faith intent to inhibit or punish plaintiffs' exercise of their rights protected under the First Amendment of the United States Constitution, among other rights, based on their perceived association with OWS.

76.    As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs were detained for an unreasonable length of time.

77.    As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs' releases were delayed for the purpose of gathering additional evidence to justify the arrest.

78.    As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, defendants delayed plaintiffs' releases based on ill-will toward their perceived association with OWS.

79.    As a result of the application of the No-Summons Policy to plaintiffs, defendants delayed plaintiffs' releases for delay's sake, and/or to punish them for their perceived association with OWS.

80.    As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, defendants delayed plaintiffs' releases to deter and/or prevent them from participating in further OWS-related demonstrations.

81.     The application of the No-Summons Policy and the MAPP to plaintiffs violated plaintiffs' First, Fourth, Sixth, and Fourteenth Amendment rights.

82.     During the relevant time period, Defendant Esposito ordered, supervised, and participated in hundreds of arrests related to OWS.

83.     For example, Defendant Esposito personally ordered and supervised the mass arrests of around 700 people on the Brooklyn Bridge in connection with an OWS-related event on October 1, 2011.

84.     By way of additional example, Defendant Esposito was personally involved in the October 15, 2011 arrest and subsequent prosecution of the plaintiff in *Dekuyper v. City of New York, et al.*, 14-cv-8294 (SDNY)(DLC).

85.     Upon information and belief, between September 17, 2011 and November 15, 2011, defendant Esposito and/or his subordinate NYPD officers or agents acting under his direction and supervision communicated with representatives of Brookfield Office Properties, Inc. regarding OWS and the occupation of Zuccotti Park, sharing information back-and-forth and planning to evict the occupation from Zuccotti Park.

86.     Upon information and belief, defendant Esposito was personally involved in developing plans to evict the occupation from Zuccotti Park in November of 2011.

87.     Upon information and belief, defendant Esposito supervised the mass eviction of Zuccotti Park on November 15, 2011.

88.     On the early hours of November 15, 2011, the NYPD raided Liberty Plaza and forcefully cleared it, arresting scores of occupiers for purported violations of the New York State Penal Law's non-criminal prohibitions on simple trespass and Disorderly Conduct.

89.     As a result of the NYPD's early morning raid on Liberty Plaza, there were mass arrests, extreme uses of force, and property destruction.

90.     For example, the NYPD and/or other City agencies destroyed The People's Library, a collection of books and other materials belonging to OWS. Plaintiffs incorporate by reference the allegations contained in the Complaint in *Occupy Wall Street, et al. v. The City of New York, et al.*, 12-cv-04129 (GBD).

91.     Upon information and belief, of the Supervisory Defendants had also been personally involved in other mass arrests related to OWS prior to and on the date of the incident, including by supervising mass arrests and mass arrest processing related to OWS.

92.     Defendants City and the Supervisory Defendants knew or should have known that, absent appropriate training and supervision, the NYPD's plans for policing and mass arrest processing in connection OWS protests would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, fabrication of evidence, and other unlawful conduct that would lead to constitutional rights violations, including those complained of herein.

93.     Based on his experience as NYPD Chief of Department since around 2000, and based on the other Supervisory Defendants' individual experiences, defendants Esposito and the Supervisory Defendants knew or should have known that their crowd control tactics would result in purported "dispersal orders" that were not lawful, not clearly communicated, and/or impossible to comply with, as well as mass arrests without appropriate individualized determinations of probable cause.

94.     Defendant Esposito was also personally involved in other mass arrests related to OWS after the incident. For example, Defendant Esposito was personally involved in the arrests

at issues in *Caravalho, et al. v. City of New York, et al.*, 13-cv-4174 (PKC)(MHD) and *Marom, et al. v. City of New York*, *et al*. 15-CV-2017 (PKC)(MHD).

95. Upon information and belief, Defendant Esposito was aware of potential plans to engage in protests in the Wall Street area on the morning of November 17, 2011.

96. Upon information and belief, Defendant Esposito was aware of potential plans to engage in protests in the vicinity of the Brooklyn Bridge area on the evening of November 17, 2011.

97. Defendant Esposito and/or other unidentified NYPD officials under his command planned for policing, and potential mass arrests, in anticipation of protests planned for November 17, 2011.

98. Defendant Esposito and other defendant City planning officials knew that if they engaged in mass arrests in connection with the morning demonstrations and subjected those arrestees to the No Summons Policy and the MAPP, those arrestees would likely not be able to participate in protests in the vicinity of the Brooklyn Bridge area on the evening of November 17, 2011.

99. In light of the mass arrests made on October 1, 2011 on the Brooklyn Bridge, Defendant Esposito and other defendant City planning officials had reasons to desire to prevent a repeat occurrence of the conditions that led up to the October 1, 2011 mass arrests, including by limiting the number of OWS protesters at liberty in the morning by making "proactive" arrests.

100. Consistent with NYPD crowd control and mass arrest customs developed and implemented in connection with police responses to First Amendment assemblies related to the RNC, Critical Mass, and other perceived events in connection with which there were First Amendment assemblies, defendant Esposito and other NYPD officials under his command

planned first to apparently accommodate and encourage a certain amount of marching, assembling, and demonstrating on the morning of November 17, 2011, conducting and regulating the flows of vehicular and pedestrian traffic in the Wall Street area, then to stop, detain, and effectively trap protesters, and thereafter to engage in mass arrests without appropriate individualized determinations of probable cause and lawful, adequate dispersal orders, thereby subjecting arrestees to mass arrest processing, prosecution, and the injuries complained of herein, pursuant to the No-Summons Policy and MAPP.

101. Based on his experience as NYPD Chief of Department since 2000, Defendant Esposito knew or should have known that the NYPD's plans for policing and mass arrest processing in connection with protests planned for November 17, 2011 would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, and the other unlawful conduct complained of herein.

102. Defendant City knew or should have known that the NYPD's plans for policing and mass arrest processing in connection with protests planned for November 17, 2011 would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, and the other unlawful conduct complained of herein.

103. On the morning of November 17, 2011, each plaintiff was lawfully present in the vicinity of the New York Stock Exchange, peacefully participating in or observing First Amendment activities associated with OWS.

104. On the morning of November 17, 2011, Defendant Esposito was the highest-ranking NYPD officer in the vicinity of plaintiffs' arrests.

105. On the morning of November 17, 2011, Defendant Esposito was the NYPD Incident Commander in connection with the incident(s) in the vicinity of plaintiffs' arrests.

106.    On the morning of November 17, 2011, Defendant Esposito was actually responsible for making command and control decisions as well as all supervisory decisions with respect to all fellow officers on the scene in connection with plaintiffs' arrests.

107.    Upon information and belief, according to NYPD policy and procedure, where there are large-scale arrests, the Incident Commander has a responsibility to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest and that arresting officers could articulate all the factual elements of the offense for which each arrest was effected.

108.    Upon information and belief, according to NYPD policy and procedure, as Incident Commander, defendant Esposito had a responsibility to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest and that arresting officers could articulate all the factual elements of the offense for which each arrest was effected.

109.    Based on his experience as NYPD Chief of Department since 2000, on the morning of November 17, 2011, Defendant Esposito knew or should have known that the NYPD's crowd control plans with respect to the planned protest activities would result in unlawful mass arrests, uses of force, excessive detentions, and other injuries to plaintiffs and others.

110.    Defendant Esposito and other unidentified NYPD supervisors maintained control of vehicular and pedestrian traffic in the Wall Street area throughout plaintiffs' participation in OWS-related protest activities, including by placing NYPD barricades and vehicles to prevent vehicular traffic from passing through the areas in which protest activities were anticipated to be conducted.

