**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

| | |
|---|---|
| In Re: New York City Policing During Summer 2020 Demonstrations | 20 Civ. 8924 (CM)(GWG) |

------------------------------------------------------------------

This filing is related to:

ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE MUCHA PINO, OSCAR RIOS, BARBARA ROSS, MATTHEW BREDDER, SABRINA ZURKUHLEN, MARIA SALAZAR, DARA PLUCHINO, and SAVITRI DURKEE, *on behalf of themselves and others similarly situated,*

                                        Plaintiffs,

         - against -

CITY OF NEW YORK; MAYOR BILL DE BLASIO; NEW YORK CITY POLICE DEPARTMENT COMMISSIONER DERMOT SHEA; NEW YORK CITY POLICE DEPARTMENT CHIEF OF DEPARTMENT TERENCE MONAHAN; NYPD DETECTIVE EDWARD CARRASCO (SHIELD NO. 1567); NYPD OFFICER TALHA AHMAD (SHIELD NO. 21358); NYPD OFFICER KEVIN AGRO (SHIELD NO. 8054); and NYPD OFFICERS JOHN and JANE DOES # 1- 40,

                                        Defendants.

------------------------------------------------------------------ X

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY DEMAND**

No. 21-cv-00533 (CM)(GWG)

         Plaintiffs, ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE MUCHA PINO, OSCAR RIOS, BARBARA ROSS, MATTHEW BREDDER, SABRINA ZURKUHLEN, MARIA SALAZAR, DARA PLUCHINO, and SAVITRI DURKEE, (collectively herein "Plaintiffs" or "Named Plaintiffs"), on behalf of themselves and others similarly situated, by and through their attorneys, Beldock Levine & Hoffman LLP; Gideon Orion Oliver; Cohen & Green P.L.L.C.; Wylie Stecklow PLLC; and Masai Lord, as and for their Complaint, allege as follows:

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 4

JURISDICTION ................................................................................................................. 6

VENUE ............................................................................................................................. 6

PARTIES .......................................................................................................................... 6

COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW ....................................... 9

JURY DEMAND .............................................................................................................. 12

STATEMENT OF FACTS ................................................................................................. 12

    Black Lives Matter Protests from May 28, 2020 to May 30, 2020 .............................. 12

    Defendant de Blasio's Curfew Orders and the NYPD's Subsequent Arrests............... 13

    NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations........ 18

    Reports and Investigations into the 2020 Protests ..................................................... 20

    The COVID-19 Pandemic in New York City................................................................ 23

NAMED PLAINTIFFS' EXPERIENCES............................................................................. 24

    Plaintiff David Jaklevic's May 30th Arrest ................................................................ 24

    Plaintiff Alexandra de Mucha Pino's May 30th Arrest .............................................. 26

    Plaintiff Oscar Rios's June 1st Arrest....................................................................... 28

    Plaintiff Barbara Ross's June 1st Arrest.................................................................... 31

    Plaintiff Matthew Bredder's June 2nd Arrest ............................................................ 32

    Plaintiff Sabrina Zurkuhlen's June 2nd Arrest........................................................... 34

    Plaintiff Maria Salazar's June 3rd Arrest.................................................................. 37

    Plaintiff Matthew Bredder's Second Arrest at the June 4th Mott Haven Protest ........ 39

    Plaintiff Dara Pluchino's June 4th Arrest ................................................................. 41

    Plaintiff Adama Sow's June 4th Arrest ..................................................................... 43

    Plaintiff Savitri Durkee's June 4th Arrest.................................................................. 46

THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS .................................. 49

    The NYPD's Failure to Train Regarding Protest Policing ............................................. 54

    The NYPD's Policy and/or Practice of Using Excessive Force to Control the
    Speech of Protestors ...................................................................................................... 61

    Defendants' Policies and Practices Regarding Arrests – Including Mass Arrests
    - Without Fair Warning .................................................................................................. 63

DEFENDANTS' PROTEST ARREST PROCESSING POLICIES AND PRACTICES ............ 66

    Defendants' Protest Arrest Processing Policies and Practices ....................................... 66

    Defendants' Failure to Monitor and Supervise NYPD Members' Protest
    Policing ..........................................................................................................................  69

DEFENDANTS' IMPOSED RESTRICTIONS ............................................................................ 69

CLASS ACTION ALLEGATIONS ............................................................................................. 70

FIRST CLAIM FOR RELIEF: UNLAWFUL SEIZURE/ FALSE ARREST ............................. 77

SECOND CLAIM FOR RELIEF: EXCESSIVE FORCE ............................................................ 77

THIRD CLAIM FOR RELIEF: FIRST AMENDMENT ............................................................. 78

FOURTH CLAIM FOR RELIEF: FIRST AMENDMENT RETALIATION .............................. 79

FIFTH CLAIM FOR RELIEF: DUE PROCESS ......................................................................... 81

SIXTH CLAIM FOR RELIEF: EQUAL PROTECTION AND SELECTIVE ENFORCEMENT
...................................................................................................................................................... 82

SEVENTH CLAIM FOR RELIEF: MUNICIPAL LIABILITY .................................................. 83

EIGHTH CLAIM FOR RELIEF: VIOLATIONS OF NEW YORK STATE LAW .................... 85

DEMANDS FOR RELIEF .......................................................................................................... 87

## PRELIMINARY STATEMENT

1.      On May 25, 2020, police killed George Floyd. Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest.

2.      In the days and weeks following Floyd's killing, the New York City Police Department ("NYPD") engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct, including, *inter alia,* corralling protestors into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the ground, using pepper spray indiscriminately, and ultimately arresting many of the protestors without lawful justification and without fair warning. Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage. They were also subjected to lengthy and unnecessary arrest processing that put them in dangerously close quarters, all at the height of the global COVID-19 pandemic.

3.      All of these activities were without lawful justification.

4.      The unlawful policies and practices used by Defendants against protestors included a crowd-control tactic known as "kettling" to corral and detain individuals who were engaged in peaceful protest. Defendants used kettling and similar tactics in order to impede constitutionally protected First Amendment activities, to conduct mass arrests without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights in the future.

5.      In addition, NYPD officers also targeted and arrested legal observers, medics, and other workers performing essential services without probable cause.

4

6. By contrast, these same Defendants have responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests) without using the same tactics employed against those who protested police conduct during the racial justice protests of 2020. In other words, it is the *message* of the protest that determines whether Defendants will respond with violent tactics and indiscriminate mass arrests.

7. The police actions in this case were part of overlapping policies and practices of the City of New York and the NYPD which were well known to Defendants New York City Mayor Bill de Blasio, New York City Police Commissioner Dermot Shea, and other City policymakers. These overlapping policies and practices include, *inter alia,* the use of excessive force, false arrests, and excessive and unreasonable detention at certain demonstrations—particularly those that focus on misconduct by the NYPD—but not others. These overlapping policies and practices have existed for years and have often resulted in litigation. Defendants have acknowledged and admitted to their failures to remedy these unconstitutional policies in recently released reports by, *inter alia,* the New York City Department of Investigation and the New York City Corporation Counsel.[1]

8. Defendants' conduct caused serious, and in many cases, lasting physical and emotional injury to members of the class. Thus, Plaintiffs, on behalf of themselves and all other similarly situated, seek damages for all members of the class as well as declaratory and injunctive relief to end the NYPD's unlawful policies and practices with regard to policing demonstrations.

---

[1] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

## JURISDICTION

9.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

10.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

11.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief they pray for herein.

12.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## VENUE

13.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

## PARTIES

14.     Plaintiff ADAMA SOW (Mr. Sow; he/him) is a resident of the City of New York, County of Kings, and State of New York.

15.     Plaintiff DAVID JAKLEVIC (Mr. Jaklevic; he/him) is a resident of the City of New York, County of New York, and State of New York.

16.     Plaintiff ALEXANDRA DE MUCHA PINO (Ms. de Mucha Pino; she/her) is a resident of the City of Philadelphia, County Philadelphia, and State of Pennsylvania.

17. Plaintiff OSCAR RIOS (Mr. Rios; he/him) is a resident of the City of New York, County of Kings and State of New York.

18. Plaintiff BARBARA ROSS (Ms. Ross; she/her) is a resident of the City of New York, County of New York, and State of New York.

19. Plaintiff MATTHEW BREDDER (Mr. Bredder; he/him) is a resident of the City of New York, County of New York, and State of New York.

20. Plaintiff SABRINA ZURKUHLEN (Ms. Zurkuhlen; she/her) is a resident of the City of New York, County of New York, and State of New York.

21. Plaintiff MARIA SALAZAR (Ms. Salazar; she/her) is a resident of the City of New York, County of Queens, and State of New York.

22. Plaintiff DARA PLUCHINO (Ms. Pluchino; she/her) is a resident of the City of New York, County of New York, and State of New York.

23. Plaintiff SAVITRI DURKEE (Ms. Durkee; she/her) is a resident of the City of New York, County of Kings, and State of New York.

24. Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

25. Defendant New York City Mayor BILL DE BLASIO was at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC

Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

26.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

27.     Defendant NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint, and still is, the Chief of Department of the NYPD who has policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

28.     Defendants NYPD Detective EDWARD CARRASCO (Shield No. 1567), NYPD Officer TALHA AHMAD (Shield No. 21358), NYPD Officer KEVIN AGRO (Shield No. 8054) and NYPD Officers JOHN and JANE DOES # 1- 40, are NYPD Police Officers who unlawfully used excessive force, arrested, and/or detained Plaintiffs and others similarly situated in violation of their constitutional rights.

29.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

30.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

31.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

32.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

33.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

34.     Each individual Defendant is sued in her or his individual and official capacities.

**COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW**

35.     Plaintiff ADAMA SOW served a Notice of Claim upon the City of New York within the statutory time.

36.     Plaintiff SOW attended a hearing pursuant to section 50-h of the New York General Municipal Law on December 1, 2020.

37.     More than thirty days have elapsed since Plaintiff SOW served a Notice of Claim and the City has not offered adjustment or payment thereof.

38.     Plaintiff DAVID JAKLEVIC served a Notice of Claim upon the City of New York within the statutory time.

39.     Plaintiff JAKLEVIC attended a hearing pursuant to section 50-h of the New York General Municipal Law on January 12, 2021.

40.     More than thirty days have elapsed since Plaintiff JAKLEVIC served a Notice of Claim and the City has not offered adjustment or payment thereof.

41.     Plaintiff ALEXANDRA DE MUCHA PINO served a Notice of Claim upon the City of New York within the statutory time.

42.     Plaintiff DE MUCHA PINO attended a hearing pursuant to section 50-h of the New York General Municipal Law on October 30, 2020.