111. Defendant Esposito and other unidentified NYPD supervisors allowed people perceived to be working on or associated with Wall Street to travel freely, while unreasonably restricting the movement of Plaintiffs and others similarly situated.

112. Based on his experience as NYPD Chief of Department since 2000, and based on the other Supervisory Defendants' individual experiences, Defendant Esposito and the Supervisory Defendants knew or should have known that their crowd control tactics would result in purported "dispersal orders" that were not lawful, not clearly communicated, and/or impossible to comply with, as well as mass arrests without appropriate individualized determinations of probable cause, and uses of force, including flex-cuffing for excessive periods of time, that were unreasonable under the circumstances.

113. Defendant Esposito suggested, endorsed, ratified, and/or enacted a policy, practice, or procedure on November 17, 2011 of not issuing summonses for Disorderly Conduct and other summons-eligible offenses in connection with planned OWS-associated protests.

114. Defendant Esposito suggested, endorsed, ratified, and/or enacted a policy, practice, or procedure on November 17, 2011 of having assigned arresting officers speak with NYPD Legal Bureau and/or CJB officers as part of the mass arrest processing procedures.

115. Based on his experience as NYPD Chief of Department since 2000, Defendant Esposito knew or should have known that processing the anticipated mass arrests at a Mass Arrest Processing Center ("MAPC"), without making individualized determinations as to summons eligibility, would unnecessarily increase their arrest to release time.

116. Defendant City knew or should have known that processing the anticipated mass arrests at a MAPC, without making individualized determinations as to summons eligibility, would unnecessarily increase their arrest to release time.

117.     Based on his experience as NYPD Chief of Department since 2000, Defendant Esposito knew or should have known that processing the anticipated mass arrests pursuant to the No-Summons Policy and MAPP would unnecessarily result in arrestees spending excessive periods of time in tight flex-cuffs.

118.     Defendant City knew or should have known that processing the anticipated mass arrests pursuant to the No-Summons Policy and MAPP would unnecessarily result in arrestees spending excessive periods of time in tight flex-cuffs.

119.     In Plaintiffs' cases, their arrest to release time was around double that of others similarly situated.

120.     Upon information and belief, Defendant Esposito and other unidentified NYPD supervisors enacted, adopted, and/or ratified the No-Summons Policy, and/or the other mass arrest-related policies and practices complained of herein, in order to keep persons arrested in morning protests from further protesting, including by participating in the anticipated evening protest on or near the Brooklyn Bridge on November 17, 2011.

121.     Based on his experience as NYPD Chief of Department since 2000, Defendant Esposito knew or should have known that the NYPD's November 17, 2011 mass arrest processing plans would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations.

122.     Defendant City knew or should have known that the NYPD's November 17, 2011 mass arrest processing plans would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations.

123.     On the morning of November 17, 2011, Defendant McCarthy was a NYPD Deputy Chief, and as such was a high-raking supervisor and policymaking official on the scene

who was actually responsible for making command and control decisions as well as all supervisory decisions with respect to all fellow officers on the scene.

124.    On the morning of November 17, 2011, Defendant Groht was a NYPD Lieutenant, and as such was a supervisor and who was actually responsible for making supervisory decisions and undertaking other supervisory responsibilities with respect to fellow officers on the scene.

125.    On the morning of November 17, 2011, Defendant Papola was a NYPD Sergeant, and as such was a supervisor and who was actually responsible for making supervisory decisions and undertaking other supervisory responsibilities with respect to fellow officers on the scene.

126.    On the morning of November 17, 2011, Defendants Almonte, Conforti, Downes, Tverdokhleb, and Maldonado were all NYPD Officers under the command and supervision of Defendants Esposito, McCarthy, Groht, and Papola.

127.    On the morning of November 17, 2011, all other defendants were under Defendant Esposito in the chain of command.

128.    The NYPD chain of command works such that when Defendant Esposito gives an order on the scene of an incident all of the other officers present who receive that order are supposed to comply with the order.

129.    Upon information and belief, on the morning of November 17, 2011, defendant Esposito made the determination to engage in mass arrests, and communicated that determination to subordinates, including verbally in person and/or over the radio and/or over other NYPD communications mechanisms.

130.    On the morning of November 17, 2011, Defendant Esposito actually directed and/or supervised Defendants McCarthy's, Groht's, and/or Papola's activities with respect to

giving what the NYPD has characterized as "dispersal orders" and/or directing, supervising, or assisting in arrests and/or arrest processing.

131.    At some time around or after 9:00AM on November 17, 2011, Defendant Esposito gave, and/or caused to be given, what the NYPD has characterized as "dispersal orders" to perceived protesters in the vicinity of plaintiffs' arrests.

132.    At some time around or after 9:00AM on November 17, 2011, Defendant McCarthy gave, and/or caused to be given, what the NYPD has characterized as "dispersal orders" to perceived protesters in the vicinity of plaintiffs' arrests.

133.    At some time around or after 9:00AM on November 17, 2011, Defendant Groht gave, and/or caused to be given, what the NYPD has characterized as "dispersal orders" to perceived protesters in the vicinity of plaintiffs' arrests.

134.    At some time around or after 9:00AM on November 17, 2011, Defendant Papola gave, and/or caused to be given, what the NYPD has characterized as "dispersal orders" to perceived protesters in the vicinity of plaintiffs' arrests.

135.    Upon information and belief, at all times relevant herein on November 17, 2011, defendant Esposito was a NYPD supervisor whose responsibility it was, among others, according to NYPD policy and procedure, to ensure the accuracy of the Supervisory Defendants', as well as defendants Almonte's, Conforti's, Downes's, Tverdokhleb's, and Maldonado's arrest processing paperwork, as well as the accuracy of other arrest processing paperwork related to the incident.

136.    Upon information and belief, at all times relevant herein on November 17, 2011, defendant Papola was a NYPD supervisor whose responsibility it was, among others, according

to NYPD policy and procedure, to ensure the accuracy of defendant Almonte's arrest processing paperwork, as well as the accuracy of other arrest processing paperwork related to the incident.

137.   Upon information and belief, at all times relevant herein on November 17, 2011, defendant McCarthy was a NYPD supervisor whose responsibility it was, among others, according to NYPD policy and procedure, to ensure the accuracy of defendant Conforti's arrest processing paperwork, as well as the accuracy of other arrest processing paperwork related to the incident.

138.   Upon information and belief, at all times relevant herein on November 17, 2011, defendant Groht was a NYPD supervisor whose responsibility it was, among others, according to NYPD policy and procedure, to ensure the accuracy of defendant Tverdokhleb's arrest processing paperwork, as well as the accuracy of other arrest processing paperwork related to the incident.

139.   At some time around or after 9:00AM on November 17, 2011, Defendants Esposito, McCarthy, Groht, and Papola directed and/or supervised Defendants Almonte, Conforti, Downes, Tverdokhleb, and Maldonado, and other NYPD officers, with respect to effecting plaintiffs' arrests and/or processing plaintiffs' arrests.

140.   When Defendants Defendants Esposito, McCarthy, Groht, and Papola gave or caused to be given what the NYPD has characterized as "dispersal orders" and/or directed and/or supervised Plaintiffs' arrests, Defendants did not have probable cause to believe that any Plaintiff had committed Disorderly Conduct or any other offense.

141.   Plaintiffs were each detained and arrested by NYPD officers, including some the defendants, as described more fully below.

142.    Each plaintiff was eventually transported to the MAPC at One Police Plaza for mass arrest processing pursuant to the MAPP and the No-Summons Policy.