43.     More than thirty days have elapsed since Plaintiff DE MUCHA PINO served a Notice of Claim and the City has not offered adjustment or payment thereof.

44.     Plaintiff BARBARA ROSS served a Notice of Claim upon the City of New York within the statutory time.

45.     Plaintiff ROSS attended a hearing pursuant to section 50-h of the New York General Municipal Law on February 18, 2021.

46.     Plaintiff OSCAR RIOS served a Notice of Claim upon the City of New York within the statutory time.

47.     Plaintiff RIOS attended a hearing pursuant to section 50-h of the New York General Municipal Law on January 4, 2021.

48.     More than thirty days have elapsed since Plaintiff RIOS served a Notice of Claim and the City has not offered adjustment or payment thereof.

49.     Plaintiff MATTHEW BREDDER served a Notice of Claim upon the City of New York within the statutory time.

50.     Plaintiff BREDDER attended a hearing pursuant to section 50-h of the New York General Municipal Law on December 18, 2020.

51.     More than thirty days have elapsed since Plaintiff BREDDER served a Notice of Claim and the City has not offered adjustment or payment thereof.

52.     Plaintiff SABRINA ZURKUHLEN served a Notice of Claim upon the City of New York within the statutory time.

53.     Plaintiff ZURKUHLEN attended a hearing pursuant to section 50-h of the New York General Municipal Law on January 12, 2021.

54.     More than thirty days have elapsed since Plaintiff ZURKUHLEN served a Notice of Claim and the City has not offered adjustment or payment thereof.

55.     Plaintiff MARIA SALAZAR served a Notice of Claim upon the City of New York on within the statutory time.

56.     Plaintiff SALAZAR attended a hearing pursuant to section 50-h of the New York General Municipal Law on December 4, 2020.

57.     More than thirty days have elapsed since Plaintiff SALAZAR served a Notice of Claim and the City has not offered adjustment or payment thereof.

58.     Plaintiff DARA PLUCHINO served a Notice of Claim upon the City of New York within the statutory time.

59.     Plaintiff PLUCHINO attended a hearing pursuant to section 50-h of the New York General Municipal Law on December 16, 2020.

60.     More than thirty days have elapsed since Plaintiff PLUCHINO served a Notice of Claim and the City has not offered adjustment or payment thereof.

61.     Plaintiff SAVITRI DURKEE served a Notice of Claim upon the City of New York within the statutory time.

62.     Plaintiff DURKEE attended a hearing pursuant to section 50-h of the New York General Municipal Law on December 15, 2020.

63.     More than thirty days have elapsed since Plaintiff DURKEE served a Notice of Claim and the City has not offered adjustment or payment thereof.

**JURY DEMAND**

64.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which a jury trial is legally available.

**STATEMENT OF FACTS[2]**

**Black Lives Matter Protests from May 28, 2020 to May 30, 2020**

65.     On May 28, 2020, days after George Floyd's death, protests began across New York City. One protest in Union Square saw a mobilization of hundreds of NYPD officers in response who made several arrests. A group of protestors marched to City Hall where officers trapped them with bicycles, and arrested approximately 75 people.

---

[2] Plaintiffs incorporate by reference the factual allegations in the complaints in related cases *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM), *Wood v. De Blasio et al*, 20-cv-10541 (CM), *Payne et al v. De Blasio et al*, 20-cv-8924 (CM), and *Sierra et al v. City of New York et al*, 20-cv-10291 (CM) as well as the facts contained in the reports that have been issued concerning these series of protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigations. *See,* footnote 1 above.

66.     Protests continued on May 29th at Foley Square in Manhattan and Barclay's Center in Brooklyn. At Barclay's Center, NYPD officers peppered sprayed and struck protesters with batons and hundreds of protestors were arrested.

67.     On May 30, protests continued in New York City in all five boroughs. The protests were again met with NYPD shows of force including pepper spray, baton strikes, fist strikes and mass arrests. In the Flatbush area of Brooklyn, a police helicopter flew low overhead swirling debris, trash, and dust into the marchers' faces. Collectively, at least 321 protestors were arrested following encounters with the Defendants on May 30th.

68.     On May 31, the protests in New York City continued, with thousands marching from the Barclays Center over the Manhattan Bridge into Lower Manhattan, near the Williamsburg Bridge, and in Times Square and Midtown. At least 325 protestors were arrested.

69.     Although there were some instances of property damage and injuries to NYPD officers occurred at some of these protests, the vast majority of the protesters were peaceful and did not engage in property damage. Defendants failed to distinguish protestors from the individuals who damaged property or otherwise violated the law. Defendant Shea acknowledged that those protesting the death of George Floyd and other Black victims of police misconduct in New York were "overwhelmingly . . . good people coming out to voice their opinion." Defendant Monahan also admitted in a public statement that, "the vast majority of people are out there to express their views."

**Defendant de Blasio's Curfew Orders and the NYPD's Subsequent Arrests**

72.     On June 1, 2020, in the midst of the protests in New York City, Governor Andrew Cuomo and Defendant de Blasio announced that New York City would be subject to an 11:00 p.m.

to 5:00 a.m. curfew.[3]

73.     On the evening of June 1, 2020, Defendant de Blasio announced he would be extending the curfew to the evening of June 2, 2020 from 8:00 p.m. to 5 a.m.[4]

74.     On June 2, 2020, Defendant de Blasio issued Emergency Executive Order No. 119, ordering "a City-wide curfew to be in effect each day from 8:00 p.m. until 5:00 a.m., beginning at 8:00 p.m. on June 3, 2020 and ending at 5:00 a.m. on June 8, 2020" during which "no persons or vehicles" could "be in public."[5]

75.     Under the Curfew Orders[6]: "Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."

76.     The Curfew Orders specifically targeted those engaged in First Amendment expression, as they exempted certain categories of workers that were deemed "essential", including "police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies."

77.     Pursuant to the Curfew Orders, "any person who knowingly violate[d] the provisions in th[e] Order[s] [was] guilty of a Class B misdemeanor" under NYC Administrative Code § 3-108.

---

[3] *See* https://www.governor.ny.gov/news/governor-cuomo-and-mayor-de-blasio-announce-citywide-curfew-new-york-city-will-take-effect; Emergency Executive Order No. 117, *available at*
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf.
[4] *See, e.g.,* https://twitter.com/NYCMayor/status/1267642422194057217?s=20; Emergency Executive Order No. 118, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf.
[5] *See* Emergency Executive Order No. 119, *available at*
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf.
[6] Hereinafter, we refer to Defendant de Blasio's Emergency Executive Orders related to the curfew collectively as the "Curfew Orders."

78.     NYC Administrative Code § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

79.     Under New York Penal Law § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

80.     On June 1, the NYPD Operations Division issued a FINEST message—an internal message to NYPD members—regarding the curfew orders, instructing officers that "[e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply." (emphasis added).

81.     On June 2, demonstrations again occurred at multiple locations throughout Manhattan. Protestors encountered NYPD officers in Lower Manhattan, the Upper West Side, Astor Place, Chelsea, and Midtown. More than 290 protesters were arrested at these locations. As occurred in many of the mass arrest locations identified herein, these arrests were made without adequate notice to those engaged in protest and without permitting sufficient time for those who were notified to disperse.

82.     On June 3, another FINEST message omitted the instruction to issue a dispersal order prior to curfew enforcement stating that, for a "person violating the curfew, a C-summons may be issued . . . for violating the Mayoral emergency order."

83.     On June 3, protests again occurred in Brooklyn, at Cadman Plaza and Maria Hernandez Park and in Manhattan, at Midtown East and the Upper East Side near Gracie Mansion. Another 191 protesters were arrested following encounters with NYPD officers at these locations.

84.     On June 4, 2020, protests continued across the City. More arrests were made on this day than any date before.

85.     NYPD officers arrested protesters on June 4 just minutes before, at, or after the 8:00 p.m. curfew in Brooklyn and Manhattan, trapping or kettling (as described above) protesters and using unreasonable and excessive force against protesters in Midtown Manhattan as well as in Fort Greene and Williamsburg in Brooklyn.

86.     Also on June 4, police in the Mott Haven neighborhood of the Bronx engaged in what Human Rights Watch later called a "planned assault"[7] on a protest against, among other things, police misconduct, trapping protesters on 136th Street before the 8:00 p.m. curfew had expired.

87.     Defendant Monahan was present at the June 4, 2020 Mott Haven demonstration and subsequent kettle, directing, authorizing, and ratifying enforcement actions taken by subordinate NYPD members.

88.     At approximately 7:45 p.m., NYPD Strategic Response Group ("SRG") officers wearing body armor formed a line with their bodies and NYPD bicycles at 135th Street and Willis Avenue, causing protesters who had been proceeding south on Willis Avenue to turn east onto 136th Street.

89.     At or around the same time, NYPD officers formed a police blockade ahead of, and downhill from, the protesters on 136th Street and Brook Avenue. As protesters arrived on the 136th Street block between Brown Place (on the west) and Brook Avenue (on the east, downhill), they were effectively trapped between police lines.

---

[7] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states. (Last accessed March 5, 2021).

90.     Officers blocked passage on 136th Street between Brown Place and Brook Avenue. A third group of NYPD Officers formed a third police blockade between the 136th Street roadway and the sidewalks to the north and south of 136th Street, effectively preventing people trapped on 136th Street between Brook Avenue and Brown Place from going onto the sidewalk, and people trapped on the sidewalk from entering the roadway.

91.     At 8:00 p.m., having kettled the protestors into a space blocking their ability to leave, the NYPD then effectuated mass arrests with heavy use of force for purported violations of the Curfew Orders. The force included striking protesters with batons, deploying pepper spray, and arresting National Lawyers Guild – New York City Chapter Legal Observers, and medical volunteers along with them.

92.     Plaintiffs Bredder, Pluchino, Sow, and Durkee were among the hundreds of people who were trapped on 136th Street by the NYPD's use of the kettling tactic.

93.     In Mott Haven on June 4, and elsewhere throughout the City during the protests, NYPD officers failed to issue dispersal orders allowing for compliance in advance of making arrests for perceived violations of the Curfew Orders.

94.     As protests continued across the City on June 5 and 6, police used almost identical tactics against protestors.

95.     On June 7, 2020, Defendant de Blasio lifted the Curfew Orders—one day earlier than the last of the orders was to remain in effect.