143.    After between approximately fifteen and twenty hours each in police custody, each plaintiff was eventually released with Desk Appearance Tickets ("DAT"s), except for Ms. Catlin, who was fully booked and processed and who remained in custody for almost forty hours.

144.    Upon information and belief, the average time from arrest to release on a summons in Manhattan is around two hours.

145.    Upon information and belief, the average time from arrest to release on a DAT in Manhattan is less than seven hours.

146.    On later appearing in court, each Plaintiff aside from Mr. Case and Ms. Catlin was charged with violations and pleaded not guilty to the charges.

147.    Plaintiff Case eventually pleaded guilty to a Disorderly Conduct violation to resolve his case.

148.    With that exception, plaintiffs returned to court and eventually accepted Adjournments in Contemplation of Dismissal ("ACD"s) to resolve the criminal cases against them.

149.    Defendants' police responses to plaintiffs' actions on November 17, 2011 complained of herein were based on the content of plaintiffs' speech, not their conduct.

150.    In connection with other demonstrations and similar events in the Wall Street area and under the leadership of a different Mayor, the NYPD has accommodated peaceful protest far more disruptive than the conducted plaintiffs in this case were alleged to have engaged in.

151.    For example, in connection with "Flood Wall Street" protests in September of 2014, Defendant City allowed hundreds of protesters to occupy the same areas in the vicinity of

Wall Street in which plaintiffs were arrested for over eight hours hours, controlling and directing traffic without making mass arrests, before eventually taking police action and making mass arrests. *See, e.g.,* Aronoff, Kate, "The 'Flood Wall Street 10' Fought the Law and Won," *Truthout*, March 12, 2015, available online at *http://www.truth-out.org/news/item/29618-the-flood-wall-street-10-fought-the-law-and-won* (last accessed September 9, 2015).

152. Responding to critiques about the purported disruptions caused by the action, New York City Mayor Bill de Blasio was widely quoted as saying, "I think the first Amendment is a little more important than traffic."

153. Additionally, even after dispersal orders were made as a result of protesters' sitting in the streets in the Wall Street area for over eight hours, and arrestees did not comply with the dispersal orders by leaving the area, New York City Criminal Court Judge Robert Mandelbaum acquitted ten Flood Wall Street protesters, finding: "There is simply no principle of First Amendment law that affords defendants absolute entitlement to close the streets t their election. But Sergeant Vega's order here did not simply direct defendants to clear the street and move the sidewalk. It went on to advise them that they could avoid arrest only if they left 'the area' by exiting westbound on Rector Street. . . . . The actual order given, which not only required defendants to clear the roadway, but also forbade them from remaining in the area, necessarily including the adjoining sidewalk, was not narrowly tailored and did not afford defendants ample alternative channels for communication. The People have failed to establish the lawfulness of the order beyond a reasonable doubt."

## PLAINTIFF BENJAMIN CASE

154. Prior to Mr. Case's detention by the NYPD in connection with this incident, Mr. Case was engaged in peaceful, First Amendment-protected conduct - peacefully assembling and

demonstrating with others in the Wall Street area in connection with an OWS-related demonstration.

155.    According to defendant Almonte's sworn allegations, defendants Almonte and Papola were personally involved in Mr. Case's arrest.

156.    According to defendant Almonte's sworn allegations, defendant Papola was a higher-ranking supervisor on the scene who was personally involved in Mr. Case's arrest and arrest processing at least in that he allegedly gave dispersal orders and supervised defendant Almonte and directed and/or supervised other NYPD officers in making arrests, including plaintiff's.

157.    Defendant Downes and other unidentified NYPD officers detained and subsequently arrested Mr. Case at some time after 9:00AM and before 10:15AM in the vicinity of William Street and Beaver Street.

158.    At around that time, place, and location, neither plaintiff nor other non-NYPD persons present were causing or creating the risk of any substantial blockage of vehicular or pedestrian traffic, or any other serious public ramifications.

159.    Without first having given a clearly communicated dispersal order or clearly communicated orders to plaintiff and a meaningful opportunity or meaningful opportunities to comply, police began to make arrests.

160.    Defendant Downes approached Mr. Case with his baton cocked and told Mr. Case that he was under arrest.

161.    Defendant Downes then rear-cuffed Mr. Case with plastic flex-cuffs.

162.    Defendant Downes then escorted Mr. Case to a Prisoner Transport Vehicle.

163.     After Mr. Case got to the Prisoner Transport Vehicle, Defendant Almonte was assigned to process Mr. Case's arrest by an NYPD supervisor.

164.     Upon information and belief, Defendant Almonte was assigned to process, and did process, other arrests that morning.

165.     As part of Defendant Almonte's mass arrest processing duties, several Polaroid photographs of Defendant Almonte and Mr. Case were taken by fellow NYPD officers.

166.     As part of Defendant Almonte's mass arrest processing duties, several Polaroid photographs of Defendant Almonte and other arrestees whose arrests Defendant Almonte was assigned to process were taken by fellow NYPD officers.

167.     As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte met with a supervisor from the NYPD's Legal Bureau.

168.     As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte met with a supervisor from the NYPD's CJB.

169.     As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte filled out NYPD paperwork regarding Mr. Case's arrest..

170.     As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on November 17, 2011.

171.     Mr. Case remained rear-cuffed in the plastic flex-cuffs for around five hours.

172.     The flex-cuffs were too tight and hurt Mr. Case.

173.     Mr. Case asked to use the bathroom three hours during that approximately five-hour period and was denied permission to use the bathroom each time.

174.    As a result of the defendants' decisions to arrest plaintiff, to issue plaintiff a DAT rather than a summons, and to subject plaintiff to excessively long mass arrest processing, Mr. Case was in NYPD custody until after 11:30PM on November 11, 2011.

175.    As a result of the defendants' mass arrest processing policies, procedures, and practices, at least defendants Almonte and Papola provided false and misleading information to the Office of the District Attorney of New York County ("DANY").

176.    For example, in an accusatory instrument sworn to by Defendant Almonte, he swore that, on November 17, 2011, at about 10:15 hours on the corner of William and Beaver Streets, in the County and State of New York, he observed

…defendant, standing in a group of approximately 70 individuals, in the middle of the roadway at the above location.

Deponent states that deponent observed the defendant refuse to comply with repeated lawful orders to disperse from the intersection given by Sergeant Lawrence Papola, shield # 03646, a uniformed member of the New York City Police Department.

Deponent states that after the above orders were given, deponent observed the defendant seated on the ground at the above location and the defendant had both of defendant's arms interlocked with the arms of two other individuals. Deponent further states that when police officers attempted to separate the defendant from said other persons, the defendant tightened defendant's arms to prevent the deponent from removing the defendant from said other persons.

Deponent further states that the defendant's above stated conduct prevented the deponent from conducting a lawful duty and official function, specifically a police operation and to disperse persons from the above location.

Deponent further states that the above-described conduct cause a public inconvenience and disturbance in that the defendant and the other individuals were obstructing vehicular traffic and preventing any vehicles from being able to drive on the road at the above location.

177.     Based on that accusatory instrument, DANY charged Mr. Case with violating

New York State Penal Law ("PL") §§ 240.20(5) and 240.20(6) (Disorderly Conduct), as well as

PL § 190.05 (Obstruction of Governmental Administration in the Second Degree).

178.     Upon information and belief, Defendant Almonte was not on the scene when and

where Mr. Case was seized and placed into cuffs.

179.     Upon information and belief, Defendant Almonte did not personally observe the

conduct leading up to Mr. Case's arrest.

180.     Upon information and belief, no fellow officer who observed plaintiff engage in

misconduct prior to his detention communicated with defendant Almonte and provided him with

information related to that misconduct sufficient to establish probable cause to arrest or

prosecute plaintiff for any offense.