96.     At the time of these arrests, NYPD personnel who were present failed to give clearly communicated dispersal orders and/or provided meaningful opportunities to disperse before trapping or arresting protesters.

97.     While the Curfew Orders were in effect, the NYPD arrested approximately 1,350

17

individuals, disproportionately Black and minority individuals, for allegedly violating the Curfew Orders.

98.     Upon information and belief, all charged violations of the Curfew Orders related to the protests that are the subject of this litigation were eventually dismissed.

99.     During this series of arrests, police officers routinely failed to distinguish the protesters from individuals taking advantage of the demonstrations to destroy property and steal from businesses.

**NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations**

100.     The NYPD's violent response to protests against police brutality was dramatically different from their response to other kinds of protests and rallies.

101.     On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[8]

102.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[9]

---

[8] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.
[9] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

103.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[10]

104.     On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[11]

105.     On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[12]

106.     On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked

---

[10] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[11] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

[12] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[13][14]

107. The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.

    a.    In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

    b.    In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[15],[16]

    c.    More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[17] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[18]

**Reports and Investigations into the 2020 Protests**

[13] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[14] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[15] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[16] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

[17] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[18] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

108.    In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[19]

109.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

110.    The AG Report also found the pervasive use and misuse of tightly fastened flex-cuffs during arrests, NYPD officers covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

111.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[20]

112.    The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[21]

---

[19] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiffs herein incorporate by reference into this case the facts set forth in the AG Report.
[20] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18 .2020.pdf.
[21] *Id.* at 36.

113.    In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[22]

114.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

115.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

116.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

117.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[23]

118.    The DOI also found that Black arrestees were disproportionately charged with felonies.[24]

119.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[25]

120.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[26]

---

[22] *Id.* at 61.
[23] *Id.* at 26.
[24] *Id.* at 27.
[25] DOI Report at 56.
[26] *Id.* at 28.

121.     In September of 2020, Human Rights Watch issued a detailed analysis of the Mott Haven protest (the "HRW Report") describing the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan, who was present at the NYPD mobilization.[27]

122.     The HRW Report describes the systematic kettling of protesters in Mott Haven before the 8:00 p.m. curfew and the subsequent excessive force and mass arrest of the marchers, including National Lawyers Guild – New York City Chapter Legal Observers, as well as medics, all of whom were classified as essential workers exempt from the Mayor's Curfew Orders.

123.     Notwithstanding these reports condemning the conduct of the NYPD, following the Mott Haven protest, Defendant Shea ratified the misconduct that occurred when he said the mobilization by the NYPD in Mott Haven was "executed nearly flawlessly."[28]

124.     Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

### The COVID-19 Pandemic in New York City

125.     As protesters were taking to the streets in the summer of 2020 to speak out against police brutality and in support of Black lives, the COVID-19 virus raged across the country.

126.     In April 2020, Governor Cuomo ordered people to wear protective face masks in public, to protect themselves and others from the spread of the virus.

---

[27] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.
[28] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protesters Was "Executed Nearly Flawlessly," City Leaders Agree, Gothamist, June 5, 2020, available at *https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.*

127.    However, many police officers failed to abide by this directive to wear masks. As the AG Report documented, many officers who interacted with and arrested protesters in May and June of 2020 were not wearing face masks, even as the City continued to record hundreds of new coronavirus cases each week. By contrast, most protesters wore protective face masks—at least until their contacts with NYPD members.

128.    During their arrests, some protesters' masks fell off or were removed. These protesters were transported in vans and/or buses and placed in holding cells in close indoor contact with other arrestees whose masks fell off or were removed, and police officers who were not wearing masks.

**Named Plaintiffs' Experiences**

***Plaintiff David Jaklevic's May 30th Arrest***

129.    Plaintiff David Jaklevic is a 41-year-old attorney who has worked for the U.S. Department of Labor for approximately ten years.

130.    Mr. Jaklevic participated in a protest at and around Union Square on the night of May 30, 2020.

131.    Mr. Jaklevic wore a protective face covering to protect himself and others from the spread of COVID-19.

132.    When Mr. Jaklevic attempted to leave the protest to return home at approximately 10:15 p.m., NYPD members forced protesters westward on 13th Street.

133.    With no other way to move, Mr. Jaklevic moved as directed west on 13th Street.

134.    Officers on bicycles then formed a wall across 13th Street in front of protestors, trapping Mr. Jaklevic and the other protesters on the block between Broadway and University Place.

135.    Without any announcements or orders, the officers on bicycles charged forward into the protesters.

136.    At least two officers on bicycles, including Defendant NYPD Officer Kevin Agro (NYPD Shield No. 8054), struck Mr. Jaklevic with their bicycles as they drove into the protesters.

137.    An officer then grabbed Mr. Jaklevic from behind, threw him into the air, and slammed him to the ground.

138.    The force of their actions caused Mr. Jaklevic's mask to fall off.

139.    The officer pulled Mr. Jaklevic's left wrist, arm, and shoulder forcefully back and up his back at an unnatural angle, causing pain.

140.    An officer put Mr. Jaklevic in flex-cuffs, pulling Mr. Jaklevic's flex-cuffs as hard as he could and as tight as the cuffs would go.

141.    The officer lifted Mr. Jaklevic off the ground using the flex-cuffs, causing excruciating pain in Mr. Jaklevic's left shoulder and wrists.

142.    Mr. Jaklevic informed the officer that the flex-cuffs were too tight and repeatedly pleaded for his flex-cuffs to be loosened or removed.

143.    An officer replied, in sum and substance, "Shut the fuck up and sit down."

144.    Mr. Jaklevic was told to sit on the curb, which increased the pain to his shoulder and wrists, and remain there for approximately one hour.

145.    Mr. Jaklevic repeatedly told the officers around him that he had lost feeling in his hands.

146.    Mr. Jaklevic repeatedly requested that his mask be replaced, but officers refused.

147.    Officers with whom Mr. Jaklevic interacted overwhelmingly did not wear masks.

148.    After an hour, an officer finally removed Mr. Jaklevic's flex-cuffs and released him from custody with no charges.

149.    Mr. Jaklevic asked the officer who had told him to shut up and forced him to sit for his badge number.

150.    The officer refused to give his badge number and told Mr. Jaklevic to leave immediately, and said if Mr. Jaklevic did not, he would be re-arrested.

151.    The Defendants' conduct directly and proximately caused physical and emotional injury to Mr. Jaklevic, including, *inter alia*, sustained bruises and scrapes to his right shoulder and elbow, bruising and swelling to his left hand, and numbness, tingling, and nerve damage to his left wrist that has required repeated medical treatment including physical therapy, among other injuries.

### *Plaintiff Alexandra de Mucha Pino's May 30th Arrest*

152.    Plaintiff Alexandra de Mucha Pino is a 29-year-old senior program associate at Earthjustice with a B.S. in Environmental Resource Management.

153.    On the evening May 30, 2020, Ms. de Mucha Pino participated in a march from City Hall across the Brooklyn Bridge.

154.    Ms. de Mucha Pino wore a protective face covering to protect herself and others from the spread of COVID-19.

155.    As the marchers made their way over the Brooklyn Bridge, officers waiting near the Brooklyn end of the bridge formed a wall across the street.

156.    As the marchers exited the bridge, officers charged at them, including Ms. de Mucha Pino.

157.    Officers did not give any orders before charging at the protesters.

158. Ms. de Mucha Pino turned around and retreated from the charging officers.

159. As she looked over her shoulder, she saw officers tackle, body slam, and strike protesters with batons.

160. Ms. de Mucha Pino stood on the sidewalk and began recording the police activity.

161. Two officers rushed at Ms. de Mucha Pino.

162. One officer pushed Ms. de Mucha Pino with his baton and told her to move back, but she could not physically move backwards because of a row of bushes behind her.

163. The second officer also began pushing Ms. de Mucha Pino.

164. Ms. de Mucha Pino put her arms in the air.

165. The two officers ripped a metal cuff bracelet off Ms. de Mucha Pino's wrist, causing a gash to her left arm that left a permanent scar.

166. The two officers twisted Ms. de Mucha Pino's arms and hands such that one palm was facing inwards and one palm was facing outwards, and then placed flex-cuffs tightly on her in this incorrect position, which caused the flex-cuffs to further cut into her skin.

167. Officers then forced Ms. de Mucha Pino to wait for approximately thirty minutes in the street.

168. While she waited, Ms. de Mucha Pino told officers that her flex-cuffs were too tight and were hurting her.

169. Eventually, she was loaded into a prisoner transport vehicle, with approximately ten other protesters, many of whom had their personal protective equipment removed by officers.

170. Ms. de Mucha Pino was held in this extremely hot transport vehicle with the other protesters for over three hours with her hands cuffed behind her in an incorrect position, and with no air-conditioning.

27

171.    When she was finally allowed to exit the vehicle, Ms. de Mucha Pino was forced to wait outside of One Police Plaza in a line for approximately an hour, during which time Ms. de Mucha Pino's flex-cuffs were finally removed.

172.    Ms. de Mucha Pino then spent approximately four and a half hours in a cell with two to three other people, which was so small that there was not enough room on the bench in the cell for all four individuals.

173.    Ms. de Mucha Pino's cellmates asked for water but officers told them that they could not give them water because they did not have cups.

174.    When arrestees asked about food, officers laughed and said in sum and substance "No, you aren't getting any meals."

175.    After about eight and a half hours in custody, Ms. de Mucha Pino was given two summonses for Disorderly Conduct and released from custody.

176.    Ms. de Mucha Pino's charges were eventually dismissed.

177.    The Defendants' conduct directly and proximately caused Ms. de Mucha Pino physical and emotional injuries, including, *inter alia*, loss of circulation in her wrist and bruising and a cut to her left arm, as well as nightmares and a fear of the police.

178.    Ms. de Mucha Pino missed work as a result of this incident.

***Plaintiff Oscar Rios's June 1st Arrest***

179.    Plaintiff Oscar Rios is a 29-year-old software developer.

180.    On June 1, 2020, Mr. Rios attended a protest that began at Barclay's Center, crossed the Manhattan Bridge, and approached Port Authority.

181.    Mr. Rios wore a protective face covering to protect himself and others from the spread of COVID-19.

182.     As the protesters approached Port Authority, the NYPD blocked off the forward path with police cars, began intersecting blocks, and pushing in from behind the crowd as well, forcing the crowd to steer in a different direction.

183.     When the protest march arrived at Port Authority, Mr. Rios saw hundreds of police officers lined up.

184.     Without giving any announcements or any orders to disperse, officers rushed the protesters.

185.      An officer tackled Mr. Rios, forced him prostrate on the ground, struck him multiple times with a baton, and then punched him repeatedly.