181.     Prior to Plaintiff's arrest, plaintiff was not causing any significant blockage of

vehicular or pedestrian traffic.

182.     Prior to Plaintiff's arrest, plaintiff was not recklessly creating the risk of causing

any significant blockage of vehicular or plaintiff traffic.

183.     Prior to Plaintiff's arrest, Plaintiff was not creating or recklessly creating the risk

of serious public ramifications such as real public inconvenience, annoyance, and/or alarm.

184.     Prior to Plaintiff's arrest, plaintiff did not refuse to comply with a lawful order to

disperse.

185.     Prior to plaintiff's arrest, defendants did not provide plaintiff with, and/or plaintiff

did not have, a meaningful opportunity to comply with any dispersal order.

186.     Prior to plaintiff's arrest, plaintiff did not prevent defendants from conducting

lawful duty or official function.

187.    After numerous court appearances, Mr. Case eventually pleaded guilty to a Disorderly Conduct violation to resolve his case.

188.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## PLAINITFF ELIZABETH CATLIN

189.    Prior to Ms. Catlin's detention by the NYPD in connection with this incident, Ms. Catlin was engaged in peaceful, First Amendment-protected conduct - peacefully assembling and demonstrating with others in the Wall Street area in connection with an OWS-related demonstration.

190.    According to defendant Conforti's sworn allegations, defendants Conforti and McCarthy were personally involved in Ms. Catlin's arrest.

191.    According to defendant Conforti's sworn allegations, defendant McCarthy was a higher-ranking supervisor on the scene who was personally involved in Ms. Catlin's arrest and arrest processing at least in that he allegedly gave dispersal orders, represented that there was no permit for the conduct the protesters were allegedly engaging in, and directed and/or supervised defendant Conforti and other NYPD officers in making arrests, including plaintiff's.

192.    Unidentified NYPD officers arrested Ms. Catlin at some time after 9:00AM and before 9:30AM in the vicinity of the Southwest corner of Pine Street and William Street.

193.    At around that time, place, and location, neither plaintiff nor other non-NYPD persons present were causing or creating the risk of any substantial blockage of vehicular or pedestrian traffic, or any other serious public ramifications.

194.    Without first having given a clearly communicated dispersal order or clearly communicated orders to plaintiff and a meaningful opportunity or meaningful opportunities to comply, police began to make arrests.

195.    An unidentified NYPD officer stepped on the right side of plaintiff's face with his boot.

196.    An unidentified NYPD officer then rear-cuffed Ms. Catlin with plastic flex-cuffs.

197.    At this time, Ms. Catlin cannot rule out that defendant Conforti was the officer who stepped on her face or put her in cuffs.

198.    Defendant Conforti was assigned to process, and did process, Ms. Catlin's arrest.

199.    Upon information and belief, Defendant Conforti was assigned to process, and did process, other arrests that morning.

200.    As part of Defendant Conforti mass arrest processing duties, several Polaroid photographs of Defendant Conforti and Ms. Catlin were taken by fellow NYPD officers.

201.    As part of Defendant Conforti's mass arrest processing duties, several Polaroid photographs of Defendant Conforti and other arrestees whose arrests Defendant Conforti was assigned to process were taken by fellow NYPD officers.

202.    As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti met with a supervisor from the NYPD's Legal Bureau.

203.    As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti met with a supervisor from the NYPD's CJB.

204.    As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti filled out NYPD paperwork regarding Ms. Catlin's arrest.

205.     As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on November 17, 2011.

206.     Ms. Catlin remained rear-cuffed in the plastic flex-cuffs for an excessive period of time.

207.     The flex-cuffs were too tight and hurt Ms. Catlin.

208.     Through the time Ms. Catlin was in his custody, Ms. Catlin had a visible blood blister or bruise on her face where the NYPD officer had stepped on her face.

209.     Defendant Conforti saw that Ms. Catlin was injured and/or knew or should have known that Ms. Catlin was injured.

210.     Upon information and belief, Defendant Conforti did nothing to report Ms. Catlin's injury.

211.     Upon information and belief, Defendant Conforti did nothing to report the use of force that caused Ms. Catlin's injury.

212.     As a result of the Defendants' decisions to arrest plaintiff, to suggest to DANY arrest charges including Obstruction of Governmental Administration, and to subject plaintiff to excessively long mass arrest processing, Ms. Catlin was in NYPD custody for approximately thirty-eight hours before she was arraigned before a New York City Criminal Court judge and released on her own recognizance.

213.     As a result of the defendants' mass arrest processing policies, procedures, and practices, at least Defendants Conforti and McCarthy provided false and misleading information to DANY.

214.    For example, in an accusatory instrument sworn to by Defendant Conforti, shield 26403 of the Patrol Boro Queens South Task Force, Officer Conforti swore that, on November 17, 2011, at about 9:30 hours on the Southwest corner of Pine Street and William Street in the County and State of New York, he observed Ms. Catlin and two others, whose names are omitted for privacy reasons, as follows:

Deponent states the deponent observed defendant **[OMITTED]** obstructing pedestrian traffic, as follows: deponent observed defendant **[OMITTED]** in a crowd of approximately fifty (50) people, sitting in the middle of the street, locking arms with each other, at the above location. Deponent further states that defendant **[OMITTED]** and others were blocking vehicular traffic in that cars could not drive down Pine Street or William Street.

Deponent further states that deponent observed Deputy Chief Brian McCarthy of the Patrol Services Bureau, repeatedly state to defendant **[OMITTED]** and others, in substance: YOU ARE BLOCKING TRAFFIC. YOU MUST STAND UP AND DISPERSE OR YOU WILL BE ARRESTED. YOU DO NOT HAVE A PERMIT TO BE HERE.

Deponent further states that defendant **[OMITTED]** remained sitting with defendant **[OMITTED]**'s armed linked and did not move. Deponent further states that in attempting to arrest defendant **[OMITTED]**, deponent had to unlink defendant **[OMITTED]**'s arms and carry defendant **[OMITTED]**, causing deponent to have difficulty performing deponent's official function in ensuring that traffic could freely flow.

Deponent further states that deponent observed defendant **[OMITTED]** obstructing pedestrian traffic, as follows: deponent observed defendant **[OMITTED]** in a crowd of approximately fifty (50) people, sitting in the middle of the street, locking arms with each other, at the above location. Deponent further states that defendant **[OMITTED]** and others were blocking vehicular traffic in that cars could not drive down Pine Street or William Street.

Deponent further states that deponent observed Deputy Chief Brian McCarthy of the Patrol Services Bureau, repeatedly state to defendant **[OMITTED]** and others, in substance, YOU ARE BLOCKING TRAFFIC. YOU MUST STAND UP AND DISPERSE OR YOU WILL BE ARRESTED. YOU DO NOT HAVE A PERMIT TO BE HERE.

Deponent further states that defendant [**OMITTED**] remained sitting with defendant's armed linked and did not move. Deponent further states that deponent observed another New York City Police Officer attempting to arrest defendant

[**OMITTED**], and observed said Officer have to unlink defendant [**OMITTED**]'s arms in order to arrest defendant [**OMITTED**], causing said Officer to have difficulty performing said Officer's official functions in ensuring that traffic could freely flow.

Deponent states that deponent observed defendant Catlin obstructing pedestrian traffic, as follows: deponent observed defendant in a crowd of approximately fifty (50) people, sitting in the middle of the street, locking arms with each other, at the above location. Deponent further states that defendant Catlin and others were blocking vehicular traffic in that cars could not drive down Pine Street or William Street.