186.     One or more officers sat or kneeled on top of Mr. Rios and handcuffed him with flex-cuffs with excessive tightness on the ground, impeding Mr. Rios's breathing.

187.     Officers continued to strike Mr. Rios while he was on the ground, causing cuts to his hands and knees, punched him in the stomach, and struck his back with a baton.

188.     As Mr. Rios's face was being pressed to the ground while he was wearing a protective face mask, he experienced difficulty breathing and told an officer that he was struggling to breathe.

189.     The officer responded, in sum and substance, "Shut the fuck up," and he then stepped intentionally on Mr. Rios's face, breaking his eyeglasses.

190.     Mr. Rios begged officers to let him recover his eyeglasses after officers made him stand up.

191.     When officers finally gave Mr. Rios his eyeglasses, they were completely broken, with both arms and lenses snapped off and warped.

192.     An officer asked Mr. Rios, in sum and substance, why he was attending the protest.

193.    When Mr. Rios responded that he was there to protest police brutality and that his arrest was part of that brutality, the officer told him, in sum and substance, "Shut the fuck up."

194.    Another officer threatened Mr. Rios with a baton and also told him, in sum and substance, "Shut the fuck up."

195.    Mr. Rios complained about the excessive tightness of his flex-cuffs and the numbness of his hands to officers.

196.    Officers informed Mr. Rios that they could not do anything about the tightness of his flex-cuffs.

197.    Officers loaded Mr. Rios into a prisoner transport vehicle with several other protesters.

198.    While in the vehicle, Mr. Rios asked officers for a mask and was denied one.

199.    Another protester in the transport van commented that Mr. Rios's hands had turned purple, and only then did an officer finally remove the flex-cuffs and replace them with a pair of metal handcuffs.

200.    Officers confiscated Mr. Rios's fannypack and phone.

201.    When the transport van arrived at One Police Plaza, Mr. Rios waited outside in line for hours.

202.    During Mr. Rios's approximately seven hours in custody, the NYPD member assigned as Mr. Rios's arresting officer asked Mr. Rios if he intended to sue him for his arrest.

203.     This officer demanded the email address of Mr. Rios and told him, in sum and substance that if Mr. Rios sued, he would lie and say Mr. Rios had tried to assault him.

204.     After approximately seven hours in custody, Mr. Rios and the other individuals in the van were led to an area away from the protests, told they would be emailed a summons for breaking curfew, and then released from custody.

205.     Mr. Rios never received his summons and attempts to locate his summons via the New York State Unified Court System Electronic Document Delivery System ("EDDS") returned no filings found.

206.     The Defendants' conduct directly and proximately caused Mr. Rios physical and emotional injuries, including, *inter alia,* loss of circulation in his wrists, numbness in his left hand, open wounds on his hands and knees, and bruising and swelling across his body from baton strikes.

207.     Mr. Rios missed a deadline at work due to the complete numbness in his left hand for three weeks that resulted from Defendants' actions.

### Plaintiff Barbara Ross's June 1st Assault

208.     On June 1, 2020, Plaintiff Barbara Ross, a 57-year-old woman, attended a march that was moving south through midtown Manhattan.

209.     Ms. Ross wore a protective face covering to protect herself and others from the spread of COVID-19.

210.     Ms. Ross proceeded peacefully on her bicycle along with the march down 3rd Avenue in Manhattan.

211.     At approximately 11:50 p.m., roughly one hour after the 11:00 p.m. curfew then in effect in Manhattan, a police presence that had until then been following behind the march began grabbing and arresting protesters.

212.     At approximately 11:56 p.m., Ms. Ross made a right turn on her bicycle onto 59th Street.

213.     Shortly after Ms. Ross turned onto 59th Street, an unknown female NYPD officer abruptly flung open the door of an NYPD van and grabbed the handlebar of the bicycle Ms. Ross was riding as she moved past.

214.     The violent interference with her bicycle threw Ms. Ross to the street and resulted in the fracturing of her foot in two places, and substantial bruising.

215.     Despite her obvious physical pain, the officer did not call for medical assistance.

216.     The NYPD officer released Ms. Ross's bicycle and moved away from Ms. Ross to detain another protester, leaving Ms. Ross in the street with a broken foot.

217.     Ms. Ross was forced to walk on her broken foot with her bicycle down 3rd Avenue in order to return home.

218.     Ms. Ross sought medical attention, including from an urgent care and an orthopedist, for her injuries.

219.     The Defendants' conduct directly and proximately caused physical and emotional injuries to Ms. Ross, including, *inter alia*, bruising and fractures to her foot in two places.

### *Plaintiff Matthew Bredder's June 2nd Arrest*

220.     Plaintiff Matthew Bredder is a 26-year-old Ph.D. student in neuroscience.

221.     On June 2, 2020, Mr. Bredder attended a protest that began on Christopher Street and moved south along the West Side Highway.

222.     Mr. Bredder wore a protective face covering to protect himself and others from the spread of COVID-19.

223.     At or around 10:00 p.m., two or more officers threw Mr. Bredder to the ground and slammed his head against the street.

224.     The impact of that slam chipped Mr. Bredder's tooth and cut his chin.

32

225.    Officers pulled Mr. Bredder's arms behind his back and placed flex-cuffs on him and sat him in the middle of the street.

226.    Eventually, Mr. Bredder was placed on the curb of the sidewalk at Fifth Avenue and 14th Street, along with 20 other people.

227.    Between sitting in the street and on the curb, Mr. Bredder was kept at the location of his arrest for over an hour.

228.    Officers loaded Mr. Bredder into a prisoner transport vehicle.

229.    After being loaded in the van, the van did not depart for approximately 45 minutes.

230.    The van eventually left, taking Mr. Bredder and approximately 8 protesters to a centralized processing location at 120 Schermerhorn in Brooklyn.

231.    Mr. Bredder did not arrive at the central processing location until around 12:30 a.m., two and a half hours after being arrested.

232.    Once at the processing location, protesters were kept in a line outside the facility for at least an hour.

233.    After a brief period in a crowded cell, protesters, including Mr. Bredder, were lined up in a narrow hallway shoulder-shoulder to have their pictures taken by an officer using a cell phone.

234.    At the processing location, few officers were wearing masks.

235.    After about seven and a half hours in custody, at around 5:30 a.m. on June 3, 2020, Mr. Bredder was issued a summons for curfew violation and finally released from custody.

236.    Mr. Bredder's charges were eventually dismissed.

237.    The conduct of the Defendants directly and proximately caused physical and emotional injuries to Mr. Bredder including, *inter alia*, a chipped tooth and laceration to his chin.

*Plaintiff Sabrina Zurkuhlen's June 2nd Arrest*

238.    Plaintiff Sabrina Zurkuhlen is a 33-year-old director of athletics for an independent school, with a master's degree from Ohio University. She is also a registered nurse.

239.    On June 2, 2020, Ms. Zurkuhlen and her husband attended a protest that began on Christopher Street. and moved south along the West Side Highway.

240.    Ms. Zurkuhlen wore a protective face covering to protect herself and others from the spread of COVID-19.

241.    As the march moved south past Vesey Street, Ms. Zurkuhlen, who was toward the front of the group, saw a group of at least 100 NYPD officers form a line across the entire highway.

242.    The line of officers began to move towards the protesters with their helmets on and batons out.

243.    At no point did Officers give an order to disperse.

244.    Ms. Zurkuhlen walked backwards away from the officers with her hands up, while recording the police.

245.    The line of officers quickened their pace and descended upon the protesters.

246.    Ms. Zurkuhlen saw officers kick, punch, and beat with batons the protesters around her.

247.    An officer pointed his drawn baton at Ms. Zurkuhlen and began to move even faster toward her.

248.    Ms. Zurkuhlen looked to an officer next to the officer who was charging her and asked him, "Can you please help me?" as she continued to walk backwards with her hands up.

249.    The officer with his baton out then lunged at Ms. Zurkuhlen.

250. The officer forcefully knocked the phone with which she was recording out of Ms. Zurkuhlen's hands.

251. The officer struck Ms. Zurkuhlen across her chest with his baton.

252. The officer then began beating Ms. Zurkuhlen on the arms and upper body with his baton, as he tackled her to the ground.

253. Additional NYPD members descended on Ms. Zurkuhlen and beat her with their batons and kicked her.

254. One officer kneeled on Ms. Zurkuhlen's legs while another officer sat on her back.

255. One officer told Ms. Zurkuhlen to stand up, which was impossible as she had two officers on top of her body.

256. Ms. Zurkuhlen pleaded with officers as they continued to beat her, repeatedly saying that she was not resisting.

257. An officer pulled her arms behind her back and put extremely tight flex-cuffs on Ms. Zurkuhlen.

258. Eventually, a white-shirt officer said in sum and substance "Ok, that's enough guys, get her up."

259. Officers then dragged Ms. Zurkuhlen to the side of the road and forced her to sit with other arrested demonstrators for around an hour.

260. Ms. Zurkuhlen's husband was also tackled, beaten with batons, and arrested.

261. When Ms. Zurkuhlen asked for her phone back, an officer laughed and responded, in sum and substance, "Yeah, right. That shit is gone."

262. Ms. Zurkuhlen's cell phone was never returned.

263.     Ms. Zurkuhlen heard an officer tell other officers, in sum and substance, "if your body cam is not on, do not turn it on. Cover your names."

264.     No officers on the scene were wearing masks or any protective face coverings.

265.     Ms. Zurkuhlen's face mask had fallen down during her arrest.

266.     When Ms. Zurkuhlen asked if officers would pull up her mask or keep a safe distance between persons present, the officers laughed, mocked her, and refused.

267.     Ms. Zurkuhlen observed two protesters with purple hands telling officers their hands were numb from the tightness of their flex-cuffs.

268.     Ms. Zurkuhlen explained to the officers that she was a registered nurse, and she asked if she could look at protesters' wrists, or if their flex-cuffs could be loosened or removed.

269.     Officers replied that no one knew how to remove the flex-cuffs, that removing the flex-cuffs was impossible, and that Ms. Zurkuhlen should, in sum and substance, "shut the fuck up."

270.     Eventually officers loaded Ms. Zurkuhlen into a prisoner transport vehicle filled with approximately 9 other protesters.

271.     Ms. Zurkuhlen was held in the crowded NYPD van for an extended period before the van moved.

272.     When the NYPD van finally arrived at a centralized arrest processing location in Brooklyn, officers told Ms. Zurkuhlen and the other protesters that their arresting officers had not yet arrived at the location.