Deponent further states that deponent observed Deputy Chief Brian McCarthy of the Patrol Services Bureau, repeatedly state to defendant Catlin and others, in substance: YOU ARE BLOCKING TRAFFIC. YOU MUST STAND UP AND DISPERSE OR YOU WILL BE ARRESTED. YOU DO NOT HAVE A PERMIT TO BE HERE.

Deponent further states that defendant Catlin remained sitting with defendant Catlin's armed linked and did not move. Deponent further states that deponent observed another New York City Police Officer attempting to arrest defendant Catlin, and observed said Officer have to unlink defendant Catlin's arms in order to arrest defendant Catlin, causing said Officer to have difficulty performing said Officer's official functions in ensuring that traffic could freely flow.

215.    Based on that accusatory instrument, Ms. Catlin was charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct), as well as PL § 190.05 (Obstruction of Governmental Administration in the Second Degree) and Parading Without a Permit in violation of New York City Administrative Code § 10-110.

216.    Upon information and belief, Defendant Conforti did not personally observe that conduct leading up to those three arrests.

217.    Upon information and belief, no fellow officer who observed plaintiff engage in misconduct prior to his detention communicated with defendant Conforti and provided him with information related to that misconduct sufficient to establish probable cause to arrest or prosecute plaintiff for any offense.

218.     The Parading Without a Permit violation was dismissed by DANY at Ms. Catlin's arraignment.

219.     Prior to plaintiff's arrest, plaintiff was not causing any significant blockage of vehicular or pedestrian traffic.

220.     Prior to plaintiff's arrest, plaintiff was not recklessly creating the risk of causing any significant blockage of vehicular or pedestrian traffic.

221.     Prior to plaintiff's arrest, plaintiff was not creating or recklessly creating the risk of serious public ramifications such as real public inconvenience, annoyance, and/or alarm.

222.     Prior to plaintiff's arrest, plaintiff did not refuse to comply with a lawful order to disperse.

223.     Prior to Plaintiff's arrest, defendants did not provide plaintiff with, and/or plaintiff did not have, a meaningful opportunity to comply with any dispersal order.

224.     Prior to Plaintiff's arrest, plaintiff did not prevent defendants from conducting lawful duty or official function.

225.     After numerous court appearances, Ms. Catlin eventually accepted an ACD to resolve the criminal case against her.

226.     The wound on Ms. Catlin's face caused her pain for several days.

227.     The wound on Ms. Catlin's face was visible for weeks thereafter.

228.     According to an accusatory instrument sworn to by non-defendant NYPD Officer Michael Hayes, on November 17, 2011, at about 9:00AM at William and Pine Streets, he observed Jessica Hall "sitting in the middle of the intersection on the corner of William Street and Pine Street with a group of approximately 75-100 people locking arms completely blocking the intersection and blocking the normal flow of vehicular traffic" thereby creating "a public

disturbance/inconvenience in that it caused disruption of the normal flow of traffic."

229. As a result of those allegations, DANY charged Ms. Hall with violating PL 240.20(5).

230. During Ms. Hall's trial, however, another officer testified that he had arrested Ms. Hall "because she was blocking traffic" but then "admitted under cross-examination, and as the NYPD's own video documentation confirmed, it was actually the NYPD medical barricades running all the way across William Street that was preventing vehicles from passing." *See, e.g.,* Pinto, Nick. "In Second Occupy Wall Street Protest Trial, Police Claims Again Rejected." *The Village Voice*, May 17, 2012. Available online at http://www.villagevoice.com/news/in-second-occupy-wall-street-protest-trial-police-claims-again-rejected-6702612 (last accessed September 9, 2012).

231. Granting defense counsel a trial order of dismissal, New York City Criminal Court Judge Matthew Sciarrino held that although "the standard at this juncture is taking a view of the evidence in the light most favorable to the People . . . I cannot say that the People have sustained their burden, even at this juncture of establishing a prima facie case, that his defendant created a risk of pedestrian or vehicular traffic being obstructed, in light of the testimony as to where this particular defendant was particularly located on that particular day. Accordingly, the case will be dismissed."

232. As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**PLAINTIFF JENNIFER KLEIN**

233.     Prior to Ms. Klein's detention by the NYPD in connection with this incident, Ms. Klein was engaged in peaceful, First Amendment-protected conduct - peacefully assembling and demonstrating with others in the Wall Street area in connection with an OWS-related event.

234.     According to defendant Tverdokhleb's sworn allegations, defendants Tverdokhleb and Groht were personally involved in Ms. Klein's arrest.

235.     According to defendant Tverdokhleb's sworn allegations, defendant Groht was a higher-ranking supervisor on the scene who was personally involved in Ms. Klein's arrest and arrest processing at least in that he allegedly gave dispersal orders and directed and/or supervised defendant Tverdokhleb and other NYPD officers in making arrests, including plaintiff's.

236.     Unidentified NYPD officers arrested Ms. Klein at some time around 9:00AM and in the vicinity of the corner of Pine Street and William Street.

237.     At around that time, place, and location, neither plaintiff nor other non-NYPD persons present were causing or creating the risk of any substantial blockage of vehicular or pedestrian traffic, or any other serious public ramifications.

238.     Without first having given a clearly communicated dispersal order or clearly communicated orders to Plaintiff and a meaningful opportunity or meaningful opportunities to comply, police began to make arrests.

239.     An unidentified NYPD officer rear-cuffed Ms. Klein with plastic flex-cuffs.

240.     Defendant Tverdokhleb was subsequently assigned to process Ms. Klein's arrest.

241.     Defendant Tverdokhleb was assigned to process, and did process, other arrests that morning.

242.     As part of Defendant Tverdokhleb mass arrest processing duties, several Polaroid photographs of Defendant Tverdokhleb and Ms. Klein were taken by fellow NYPD officers.

243.    As part of Defendant Tverdokhleb's mass arrest processing duties, several Polaroid photographs of Defendant Tverdokhleb and other arrestees whose arrests Defendant Tverdokhleb was assigned to process were taken by fellow NYPD officers.

244.    As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb met with a supervisor from the NYPD's Legal Bureau.

245.    As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb met with a supervisor from the NYPD's CJB.

246.    As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb filled out NYPD paperwork regarding Ms. Klein's arrest.

247.    As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on November 17, 2011.

248.    Ms. Klein remained rear-cuffed in the plastic flex-cuffs for several hours.

249.    The flex-cuffs were too tight and hurt Ms. Klein.

250.    As a result of the Defendants' decisions to arrest plaintiff, to issue Ms. Klein a DAT rather than a summons, and to subject plaintiff to excessively long mass arrest processing, Ms. Klein was in NYPD custody until approximately 11:00PM on November 17, 2011.

251.    As a result of the Defendants' mass arrest processing policies, procedures, and practices, at least Defendants Tverdokhleb and Groht provided false and misleading information to DANY.

252.    In an accusatory instrument sworn to by Defendant Tverdokhleb, he swore that, on November 17, 2011, at about 09:25 hours on the corner of Pine Street and Nassau, in the County and State of New York, he observed

…defendant standing amongst a group of over two-hundred (200) individuals in the middle of the street at the above-listed location. Deponent further states that the actions of the defendant and others obstructed all vehicular traffic in that no cars could drive through the intersection.

Deponent further states that deponent observed Lieutenant David Groht of the 17th Precinct tell the defendant and others multiple times that they were obstructing all vehicular traffic and were ordered to leave the roadway. Deponent further states that deponent observed defendant refuse to leave the roadway after being told multiple times to move. Deponent further states that defendant's actions caused public inconvenience, annoyance, and alarm.

253. Based on that accusatory instrument, DANY charged Ms. Klein with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct).