273.     Officers continued to drive Ms. Zurkuhlen and the other arrestees around the block in circles for an extended period of time.

274.    Ms. Zurkuhlen was then unloaded from the van and forced to wait in an extremely long line outside of the centralized arrest processing location.

275.    The officer assigned to Ms. Zurkuhlen's arrest repeatedly remarked that he did not have the tool to remove the tight flex-cuffs, that he was from the Bronx, and that he had no idea what was going on.

276.    Only after Ms. Zurkuhlen was inside the building were her tight flex-cuffs finally removed and replaced.

277.    Ms. Zurkuhlen asked for a phone call and was denied.

278.    Ms. Zurkuhlen asked for water many times, for herself and others held in the cells with her.

279.    In response to her pleas for water, officers mocked Ms. Zurkuhlen, telling her, in sum and substance, that she should "shut the fuck up."

280.    After about eight and a half hours in custody, around 3:00 a.m. on June 3, 2020, Ms. Zurkuhlen was issued a summons for curfew violation and released from custody.

281.    Ms. Zurkuhlen's charges were dismissed.

282.    The conduct of the Defendants directly and proximately caused Ms. Zurkuhlen to suffer physical and emotional injuries, including, *inter alia,* substantial bruising from being hit by batons, being thrown onto the street, being pinned by officers, and being kicked by officers.

### Plaintiff Maria Salazar's June 3rd Arrest

283.    Plaintiff Maria Salazar is a 29-year-old Ph.D. student at the City University of New York Graduate Center in Philosophy and an adjunct lecturer at Queens College.

284.    On June 3, 2020, Ms. Salazar participated in a protest, marching downtown from Gracie Mansion.

37

285.    Ms. Salazar wore a protective face covering to protect herself and others from the spread of COVID-19.

286.    At around 9 p.m., when the march reached the area of 54th Street and 3rd Avenue, NYPD officers on bicycles charged the back of the march.

287.    NYPD members did not make any announcements and did not give any orders to disperse.

288.    As Ms. Salazar stood on the sidewalk, two officers rammed their bicycles into Ms. Salazar.

289.    Ms. Salazar's mask came off when the officers rammed her with their bicycles.

290.    An officer threw her bicycle onto Ms. Salazar.

291.    Officers instructed Ms. Salazar to turn onto 54th Street.

292.    When Ms. Salazar attempted to turn onto 54th Street as directed, a fleeing crowd of protesters coming informed Ms. Salazar that NYPD officers had just told them to turn back and return the other way.

293.    The NYPD's actions trapped Ms. Salazar and the other protesters, without the ability to disperse or move.

294.    With the protesters kettled into one location without the ability to leave, officers began violently striking protestors with batons and arresting them in a seemingly random fashion.

295.    Ms. Salazar began recording the police activity with her cell phone and continued recording until an officer threw her against a wall, told her she was under arrest, and placed her in plastic flex-cuffs.

296.    Ms. Salazar told officers that she had not done anything wrong.

297.    An officer replied, in sum and substance, "I know, I am sorry."

298.    Ms. Salazar was then forced to sit in the street in the pouring rain for approximately half an hour.

299.    Officers repeatedly stated that they could not remove the protestors' overly tight flex-cuffs.

300.    Ms. Salazar was placed into a crowded prisoner transport vehicle with approximately nine other protesters, most of whom were not wearing masks.

301.    None of the officers with whom Ms. Salazar interacted wore masks.

302.    Ms. Salazar was forced to remain in the crowded van, with no ventilation and without a face covering and in the presence of others without face coverings for 3 to 4 hours.

303.    Ms. Salazar told officers that she was thirsty and that she was in pain from being handcuffed.

304.    Ms. Salazar was finally removed from the van and directed to stand outside the arrest processing location for approximately 45 minutes before officers brought her inside.

305.    Ms. Salazar repeatedly asked officers for water and to use the bathroom.

306.    Ms. Salazar was placed in an extremely crowded holding cell with approximately 20 to 25 other arrestees, which only had seating for approximately 14 people.

307.    After approximately eight and a half hours in custody, Ms. Salazar was finally given a summons for curfew violation and released from custody.

308.    Ms. Salazar's charges were dismissed.

309.    The conduct of the Defendants directly and proximately caused Ms. Salazar to suffer physical and emotional injuries, including, *inter alia,* sprained and painful wrists and injury to her shoulders.

**Plaintiff Matthew Bredder's Second Arrest at the June 4th Mott Haven Protest**

39

310.    On the night of June 4, 2020, Mr. Bredder participated in the Mott Haven protest.

311.    Mr. Bredder again wore a protective face covering to protect himself and others from the spread of COVID-19.

312.    Before 8:00 p.m., Mr. Bredder was encircled by officers and trapped with a large group of protesters on 136th Street between Brown Place and Brook Avenue by officers.

313.    Officers told Mr. Bredder and others in the front of the march to move back, but there was no room or ability for them to do so due to the pressing forward by officers at the back of the march.

314.    An officer said to Mr. Bredder, in sum and substance, "Fuck you," and punched Mr. Bredder on the chin.

315.    Another officer grabbed Mr. Bredder by the shirt, partially ripping it off.

316.    Two more officers then grabbed Mr. Bredder and pulled him into the air so he was in a horizontal position approximately three feet above the ground, with his face towards the ground.

317.    While he was in the air, Mr. Bredder told the officers he was not resisting arrest.

318.    The officers then intentionally dropped Mr. Bredder onto the ground from three feet up in the air.

319.    Mr. Bredder took the majority of the impact from that fall in his right elbow, right knee, and left knee.

320.    The fall was enough to rip open the denim of Mr. Bredder's jeans.

321.    Mr. Bredder sustained bruises to both knees, a large cut on his right knee, a large cut and bruise on his right elbow, and cuts to his hands, among other injuries.

322.    The fall made Mr. Bredder's mask became misaligned on his face.

323.    Mr. Bredder was trapped on the ground, surrounded by officers and bicycles.

324.    Defendant Edward Carrasco applied flex-cuffs to Mr. Bredder's wrists, oriented in the wrong direction, and with extreme tightness.

325.    Mr. Bredder was held in a prisoner transport bus with approximately 16 other individuals for between 3 and 4 hours with his hands cuffed behind him.

326.    When they finally arrived at an arrest processing center in Queens, Mr. Bredder was forced to wait in line outside for over 45 minutes.

327.    At approximately 2:00 a.m. on June 5, 2020, Mr. Bredder was issued a summons for curfew violation and released from custody.

328.    The summons was eventually dismissed.

329.    The conduct of the Defendants directly and proximately caused Mr. Bredder to suffer physical and emotional injuries, including, *inter alia,* losing feeling in his right palm for over a month, as well as cuts and abrasions.

330.    Mr. Bredder's injuries caused him substantial concerns about his work as a neuroscience Ph.D. student, which requires fine motor tasks up to and including brain surgery.

### Plaintiff Dara Pluchino's June 4th Arrest

331.    Plaintiff Dara Pluchino is a 27-year-old master's student at the Columbia University School of Social Work.

332.    On June 4, 2020, Ms. Pluchino participated in the protest in Mott Haven.

333.    Ms. Pluchino was wearing a protective face covering to protect herself and others from the spread of COVID-19.

334.    Before 8:00 p.m., Ms. Pluchino was trapped NYPD officers on 136th Street between Brown Place and Brook Avenue.

41

335.     As Ms. Pluchino tried to leave via a sidewalk, an NYPD officer applied flex-cuffs to Ms. Pluchino's wrists with extreme tightness, causing significant pain in both of Ms. Pluchino's hands and wrists.

336.     The officer then grabbed Ms. Pluchino and pulled her to the center of the road by her arm, such that his grip and pulling left a bruise on her left upper arm.

337.     The officer also removed Ms. Pluchino's mask.

338.     After pulling her into the street, the officer pushed Ms. Pluchino to the ground and forced her to sit in the street for at least an hour, during which time the extremely tight flex-cuffs caused significant pain in her hands and wrists.

339.     Ms. Pluchino was held in an NYPD van with around 10 other arrestees for between one and a half to two hours before departing Mott Haven.

340.     Ms. Pluchino was brought to a centralized arrest processing location in Queens, where she was forced to wait in the van for approximately one additional hour.

341.     Ms. Pluchino was then forced to wait outside of the processing location for approximately one additional hour.

342.     Ms. Pluchino was then forced to wait in a cell for several more hours.

343.     At approximately 4:30 a.m. on June 5, 2020, Ms. Pluchino was finally given a summons for curfew violation and released from custody.

344.     Ms. Pluchino's charges were dismissed.

345.     The conduct of the Defendants directly and proximately caused Ms. Pluchino to suffer physical and emotional injuries, including, *inter alia,* pain to both wrists and both hands, and fear of police officers.

346.     Ms. Pluchino experienced a chilling effect from her arrest and detention, including a fear for her own and her family's safety when she attends protests.

***Plaintiff Adama Sow's June 4th Arrest***

347.     Plaintiff Adama Sow is a 22-year-old doula-in-training who moved to the United States from Cameroon in 2016 to attend Columbia University.

348.     On June 4, 2020, Mr. Sow participated in the protest at Mott Haven.

349.     Mr. Sow wore a protective face covering to protect himself and others from the spread of COVID-19.

350.     Before 8 p.m., Mr. Sow was trapped in the Mott Haven Kettle between Brown Place and Brook Avenue.

351.     Mr. Sow repeatedly asked officers to leave the kettle, but they did not let him leave.

352.     An officer sprayed pepper spray into Mr. Sow's left eye.

353.     Another officer grabbed Mr. Sow from behind and pushed him against a car.

354.     Mr. Sow's mask fell from his nose and mouth during this process.

355.     When Mr. Sow asked an officer to pull his mask up to cover his nose and mouth, the officer pulled up Mr. Sow's mask so that it covered Mr. Sow's eyes instead, like a blindfold.

356.     Mr. Sow asked for the mask to be removed from his eyes and the officer ignored the request, instead saying in sum and substance, "we'll deal with it when you're down."

357.     The officer then shoved Mr. Sow onto the ground.

358.     Officers put extremely tight flex-cuffs on Mr. Sow.

359.     Mr. Sow was forced to kneel in the street, still blindfolded.

360.     Eventually, someone removed the mask from Mr. Sow's eyes.

361.    Now able to see, Mr. Sow discovered that he was kneeling in a pool of someone else's blood.

362.    Mr. Sow's flex-cuffs were so tight he lost feeling in his hands.

363.    A nearby friend told Mr. Sow his hands had turned purple.

364.    Mr. Sow begged officers for help with his flex-cuffs for at least 30 minutes.

365.    During that period, other protesters also saw that Mr. Sow's hands were turning purple and shouted for help as well.