254. Upon information and belief, Defendant Tverdokhleb was not on the scene when and where Mrs. Klein was seized and placed into cuffs.

255. Upon information and belief, Defendant Tverdokhleb did not personally observe the conduct leading up to plaintiff's arrest.

256. Upon information and belief, no fellow officer who observed plaintiff engage in misconduct prior to his detention communicated with defendant Tverdokhleb and provided him with information related to that misconduct sufficient to establish probable cause to arrest or prosecute plaintiff for any offense.

257. Prior to plaintiff's arrest, plaintiff was not causing any significant blockage of vehicular or pedestrian traffic.

258. Prior to plaintiff's arrest, plainitff was not recklessly creating the risk of causing any significant blockage of vehicular or pedestrian traffic.

259. Prior to plaintiff's arrest, plainitff was not creating or recklessly creating the risk of serious public ramifications such as real public inconvenience, annoyance, and/or alarm.

260.     Prior to plaintiff's arrest, plainitff did not refuse to comply with a lawful order to disperse.

261.     Prior to plaintiff's arrest, defendants did not provide plainitff with, and/or plainitff did not have, a meaningful opportunity to comply with any dispersal order.

262.     After numerous court appearances, Ms. Klein eventually accepted an ACD to resolve the criminal case against her.

263.     As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**PLAINITFF MARK KUSHNEIR**

264.     Prior to Mr. Kushneir's detention by the NYPD in connection with this incident, Mr. Kushneir was engaged in peaceful, First Amendment-protected conduct - peacefully assembling and demonstrating with others in the Wall Street area in connection with an OWS-related event.

265.     According to defendant Maldonado's sworn allegations, he was personally involved in Mr. Kushneir's arrest.

266.     Unidentified NYPD officers arrested Mr. Kushneir at some time shortly after 9:00AM in the vicinity of Broadway and Exchange Place.

267.     Defendant Esposito was personally on the scene in the vicinity of Broadway and Exchange Place.

268.     Upon information and belief, defendant Esposito ordered, directed, and/or otherwise supervised the mass detention and arrests.

269. At around that time, place, and location, neither plaintiff nor other non-NYPD persons present were causing or creating the risk of any substantial blockage of vehicular or pedestrian traffic, or any other serious public ramifications.

270. Without first having given a clearly communicated dispersal order or clearly communicated orders to plaintiff and a meaningful opportunity or meaningful opportunities to comply, police began to make arrests.

271. An unidentified NYPD officer rear-cuffed Mr. Kushneir with plastic flex-cuffs.

272. Well after Mr. Kushneir got to the Prisoner Transport Vehicle, Defendant Maldonado was assigned to process Mr. Kushneir's arrest by an NYPD supervisor.

273. Upon information and belief, Defendant Maldonado was assigned to process, and did process, other arrests that morning.

274. As part of Defendant Maldonado's mass arrest processing duties, several Polaroid photographs of Defendant Maldonado and Mr. Kushneir were taken by fellow NYPD officers.

275. As part of Defendant Maldonado's mass arrest processing duties, several Polaroid photographs of Defendant Maldonado and other arrestees whose arrests Defendant Maldonado was assigned to process were taken by fellow NYPD officers.

276. As part of Defendant Maldonado's mass arrest processing duties, Defendant Maldonado met with a supervisor from the NYPD's Legal Bureau.

277. As part of Defendant Maldonado's mass arrest processing duties, Defendant Maldonado met with a supervisor from the NYPD's CJB.

278. As part of Defendant Maldonado's mass arrest processing duties, Defendant Maldonado filled out NYPD paperwork regarding Mr. Kushneir's arrest.

279.    As part of Defendant Maldonado's mass arrest processing duties, Defendant

Maldonado filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on

November 17, 2011.

280.    Mr. Kushneir remained rear-cuffed in the plastic flex-cuffs for around five hours.

281.    The flex-cuffs were too tight and hurt Mr. Kushneir.

282.    As a result of the Defendants' decisions to arrest Plaintiff, to issue plaintiff a DAT

rather than a summons, and to subject plaintiff to excessively long mass arrest processing, Mr.

Kushneir was in NYPD custody until around or after 11:30PM on November 11, 2011.

283.    As a result of the defendants' mass arrest processing policies, procedures, and

practices, at least Defendant Maldonado provided false and misleading information to DANY.

284.    In an accusatory instrument sworn to by Defendant Maldonado, he swore that, on

November 17, 2011, at about 9:15 hours on the corner of Broadway and Exchange Place, in the

County and State of New York, he observed

> …defendant standing in the middle of the sidewalk at the above-
> mentioned location with approximately one-hundred others. Deponent further
> states that the actions of the defendant and the above-mentioned others caused
> public inconvenience and annoyance, in that the defendant and others completely
> blocked the sidewalks and prevented use of the sidewalk by pedestrians, and that
> said pedestrians were forced to walk in the street to pass through the area.

285.    Based on that accusatory instrument, DANY charged Mr. Kushneir with violating

PL § 240.20(5) (Disorderly Conduct).

286.    Upon information and belief, Defendant Maldonado did not personally observe

the conduct leading up to plaintiff's arrest.

287.    Upon information and belief, no fellow officer who observed plaintiff engage in

misconduct prior to his detention communicated with defendant Maldonado and provided him

with information related to that misconduct sufficient to establish probable cause to arrest or prosecute plaintiff for any offense.

288.    Prior to plaintiff's arrest, plaintiff was not causing any significant blockage of vehicular or pedestrian traffic.

289.    Prior to plaintiff's arrest, plaintiff was not recklessly creating the risk of causing any significant blockage of vehicular or pedestrian traffic.

290.    Prior to plaintiff's arrest, plaintiff was not creating or recklessly creating the risk of serious public ramifications such as real public inconvenience, annoyance, and/or alarm.

291.    After numerous court appearances, Mr. Kushneir eventually accepted an ACD to resolve the case.

292.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FIRST CLAIM

### AGAINST ALL DEFENDANTS, EXCEPT AS OTHERWISE LIMITED ELSEWHERE HEREIN, FOR DEPRIVATION OF RIGHTS UNDER THE FIRST, FOURTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

293.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

294.    By their conduct and actions and/or omissions in depriving plaintiffs of their freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy their property, in seizing them, in falsely arresting them, in assaulting and battering them, in detaining them for excessive periods of time, in creating false evidence against them, in maliciously abusing process

against them, in retaliating against them for the exercise of constitutionally protected rights, in

inflicting emotional distress upon them, in violating their rights to due process and equal

protection, and/or for failing to remedy the aforementioned violations after having witnessed

them or having been informed of them by report or appeal, and/or by failing properly to train,

supervise, or discipline employees of the Defendant CITY OF NEW YORK under their

supervision, defendants, acting under color of law and without lawful justification, intentionally,

maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and

probable consequences of their acts, deprived plaintiffs of the equal protection of the laws and/or

of equal privileges and immunities under the laws, and thereby caused injury and damage in

violation of plaintiffs' constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United

States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments.

    295.    By the conduct described above, defendants, under color of state law, subjected

plaintiffs to the foregoing acts and omissions without due process of law and in violation of the

First, Fourth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. §

1983, thereby depriving Plaintiffs of their rights, privileges and immunities, including, without

limitation, deprivation of the following constitutional rights:

    a.    Freedom to engage in protected speech, expression and association, without undue constraint or governmental retaliation;

    b.    Freedom from unreasonable seizures of their persons, including but not limited to the excessive use of force;

    c.    Freedom from arrest without probable cause;

    d.    Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Plaintiffs were aware and did not consent;

    e.    Freedom from deprivation of liberty and property without due process of law;

    f.    Freedom from excessive detention;

g.  Freedom from charges falsely lodged, or "evidence" falsely created, against them by police officers;

h.  Freedom from malicious abuse of process; and

i.  The enjoyment of equal protection, privileges and immunities under the laws.