366.    At least two officers directly in front of Mr. Sow heard and ignored his complaints about the tightness of the flex-cuffs and his hands having turned purple.

367.    Eventually an officer removed and re-applied Mr. Sow's flex-cuffs.

368.    Before removing the flex-cuffs, however, the officer deliberately squeezed Mr. Sow's wrists and smacked him on his neck, causing significant pain.

369.    The replacement flex-cuffs were again extremely tight.

370.    Mr. Sow was made to kneel in the street, in overtight flex-cuffs, for 3 hours.

371.    While being detained, Mr. Sow requested medical assistance from Defendant Officer Talha Ahmad for pain in both his wrists and numbness in both hands, but Ahmad refused.

372.    While Defendant Ahmad was detaining Mr. Sow, Ahmad spoke suggestively to him, stroked his left forearm, and called Mr. Sow his (Ahmad's) "Boo."

373.    Defendant Ahmad held Mr. Sow's forearm for a prolonged period of time, while stroking it.

374.    When Defendant Ahmad transported Mr. Sow to a correctional center in Queens, Ahmad made Mr. Sow travel alone with him despite announcements overheard by Mr. Sow telling all officers to bring "two bodies" (that is, protesters).

44

375.     Rather than issuing Mr. Sow a summons or other legal process on the street, officers loaded Mr. Sow into a prisoner transport vehicle and took Mr. Sow to a centralized arrest location.

376.     Mr. Sow had to wait outside in a line of other protesters for approximately 2 hours while he awaited processing.

377.     While waiting in line, Mr. Sow overheard an officer tell Ahmad, in sum and substance, "I miss the raping days," in response to which Ahmad laughed.

378.     Between this and Ahmad's earlier behavior, Mr. Sow spent the entire night in Ahmad's custody in a state of anxiety, stress, and trauma about sexual assault.

379.     Mr. Sow was placed in an intermediary cell for around ten minutes, then moved to another cell for an hour.

380.     Mr. Sow's belongings were taken while he was in the precinct.

381.     Throughout his time in custody, Mr. Sow repeatedly asked Ahmad for medical attention, stating that his wrists were in pain and both of his hands had gone numb.

382.     Ahmad repeatedly said in response to those requests, in sum and substance, "No."

383.     The cells in the centralized arrest location were filthy.

384.     There was a toilet in the cell, but it was not working, there was no toilet paper, and it was covered in feces.

385.     There was urine all over the floor of the cell, flies throughout the cell, and vomit in the corner.

386.     At least 20 to 25 people were crowded into the cell, with no way to keep any social distance.

387.     The temperature in the cell was extremely hot.

388.     After approximately one hour in the second cell, Mr. Sow's belongings were returned to him and he was given a summons for curfew violation and released from custody.

389.     Mr. Sow's charges were dismissed.

390.     The conduct of the Defendants directly and proximately caused Mr. Sow physical and emotional pain and suffering, including, *inter alia*, pain in both wrists and numbness and loss of feeling in both hands.

### Plaintiff Savitri Durkee's June 4th Arrest

391.     Plaintiff Savitri Durkee is a 48-year-old performing artist at the nonprofit The Immediate Life with a bachelor's degree from the University of Montana.

392.     One June 4, 2020, Ms. Durkee participated in the protest at Mott Haven.

393.     Ms. Durkee wore a protective face covering to protect herself and others from the spread of COVID-19.

394.     Ms. Durkee arrived at the Mott Haven protest at approximately 6:30 p.m. in support of a women-run local organizing group against police brutality, Take Back the Bronx, and listened peacefully to speakers in a park prior to the march.

395.     Ms. Durkee noticed that police presence was very heavy from the moment she stepped off the train.

396.     Between approximately 7:40 p.m. and 8:00 p.m., Ms. Durkee was caught in the Mott Haven Kettle on 136th Street between Brown Place and Brook Avenue when the Brook Avenue Line formed a barricade with their bicycles to prevent passage to Brook Avenue and began pushing the crowd back with their bicycles, at the same time that the Brown Place Line began pushing the crowd forward from the rear and the Sidewalk Lines formed to either side.

46

397.    Ms. Durkee was near the back of the march when the Brown Place Line rushed the march from behind.

398.    Ms. Durkee witnessed officers beating protesters with batons, arresting protesters, removing eyeglasses from protesters and throwing the eyeglasses to the ground, and opening protester's backpacks and dumping the contents in the street.

399.    NYPD members never gave Ms. Durkee an order to disperse.

400.    Ms. Durkee was so tightly crushed by the police and the protesters attempting to escape them that she could not even move her hands and she became concerned for some of the smaller young women in the crowd, at least one of whom was a teenager.

401.    A helicopter that had been hovering over the protest moved in quickly and so close that Ms. Durkee was buffeted by the wind from it and alarmed by its loudness and proximity.

402.    An officer grabbed Ms. Durkee from behind and threw her to the ground and on top of other women who had been pushed to the street by officers as he said in sum and substance, "Shut the fuck up, shut the fuck up."

403.    The officer grabbed Ms. Durkee's hair and pulled her head back and ripped her mask down.

404.    The officer then put his knee or baton into her back and forced her down on top of the other women.

405.    At no point did Ms. Durkee resist arrest.

406.    The officer applied cuffs to Ms. Durkee by yanking her up roughly and cuffing her arms behind her back.

407.    The officer handed Ms. Durkee off to another officer, who would act as Ms. Durkee's arresting officer.

408.    Both officers had tape over their badges, preventing Ms. Durkee from learning their names or badge numbers.

409.    NYPD Officers making up the kettle deployed pepper spray amid the protesters, causing Ms. Durkee to cough due to the removal of her mask and exposing her to coughing of other protesters whose masks had been removed by the NYPD.

410.    An officer forced Ms. Durkee to stand with a number of other protesters while they awaited transportation.

411.    When all officers ignored the arrested protester's requests to have their masks pulled up, the protesters began leaning on one another to help pull each other's masks up with their hands cuffed behind their backs.

412.    Officers loaded Ms. Durkee into a prisoner transport vehicle with 2 other protesters.

413.    Ms. Durkee was held in an NYPD SUV with 2 other protesters for 45 minutes with the windows up and her hands cuffed behind her back.

414.    The SUV traveled first to one local precinct, then another.

415.    After two hours in the second precinct, Ms. Durkee was moved to a centralized arrest processing location in Queens and placed in a holding cell with 25 people, many of whom were unmasked.

416.    Ms. Durkee assisted others in pulling up their masks.

417.    At approximately 2:00 in the morning on June 5, 2020, Ms. Durkee was issued a summons for a curfew violation, that was later dismissed.

418.    The conduct of the Defendant officers directly and proximately caused Ms. Durkee to suffer physical and emotional injuries, including, *inter alia,* persistent neck pain, a fear of the

police, difficulty sleeping, feelings of trauma, and feelings of nervousness when someone approaches her from behind.

419.     Ms. Durkee experienced a chilling effect from her arrest and detention. Her fear that she was nearly crushed in the kettle has caused her to worry that she should not go to future protests in case she is killed, and her minor daughter is left without a mother.

420.     Ms. Durkee missed two days of work due to her arrest and detention and subsequent recovery, which set her behind on production schedules.

### The NYPD's History of Mishandling Certain Protests

421.     The extensive deprivations of constitutional rights suffered by Plaintiffs and class members during the 2020 protests are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

422.     The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

423.     For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes

49

to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[29]

424.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[30]

425.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[31]

426.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.[32]

427.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

428.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiffs in this case.

429.    In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating

---

[29] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[30] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[31] *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[32] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

    a.    *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

    b.    *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

    c.    *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

    d.    *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.    *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.    *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.    *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.    *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an

individual basis");

i.    Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[33] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.    In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[34] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.    Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.    The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.    The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of

---

[33] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.
[34] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.  Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.  The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.  The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.  The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.  *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

### The NYPD's Failure to Train Regarding Protest Policing

430.  Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

431. In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

432. In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

433. Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

434. The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

435. Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

436. These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Named Plaintiffs and Class Members in this case.

437. Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

438. However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

439.     On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

438.     Defendants' failures to train, which led to violations of Plaintiffs' rights in this case, include, *inter alia,* the following:

a.     The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

b.     The failure to make clear the need for individualized probable cause to arrest in a protest context;

c.     The need failure to provide training on the need for fair warning and a meaningful opportunity to comply with police directions as a prerequisite for probable cause to arrest for a Curfew Order violation;

d.     The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

e.     The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters;

f.     The failure to provide training on the proper application and removal of flex-cuffs, including how to measure the appropriate tension on flex cuffs; how to assess the need to remove flex-cuffs; how long flex-cuffs may be worn before a significant risk of nerve damage develops; the safest types of flex-cuffs to use (for example, flex-cuffs with a double-locking feature and padding); the safest types of removal equipment to use and how to use removal equipment properly so as not to accidentally tighten flex-cuffs further in the process of removal; and other topics related to the use of flex-cuffs; and

g.     The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and

56

to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

440. Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

441. The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

442. The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

443. In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[35]

444. However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

445. Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[36]

446. SRG members are meant to have additional DCU training.

---

[35] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[36] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct* Histories, The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.

447.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

448.    However, many of the officers deployed to respond to the protests in 2020 did not even receive *that* training, which was supposedly required of them.

449.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[37]

450.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

451.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

452.    For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF

---

[37] OCC Report at 37.

after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[38]

453. Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

454. After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

455. For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

456. Nevertheless, upon information and belief, at all times relevant herein, Defendants de Blasio, Shea, Monahan, and other defendant City policymakers, routinely received reports regarding arrests made in connection with First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in

---

[38] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

457.    Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

458.    For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

459.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

460.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b)(6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

461.    Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[39]

---

[39] OCC Report at 2, 30.

462.     At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

**The NYPD's Policy and/or Practice**
**of Using Excessive Force to Control the Speech of Protestors**

463.     Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiffs and other similarly situated protestors.

464.     In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

465.     In many cases, Defendants failed to document, and/or require that fellow Defendants and/or other fellow officers document, uses of force in accordance with related NYPD policies and/or training.

466.     In many cases, Defendants used force against Plaintiffs based on their position in or proximity to a perceived group, without first having given the perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

467.     In many cases, Defendants used types of force, such as deploying pepper spray, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate

61

determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

468.    Additionally, Plaintiffs and others arrested at the protests that are the subject of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs.