296.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**SECOND CLAIM**

**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

**ON BEHALF OF ALL PLAINTIFFS AGAINST DEFENDANT CITY AND THE
SUPERVISORY DEFENDANTS**

297.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

298.    By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in plaintiffs' constitutional injuries, as set forth elsewhere herein, Defendant City and the Supervisory Defendants caused damage and injury in violation of plaintiffs' rights guaranteed under the United States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments, through 42 U.S.C. §1983.

299.    For example, as described above, defendant Esposito directed and supervised the other Supervisory Defendants in connection with plaintiffs' arrests, and the Supervisory Defendants were each personally involved in plaintiff's arrests, arrest processing, and/or prosecutions, at least to the extents described above.

300.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

### THIRD CLAIM

### FAILURE TO INTERVENE

**ON BEHALF OF EACH PLAINTIFF AGAINST EACH NON-MUNICIPAL DEFENDANT WHO DID NOT DIRECTLY PARTICIPATE IN, BUT KNEW OR SHOULD HAVE KNOWN ABOUT, EACH CONSTITUTIONAL VIOLATION PLAINTIFF COMPLAINS OF HEREIN, INCLUDING, BUT NOT LIMITED TO:**

**ON BEHALF OF PLAINTIFF CASE AGAINST DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;**

**ON BEHALF OF PLAINTIFF CATLIN AGAINST DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;**

**ON BEHALF OF PLAINTIFF KLEIN AGAINST DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND**

**ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST DEFENDANTS ESPOSITO AND MALDONADO**

301.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

302.    Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the NYPD or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian, or when they observe or become aware of another constitutional violation.

303.    As described above, certain defendants were present for the above-described incident and witnessed other defendants unlawfully arrest plaintiffs.

304.   Defendants' use of force against plaintiffs was obviously excessive and unjustified under the circumstances, because defendants lacked even arguable probable cause to arrest plaintiffs and for other reasons.

305.   Yet defendants who were not involved in the obviously unlawful uses of force related to plaintiffs' arrests and detentions failed to take any action or make any effort to intervene, halt, or protect the plaintiffs from being subjected to those instances of excessive force by other defendants.

306.   Additionally, as discussed elsewhere herein, defendants supervised and otherwise participated in plaintiffs' mass arrest processing, and subjecting them to the No-Summons Policy and the MAPP, thereby participating in plaintiffs' excessive detentions, and/or criminal prosecutions related to the incident, including by creating and forwarding false information to prosecutors, or failing to correct the record when such false information was provided to prosecutors.

307.   Plaintiffs' arrests, the use of process against them, and the initiation and prosecution of criminal charges against them were without probable cause or other legal justification, and were based on facts alleged by defendants, which defendants knew to be false, yet defendants failed to take any action or make any effort to intervene, halt or protect plaintiffs from being unlawfully and wrongfully arrested, detained, and prosecuted.

308.   As a result of defendants' violations of plaintiffs' constitutional rights by failing to intervene in other defendants' clearly unconstitutional uses of force and plaintiffs' unconstitutional arrests and prosecutions, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering,

psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## FOURTH CLAIM

## FALSE ARREST – FOURTH AMENDMENT

**ON BEHALF OF PLAINTIFF CASE AGAINST
DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;**

**ON BEHALF OF PLAINTIFF CATLIN AGAINST
DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;**

**ON BEHALF OF PLAINTIFF KLEIN AGAINST
DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND**

**ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST
DEFENDANTS ESPOSITO AND MALDONADO**

309.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

310.    As a result of defendants' conduct as described above, plaintiffs were subjected to illegal, improper, and false arrest by defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

311.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## FIFTH CLAIM

## EXCESSIVE USE OF FORCE

**ON BEHALF OF PLAINTIFF CASE AGAINST
DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;**

**ON BEHALF OF PLAINTIFF CATLIN AGAINST**

56

**DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;**

**ON BEHALF OF PLAINTIFF KLEIN AGAINST
DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND**

**ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST
DEFENDANTS ESPOSITO AND MALDONADO**

312.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

313.    The level of force employed by defendants in arresting plaintiffs and in connection with their detentions, including their flex-cuffing, was objectively unreasonable and in violation of plaintiffs' constitutional rights.

314.    As discussed elsewhere herein, defendants City and Esposito designed and/or implemented policies and practices pursuant to which those defendants who used force against plaintiffs subjected plaintiffs to excessive force, including in the form of applying unreasonably and even dangerously tight plastic flex-cuffs for excessive periods of time, as well as policies and practices pursuant to which such uses of force were not reported and/or documented.

315.    Plaintiffs were handcuffed with plastic manacles behind their backs, not the metal handcuffs normally used by the NYPD, which results in tighter cuffing and as a result more physical pain to the person cuffed.

316.    As a result of decades of litigation and related complaints and reports of excessive use of force in connection with the use of plastic flex-cuffs in connection with mass arrests, defendants City and Esposito knew or should have known that the use of flex-cuffs as opposed to metal handcuffs would result in tighter cuffing and as a result more physical pain to the person cuffed.

317.   Plaintiffs remained handcuffed after they were transported from the scene of their arrests to the mass arrest processing center.

318.   Plaintiffs remained at the mass arrest processing center and in the excessively tight flex-cuffs for longer than they would have had they not been subjected to the No-Summons Policy and the MAPP.

319.   The excessive handcuffing operated along with the other policies and practices articulated to remove protesters from the streets and to penalize and deter perceived participation in OWS-related demonstrations.

320.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, and were otherwise damaged and injured.

## SIXTH CLAIM

## FIRST AMENDMENT

**ON BEHALF OF PLAINTIFF CASE AGAINST
DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;**

**ON BEHALF OF PLAINTIFF CATLIN AGAINST
DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;**

**ON BEHALF OF PLAINTIFF KLEIN AGAINST
DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND**

**ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST
DEFENDANTS ESPOSITO AND MALDONADO**

321.   Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

322.   In detaining, assaulting, and arresting plaintiffs, in prosecuting plaintiffs, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies, practices, and/or

customs punishing peaceful protest, defendants violated plaintiffs' rights to speak, assemble, associate, and petition the government for redress of grievances peaceably.

323.    To the extent that defendants' acts and omissions complained of herein

324.   Defendants engaged in the acts and omissions complained of herein with ill will and/or actual malice.

325.   Defendants engaged in the acts and omissions complained of herein in retaliation for plaintiffs' protected conduct and/or speech.

326.   Defendants engaged in the acts and omissions complained of herein in order to prevent plaintiffs from continuing to engage in protected conduct.

327.   Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage plaintiffs from engaging in similar protected conduct in the future.

328.   Each plaintiff was actually chilled in that each plaintiff was prevented and /or deterred from participating in protected conduct on the date of and on numerous dates after the incident as a result of defendants' violations of their rights as complained of herein.

329.   In addition to being retaliatory, the restrictions imposed by defendants on plaintiffs' First Amendment rights complained of herein were:

  a.   Not content-neutral and lacked narrowly tailored to promote a compelling government interest;

  b.   Content-neutral, but lacked narrow tailoring to serve a significant governmental interest and/or failed to provide ample alternatives for expression;

    c.   Afforded defendants unbridled discretion to limit or deny plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns); and/or

    d.   Amounted to the imposition of strict liability on plaintiffs for participating in protected conduct.