469.    In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight and/or causing them injury.

470.    Specifically, because they were arrested at a protest, Plaintiffs were subjected to flex-cuffing pursuant to Defendants' Protest Arrest Processing Policies, in connection with which Defendant City did not supply Defendants with enough of cutting tools with which to loosen or remove flex-cuffs, or *any* flex-cuff pads, which are designed to prevent the very types of injuries Plaintiffs and other arrestees suffered as a result of having flex-cuffs applied to them.

471.    It was no secret to Defendants that using flex-cuffs to restrain protesters— including without providing adequate numbers of cutting tools or any protective padding—would result in injuries to protesters, of the sort that appropriate policies, training, and/or supervision would have avoided.

472.    For example, *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, the NYPD's then-policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed."

473.    Plaintiffs in *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police

responses to protests on April 7, 2003, also raised *Monell* claims around NYPD members' use of extremely tight, plastic handcuffs.

474. Additionally, in *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.), the Court certified a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs." *See MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

475. Those cases, and many others, challenged the City's and NYPD's policies and practices regarding the use of flex-cuffs to restrain protesters, and put the Defendants in this case on notice of the

476. Relatedly, the DOI Report found, "When voicing those concerns to their arresting officers or other officers in the area, arrestees were told that the officers lacked the necessary equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed."[40]

**Defendants' Policies and Practices
Regarding Arrests—Including Mass Arrests—Without Fair Warning**

477. In many cases, Defendants seized Plaintiffs based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff in question based on their own, individual conduct, as opposed to the perceived "group conduct."

478. In many cases, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

---

[40] *See, e.g.,* DOI Report at 42. *See also,* AG Report at 29 ("Officers kept the [flex-cuffs] on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.").

479.     For example, with respect to Plaintiffs who were arrested in connection with perceived violations of Defendant de Blasio's Curfew Orders, or for perceived violations of New York Penal Law § 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order), Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests, and/or ensure that each such arrested Plaintiff had the state of mind required for such arrest.

480.     With respect to Defendant de Blasio's Curfew Orders, the plain language of Defendant de Blasio's Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest *and* (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

481.     As pleaded elsewhere herein, Defendants enforced the Curfew Orders by arresting Plaintiffs and other protesters without first ensuring that they had been given dispersal orders, meaningful opportunities to disperse, and refused to comply, under circumstances in which they had not ensured that arrestees had knowingly violated the Curfew Orders.

482.     That enforcement was consistent with official NYPD policy.

483.     For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch,[41] Deputy Commissioner Hart stated that officers who merely "observed individuals who were not essential workers in public…[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

---

[41] Available at https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

484.    Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiffs and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

485.    For example, with respect to Plaintiffs who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

486.    By way of further example, with respect to Plaintiffs who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

487.    Defendants enforced provisions of New York law against Plaintiffs that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with – for example, VTL § 1156(a), which involves walking along or upon a roadway when an adjacent and usable sidewalk is available – the equivalent of jaywalking, an everyday offense that Defendants all but ignore in the City.

488.    In many cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiffs and other perceived protesters, including by kettling, without first having given Plaintiffs and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse

or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

489.    Plaintiffs amount an as-applied, First Amendment-based challenges to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

## Defendants' Protest Arrest Processing Policies and Practices

490.    Beyond that, in many cases, Defendants arrested Plaintiffs for alleged offenses which New York Criminal Procedure Law § 150.20 required them to grant Plaintiffs summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

491.    However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiffs and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

492.    Additionally, as a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiffs to flex-cuffing as well as unreasonably lengthy, onerous arrest

processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

493.    In some cases, NYPD members destroyed and/or damaged property belonging to Plaintiffs and other arrestees.

494.    In other cases, NYPD members seized and retained property from Plaintiffs and other arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

495.    In still other cases, NYPD members seized and retained property without providing Plaintiffs with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

496.    The conditions of confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

497.    With particular respect to the COVID-19 pandemic, during Plaintiffs' confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well as Defendants Shea, Monahan, and other NYPD members, enforced Executive Orders issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

498.    However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants transported Plaintiffs to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

499.    Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining Plaintiffs.

500.    Also relatedly, Defendants and other NYPD members removed masks many Plaintiffs and other arrestees who had masks at one point prior to or during their arrests or detentions.

501.    Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs and other arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public health and safety.

502.    Defendants knew or should have known that, as a result of subjecting Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive Plaintiffs and other arrestees of basic needs, including for example the need to stay safe from COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

503.    Defendants acted intentionally to impose those conditions because they subjected Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP.

504.    Additionally, Defendants recklessly failed to act with reasonable care to mitigate the risks that the conditions posed even though they knew or should have known that they posed

excessive risks to Plaintiffs' physical and/or mental health or safety through potential exposure to COVID-19.

505.    Moreover, the risks were obvious and apparent, including based on the State and City policies and practices related to COVID-19 safety, and common sense.

**Defendants' Failure to Monitor and Supervise NYPD Members' Protest Policing**

506.    Although Defendants City, de Blasio, Shea, Monahan, and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

507.    For example, despite statements made by Defendants de Blasio and Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

**DEFENDANTS' IMPOSED RESTRICTIONS**

508.    Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in falsely arresting Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

509.    In addition to being retaliatory, the restrictions Plaintiffs complain of herein, which Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand

nearby speech, conduct, association, and/or other expressive activities protected by the First

Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

    a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

    b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened; and/or

    c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

    d.    Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

## CLASS ACTION ALLEGATIONS

510.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

the named Plaintiffs ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE MUCHA PINO,

OSCAR RIOS, MATTHEW BREDDER, SABRINA ZURKUHLEN, MARIA SALAZAR,

DARA PLUCHINO, and SAVITRI DURKEE seek to represent a certified Plaintiff class

consisting of (a) all persons who were targeted for their First Amendment protected activity

including being, *inter alia*, unlawfully detained and/or arrested without fair warning or ability to

disperse, subjected to excessive force, and/or subjected to unreasonably lengthy and unsafe

custodial arrest processing during the New York City protest marches in opposition to police

misconduct and in support of police reform from May 28, 2020 through no earlier than November,

2020 (the "Protests"); (b) all persons who have been or will be unlawfully detained and/or arrested

without fair warning or ability to disperse since May 28, 2020, pursuant to the NYPD's policy,

practice, and/or custom of, without legal justification, conducting retaliatory arrests and detentions of individuals protesting in opposition to police misconduct and in support of police reform (the "Class" or "Class Members").The members of the Class are so numerous as to render joinder impractical. A report from the NYC Department of Investigation indicates that at least 2,047 individuals were arrested by the NYPD in connection with the Protests.[42] Individual demonstrations during the Protests sometimes numbered up to 10,000 individuals, and large protest groups were subjected to mass detention through kettling.[43] Given the substantial number of individuals arrested and detained during the Protests, the members of the Class and any potential future subclasses are so numerous as to render joinder impractical. It is likely that, without an injunction prohibiting Defendants' unconstitutional practices, thousands more protesters against police brutality will be unlawfully arrested or detained in the future.

511.    In addition, joinder is impractical because, upon information and belief, many members of the Class are not or will be not be aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Upon information and belief, many members of the class are or will be without the means to retain an attorney to represent them in a civil rights lawsuit.

512.    Common questions of law and fact predominate over individual ones among Class Members, including, but not limited to:

a.      Whether Defendants violated the Class members' rights to be free of unreasonable and excessive force;

b.      Whether Defendants' use of unreasonable and excessive force was the result of a municipal policy or practice;

c.      Whether Defendants' use of unreasonable and excessive force violated the First, Fourth and Fourteenth Amendments to the United States Constitution;

---

[42] DOI Report, Dec. 2020, at 30.
[43] *Id.* at 22, 20.

d.      Whether Defendants engaged in indiscriminate mass arrests without probable cause and/or individualized determinations thereof;

e.      Whether the indiscriminate mass arrests without probable cause were the result of a municipal policy or practice;

f.      Whether Defendants' indiscriminate mass arrests without probable cause violated the First, Fourth and Fourteenth Amendments to the United States Constitution;

g.      Whether the Defendants deliberately detained protesters for excessive and unreasonably prolonged periods of time;

h.      Whether Defendants' deliberate detentions of protesters for excessive and unreasonable periods of time were the result of a municipal policy or practice;

i.      Whether Defendants' deliberate detentions of protesters for excessive and unreasonable periods of time violated the First, Fourth and Fourteenth Amendments to the United States Constitution;

j.      Whether Defendants retaliated against Class Members for engaging in speech and/or conduct protected by the First Amendment;

k.      Whether the City's full-blown, custodial arrest and treatment of protestors against police brutality during the ongoing COVID-19 pandemic amount to an unreasonable seizure and/or unconstitutional conditions of confinement in violation of the First, Fourth, and/or Fourteenth Amendments to the United States Constitution;

l.      Whether the City, New York City Police Commissioner Dermot Shea, and other supervisory defendants, supervising officials, and/or personnel have knowingly and deliberately failed to screen, train, supervise, monitor, and discipline officers, and whether those failures have resulted and will continue to result in constitutional violations by officers and City employees against Class Members; and

m.      Whether the City, New York City Police Commissioner Dermot Shea, and other supervisory defendants, supervising officials, and/or personnel sanctioned and/or deliberately failed to rectify unconstitutional practices and customs, and whether such acts and omissions have resulted and will continue to result in constitutional violations by officers and City employees against Class Members.

513.    These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants. Defendant City of New York's city-wide policies, practices, and customs applied at the Protests constitute a unitary scheme in which

the Defendants violated the constitutional rights of Class Members. The named Plaintiffs and all Class Members were and will be victimized by these same retaliatory policies of arresting protestors against police brutality without legal justification in violation of, *inter alia*, the First, Fourth and Fourteenth Amendments of the United States Constitution, and the New York State Constitution, and thus the foregoing common questions of law and fact greatly predominate over questions affecting only individual members, including legal and factual issues relating to damages.

514. The claims of the named Plaintiffs are typical of those of the Class in that at the time the named Plaintiffs constitutional rights were violated, they were engaging and/or attempting to engage in activities protected by the First Amendment or were simply observing or in the vicinity of such conduct as bystanders. The Named Plaintiffs were the victims of the Defendants' policies or arresting, without individualized determinations of probable cause and indeed without probable cause in general, groups of individuals engaged in lawful political protest. The Named Plaintiffs the victims of excessive and unreasonable force in the course of these unconstitutional arrests and, following their arrests, were detained under conditions that were unreasonable, inhumane, excessive and punitive, all in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

515. The legal claims for which the Named Plaintiffs seek declaratory and injunctive relief are the same as or similar to those on which all members of the Class will rely, and the harms suffered by the Named Plaintiffs are typical of the harms suffered by the class members.