330. For purposes of plaintiffs' First Amendment-based claims, plaintiffs content that each of the policies, practices, and customs complained of in relation to plaintiffs' *Monell* claims violated plaintiffs' First Amendment rights, including by targeting participants in OWS demonstrations.

331. As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured, and defendants chilled and created the risk of chilling conduct protected by the First Amendment.

## SEVENTH CLAIM

## MALICIOUS ABUSE OF PROCESS

**ON BEHALF OF PLAINTIFF CASE AGAINST
DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;**

**ON BEHALF OF PLAINTIFF CATLIN AGAINST
DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;**

**ON BEHALF OF PLAINTIFF KLEIN AGAINST
DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND**

**ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST
DEFENDANTS ESPOSITO AND MALDONADO**

332.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

333.    Defendants issued legal process in the form of police records and sworn statements in criminal court complaints against plaintiffs to detain and prosecute plaintiffs.

334.    Defendants arrested plaintiffs in order to obtain a collateral objective and/or collateral objectives outside the legitimate ends of the legal process.

335.    Defendants created false NYPD paperwork related to plaintiffs' arrests and forwarded false information to DANY as a result of which plaintiffs were prosecuted in order to obtain a collateral objective and/or collateral objectives outside the legitimate ends of the legal process.

336.    For example, defendants' arrests and prosecutions of plaintiffs furthered the collateral objectives of detaining plaintiffs for an excessively long period of time in order to fabricate evidence against them and/or in retaliation for their protected conduct and/or to prevent and/or deter them from returning to the streets to protest.

337.    For example, the No Summons Policy furthered the collateral objective of detaining plaintiffs for an excessively long period of time in order to fabricate evidence against them and/or in retaliation for their protected conduct and/or to prevent and/or deter them from returning to the streets to protest.

338.    Defendants acted with malicious intent to do harm to plaintiffs without excuse or justification.

339.    Each plaintiff suffered significant post-arraignment deprivations of liberty.

340.    After each plaintiff's arraignment, each plaintiff was required to return to court.

341.   After each plaintiff's arraignment, the ongoing criminal cases imposed other restrictions were imposed on plaintiffs' abilities to travel.

342.   For example, each plaintiff was released on their own recognizance, and as such each plaintiff was subjected at all times to the orders and processes of the court.

343.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## EIGHTH CLAIM

## EQUAL PROTECTION – FOURTEENTH AMENDMENT

### ON BEHALF OF PLAINTIFF CASE AGAINST
### DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;

### ON BEHALF OF PLAINTIFF CATLIN AGAINST
### DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;

### ON BEHALF OF PLAINTIFF KLEIN AGAINST
### DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND

### ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST
### DEFENDANTS ESPOSITO AND MALDONADO

344.   Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

345.   For purposes of plaintiffs' Equal Protection-based claims, plaintiffs content that each of the policies, practices, and customs complained of in relation to plaintiffs' *Monell* claims violated plaintiffs' Fourteenth Amendment rights to equal protection under the laws, including by targeting perceived participants in OWS demonstrations.

346.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## NINTH CLAIM

## EXCESSIVE DETENTION – FOURTH AMENDMENT

**ON BEHALF OF PLAINTIFF CASE AGAINST
DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;**

**ON BEHALF OF PLAINTIFF CATLIN AGAINST
DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;**

**ON BEHALF OF PLAINTIFF KLEIN AGAINST
DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND**

**ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST
DEFENDANTS ESPOSITO AND MALDONADO**

347.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

348.    As a result of the defendants' acts and omissions complained of herein, plaintiffs were detained without lawful excuse or justification for an unreasonable period of time.

349.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## TENTH CLAIM

## DEPRIVATION OF FAIR TRIAL RIGHTS – SIXTH AMENDMENT

**ON BEHALF OF PLAINTIFF CASE AGAINST
DEFENDANTS ESPOSITO, PAPOLA, DOWNES, AND ALMONTE;**

**ON BEHALF OF PLAINTIFF CATLIN AGAINST
DEFENDANTS ESPOSITO, MCCARTHY, AND CONFORTI;**

**ON BEHALF OF PLAINTIFF KLEIN AGAINST
DEFENDANTS ESPOSITO, GROHT, AND TVERDOKHLEB; AND**

**ON BEHALF OF PLAINTIFF KUSHNEIR AGAINST
DEFENDANTS ESPOSITO AND MALDONADO**

350.   Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

351.   Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which each plaintiff suffered deprivations of liberty.

352.   Each plaintiff suffered significant post-arraignment deprivations of liberty.

353.   After each plaintiff's arraignment, each plaintiff was required to return to court.

354.   After each plaintiff's arraignment, the ongoing criminal cases imposed other restrictions were imposed on plaintiffs' abilities to travel.

355.   For example, each plaintiff was released on their own recognizance, and as such each plaintiff was subjected at all times to the orders and processes of the court.

356.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and Sixth Amendment and other constitutional rights, endured pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise injured.

ELEVENTH **CLAIM**

*MONELL* **CLAIM(S) AGAINST DEFENDANT CITY
THROUGH 42 U.S.C. § 1983**

357.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

358.    All of the acts and omissions by the named and unnamed individual police officer Defendants described above were carried out pursuant to policies and practices of Defendant City that were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant City and its agency, the NYPD.

359.    Defendant City and the NYPD, by their policy-making agents, servants and employees, including, but not limited to, Defendant Esposito, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

360.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the Defendant City and the NYPD, all under the supervision of ranking officers of the NYPD.

361.    The aforementioned customs, practices, procedures and rules of the Defendant City and the NYPD include, but are not limited to:

    a.  The use of police resources to corral and trap perceived participants in First Amendment assemblies;

    b.  The policy and practice of failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies;

c.  The policy and practice of treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes without ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived "group" as a "unit";

d.  The policy and practice of applying PL § 240.20 (5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic) in in connection with actual or perceived protest activity in circumstances where the person arrested neither created nor recklessly risked substantial disruption of vehicular or pedestrian traffic or other criminally significant public ramifications;

e.  The policy and practice of applying PL § 240.20 (6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order) in connection with actual or perceived protest activity in circumstances where neither lawful dispersal orders, nor meaningful opportunities to disperse, were in fact given;

f.  The use of arrests in lieu of individualized determinations related to arrestees' eligibility for releases with summonses for summons-eligible offenses in connection with perceived OWS demonstrations (the "No-Summons Policy");

g.  The policy and practice of assigning "arrest teams" of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to "process" the arrests of multiple arrestees, including by filling out NYPD paperwork and swearing out accusatory instruments containing false information;

h.  The policy and practice of inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest

Processing Center that manufactured false business and court records after the fact designed to give the impression that assigned arresting officers witnessed or knew things they had not, in fact, witnessed or known of; and

   i.   Failing to train and/or supervise NYPD officers in connection with the above.

362.   Despite decades of litigation over the recurring problems framed by plaintiffs' *Monell* claims herein, defendant City and the Supervisory Defendants, including specifically defendant Esposito, failed to develop and implement adequate training in connection with, and to supervise and/or discipline their subordinates in connection with, the policies, practices, and customs complained of.

363.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## JURY DEMAND

364.   Plaintiffs demand a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.   Compensatory damages against the Defendants jointly and severally; and

B.   Punitive damages against the individual Defendants; and

C.   Attorney's fees and costs pursuant to 42 USC §1988; and

D.   Such other and further relief as the Court deems just and proper.

DATED:      Queens, New York

September 9, 2015

Respectfully submitted,

_____

Gideon Orion Oliver
*Attorney for Plaintiffs*
277 Broadway, Suite 1501
New York, NY  10007
t: 646-263-3495