516. The Named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Class, and will fairly and adequately protect the interests of the Class. Moreover, many of the Named Plaintiffs reside in the New York City area

where the Defendants' unconstitutional policies, practices and/or customs are implemented, and therefore remain at high risk of being unconstitutionally harmed in the future pursuant to these policies, practices and customs as they wish to participate in future protests in New York City against police misconduct.

517.    The Named Plaintiffs are adequate class representatives because they were arrested in New York City, without legal justification, while attending protests against police brutality between May 28 and June 6, 2020, their summonses or other charging instruments were later dismissed, and they were subjected to Defendants' Protest Arrest Processing Policies. Plaintiffs are also typical of the members of the Class. Like other members the Class, the Named Plaintiffs were subject to arrests in violation of their First Amendment rights, excessive use of force, and unconditional conditions of confinement.

518.    The named Plaintiffs are represented by Jonathan C. Moore, David B. Rankin, and Luna Droubi of the law firm Beldock, Levine & Hoffman LLP ("BLH"); Elena L. Cohen and J. Remy Green Cohen&Green P.L.L.C. ("C&G"); Gideon Orion Oliver ("Oliver"); Wylie Stecklow PLLC ("Stecklow"), and Masai Lord of Lord Law Group PLLC ("Lord").

519.    BLH attorneys have litigated a number of class action lawsuits including, but not limited to: *Floyd v. City of New York*, 08-cv-1034 (S.D.N.Y.) (currently in the remedial stages); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("Aided by the capable hands of Jonathan C. Moore . . ., class counsel is undoubtedly qualified and experienced to conduct this litigation."); *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011); *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests); *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005

WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City); and *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.). See also, *Syed v. City of New York*, 16-cv-04789 (S.D.N.Y.); *Elsayed v. City of New York et al.*, 18-cv-10566 (S.D.N.Y.).

520.    C&G attorneys have litigated a number of class action and police suits, including, but not limited to: *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), *cert. denied Maguire v. Edrei*, 139 S. Ct. 2614 (2019) (with Oliver)); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

521.    Oliver has over 16 years of experience litigating civil rights cases against the NYPD, including hundreds of cases challenging the City's policies, practices, and customs related to protest policing. Oliver has frequently co-counseled with BLH attorneys and C&G attorneys in litigation. For example, in addition to litigating other 2004 RNC-related cases, Oliver was Of Counsel to BLH attorneys at the summary judgment briefing stage of the *MacNamara* RNC 2004 class action litigation. Ever since, Oliver has always maintained a docket including at least dozens of Plaintiffs' protest-policing related cases. One such recent case was *Edrei* (with C&G).

522.    Stecklow has extensive experience litigating civil rights both in New York and elsewhere including Baltimore, Maryland: *Lomax v. O'Ree*, 24-C-16-002313 (Circuit Court, Baltimore City) and Iowa: *Cordero v. World Food Prize*, 17-cv-0347 (S.D.Iowa). Stecklow has

been litigating NYPD policies and practices for fifteen (15) years, including, but not limited to: *Alford v. City of New York*, 06-cv-2512 (S.D.N.Y.); *Peat v. City of New York*, 12-cv-8230 (S.D.N.Y.); *Gerskovich v. Iocco, City of New York*, 15-cv-7280 (S.D.N.Y.), *Packard v. City of New York*, 15-cv-7130 (S.D.N.Y.); *Nigro v. City of New York*, 19-cv-2369 (S.D.N.Y.); *Monahan v. City of New York*, 20-cv-2610 (S.D.N.Y.).

523.    Lord has litigated dozens of civil rights cases involving the NYPD and other New York state law enforcement agencies. Lord has been of counsel in 1983 actions throughout New York state, including *Epps v. City of Buffalo et al,* 19-cv-281 (W.D.N.Y.) and *Jones v. Albany et al*, 18-cv-81 (N.D.N.Y.). He has also been lead counsel in multiple pending actions, including but not limited to, *Iyahen v. City of New York et al*, 20-cv-03448 (S.D.N.Y), and *Williams v. City of New York et al*, 20-cv-5995 (S.D.N.Y).

524.    Plaintiffs' counsel's firms have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the Class or between the attorneys and members of the Class.

525.    An Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

526.    A Damages Class should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class-wide proceeding will generate common answers to these questions.

## FIRST CLAIM FOR RELIEF
### Unlawful Seizure / False Arrest
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

527.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

528.    Defendants' seizure of the Plaintiffs herein was done without any judicial warrant authorizing then to seize any Plaintiff was unreasonable and was done without privilege or lawful justification,

529.    Plaintiffs did not consent and were conscious of their confinements by Defendants.

530.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiffs.

531.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

532.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF
### Excessive Force
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

533.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

534.    Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

535. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

536. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF
### First Amendment
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

537. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

538. In committing the acts and omissions set forth herein, the Defendants acted under color of state law, individually and in concert, without lawful justification to deprive Plaintiffs of their rights to speech, expression and to assemble in violation of the First, Fifth, and Fourteenth Amendments to the United States.

539. As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses and were otherwise damaged and injured.

540. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF
### First Amendment Retaliation
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

541. Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

542. Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

543. Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

544. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

545. Additionally, as discussed elsewhere herein, Defendants City, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of the First Amendment rights.

546. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

547. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiffs.

548.     Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiffs in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

549.     Additionally, the offenses charged against Plaintiffs, which Defendants might argue provided probable cause for Plaintiffs' arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

550.     Each Plaintiff suffered actual chill in that each Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

551.     Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiffs were engaging, before suddenly using force and/or making arrests, without first having given reasonable notice that such force and/or arrest activity would result if Plaintiffs did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

552.     Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiffs subjected Plaintiffs to the violations of their First Amendment rights described elsewhere herein.

553.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

### FIFTH CLAIM FOR RELIEF
**Due Process**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution*

554.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

555.    In addition to the Due Process violations described above, Plaintiffs hereby mount an as-applied, Due Process-based challenge to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

556.    As described above, Defendants enforced offenses, including the Curfew Orders and NYC Administrative Code § 3-108; PL §§ 240.20(5) and 240.20(6); and VTL § 1156(a), in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

557.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

558.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

### SIXTH CLAIM FOR RELIEF
**Equal Protection and Selective Enforcement**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution*

559.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

560.     Plaintiffs hereby mount an as-applied, Equal Protection-based, selective enforcement challenge to the application of NYC Administrative Code § 3-108; P.L. §§ 240.20(5) and/or 240.20(6); and/or V.T.L. § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

561.     Additionally, as described above, in many cases, Defendants arrested Plaintiffs for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiffs receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

562.     However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, rather than issuing them summonses, and releasing them from custody, on the street, while Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

563.     Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiffs subjected Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.

564.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

### SEVENTH CLAIM FOR RELIEF
**Municipal Liability**

*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*
*On behalf of Plaintiffs against Defendant City of New York, Defendant Bill de Blasio, Defendant Dermot Shea, and Defendant Terence Monahan*

565.     Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

566.     The facts pleaded above describe the policies, practices, and customs Defendants subjected the Named Plaintiffs and other Class Members to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the Curfew Orders and other violations against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately clear standards to guide police officials' extremely

broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning; using flex-cuffs for protest-related arrests, while failing to supply officers with protective padding and adequate numbers of cutting tools to loosen or remove flex-cuffs, while and/or to ensure that such cutting tools are readily available when needed; failing to loosen or remove over-tight cuffs; and subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

567.     All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## EIGHTH CLAIM FOR RELIEF
### Violations of New York State Law
### *Pursuant to the New York State Constitution and New York State Common Law*

568.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

569.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

### Violations of the New York State Constitution

570.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

571.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

572.    As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs and expenses and were otherwise damaged and injured.

573.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Assault and Battery**

574.     Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

575.     Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

576.     Defendants did thereby inflict assault and battery upon the Plaintiffs.

**Conversion**

577.     Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiffs' personal property in derogation of Plaintiffs' rights.

578.     Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

**False Imprisonment and Unreasonable Detention**

579.     By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement and it was without their consent.

**Negligent Training and Supervision**

580.     Upon information and belief, Defendant City supervised, and trained the police officials described above.

581. The acts and conduct of the police officials were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

582. Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

583. As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**Excessive Detention**

584. Defendants deliberately detained protesters for excessive and unreasonably prolonged periods of time.

585. As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

## DEMANDS FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following relief against the Defendants:

a. Enter an order certifying this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE MUCHA PINO, OSCAR RIOS, BARBARA ROSS, MATTHEW BREDDER, SABRINA ZURKUHLEN, MARIA SALAZAR, DARA PLUCHINO, and SAVITRI DURKEE as class representatives;

b. Issue a class-wide declaratory judgment;

c.        Issue a permanent injunction enjoining Defendant City of New York and the NYPD from violently disrupting protests;

d.        Retain jurisdiction in this case until the unlawful conditions, practice, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

e.        Award Plaintiffs compensatory and punitive damages in amounts that are fair, just and reasonable, to be determined at trial;

f.        Award Plaintiffs, and the members of the class, reasonable attorneys' fees and costs; and

g.        Grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

[Signatures on Following Page]

Dated: March 6, 2021
New York, New York

**BELDOCK LEVINE & HOFFMAN LLP**

By: _____
Jonathan C. Moore
David B. Rankin
Luna Droubi
Marc Arena
Deema Azizi
Rebecca Pattiz
Katherine "Q" Adams
Regina Powers

99 Park Avenue, PH/26th Floor
New York, New York 10016
t: 212-490-0400
f: 212-277-5880
e: jmoore@blhny.com
drankin@blhny.com
ldroubi@blhny.com
marena@blhny.com
dazizi@blhny.com
rpattiz@blhny.com
qadams@blhny.com
rpowers@blhny.com

**GIDEON ORION OLIVER**

_____
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

**COHEN&GREEN P.L.L.C.**

By: _____
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
remy@femmelaw.com
jessica@femmelaw.com

**WYLIE STECKLOW PLLC**

_____
By: Wylie Stecklow
Wylie Stecklow PLLC
231 West 96th Street
Professional Suites 2B3
NYC NY 10025
t: 212 566 8000
Ecf@wylielaw.com

**LORD LAW GROUP PLLC**

_____
Masai I. Lord
14 Wall St., Ste 1603
New York, NY 10005
P: 718-701-1002
E: lord@nycivilrights.nyc

89