## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PEOPLE OF THE STATE OF
NEW YORK, by Letitia James,
Attorney General of the State of
New York,

                Plaintiff,

     v.

CITY OF NEW YORK, MAYOR
BILL DE BLASIO, POLICE
COMMISSIONER DERMOT F.
SHEA, and CHIEF OF
DEPARTMENT TERENCE A.
MONAHAN,

                Defendants.

CIVIL ACTION NO. 21-cv-322 (CM)(GWG)

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF

## PRELIMINARY STATEMENT

1.    The People of the State of New York, by their Attorney General, Letitia James, bring this action to end the pervasive use of excessive force and false arrests by the New York City Police Department (NYPD) against New Yorkers in suppressing overwhelmingly peaceful protests.

2.    Beginning in May 2020, thousands of New Yorkers participated in protests across New York City ("New York Residents") to bring attention to police brutality against Black people, the police killings of George Floyd in Minnesota and Breonna Taylor in Kentucky, police accountability, and racial injustice (the "2020 Racial Justice Protests" or "Protests"). These protests are ongoing.

3.    From May 28, 2020 to at least January 18, 2021, NYPD officers of various ranks ("NYPD Officers") repeatedly and without justification used batons, fist strikes, pepper spray, and

other physical force against New York Residents at the Protests. Protesters—many of whom were never charged with any crime and were merely exercising their First Amendment rights—suffered concussions, broken bones, cuts, bruises, and other physical injuries.

4.      NYPD Officers also arrested journalists, legal observers, medics, and other workers performing essential services without probable cause and used a crowd-control tactic called "kettling" to corral and detain individuals who were peacefully protesting in order to impede constitutionally-protected assemblies and to conduct mass arrests without individualized probable cause.

5.      Through the use of these unlawful tactics, NYPD Officers also sought to prevent or discourage journalists and legal observers from documenting police interactions and protesters from peaceably assembling and, at times, NYPD Officers sought to retaliate against those who were present for the Protests, in violation of their First Amendment rights.

6.      The unlawful policing practices NYPD Officers engaged in at these Protests are not new. Instead, they are the latest manifestation of the NYPD's de facto policy of policing protests with unconstitutional tactics.

7.      For at least the last two decades, the NYPD has engaged in the same unlawful excessive force and false arrest practices while policing large-scale protests. These practices are widely documented in prior lawsuits, complaints, and reports and have been known to New York City and NYPD leadership long before the 2020 Racial Justice Protests began.

8.      City and NYPD leadership have further entrenched those practices by ratifying them through inaction and praise. Commissioner Dermot F. Shea commended officers who kettled, beat, and unlawfully arrested protesters and essential workers on June 4 in the Bronx.  Chief Terence A. Monahan stood at the front lines of the June 4 and other protests and, along with other

supervising officers, directed unlawful mass arrests and tolerated the pervasive use of excessive force against protesters.

9.      Defendants also failed to supervise and train officers in policing protests to correct and prevent this misconduct—a failure that Defendants have now openly admitted following the release of public reports by the City's Department of Investigation ("NYC-DOI") and Corporation Counsel about NYPD's conduct during the Protests.

10.     When Defendants, starting in May 2020, chose to dispatch thousands of inadequately trained and supervised officers to large-scale protests challenging police conduct and authority, the results were predictable: mass arrests, excessive force, and other unlawful efforts to suppress the Protests.

11.     These practices, which violate New York Residents' rights under the federal and state constitutions and state common law, have caused significant harm to New York Residents. While many aggrieved protesters have sought monetary relief to remedy their injuries, this suit seeks solely declaratory and injunctive relief—relief that is imperative to ending NYPD's decades-long, unlawful practices in policing protests.

**JURISDICTION AND VENUE**

12.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, seeking redress for violations of the First, Fourth, and Fourteenth Amendments of the United States Constitution, parallel New York State constitutional provisions, and state common law.

13.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3–4), and over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This Court has the authority to confer the declaratory and injunctive relief Plaintiff

seeks under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and under Rule 57 of the Federal Rules of Civil Procedure.

15.   Venue is proper pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to Plaintiff's claims arose in the Southern District of New York.

## PARTIES

16.   Plaintiff, the People of the State of New York, is represented by and through its Attorney General, Letitia James. New York is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to Executive Law § 63(1) and *parens patriae* doctrine.

17.   Where, as here, the interests in the health and well-being of the People of the State of New York as a whole are implicated, the Office of the Attorney General (OAG) possesses *parens patriae* standing to commence legal action against Defendants to stop their unlawful practices.

18.   The OAG has a quasi-sovereign interest in the health and well-being of the People of the State of New York, particularly as to unconstitutional policing practices that have harmed, and are likely to continue harming, New York Residents in the manner set forth in this Complaint. *People ex rel. Spitzer v. Grasso*, 11 N.Y.3d 64, 69 n.4 (2008) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)) (*parens patriae* standing "permits the state to commence an action to protect a public interest, like the safety, health or welfare of its citizens").

19.   The OAG has a "unique status as the representative of the greater public good and [a] concomitant mandate to secure wide-ranging relief that will inure to the direct and indirect benefit of the broader community." *New York v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 753–54 (N.D.N.Y. 2016); *see also People ex rel. Cuomo v. Liberty Mut. Ins. Co.*, 52 A.D.3d 378, 379 (N.Y. App. Div. 1st Dep't 2008) ("The State has inherent authority to act in a *parens patriae*

4

capacity when it suffers an injury to a quasi-sovereign interest apart from the interests of particular private parties." (internal citation omitted)). The OAG seeks comprehensive prospective relief to end the City's unconstitutional and unlawful policies, practices and/or customs and ensure that they do not continue in the future.

20.     Defendant City of New York ("City") is a municipal corporation organized and existing under the laws of the State of New York and maintains its principal office in the County of New York. The NYPD is an agency of the City charged with law enforcement.

21.     Defendant Bill de Blasio was at all times relevant to this Complaint the mayor of the City of New York and chief policymaking official with respect to City policy generally, including NYPD policy. He is sued in his individual and official capacities.

22.     Defendant Dermot F. Shea was at all times relevant to this Complaint the New York City police commissioner, who has final policymaking authority with respect to the NYPD and responsibility for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD. He is sued in his individual and official capacities.

23.     Defendant Terence A. Monahan was at all times relevant to this Complaint the Chief of Department for the NYPD. As the highest-ranking uniformed officer of the NYPD, Chief Monahan has been delegated final policymaking authority with respect to NYPD policies, including, but not limited to, those related to management of protests, use of force, and arrests. He is sued in his individual and official capacities.

## FACTUAL BACKGROUND

### I.     The NYPD's Aggressive Response to Prior Protests.

24.     The NYPD's unconstitutional response to the 2020 Racial Justice Protests is part of its long history of aggressively policing protests.

25.     Following a 2003 anti-war protest, an investigation by the New York Civil Liberties Union (NYCLU) documented 198 accounts of excessive force by NYPD Officers, including the use of horses and batons to disperse crowds as well as indiscriminate pepper spraying. This investigation also documented the use of crowd control tactics such as physically preventing demonstrators from reaching their rally location, herding protesters into pens fashioned from metal barricades, and mass arrests.[1]

26.     NYCLU documented similar unconstitutional practices at protests of the 2004 Republican National Convention ("RNC"). NYCLU received over 200 complaints from witnesses at the RNC protests and published on its website a report finding that the NYPD "severely undermined" protesters' rights in part through, *inter alia*, "mass arrests of hundreds of peaceful demonstrators and bystanders" and "the pervasive surveillance of lawful demonstrators."[2]

27.     In 2006, the Civilian Complaint Review Board ("CCRB"), an independent NYPD oversight agency, published its own findings regarding the RNC protests following an investigation of 63 complaints. The Board found that then-Deputy Chief Monahan and another deputy chief failed to make their orders to disperse sufficiently audible, understandable, or with enough time to allow protesters to leave before effecting arrests, resulting in the unlawful mass arrest of nearly 250 protesters.

28.     Likewise, then-District Court Judge Richard Sullivan, now a Judge on the Court of Appeals for the Second Circuit, concluded that defendant Monahan's actions at the RNC were

---

[1]     N.Y. Civil Liberties Union, *Arresting Protest* (2003), https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

[2]     N.Y. Civil Liberties Union, *Rights and Wrongs at the RNC* (2005), https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

unconstitutional and entered summary judgment against him for mass arrests lacking probable cause.

29.     On information and belief, Monahan was not disciplined for his unconstitutional actions during the RNC protests. Instead, then-Police Commissioner Raymond Kelly rejected the CCRB's findings and described the NYPD's response to the protests as "one of the Police Department's finest hours."

30.     Monahan was later promoted to Chief of Department and responsible for overseeing the NYPD's response to all protests.

31.     Following large-scale demonstrations in downtown Manhattan in 2011, known as the "Occupy Wall Street" protests, the Protest and Assembly Rights Project widely disseminated a 2012 report detailing 130 complaints of excessive or unnecessary force against protesters, bystanders, lawyers, legal observers, and journalists. These claims included over a dozen instances where officers interfered with independent monitoring by journalists and legal observers by threatening to or in fact arresting them, and the repeated use of kettling against peaceful protesters, which "inflamed tensions," "caused confusion and panic," and "chilled ongoing and future protest activity."[3]

32.     Numerous lawsuits were filed against the NYPD following the 2003 anti-war protest, 2004 RNC protests, and 2011 Occupy Wall Street protests. These suits alleged, *inter alia*, that the NYPD: used unnecessary and excessive force against peaceful protesters, bystanders, legal

---

[3] Protest & Assembly Rights Proj., *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (2012), https://cdn.theatlantic.com/static/mt/assets/politics/Suppressing%20Protest.pdf.

observers, and journalists;[4] unjustifiably detained and kettled protesters; effected unlawful and mass arrests without probable cause; and suppressed protected First Amendment activities.[5]

33.     In October 2015, the NYPD Office of the Inspector General (NYPD-OIG) issued a report acknowledging specific deficiencies in the NYPD's training and discipline regarding the use of force. It found that its "use-of-force policy was vague and imprecise, providing little guidance to individual officers on what actions constitute force and providing insufficient instruction on de-escalation"; that the "NYPD's training programs did not adequately focus on de-escalation"; and that the "NYPD frequently failed to impose discipline even when provided with evidence of excessive force."

34.     Between 2013 and 2019, the CCRB substantiated numerous complaints that NYPD Officers used excessive force in violation of NYPD's use of force policy, including: 30 allegations involving pepper spray; 17 involving batons; 38 involving body strikes or physical force; and 10 involving hits against an inanimate object. In total, the CCRB substantiated 471 allegations of excessive force during this period against NYPD Officers who were still employed with the agency

---

[4] *See e.g., Tardif v. City of New York*, 344 F. Supp. 3d 579, 589 (S.D.N.Y. 2018); *Brown v. City of New York*, 798 F.3d 94, 97 (2d Cir. 2015); *Abujayyab v. City of New York*, No. 15 CIV. 10080 (NRB), 2018 WL 3978122, at *9 (S.D.N.Y. Aug. 20, 2018); *Dekuyper v. City of New York*, No. 14-CV-8249 (DLC), 2016 WL 7335662, at *3 (S.D.N.Y. Dec. 16, 2016); *Marlin v. City of New York*, No. 15-cv-2235 (CM), 2016 WL 4939371, at *13 (S.D.N.Y. Sept. 7, 2016); *Caravalho v. City of New York*, No. 13-cv-4174 (PKC)(MHD), 2016 WL 1274575, at *12 (S.D.N.Y. Mar. 31, 2016); *Pesola v. City of New York*, No. 15-cv-1917 (PKC)(SN), 2016 WL 1267797, at *7 (S.D.N.Y. Mar. 30, 2016); *Pluma v. City of New York*, No. 13-cv-2017 (LAP), 2015 WL 1623828, at *6 (S.D.N.Y. Mar. 31, 2015); *Douglas v. City of New York*, No. 14-cv-8124 (S.D.N.Y.); *Long v. City of New York,* 09-cv-9216 (AKH) (S.D.N.Y.); *Kunstler v. City of New York*, No. 04-cv-01145 (S.D.N.Y.).

[5] *See Lynch v. City of New York*, 952 F.3d 67, 76 (2d Cir. 2020); *Landers v. City of New York*, No. 16-CV-5176 (PKC)(CLP), 2019 WL 1317382, at *6–7 (E.D.N.Y. Mar. 22, 2019); *Case v. City of New York*, 233 F. Supp. 3d 372, 405 (S.D.N.Y. 2017); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 375 (S.D.N.Y. 2015); *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 721 (S.D.N.Y. 2015); *Dinler v. City of New York*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *10 (S.D.N.Y. Sept. 30, 2012); *Osterhoudt v. City of New York*, No. 10-cv-3173, 2012 WL 4481927, at *1–2 (E.D.N.Y. Sept. 27, 2012); *Mandal v. City of New York*, Nos. Civ. 1234, 02 Civ. 1367, 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007); *MacNamara v. City of New York* , No. 04-cv-9216, 2007 WL 3196295, at *1 (S.D.N.Y. Oct. 30, 2007).

as of June 2020. Since 2003, the CCRB substantiated 730 excessive force allegations against NYPD Officers who were still employed with the agency as of June 2020.

35.    According to a ProPublica review of CCRB data between 2014 and 2018, in 240 of the 600 most serious cases in which the CCRB recommended charges, the police commissioner utilized his unchecked power over police discipline to reduce CCRB-recommended penalties, including in 40 cases in which no discipline at all was imposed.

36.    According to CCRB data, in 2019, the police commissioner concurred with the discipline recommended by the CCRB for the most serious infractions only 21 percent of the time.

37.    Upon information and belief, only three NYPD Officers have faced discipline for their behavior during the Protests despite widespread unconstitutional actions.

38.    Defendants' failure to discipline officers for the use of excessive force, unlawful detention and arrests, and other unconstitutional actions have ensured that these same and other officers continue engaging in such unconstitutional actions during the Protests.

39.    Despite repeated notice about the NYPD's shortcomings in lawfully managing protests and the NYPD-OIG's own report on training deficiencies in connection with the use of force, the City's recent conduct demonstrates that it failed to correct these practices and adequately supervise and train its officers on constitutional policing during a protest.

40.    While the City has acknowledged the NYPD's failures, the NYC-DOI report noted that top NYPD officials almost uniformly failed to acknowledge that they "could have done anything else differently" to respond to the protests.

41.    Consequently, the NYPD continued to fail New York Residents by responding to the Protests unlawfully and will continue to do so unless abated.

II.     **New York Residents Participate in the 2020 Racial Justice Protests.**

42.     On May 25, 2020, police officers in Minneapolis, Minnesota, killed George Floyd, an unarmed Black man accused of a minor, nonviolent crime.

43.     Shortly before Floyd's death, on March 13, 2020, police officers in Louisville, Kentucky, while executing a no-knock warrant, shot and killed Breonna Taylor, an unarmed Black woman.

44.     These deaths, the most recent in a steady string of police killings of unarmed Black people, triggered a wave of national protests under the banner of the Black Lives Matter (BLM) movement, which condemns systemic racism and anti-Black police violence.

45.     Large-scale protests in New York City began on May 28, 2020 and occurred on a near-daily basis through early June at multiple sites in each borough of New York City. Protests have continued on a smaller scale since then. In all, thousands of New Yorkers, including many from across the State, participated.

46.     Although there were instances of property damage and injuries to NYPD Officers at or near some of these early protests, the vast majority of the Protests were peaceful.

47.     The vast majority of arrests were "simply for protesting," as the Kings County district attorney put it—alleged misdemeanors or violations like unlawful assembly or curfew violation that district attorneys systematically declined to prosecute.

48.     Commissioner Shea acknowledged that those New Yorkers in attendance "overwhelmingly [] are good people coming out to voice their opinion."

49.     Chief Monahan also admitted in a public statement that "the vast majority of people are out there to express their views."

50.     In response to these largely peaceful Protests, NYPD Officers effected mass arrests without probable cause, unjustifiably deployed pepper spray, batons, and other force against protesters, and targeted and retaliated against First Amendment activity so frequently and pervasively as to constitute customs or usages of the NYPD.

51.     On the first day of the Protests, May 28, over one hundred protesters assembled in Union Square in Manhattan. A contingent later marched down Lafayette Street in Manhattan towards City Hall. Over 70 protesters were arrested.

52.     On May 29, hundreds of protesters proceeded from Foley Square in Manhattan over the Brooklyn Bridge to the Barclays Center arena in Brooklyn, where thousands gathered by nightfall. At least 204 protesters were arrested in Manhattan and Brooklyn, mostly following violent encounters, some of which were initiated by NYPD Officers, in Herald and Union Squares in Manhattan, as well as in the Clinton Hill, Fort Greene, and Bedford-Stuyvesant neighborhoods of Central Brooklyn.

53.     On May 30, there were protests throughout Manhattan and in Jackson Heights in Queens, Park Slope and Flatbush in Brooklyn, and portions of the Bronx and Staten Island. Collectively, at least 321 protesters were arrested following encounters with NYPD Officers in Union Square, Flatbush, and Park Slope.

54.     On May 31, protests throughout the city continued, with thousands marching from the Barclays Center over the Manhattan Bridge into Lower Manhattan, near the Williamsburg Bridge, and in Times Square and Midtown. At least 325 protesters were arrested.

55.     On, June 1, Mayor de Blasio issued Emergency Executive Order 117, imposing an 11:00 p.m. curfew for New York City. The Mayor subsequently expanded the nightly curfew to begin at 8:00 p.m. on June 2 and end at 5:00 a.m. on June 8. These Curfew Orders exempted

"essential workers" and directed that people in violation of the curfew be "order[ed] to disburse [sic]" before being arrested. Nevertheless, during the period when the Curfew Orders were in effect, Officers routinely disregarded these two provisions and arrested essential workers exempt from the executive order and protesters without the required prior orders to disperse. On June 1, the first night the curfew was in effect, NYPD Officers arrested at least 308 protesters in Manhattan at Times Square, the East Village, and Union Square Park; in Brooklyn at the Barclays Center and Bay Ridge; in the Bronx at Fordham Manor; and in Flushing, Queens.

56.     On June 2, demonstrations occurred at multiple locations throughout Manhattan. Protesters encountered NYPD Officers in Lower Manhattan, Union Square, the Upper West Side, Astor Place, Chelsea, and Midtown. More than 290 protesters were arrested at these locations.

57.     On June 3, protests occurred in Cadman Plaza and Maria Hernandez Park in Brooklyn, Midtown East, and the Upper East Side near Gracie Mansion, and at least 191 protesters were arrested following encounters with NYPD Officers.

58.     On June 4, protests occurred in Mott Haven in the Bronx, where NYPD Officers detained and arrested over 250 people as soon as the curfew took effect. Among those detained without probable cause were non-protesters serving as legal observers, medics, and other essential workers exempt from the curfew order.

59.     Protests also occurred on June 4 in Midtown and in and around Central Park, Manhattan; Flushing, Queens; the Brooklyn Bridge; and throughout Brooklyn, including the neighborhoods of Clinton Hill, Prospect Heights, and Flatbush.

60.     On June 5, protests continued, including in the Brooklyn neighborhoods of downtown Brooklyn, Prospect Heights, Crown Heights, and Sunset Park; Staten Island; and near Gracie Mansion. At least 41 people were arrested.

61.     From June 6 through the end of June, protests continued across New York City, largely without violence or mass arrests. But a number of times since then, the NYPD has repeated its pattern of responding to racial justice and related protests with gratuitous force.

62.     On June 28, 2020, several thousand protesters took part in the Queer Liberation March for Black Lives & Against Police Brutality starting in Foley Square and ending at the Stonewall Inn. At Washington Square Park, this group encountered hundreds of NYPD Officers who initiated a violent response, pushing and pepper spraying peaceful protesters.

63.     Protests also occurred from late June through July 2020 at City Hall Park, where NYPD Officers at various times used unwarranted force against New Yorkers who established an encampment there.

64.     On July 28, 2020, NYPD Officers interrupted a protest in Kips Bay, Manhattan, blocking protesters as officers grabbed a protester and pushed her into an unmarked van.

65.     On September 11, 2020, dozens of NYPD Officers surrounded McCarren Park in Brooklyn and advanced on and shoved mourners at a peaceful vigil being held there for Sarah Pitts, a prosecutor and BLM supporter who was fatally struck by a bus.

66.     On September 26, 2020, hundreds of NYPD Officers disrupted and confiscated the property of a small group of BLM protesters gathered in Washington Square Park, Manhattan. When protesters attempted to retrieve their property from the nearby Sixth Precinct stationhouse, NYPD Officers ordered them to leave the area and, without provocation, charged into the protesters and knocked some of them to the ground and into nearby outdoor dining patrons.

67.     On October 7, 2020, NYPD Officers surrounded and arrested protesters gathered in Bedford-Stuyvesant in Brooklyn to protest the arrest of BLM activist Nia Peterson, who had been arrested without provocation for filming NYPD Officers standing on the street.

13

68.     Following the presidential election, on November 4, protesters gathered in Washington Square Park in Manhattan, calling for police reform to continue regardless of the outcome of the election and began to march peacefully around 7:45 p.m. Within approximately thirty minutes, NYPD Officers kettled protesters on West 8th Street and on Greenwich Avenue and forcefully arrested protesters and volunteer medics. NYPD Officers also kettled and arrested protesters who had marched without incident from Central Park to Union Square.

69.     On November 5, NYPD Officers confronted the "We Choose Freedom" protest, organized by BLM- and trans-rights organizers to march from the Stonewall Inn to Union Square, briefly detaining a group of marchers in the NoLita neighborhood of Manhattan.

70.     On December 11, Abolition Park, one of the BLM organizers of summer protests, co-led a small group of approximately 30 tenant advocates in and around the Downtown Brooklyn office of a real estate attorney known for representing landlords. Approximately 50 NYPD Officers were present. Of these, a group of NYPD Officers prevented 19 advocates from complying with any order to leave the premises by blocking their exit and arresting them. Outside of the building, officers shoved advocates against mailboxes and scaffolding as they arrested one of the protesters.

71.     On January 18, 2021, Martin Luther King Jr. Day, protesters calling for racial justice traveled from the Barclays Center to City Hall Park where they were met by a large police presence that used excessive force and kettled and arrested protesters on the park's sidewalk.

72.     BLM activists and other protesters continue to participate in peaceful civil demonstrations in support of racial justice and against police violence in New York City.

III.    **The City Failed to Prevent or Correct the NYPD's Unconstitutional Policing Practices Used at the 2020 Racial Justice Protests.**

73.    Prior to and during the Protests, Defendants failed to adequately train, supervise, and discipline NYPD Officers to prevent the violation of 2020 Racial Justice Protest attendees' constitutional rights.

74.    Despite public reports, lawsuits, and other complaints about the NYPD's conduct in policing protests since 2003, the NYPD failed to provide adequate training to officers on constitutional policing in this context and failed to develop relevant policies to ensure that the unlawful conduct observed during prior protests ceased.

75.    As the NYC-DOI concluded in a recent report, prior to the Protests, the NYPD lacked standardized, agency-wide, in-service training related to policing protests and as a result it "deployed a large number of front-line supervisors and officers to police the Floyd protests without adequate training."[6]

76.    NYC-DOI also noted that multiple officers reported that there was an inadequate number of supervisors present during the Protests and that officers were overseen by "unfamiliar supervisors" given the shifting deployments, all of which created "chaos and confusion."

77.    Further, as a December 2020 report by the Corporation Counsel of the City of New York uncovered, the NYPD failed to conduct "any protest-related after action-reviews" between at least the 2004 RNC protests and the 2020 Racial Justice Protests.[7]

---

[6] New York City Department of Investigations, Investigation into NYPD Response to the George Floyd Protests (Dec. 2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[7]    New York City Law Department, Corporation Counsel Report (Dec. 2020), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

78.     Likewise, referring to the NYPD's failure to learn from and correct its unconstitutional practices during the 2004 RNC protests and 2011 Occupy Wall Street protests, the Commissioner of NYC-DOI referred to the NYPD's unlawful practices at the 2020 Racial Justice Protests as "deja vu all over again."

79.     Additionally, as the NYC-DOI concluded, the NYPD's Patrol Guide does not include a specific policy on policing protests or safeguarding peaceful assemblies that would direct officers on how to conduct themselves under these circumstances.

80.     NYPD leadership admitted that it failed to prepare NYPD Officers for the Protests. Chief Monahan knew that "[a] lot of cops had not received disorder trainings since they first came on the job."

81.     Without appropriate training and supervision for policing protests, NYPD supervisors and officers developed their own unconstitutional practice of disrupting peaceful protests using excessive force and mass arrests without probable cause. Despite decades of notice of these unconstitutional practices, NYPD policymakers failed to issue policies, guidance, supervision, discipline, and training that would have prevented constitutional injuries.

82.     Further, Defendants knew that NYPD Officers would confront demonstrations protesting police brutality, that NYPD Officers have previously mishandled such demonstrations using excessive force and arrests lacking probable cause, and that without intervention or sufficient training and supervision, NYPD Officers would again rely on similar tactics. Nevertheless, Defendants knowingly deployed thousands of insufficiently trained and supervised NYPD Officers to police the Protests.

83.     This failure predictably led to constitutional violations. NYPD's Chief of Patrol in October 2020 acknowledged the unlawful nature of widespread arrests that occurred at the

Protests: "[i]f [the officers] [saw] something that they perceived to be a violation of the law, they arrested that person, not realizing that protests are allowed—that peaceful protests are allowed."

84.   She further admitted that "we had officers that did things that never should have been done; that's not in alignment with what we stand for as agency."

85.   Further compounding the error of deploying thousands of inadequately trained officers, Defendants utilized officers from the Strategic Response Group ("SRG") as the primary unit to respond to the Protests.

86.   SRG is a specialized unit trained to respond to major disorder control events, such as riots, and engage in counter-terrorism efforts.

87.   When the unit was created in 2015, civil rights organizations and activists immediately raised objections to SRG being used to police protests. In response, then-Chief of Department James O'Neill pledged that SRG "will not be involved in handling protests and demonstrations" and would instead focus only on counter-terrorism with "no role in protests."

88.   Despite tacitly acknowledging that SRG officers were not trained to respond to protests, the NYPD immediately violated that pledge and sent scores of SRG officers to aggressively respond to Black Lives Matter protests in 2015 with illegal tactics, including excessive force and unlawful arrests.

89.   Since its creation in 2015, SRG has been regularly deployed to respond to peaceful protests.

90.   SRG officers are not only inadequately trained to respond to peaceful protests, but their training in terrorism response, which necessarily requires aggressive tactics and extreme force, is almost certain to result in constitutional violations when applied to peaceful protesters. Defendants have been aware of and acknowledged SRG's inadequate training for peaceful protests

since 2015, but have nevertheless enacted a policy, practice, and custom of using such officers as the primary means of responding to peaceful protests.

91.    Upon information and belief, SRG officers and supervisors have a disproportionate number of complaints filed against them and substantiated by the CCRB compared to NYPD Officers overall.

92.    SRG officers are trained to use crowd control techniques and strategies, such as kettling, mass arrests, and the deployment of bicycle squads to perform disorder control.

93.    SRG routinely relied on these tactics when responding to the peaceful Protests, which amounted to an unconstitutional policy, practice, and custom of using excessive force against peaceful protesters and infringing upon and retaliating against the exercise of First Amendment activity.

94.    Both NYC-DOI and the Corporation Counsel found that SRG's mission and training to respond to terrorism and mass civil disorder were inconsistent with allowing the First Amendment activities of protesters.

95.    The NYC-DOI report concluded that the "broad disorder control approach" of SRG "focused on force, control, and arrests . . . . inevitably led to instances where NYPD officers acted indiscriminately as between lawful, peaceful protesters and unlawful actors, thereby exercising force beyond what was necessary under the circumstances."

96.    Corporation Counsel likewise concluded that the NYPD's official training materials for responding to protests and SRG's mission statement provided insufficient emphasis on the First Amendment "rights of protesters and the affirmative responsibility that officers have to protect the rights of citizens who take part."

97.     As the Protests unfolded, Defendants also knew about, but allowed, the unlawful practices to continue, including after the original Complaint in this action was filed.

98.     Throughout the first month of the Protests, Mayor de Blasio and Commissioner Shea received regular reports on details of the Protests and the NYPD's response from Chief Monahan and other NYPD officials responsible for implementing the City's response to the Protests.

99.     At press conferences during this early period, Mayor de Blasio repeatedly referenced his daily briefings with police leadership, noting that he "constantly was in touch with Commissioner Shea, Chief Monahan, and Chief [of Patrol] Pichardo" on the progress of the Protests, commented on the content of video and other media posted online of police interactions at the Protests, and responded to questions regarding specific acts of misconduct.

100.    Commissioner Shea joined some of these conferences to discuss details of the Protests with the press.

101.    At a June 7 press conference, Mayor de Blasio was asked: "Did you approve the tactics that we saw at [sic] the NYPD using, starting on June 3rd and June 4th? That's the use of batons, more sort of pushing at protests, that kind of thing? Did you approve those?" Mayor de Blasio replied, in part, "I approved the broad strategies and sometimes very specific choices. And I've mentioned some of those. Do I like everything I saw in the videos? No, not at all."

102.    On information and belief, Mayor de Blasio, Commissioner Shea, and Chief Monahan regularly reviewed widely reported media coverage throughout the Protests documenting patterns of police misconduct, including excessive force, unlawful seizures and other First Amendment violations, in response to the Protests. Throughout the Protests, the Mayor and police leadership, on information and belief, were aware of persistent NYPD actions to violently

suppress the Protests through media reports; the CCRB's public hearing; reports from staff, including the NYPD Internal Affairs Bureau and the Mayor's Community Affairs Unit; regular interactions with other NYPD leaders; and testimony collected, and a report published, by the OAG.

103.    Despite their contemporaneous awareness of these unlawful practices, the Mayor, Commissioner Shea, Chief Monahan, and NYPD borough commanders who were delegated final decision-making authority deliberately failed to prevent NYPD Officers from using these tactics, and at times, actively encouraged the use of such tactics.

104.    Upon information and belief, they also failed to discipline all NYPD Officers who engaged in misconduct during the Protests.

105.    Their inaction to address these patterns constitute a City policy or custom to engage in excessive force, unlawfully seize protest attendees, and suppress First Amendment-protected activities by using such tactics at protests and retaliating against people engaged in their constitutionally protected rights to protest and observe and report police activity.

106.    Although NYPD instituted new training in "disorder control" after the bulk of the 2020 Racial Justice Protests, between July and October 2020, that training focused on Officers' physical formations during demonstrations that served only to reinforce the use of kettling and did nothing to address the practice of excessive force against protesters.

107.    As the NYC-DOI concluded, the new training had "no discernable reference to managing interactions, facilitating First Amendment rights, and minimizing the use of force."

108.    This reinvigorated focus on trapping and arresting protesters resulted in a continued pattern of excessive force and false arrests at protests in November and December.

109.    The NYC-DOI's December 2020 report additionally found that the "NYPD's use of force on protesters—encirclement (commonly called 'kettling'), mass arrests, baton and pepper spray use, and other tactics—reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views." The result was a pattern of excessive force and abuse of authority, which the NYC-DOI attributed to the NYPD's "errors or omissions."

110.    In a December 18, 2020 video statement posted on social media, Mayor de Blasio acknowledged that he "agree[d] with [the NYC-DOI's] analysis" and with its recommendations. He confirmed that Commissioner Shea also agreed. He further admitted that "there were things that happened that were not about whether someone made the individual mistake, there were choices made, strategic choices, that weren't good choices it turns out; that end up causing problems. And we have to come to grips with that. We have to train our police force differently."

111.    Despite these public admissions of its failures to prevent pervasive constitutional violations, just four days after Plaintiff filed this action, NYPD Officers demonstrated that the policy and practice of unlawful tactics exhibited throughout the summer of Racial Justice Protests are very much still in effect.

112.    On January 18, 2021, Martin Luther King, Jr. Day, hundreds of aggressively armed and outfitted SRG officers confronted a small group of peaceful demonstrators at City Hall Park with excessive force and mass unlawful arrests.

113.    NYPD Officers ordered protesters onto sidewalks from the street and responded with unlawful kettling, baton strikes, punches, kicks, and arrests of protesters who had complied with their directive. In total, 29 people were arrested.

114.    The following day, Commissioner Shea falsely claimed that the demonstrators engaged in widespread violence and were "the antithesis of what Martin Luther King stood for."

### IV.    The NYPD Continued its Custom of Using Unjustified Force at the 2020 Racial Justice Protests.

115.    NYPD Officers continued the NYPD's practice of using excessive force against peaceful protesters at the Protests.

116.    NYPD Officers applied excessive force in myriad ways at the Protests, including with batons, bicycles, Oleoresin Capsicum (O.C.) spray (also known as pepper spray), body strikes, overly tight zip-ties, cars, and Tasers.

117.    Such excessive force complaints formed the majority of the 1,646 allegations of police misconduct occurring between May 28 and June 20, 2020 that were reported to the CCRB.

118.    NYPD Officers repeatedly violated New York Residents' constitutional rights and applicable NYPD policies regarding the use of force by using force against non-resisting or passively resisting individuals.

119.    Defendants knew or should have known that NYPD Officers had a practice of using unconstitutionally excessive force to control and disperse protests yet did not enforce its policies to end that practice.

120.    Upon information and belief, Defendants have not disciplined the vast majority of NYPD Officers who used excessive force against Protest attendees.

### A.    *NYPD Officers Dangerously and Indiscriminately Wielded Batons and Bicycles.*

121.    Throughout the Protests, NYPD Officers engaged in a pattern of indiscriminately striking protesters using blunt instruments, including batons and bicycles, without provocation or justification. At times, NYPD Officers, aiming batons at protesters' heads, struck with potentially deadly force.

122.    The NYPD's Use of Force Policy, Patrol Guide Procedure Number 221-02, provides that police officers must, prior to using force, attempt to de-escalate, meaning to "stabilize the situation and reduce the immediacy of the threat . . . to reduce or eliminate the necessity to use force."

123.    The policy further instructs NYPD Officers to "advise the offender that physical force or other devices (e.g., O.C. pepper spray, shield, baton/asp, etc.) will be used to handcuff/restrain him/her before applying such force, if appropriate" and if de-escalation efforts fail.

124.    The NYPD Use of Force Policy prohibits use of batons on persons who are "passively resisting," such as failing to comply with a lawful command.

125.    NYPD Officers systematically disregarded these use-of-force policies in the face of large-scale protests, instead reverting to their decades-long practice of using excessive force to suppress such protests.

126.    At least 50 times during the Protests, in violation of the NYPD Use of Force Policy and constitutional protections, NYPD Officers indiscriminately and unreasonably struck protesters with blunt instruments without provocation or justification.

127.    Below are representative examples of this unlawful practice:

*Hannah Lillevoy*

128.    Hannah Lillevoy participated in a May 28 protest at Union Square.

129.    During the protest, a line of NYPD Officers formed a barrier with their bicycles across from approximately thirty to forty protesters gathered on the sidewalk along Broadway, chanting and filming the police.

130.    When a protester stepped off the curb, three NYPD Officers repeatedly rammed the frames of their bicycles into protesters standing on the sidewalk, pushing Lillevoy onto and over a concrete barrier on the sidewalk. As this happened, the front wheel of the bicycle dragged across the back of her head and arm. Below are images from the encounter:





131.    The protesters rammed by the bicycles did not present any threat of harm to the NYPD Officers or others, were not resisting or evading arrest, and were not charged with any crime.

132.    The bicycle ramming caused the protesters, including Lillevoy, to suffer bruising, scratches, and pain.

***Patricia Delfin***

133.    On May 29, Patricia Delfin joined a protest moving through the Clinton Hill neighborhood of Brooklyn at approximately 9:30 p.m.

134.    When a wall of NYPD Officers on Classon Avenue blocked Delfin and fellow protesters, they stood stationary, chanting about George Floyd and Breonna Taylor for approximately fifteen minutes.

135.    Then, without warning, NYPD Officers charged towards the protesters, compressing the crowd and pushing Delfin towards the line of officers. After tightening their formation, the officers again charged without warning into the crowd.

136.    Without provocation or justification, an NYPD Officer hit Delfin's face with a baton held horizontally, causing her to bleed profusely from her forehead and into her facemask.

137.    The onslaught of retreating protesters and advancing NYPD Officers then quickly swept Delfin back against a parked car, which she rolled off of and onto the sidewalk.

138.    Neither the Officer who hit Delfin nor any other Officer sought or provided medical attention for Delfin's wound. Instead, the only assistance Officers provided was to instruct her to go to a nearby hospital.

139.    Delfin was not arrested or charged with a crime.

140.    Delfin received five stitches to close the gash on her forehead. She was diagnosed with a concussion and experienced post-concussive symptoms—including headaches blurred vision, nausea, memory loss, confusion, and dizziness. Delfin also experienced fear and emotional distress from the attack.

### *Kerry Leigh Pittenger*

141.    That same night in Bedford-Stuyvesant in Brooklyn, Kerry Leigh Pittenger joined a group of protesters chanting and walking towards the Herbert von King Park. Pittenger left the protest, but then returned when she saw Officers become more aggressive towards the protesters.

142.    Later, as Pittenger stood peacefully with other protesters on the sidewalk across from a mass of NYPD Officers three-lines deep who had formed on the street and began smacking their batons in their hands to threaten protesters.

143.    Without warning, provocation, or justification, NYPD Officers then charged towards the protesters, pushing Pittenger to the ground.

144.     As she lay on the ground, another NYPD Officer swung a baton overhead and hit Pittenger's head, causing a laceration approximately two inches wide on her forehead that bled profusely down her face.

145.     This is a photograph of Pittenger after the strike:



146.     The NYPD Officer who hit Pittenger did not seek or provide medical attention for Pittenger's injuries.

147.     Pittenger was not arrested or charged with a crime.

148.     The attack caused Pittenger to experience anxiety and stress when she later returned to Herbert von King Park, which is situated across from the 79th Precinct stationhouse.

149.     When Pittenger attempted to attend a subsequent protest, the sight of the police officers there triggered the same fear of police violence she experienced because of the May 29 attack, causing her to leave the protest and not attend any other demonstration in 2020.

***Huascar Benoit***

150.     During the early morning of May 31, Huascar Benoit filmed NYPD Officers occupying Dekalb and Flatbush Avenues.

27

151.    Without warning, provocation, or justification, NYPD Officers in riot gear charged towards Benoit, pushed him back towards a nearby subway station entrance, and hit him with batons on the right side of his face and elsewhere on his body.

152.    Benoit was not arrested or charged with a crime.

153.    Although Benoit was visibly bloodied and disoriented after the attack, no NYPD Officer sought or provided medical attention to him.



154.    Because of the beating, Benoit suffered a fractured eye socket (known as orbital blowout), scrapes, bruises, emotional distress and long-term damage to his eye.

**Lawrence Schober**

155.    On May 31, Lawrence Schober joined in a peaceful march north on Broadway toward East 11th Street in Manhattan.

156.    A line of NYPD Officers in riot gear blocked the marchers' path and ordered everyone to disperse.

157.    NYPD Officers then charged into the crowd, striking protesters with shields and batons.

158.    Two charging officers grabbed Schober out of the crowd and, without provocation or justification, shoved him to the sidewalk and then hit him three times with a baton.

159.    Schober was not arrested or charged with a crime.

160.     The beating fractured Schober's humerus bone and damaged his ulnar nerve.

**Brian Anderson**

161.     On May 29, Brian Anderson was observing and listening to a peaceful protest across from the 79th Precinct stationhouse. About twice as many NYPD Officers as protesters were present and suddenly, without provocation or prior warning, the officers charged into the protesters, brandishing their batons and screaming at the crowd to disperse.

162.     As Anderson walked away, attempting to comply with the officers' directive, NYPD Officers knocked him onto the ground and struck him at least 12 times with their batons. An NYPD Officer then pulled him to his feet and pushed him forward. Anderson continued walking, but then NYPD Officers again tackled him to the ground, causing his head to slam into the pavement. NYPD Officers kicked and struck him with batons. An officer's boot ripped out a lock of Anderson's hair. All of the force used against Anderson was without provocation or justification.

163.     NYPD Officers then wrongly handcuffed and detained Anderson for approximately 20 hours before he was released and told that the charges against him had been dropped.

**Luke Hanna**

164.     On the night of June 3, Luke Hanna participated in a protest at Cadman Plaza in Brooklyn.

165.     While complying with a police directive to disperse from the protest, an NYPD Officer struck the back of Hanna's head with a baton without provocation or justification

166.     The baton strike caused a gash on Hanna's head that required ten staples to close, shown in the photograph below, and caused him to suffer pain and emotional distress.



167.    Neither the Officer who hit Hanna nor any other Officer sought or provided medical attention for Hanna's wound.

168.    Hanna was not arrested or charged with a crime.

**Mott Haven Baton Strikes**

169.    On June 4 in Mott Haven, NYPD Officers, including at least one supervisor, sat on top of a parked car. Beneath them stood a large group of protesters who were barricaded in by NYPD Officers and prevented from exiting the area. The NYPD Officers perched on the car swung their batons at the heads of protesters standing below and dispersed pepper spray into the crowd, as depicted in the photograph below:



30

170.     NYPD Officers hit protesters indiscriminately and without provocation.

**B. *NYPD Officers Indiscriminately Pepper Sprayed Protesters.***

171.     During the Protests, NYPD Officers engaged in a pattern or practice of using pepper spray indiscriminately against protesters who were not posing a threat to any individual or actively resisting arrest.

172.     NYPD Patrol Guide Procedure Number 221-07, Use of Oleoresin Capsicum Pepper Spray Devices, states that pepper spray shall not be used in situations that do not require the use of force, including when an individual is merely passively resisting "(i.e., minimal physical action to prevent a member from performing their lawful duty)."

173.     Procedure 221-07 also instructs members of the service to "avoid discharging O.C. pepper spray indiscriminately over a large area for disorder control."

174.     Procedure 221-07 further instructs officers who use pepper spray against an individual to render and request medical aid for them once the situation is under control.

175.     Again, instead of relying on these policies governing routine policing, NYPD Officers hewed to the de facto policy of employing excessive force to police protests.

176.     In at least 30 incidents during the Protests, NYPD Officers used pepper spray against protesters unlawfully and in violation of Patrol Guide 221-07.

177.     Below are representative examples of this unlawful practice:

*Andrew Smith*

178.     Andrew Smith participated in a protest in Brooklyn in the early evening of May 30.

179.     Near the intersection of Bedford and Tilden Avenues in Brooklyn, an NYPD Officer unjustifiably pepper sprayed Smith's face.

180.     Moments prior, the officer formed a "V" with other NYPD Officers around a police car to clear its path through protesters.

31

181.    As the car traveled north up Bedford Avenue, the NYPD Officer pushed and verbally directed protesters to move back.

182.    Over the course of three minutes, the NYPD Officer repeated, "Step back," while pushing with his extended arm about eight protesters positioned in front of the car, all of whom appeared to be white. Some verbally objected to being touched but moved back out of the car's path.

183.    When the NYPD Officer approached Smith, who is Black, Smith was standing out of the car's path with both arms in the air. The NYPD Officer turned to face Smith and pushed his fist into Smith's chest, causing Smith to take one step back.

184.    Smith responded, "Don't touch me," but did not lower his arms, as shown in the below image of the incident:



185.    Without further warning, and without provocation or justification, the NYPD Officer reached his arm out, tore down Smith's facemask, and dispersed pepper spray directly into Smith's face.

186.    The NYPD Officer continued moving towards the intersection of Bedford and Tilden Avenues, again pushing protesters away from the patrol car's path.

187.    At the intersection, the NYPD Officer twice pushed another Black protester, and, as the man stumbled back, pepper sprayed his face.

188.    As a result of being pepper sprayed, Smith suffered a severe burning sensation to his eyes and face, exacerbation to eczema on the back of his neck that lasted for hours, and difficulty removing and wearing contact lenses for at least a week after the incident.

189.    Smith also suffered stress and fear that he had been exposed to COVID-19 when the officer removed his facemask.

190.    Smith and the second protester the NYPD Officer pepper sprayed were not arrested or charged with any crime.

191.    Smith did not receive medical aid from any of the NYPD Officers who caused him to be or witnessed him being pepper sprayed.

192.    Body-worn camera footage captured the officer asking fellow officers whether they used their pepper spray and bragging, "I took the guy's goggles, I ripped the s--- off and I used it."

*Alan Williams*

193.    Alan Williams joined a protest on May 29 in front of Brooklyn's Barclays Center. At approximately 7:20 p.m., Williams witnessed an NYPD Officer disperse pepper spray four to five times in a panoramic motion towards protesters who were standing immediately behind metal barricades. These barricades separated the protesters from the NYPD Officers.

194.    The pepper spray hit several protesters, including Williams, causing them to suffer a temporary burning sensation to their skin and eyes.

195.    There was no verbal warning or apparent provocation prior to the issuance of the pepper spray by the NYPD Officer.

33

***Senator Zellnor Myrie and Assembly Member Diana Richardson***

196.    On May 29, New York State Senator Zellnor Myrie and Assembly Member Diana Richardson joined their constituents at the protests at Barclays Center in Brooklyn. When NYPD Officers ordered protesters to move back, Senator Myrie, who was between a large crowd of protesters and NYPD Officers, repeated the directive to the crowd.

197.    As protesters began to comply, NYPD Officers pushed their bicycle frames against the crowd, hitting Senator Myrie's back and legs and Assembly Member Richardson's lower abdomen and legs.

198.    As Senator Myrie explained to officers that the protesters were obeying directives, an NYPD Officer pepper sprayed him in the face without provocation or justification, causing pain and a burning sensation in his eyes. He was then wrongly placed under arrest.

199.    Around the same time, an NYPD Officer pepper sprayed Assembly Member Richardson and protesters around her, causing blurring of her vision and substantial pain, and knocked her to the ground.

200.    Chief Monahan admitted to NYC-DOI that he personally approved the mass use of pepper spray against protesters at the Barclays Center.

201.    The below image captures the resulting pain Senator Myrie suffered:



202.    Although Senator Myrie was screaming in pain, NYPD Officers did not seek or provide him with any medical treatment until one passing officer recognized him and ordered him released from custody. Officers did not seek or provide any medical aid to Assembly Member Richardson.

***Laisa Pertet***

203.    On the night of May 30, Laisa Pertet joined other protesters in walking from Barclays Center to the Flatbush Extension in Brooklyn.

204.    There, without provocation or justification, several NYPD Officers pepper sprayed Pertet and others as they were attempting to comply with the NYPD Officers' directions to "go home."

205.    Two of the NYPD Officers also struck the retreating individuals with their batons without provocation or justification.

206.    Pertet experienced a burning sensation on her arm where she was hit with pepper spray.

207.    The NYPD Officers did not render or call for medical attention for any of those whom they had struck and pepper sprayed and did not arrest any of them at that time.

***Mass Pepper Spray on F.D.R.***

208.    On May 31, on the F.D.R. Drive in Manhattan, an NYPD Officer without provocation or justification twice indiscriminately discharged pepper spray into Carlos Polanco and a group of peaceful protesters who posed no threat and were separated from him by a concrete barrier.



209.    As a result of the NYPD Officer discharging the spray, Polanco and other protesters behind the barrier feared and sustained injury.

210.    The NYPD Officer did not seek or provide medical aid to any of the protesters he pepper sprayed.

### C.   NYPD Officers Shoved and Punched Peaceful or Non-Resisting Protesters.

211.    NYPD Officers engaged in a pattern or practice of shoving, punching, or otherwise using their hands to strike persons who posed no threat to officers or others at the Protests.

36

212.    NYPD Officers engaged in this unlawful practice of using unreasonable force through pushing or striking protesters at least 75 times during the Protests.

213.    Similarly, over a dozen times, NYPD Officers used unnecessary force while arresting people who were not resisting, causing them to suffer pain and other physical injury.

214.    Below are representative examples of this unlawful practice:

**_Dounya Zayer_**

215.    On May 29, Dounya Zayer was attempting to film NYPD Officers clearing protesters from Pacific Street in Brooklyn.

216.    Without provocation or justification, and in front of the officer's supervisor (a Deputy Inspector), an NYPD Officer smacked Zayer's phone out of her hand, causing the screen to crack, called Zayer a "stupid fucking bitch," and then shoved Zayer in the torso, causing her to fall backwards and hit her head on the pavement. The image below shows the NYPD Officer forcefully pushing Zayer to the ground:



217.    As a result, Zayer suffered a concussion and emotional distress, and she reported being too frightened to attend later protests.

218.     In response to this misconduct, the City suspended the NYPD Officer without pay and he was charged with misdemeanor assault and other related offenses by the Kings County District Attorney's Office.

219.     The Deputy Inspector, who witnessed and, in violation of NYPD procedures, did not stop or report on the alleged assault was reassigned within the NYPD but, on information and belief, was not disciplined.

***Joseph Kokesh***

220.     The same night, a lieutenant approached protester Joseph Kokesh while he was peacefully protesting and told him to get on the sidewalk.

221.     Without providing time for Kokesh to comply with the directive, and without provocation, the lieutenant violently shoved him, knocking him a few feet back onto the sidewalk and bruising his shoulder and elbow. The below image shows the lieutenant forcefully pushing the protester:



222.     Kokesh was not arrested or charged with any crime.

***Jacqui Painter and Carlos Calzadilla-Palacio***

223.    Jacqui Painter and Carlos Calzadilla-Palacio were also part of a peaceful protest on May 29, near the 88th Precinct stationhouse in Brooklyn.

224.    Without warning or an order to disperse, a large group of NYPD Officers suddenly charged and pushed their body shields into the crowd as they screamed, "Get back!" NYPD Officers pushed protesters who were dispersing away from the officers without provocation or justification.

225.    As Painter and Calzadilla-Palacio walked on Dekalb Avenue, as directed, an NYPD Officer yelled out that officers should "rip apart" a megaphone attached to Painter's wrist. Several NYPD Officers started to pull the megaphone away from Painter and, without provocation or justification, forcefully shoved her and Calzadilla-Palacio to the ground.

226.    An NYPD Officer then kicked Painter several times and struck Calzadilla-Palacio on the back of his head with a baton, as he tried to help Painter rise from the ground and walk away. Calzadilla-Palacio immediately started bleeding profusely and suffered from dizziness and disorientation. Painter suffered a large gash to her knee and several scratches to her calf. Neither were arrested or charged with a crime.

***Dorthley Beauval***

227.    On June 1, Dorthley Beauval was walking from a BLM protest in front of the Trump Tower on Fifth Avenue toward West 56th Street and Broadway in Manhattan when an unmarked police van pulled up beside him.

228.    Multiple uniformed NYPD Officers exited the van onto the sidewalk, pulled Beauval to the ground by his backpack, pinned him on his side, and, without provocation or justification, repeatedly struck his face and body with fists. Beauval heard one NYPD Officer say that he was going to "fuck him up." He was then arrested.

229.     The NYPD Officers alleged that Beauval had been attempting to burglarize a nearby store at a time when Beauval claimed that he was in fact protesting many blocks away. Video surveillance of the allegedly burglarized store did not show Beauval in or near the store.

230.     The force of the NYPD Officers' takedown and fists broke Beauval's glasses into fragments that entered Beauval's eyes and worsened his vision, scratched the bridge of his nose, bruised his body in multiple areas, and caused a hematoma to develop on his arm. The attack also aggravated Beauval's anxiety and depressive conditions, causing him to withdraw from school.

### *Dennis Mullikin*

231.     On May 31, Dennis Mullikin was peacefully protesting in front of a then-stationary line of NYPD Officers near 12th Street and Broadway in Manhattan.

232.     Without warning or justification, the NYPD Officers charged Mullikin and nearby protesters.

233.     NYPD Officers forcibly pulled Mullikin to the ground and beat him, causing him to suffer bruises, a split lip, a concussion, and emotional distress, including the exacerbation of previous anxiety and depressive conditions. A photograph of his visible injuries the night of his arrest is below:



234.    Mullikin was charged only with resisting arrest. Those charges were later dropped.

**Protester John Doe I**

235.    On May 30, at Bedford and Tilden Avenues, an NYPD Officer approached a protester (John Doe I), whose arms were being held by other officers. Without justification, the NYPD Officer placed John Doe I in a chokehold, pressed back and down against the protester's neck, and slammed him onto the ground.

236.    The protester, who was restrained and not resisting when he was thrown to the ground, did not pose any threat to anyone.

**Melanie Ryan**

237.    On June 3, NYPD Officers used excessive force to arrest Melanie Ryan at a Protest near 51st Street and 3rd Avenue.

238.    Just as the 8:00 p.m. curfew was to take effect, NYPD Officers lined up in front of Ryan and other protesters who were chanting "Black Lives Matter" and "Hands up, don't shoot."

239.    The NYPD Officers watched the protest continue until an hour later when they suddenly began arresting the protesters.

240. One NYPD Officer came up behind Ryan and swept her feet out from under her, causing her to fall face first to the ground, where she landed on her forehead.

241. Five NYPD Officers then climbed onto her back, pinning her to the ground.

242. When Ryan turned her head, an NYPD Officer punched her three times in the eye, causing a black eye.

243. When the NYPD Officers hit Ryan, she was not resisting or evading arrest, nor did she pose any harm to the Officers or others. Ryan had not heard any order to disperse before her arrest.

244. An NYPD Officer then restrained Ryan's hands with excessively tight zip-ties, restricting blood flow and circulation to her hands and causing them to appear blue and lose feeling. NYPD Officers ignored Ryan's complaints that her zip-ties were too tight. Ryan continued to feel numbness in her thumb as a result of the overly-tight zip-ties weeks after her arrest.

245. As a result of being thrown to the ground, Ryan experienced dizziness, trouble breathing, and occasional loss of consciousness. Despite fellow arrestees' pleas to officers to provide water or medical aid to Ryan in transit, no officer did so.

246. Ryan was charged only with violating the curfew order.

### Rob Goyanes

247. Rob Goyanes was also at the June 4 Mott Haven protest. Beginning shortly before the curfew took effect that evening, NYPD Officers kettled the protesters, including Goyanes, preventing them from leaving the area. As soon as the curfew order took effect at 8:00 p.m., NYPD Officers ordered Goyanes and other protesters to disperse. However, due to the Officers' kettling tactics, the protesters had no means to do so.

248. NYPD Officers encircled him and other protesters, and one Officer, without warning or justification, slammed his riot shield into Goyanes several times, causing bruising on his left arm.

249. Another NYPD Officer then, without provocation or justification, punched Goyanes four times in the chest and ribs. An NYPD Officer then grabbed him by the hair and arms, pulled him forward, and then restrained his hands with excessively tight zip-ties.

250. Goyanes asked another Officer to loosen the zip-ties because he felt his right hand going numb, but the Officer refused, stating that she did not have the necessary tool to cut the cuffs.

251. Approximately one hour later, Goyanes shifted his hands in his cuffs to relieve their numbing effect.

252. In response and without justification, the Officer pulled sharply Goyanes's zip-ties, causing them to tighten and Goyanes to suffer additional pain. When Goyanes asked the Officer why she tightened them, she stated, "Because you moved."

253. Although Goyanes's cuffs were eventually replaced with looser zip-ties, other persons transported with him to the precinct complained of excessively-tight zip-ties that cut off blood circulation and caused hand numbness. The transporting NYPD Officers ignored these complaints and failed to comply with the NYPD's procedure to periodically ensure that people restrained with zip-ties were not suffering from a loss of circulation.

254. As a result of the excessively-tight zip-ties, Goyanes suffered numbness and pain in his hands and wrists for several months after the protest. He subsequently has been diagnosed with nerve damage.

255.    Goyanes was charged only by summons with violating the curfew. The summons was later dismissed on motion of the Bronx District Attorney.

**V.      The NYPD Continued its Custom of Unlawfully Detaining and Arresting Individuals at the 2020 Racial Justice Protests.**

256.    NYPD Officers continued the Department's practice of unlawfully detaining and arresting protesters at the Protests.

257.    NYPD Officers arrested or detained without legal justification hundreds of protesters, legal observers, medics, and others at the Protests.

258.    NYPD Officers repeatedly violated New York Residents' constitutional rights and applicable NYPD policies regarding crowd control and arrest procedure by arresting curfew-exempt individuals; using kettling tactics, excessive force, and threats of force to detain peaceful protesters; and detaining and arresting individuals without probable cause that they were engaged in unlawful conduct.

259.    Defendants had knowledge of NYPD Officers' practice of violating its policies and applicable legal standards during the Protests and previous protests yet failed to uniformly enforce the policies.

260.    At times, Defendants actively encouraged NYPD Officers' use of tactics that violated Department policies and applicable legal standards.

261.    Upon information and belief, Defendants have not disciplined the majority of the NYPD Officers who unlawfully detained and arrested protesters and used excessive force at the Protests.

### A.  NYPD Officers Arrested Curfew-Exempt Individuals.

262.    On Monday, June 1, Mayor de Blasio issued Emergency Executive Order 117 that imposed an 11:00 p.m. curfew in New York City and announced that NYPD would double the number of officers assigned to the protest.

263.    On June 2, Mayor de Blasio issued Emergency Executive Orders 118 and 119, which expanded the hours of the curfew to from 8:00 p.m. until 5:00 a.m. each day until June 8.

264.    These orders (the "Curfew Orders") explicitly exempted "first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work."

265.    They further stated, "Failure to comply with this Order shall result in orders to disburse [sic], and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."

266.    Legal observers are legal workers, law students, and lawyers trained by non-profit organizations to observe and document police responses to protests.

267.    Jail support entails the provision of food, water, transportation, and other necessary resources to protesters upon their release from custody.

268.    Mayor de Blasio, through his agents, acknowledged that the Curfew Orders exempted legal observers, medics and jail support providers.

269.    For example, on June 1, 2020, Amanda Wallwin, Chief of Staff for Assemblyman Dan Quart, e-mailed Jenny Sobelman, Chief of Staff for the Mayor's Office of State Legislative Affairs, asking, "Are there any plans to exempt folks who are doing jail, legal and medical support for arrested protesters?"

270.    At 8:32 p.m. that day, Ms. Sobelman confirmed, "Yes. They are exempt from the curfew."

271.     Later that day, Persephone Tan of the Mayor's Office of City Legislative Affairs wrote in an email that lawyers and non-lawyers supporting them were not subject to the curfew, because they are "as essential as it gets."

272.     Upon information and belief, Mayor de Blasio delegated authority to enforce this Executive Order to Commissioner Shea and the NYPD.

273.     The night of the first curfew, the NYPD issued an internal announcement, called a "Finest Message," instructing law enforcement personnel that they are to "issue reminders to anyone observed violating the curfew that they are not allowed in public … [and to] direct them to return to their homes or other private locations. Enforcement will only be taken after several warnings are issued and the violator is refusing to comply. In that circumstance, a [criminal]-summons may be issued for Admin. Cod 3-108, violating a Mayoral Emergency Order."

274.     On June 3, 2020, the NYPD circulated another Finest Message informing officers about the expansion of the curfew, but omitting the previously included direction that officers should issue warnings before making arrests. Instead, the message simply stated, "[i]f [Members of Service] observe a person violating the curfew, a [criminal]-summons may be issued for . . . violating a Mayoral emergency order." This second Finest Message contradicts the Curfew Orders, which specifically require that an order to disperse be made.

275.     Throughout the Protests, NYPD Officers wrongly arrested individuals exempt from the Curfew Orders, including legal observers, medics, jail support providers and other essential workers.

***Legal Observers***

276.     Legal observers have a constitutionally-protected right to monitor demonstrations.

277.    In that same vein, NYPD Patrol Guide, Procedure Number 213-11 grants legal observers "free access through police lines at the scene of any demonstration . . . subject only to restrictions necessitated by personal safety factors."

278.    Patrol Guide Procedure Number 203-29 also recognizes all individuals have the rights in public places to observe, photograph, and record police activity, "including, but not limited to detentions, searches, arrests or uses of force." It forbids NYPD Officers from discouraging, obstructing, or otherwise interfering with such activity.

279.    Notwithstanding constitutional protections, the Curfew Orders' stated exemptions and the Patrol Guide, NYPD Officers arrested numerous essential workers for violating the Curfew Orders.

280.    The arresting officers knew or should have known that these individuals were providing essential services at the time of their arrest and were engaging in constitutionally protected activity.

281.    Legal observers and individuals trained to provide medical assistance ("medics") were clearly identifiable to NYPD Officers at the time of their arrest for purported curfew violations.

282.    For instance, legal observers trained by the National Lawyers Guild, New York City chapter wear bright neon green hats and an identification card on a lanyard that prominently identifies them as a "Legal Observer" with the National Lawyers Guild, as shown below:

 

283.    Legal observers from the National Lawyers Guild routinely monitored the Protests.

284.    On June 4, at around 8:00 p.m., on East 136th Street between Brook Avenue and Brown Place in the Bronx, NYPD Officers unlawfully detained twelve National Lawyers Guild legal observers for curfew violation in order to impede, and in retaliation for, the performance of their legal observer duties.

285.    The legal observers carried an Attestation of Essential Services, a document affirming that they were volunteer legal observers exempt from the Curfew Orders and attaching the June 1 emails between Wallwin and Sobelman.

286.    Some legal observers showed this attestation or told the NYPD Officers who detained them that they were legal observers.

287.    NYPD Officers who detained the legal observers refused to review the attestation or acknowledge that they were essential workers.

288.    In one instance, NYPD Officers shoved a legal observer onto the side a car shortly after ripping the attestation out of her hand.

289.    A supervising officer directed NYPD Officers to "round up the green hats."

290.     A member of the NYPD's Legal Bureau, who was supposed to ensure officers' compliance with NYPD procedures and constitutional protections, incorrectly shouted to officers, "Legal observers can be arrested. You're good to go." These legal observers were detained for approximately 15 minutes, during which time they were prevented from documenting events that took place during this protest.

291.     Some legal observers were told to leave the area and others were physically pushed back away from detainees, hindering their ability to record details of their arrest.

292.     Chief Monahan was present at and, as the highest-ranking officer, executed and supervised the NYPD's operation at the Mott Haven protest.

293.     He was captured on video supervising the kettling of protesters and others on 136 Street between Brook Avenue and Brown Place before the curfew and directing the arrest of a protest organizer.

294.     He was also captured on video failing to adequately supervise or intervene as multiple NYPD Officers used excessive force, including baton strikes and pushes, and made unlawful arrests of peaceful protesters.

295.     Shortly after officers moved in on those trapped and arrested legal observers and medics, Chief Monahan was filmed in the same location, laughing with and providing instructions to officers as a legal observer and medics in handcuffs stood nearby.

296.     Upon information and belief, Chief Monahan directed the kettling and allowed the interference with legal observers attempting to document police activity and arrest of medics.

297.     In a published statement, the NYPD upheld the decision to arrest and interfere with the work of legal observers, claiming they were not exempt from the curfew.

*Medics*

298.    NYPD Officers also unlawfully arrested six medics performing essential services at the June 4 Mott Haven protest.

299.    Medics providing first aid kits and emergency aid to protesters at the June 4 Mott Haven protest displayed hospital credentials, wore hospital scrubs, and marked their backpacks or clothing with the internationally-recognized image of medical personnel, red crosses.

300.    For example, NYPD Officers arrested Mike Pappas, a doctor serving as a medic at the June 4 Mott Haven protest for curfew violation. An image of Dr. Pappas's arrest, which shows that he was wearing medical scrubs with a red cross, is below:



301.    At 8:00 p.m., Dr. Pappas heard the police say to the crowd, "Unless you're an essential worker, you have to go home." Two Officers then approached Dr. Pappas and another medic Jillian Primiano, a nurse.

302.    Dr. Pappas explained that he and Primiano were acting solely as medics and offered to move wherever directed by the Officers. One of the Officers stated, "No problem man, don't worry about it. Come with me."

303.    After Dr. Pappas and Primiano complied with the officer's directions, Dr. Pappas was arrested by this same Officer. Dr. Pappas was transported to the 40th Precinct stationhouse and not released until over four hours later with a summons charging him solely for violating the curfew.

304.    Another Officer nearby detained Primiano, placed her hands behind her back, and held up his handcuffs as if he was about to restrain her. However, upon observing Primiano's medical scrubs and hearing from Primiano that she was a nurse, the Officer who had detained her released her with an order to leave the area.

305.    Primiano and three other medics then assisted with administering first aid to injured protesters until NYPD Officers ordered them to leave the area. Primiano and the others complied with the Officers' orders and walked to the 40th Precinct stationhouse to provide jail support where she learned that additional medical assistance was needed at Queens Central Booking. As Primiano and other medics attempted to enter a car to drive to Queens, an NYPD Officer stopped them and asked who they were. Primiano responded that they were providing jail support and offered to show them a letter substantiating that they were considered essential workers.

306.    The NYPD Officer claimed not to know what jail support was and unlawfully arrested Primiano and the three other jail support providers for violating curfew.

307.    Like Dr. Pappas and Primiano, Dr. Marie DeLuca, an emergency medicine physician and public health research fellow in New York City, attended the Mott Haven protest as a street medic. She too was dressed in scrubs.

308.    Shortly before 8:00 p.m., at Brook Avenue and East 136th Street, Dr. DeLuca witnessed the marchers being approached by a large number of NYPD Officers with batons.

309.    Unable to move within the crowd because they "were so tightly packed together by the police," she attempted to provide aid to a man who had been pepper sprayed. However, she was "grabbed by a male police officer and thrown to the ground."

310.    The NYPD Officer held her down and handcuffed her. He ignored Dr. DeLuca as she attempted to show her hospital identification card and a letter she had documenting that her role as a street medic was considered "essential" by the mayor's office. Dr. DeLuca was charged only with violating the curfew and released with a summons. The summonses issued to Dr. DeLuca, Dr. Pappas, Primiano, the three other medics, and all other protesters who were charged by summons only with a curfew violation and/or disorderly conduct during this protest were later dismissed on motion of the Bronx District Attorney.

### Other Curfew-Exempt Essential Workers

311.    In addition to legal observers, medics, and jail support providers, NYPD Officers also unlawfully detained and arrested at least six curfew-exempt essential workers, in transit to or from their essential work.

### Rayne Valentine

312.    On the night of May 30, 2020, Rayne Valentine, a medical worker, had just finished a shift at Kings County Hospital and was walking to a nearby subway station near the corner of Flatbush and Church Avenues in Brooklyn. While en route, he saw at least six NYPD Officers pursuing and then using physical force against another man.

313.    Valentine recorded video of the NYPD Officers with his cell phone. Valentine did not see what precipitated the incident, but did witness the Officers grab the man and push him against a car. They then pushed him to the ground and started kicking him.

314.    As Valentine was filming, one NYPD Officer approached him, and while swinging his baton, yelled, "Get back, get back!"  Valentine began walking backwards and can be heard on video saying, "I am moving back!"

315.    Suddenly, and without warning, the Officer charged at Valentine, pushed him to the ground and repeatedly struck and kicked him. Valentine's phone was knocked to the ground due to this commotion. Valentine tried to get the Officer to stop, telling him that he was just "trying to get home." An Officer standing nearby replied: "You picked the wrong time to do that."

316.    Multiple NYPD Officers hit and kicked Valentine, preventing him from entering the subway. After approximately 90 seconds, the beating abruptly stopped, the NYPD Officers walked away and threw Valentine's phone in his direction.



317.    Following the incident, Valentine was admitted to Kings County Hospital where he received staples to close a wound on his head.

*Zuleyka Morales*

318.     On June 2, 2020, Zuleyka Morales, an overnight security guard, participated in an afternoon protest in Manhattan. Following the protest, Morales began walking to her work in the Financial District in Manhattan. Morales wore a badge around her neck that was distributed by a governmental agency that identified her as an essential worker.

319.     At around 7:49 p.m., Morales saw a large police presence, including police in riot gear at the intersection of West Street and Morris Street. Morales noticed that the police were using significant force against protesters and bystanders, and she decided to take out her cell phone to record their behavior.

320.     As soon as she pressed record, Morales felt someone come from behind her and attack her, throwing her to the ground. While on the ground, she saw a NYPD Officer with three stripes on his sleeve, indicating the rank of sergeant, trying to physically restrain her.

321.     Morales told the sergeant that she was an essential worker and tried to hold up her badge around her neck to show that she was en route to work. Despite this plea, this sergeant and approximately at least two other NYPD Officers struck her head against the sidewalk and street multiple times. While she was on the ground, at least one Officer obstructed her breathing by kneeling on her back and neck, so she said, "I can't breathe." Morales repeated this several times and feared for her life.

322.     Moments later, at approximately 8:18 p.m., Morales was restrained with zip-ties. She was not told why she had been arrested. Morales was then transported to Brooklyn for arrest processing along with other arrested protesters. She arrived at a Brooklyn arrest processing facility at around 9:00 p.m. and waited in line for approximately two hours before being processed. At approximately 11:30 p.m., Morales lost consciousness and was transported by ambulance to a

hospital where she was diagnosed her with hematoma of the head and bruising. The image below shows Morales's injuries:



323.    Morales remained in the hospital until 1:15 a.m. She then was transported back to police custody and was released the following morning with only a criminal summons for violating the curfew.

### B. NYPD Officers Engaged in Unlawful Detention and False Arrests.

324.    Throughout the time the Curfew Orders were in effect, and beyond, NYPD Officers engaged in an unlawful practice of kettling or corralling protesters without providing them an opportunity to disperse and thereafter making mass arrests of protesters without probable cause.

325.    As described above, the NYPD should have "issue[d] reminders to anyone observed violating the curfew that they are not allowed in public … [and] direct[ed] them to return to their homes or other private locations" prior to enforcement.

326.    On June 3 and June 4, Mayor de Blasio confirmed at press conferences that the NYPD would be "flexible" and that protests that were "scrupulously peaceful" could continue after the curfew unless officers ordered the protesters to disperse.

327.    Despite these clear directives, the NYPD engaged in a pattern or practice whereby NYPD Officers surrounded peaceful protesters, blocking them from leaving an area and preventing them from complying with dispersal orders. NYPD leadership, including Chief Monahan actively encouraged and participated in this unlawful behavior.

328.    The NYPD's kettling practice often involved:

    a.    The use of indiscriminate, excessive force;

    b.    Mass unlawful arrests of peaceful, non-resisting protesters;

    c.    Mass unlawful detention and arrests of protesters who were not given an opportunity to disperse from protest zones; and/or

    d.    The overall quashing of peaceful protests.

329.    On June 5, Mayor de Blasio defended kettling, saying that its use was justified during the Protests.

### June 2, Manhattan Bridge

330.    On June 2, at around 8:00 p.m., a group of approximately 1,000 protesters marched from the Barclays Center through Downtown Brooklyn to the Manhattan Bridge. At around 8:20 p.m., several hundred NYPD Officers confronted the protesters at the entrance to the Bridge.

331.    This group hoped to continue their march across the Bridge to Manhattan. As protesters crossed the bridge, they learned that the Manhattan exit was blocked by NYPD Officers. When protesters tried to retreat to the Brooklyn entrance, NYPD Officers blocked that side as well, and the protesters were trapped.

332.    NYPD Officers detained protesters in this manner for nearly two hours, as shown in the below image:



333.    Multiple protesters did not hear any dispersal order from NYPD Officers, nor did they see any apparent provocation before this kettling occurred.

334.    Protesters who did hear a dispersal order were not given a meaningful opportunity to disperse because NYPD Officers blocked protesters from moving.

335.    After more than two hours, elected officials helped broker a deal whereby NYPD Officers let protesters exit the Bridge from the Brooklyn side.

336.    As a result of the NYPD Officers' actions, hundreds of peaceful protesters were wrongly detained for hours.

***June 3, Downtown Brooklyn (Cadman Plaza)***

337.    On June 3, a group of approximately 400 protesters who were marching north towards Manhattan arrived in Downtown Brooklyn, specifically Cadman Plaza, at around 8:20 p.m. Upon arrival, they were met with a heavy NYPD presence.

338.    At approximately 8:38 p.m., protesters realized they were flanked by police on both sides and could neither continue north towards the Brooklyn Bridge, nor retreat to the south.

339.    Protest organizers then tried to negotiate with NYPD Officers to allow for protesters to safely exit the protest zone. During this time, the march was at a standstill.

340.    Following 10 to 15 minutes of unsuccessful negotiations, NYPD Officers surrounding the protesters started pushing into protesters with riot shields and batons. Because protesters were flanked by NYPD Officers on both sides, they had nowhere to go.

341.    At around 9:00 p.m., several NYPD Officers charged into the crowd from both sides and began using force against protesters who were actively trying to disperse. NYPD Officers yelled at protesters to "Get back!" but due to the kettling, protesters could not move.

342.    Many protesters did not hear a dispersal warning before NYPD Officers rushed the crowd.

343.    Protesters who did not hear a dispersal order were not given a meaningful opportunity to comply because NYPD Officers blocked them from leaving the area.

344.    Without apparent provocation, NYPD Officers began using violence indiscriminately while making arrests of protesters who were unable to disperse from the protest zone.

345.    NYPD Officers unjustifiably struck the heads and backs of multiple protesters with batons.

346.    NYPD Officers also kicked, elbowed, shoved, and pushed protesters.

### June 3, Midtown Manhattan

347.    On June 3, a large demonstration was held in the Upper East Side neighborhood beginning at 7:00 p.m.

348.     Upon the conclusion of the demonstration at 7:45 p.m., protesters began marching south towards Gracie Mansion—Mayor de Blasio's residence.

349.     This march was largely peaceful with protesters chanting, carrying signs, and taking a knee.

350.     Shortly before 9:00 p.m., protesters at East 54th Street and Third Avenue noticed that they were flanked on all sides by NYPD Officers.

351.     NYPD Officers blocked protesters with their bicycle frames from leaving the protest zone.

352.     Within minutes, dozens of NYPD Officers charged into protesters from all sides and used excessive force while making unlawful arrests.

353.     One protester asked NYPD Officers how they could leave the protest zone. In response, NYPD Officers hit the protester with batons, held him to the ground and arrested him.

354.     NYPD Officers struck another protester's legs with batons even though she posed no threat to the Officers as she was actively trying to comply with their orders by fleeing the protest zone.

*June 4, South Williamsburg*

355.     On June 4, beginning at 7:00 p.m., approximately 1,000 protesters gathered at McCarren Park in Brooklyn to honor lives lost to police violence.

356.     Following the vigil, about 400 protesters marched south through Williamsburg.

357.     At around 8:45 p.m., at Penn and Wythe Avenues, NYPD Officers blocked the protest's path with their bicycle frames.

358.     Many protesters did not hear any instruction to disperse or warning that the Curfew Orders would be enforced with arrests.

359.   Instead, NYPD Officers gave contradictory instructions. One yelled, "Run!" causing a stampede in one section of the protest, while another yelled, "Get back!" though the protesters were flanked by NYPD Officers and had nowhere to retreat.

360.   Then, without provocation NYPD Officers began to rush the crowd, indiscriminately throwing protesters to the ground, beating them with batons, and arresting them.

361.   One protester was attempting to flee the area when she was pepper sprayed and then arrested by NYPD Officers.

362.   An NYPD Officer threw one protester to the ground with such force that their cell phone and personal belongings spilled out of their pockets and backpack. When they asked the NYPD Officer who had apprehended them for their phone, the Officer replied, "No, that's what you get" and stepped on their cell phone.

363.   Another NYPD Officer then struck the protester's head with a baton while another officer handcuffed the protester. At no point did the protester resist arrest.

364.   One protester was apparently hit on the head from behind by NYPD Officers. This protester was knocked unconscious, and multiple bystanders observed that this protester was bleeding from the head. Multiple NYPD Officers passed by the protester and failed to offer medical assistance.

365.   When this protester was later transported to the hospital, he received several stitches to wounds on his head.

### June 4, South Bronx

366.   A rally and march against anti-Black police brutality was held on June 4 in the Mott Haven neighborhood of the South Bronx.

367.   The rally started at approximately 7:10 p.m. near the intersection of East 149th Street and Brook Avenue with about 400 people in attendance.

368.    Those present at the rally observed a large presence of NYPD Officers, disproportionate to the number of protesters present. At least 100 NYPD Officers from multiple units were present, including personnel from the Legal Bureau, Technical Assistance Response Unit and SRG.

369.    Many of the SRG officers appeared in full riot gear, including external Kevlar vests, helmets, and forearm plates.

370.    Chief Monahan was also present, personally participated and directed NYPD Officers to make multiple unlawful arrests, and upon information and belief, witnessed officers engage in excessive force against protesters.

371.    In a video from the march, Chief Monahan is seen personally ordering officers under his command to arrest one of the protest organizers.

372.    At a press conference on June 5, 2020, Mayor de Blasio said that he "had observers from City Hall" present at the rally, who reported back to him what they saw.

373.    At around 7:20 p.m., the march began and started to move southwest.

374.    At approximately 7:45 p.m., the march came to a halt on the corners of East 136th Street and Brook Avenue.

375.    At this time, a number of protesters observed that they were flanked by rows of NYPD Officers and were not able to move forward or backwards. Protesters observed a layer of NYPD Officers on bicycles blocking their path, and another layer of NYPD Officers with vehicles behind them.

376.    Simultaneously, multiple people in the intersection—including people who were en route to their homes and were not protesting—began to ask NYPD Officers whether they could

go home or otherwise leave the protest zone. NYPD Officers refused to make space and allow individuals to safely disperse.

377.    Protesters reported that an automated dispersal message was played while they were trapped at 8:00 p.m. After this message was played, however, protesters were not given a meaningful opportunity to disperse because NYPD Officers blocked protesters from leaving the area or moving on all sides.

378.    NYPD Officers then unlawfully arrested over 300 individuals for violation of the curfew and disorderly conduct.

379.    The majority of arrests were made between 8:00 p.m. and 9:00 p.m. No protesters provoked the NYPD before these mass arrests began.

380.    NYPD Officers lacked probable cause for these mass detentions and arrests. Protesters were detained before the commencement of the curfew; made to violate the curfew due to NYPD Officers blocking them from moving forwards or backwards; and then subsequently arrested. NYPD Officers did not question protesters about their conduct, order them to disperse, or otherwise allow protesters to comply with the Curfew Orders prior to these mass arrests.

381.    On September 3, Bronx District Attorney Darcel Clark filed a motion to dismiss all 312 summonses issued during this protest for disorderly conduct and violating the Curfew Orders, which was granted by the Criminal Court of the City of New York.

382.    NYPD Officers used excessive force by pushing and kicking protesters to the ground, shoving them, and hitting them with batons on their arms, shoulders, and heads while making arrests, even though these protesters were not resisting arrest.

383.    NYPD Officers used their bicycles as weapons to push back protesters who attempted to leave the protest zone with significant force and without provocation.

62

384.    NYPD Officers indiscriminately used pepper spray against groups of protesters and hit protesters with batons while making arrests.

385.    NYPD Officers failed to render medical care to protesters who were injured by this use of force.

386.    One protester was thrown onto the street by an NYPD Officer as he was being arrested. The force crushed the protester's glasses and caused his protective mask to slip off his face. An NYPD officer then put their knee on his neck, while another NYPD Officer handcuffed this protester with zip-ties. Meanwhile, blood streamed down this protester's face and shirt. The next day, the protester received medical attention and learned that the NYPD Officers broke his nose when they slammed him to the ground.

387.    Despite the mass arrests and injuries to numerous protesters, Commissioner Shea said that the NYPD "had a plan which was executed nearly flawlessly."

***Post-Election Protest Kettling***

388.    On November 4, NYPD Officers employed kettling at protests near Washington Square Park and Union Square. Protesters gathered at Washington Square Park initially marched east towards Broadway and were forced to turn around by NYPD Officers and march back along East 8th Street. As marchers crossed Sixth Avenue down Greenwich Avenue, at approximately 8:15 p.m., dozens of NYPD Officers on foot, bicycle and motorcycles separated the protesters, trapping a group between Fifth and Sixth Avenues on West 8th Street and another group on Greenwich Avenue. The protesters did not hear an order to disperse prior to the kettling. After detaining the groups for approximately five minutes, NYPD Officers began arresting some of the trapped protesters.

389.    For example, within minutes of being kettled on Greenwich Avenue, a man serving as a medic's aide, was tackled by an NYPD Officer as he was attempting to help a medic who was

also tackled by police. The NYPD Officer punched his head, upper cheek bone, and jaw, causing his mouth to bleed and knocking out his molar tooth. He was arrested and placed in overly-tight zip-cuffs. He suffered dizziness and nausea after his arrest, as well as pain and swelling from overly-tight zip-cuffs.

390.    Another protest originating near Central Park also arrived near Union Square at around 9:30 p.m. Police followed marchers to Union Square without incident until, at East 14th Street and Fourth Avenue, NYPD Officers on bicycles suddenly veered diagonally, in front of protesters, blocking the marchers with no apparent provocation or justification.

391.    NYPD Officers then played a prerecorded announcement directing the crowd to disperse and not to block the roadway. As protesters were complying with the order and moving to the sidewalk, NYPD Officers rushed protesters, including those on the sidewalk, and began arresting them.

392.    An NYPD Officer yanked protester Alexandra Crousillat by her backpack as she was filming the arrests from the sidewalk and slammed her to the ground. After she curled into a fetal position on the ground, NYPD Officers began to hit her, yelling at her to "Stop doing that," "Put your hands where I can see them," and "I'm recording you resisting arrest!"  The Officers pushed Crousillat's face down into the sidewalk, eventually dragged and lifted her from the ground while pulling her hair, and placed zip-cuffs on her left wrist and above her right wrist overly tight, causing her to lose feeling in her right hand and forearm until the cuffs were removed. She experienced tingling in her right arm and hand for weeks thereafter. The NYPD Officers' beating caused the protester to suffer pain and bruising on her right cheekbone, upper left thigh, knees, arms, and legs.

393.     Upon information and belief, NYPD Officers continued to use their bicycles to aggressively push back and surround peaceful protesters on November 5.

***Martin Luther King Jr. Day Demonstration***

394.     On January 18, 2021, Martin Luther King Jr. Day, a group of approximately 100 protesters gathered at the Barclays Center and marched over the Brooklyn Bridge to Lower Manhattan. Once the demonstrators arrived at City Hall Park in Lower Manhattan, they were met by a large presence of NYPD Officers, which approximately equaled or slightly outnumbered the protesters.

395.     Nearly all of the protesters were on the sidewalk and inside City Hall Park while a few stood on the street. NYPD Officers played an automated message ordering protesters "to leave the roadway and utilize the available sidewalk" and advised that if they did so "no charges will be placed against you."

396.     Nevertheless, NYPD Officers charged onto the sidewalk and used excessive force and kettling to unlawfully detain and arrest protesters standing where they had been directed to minutes prior. At least 29 protesters were arrested, and a larger group of protesters was unlawfully kettled and detained on the sidewalk before being released without charges.

397.     For example, as protester Hillary Wright stood on the sidewalk filming the protest, NYPD Officers suddenly without warning or justification, charged and struck Wright's hand with a baton and pushed a police barricade into her, knocking her to the ground and causing her to suffer back and shoulder pain. Wright was not arrested or charged with a crime.

398.     In another example, as protester Tameer Peak stood on the street filming the arrests of protesters without interfering with police action, NYPD Officers approached him and, without warning or justification, punched him in the face twice, knocked him to the ground, and kicked him repeatedly. Peak was detained for approximately ten hours and suffered from

symptoms consistent with a concussion, including head pain and vomiting. He was released with

a summons for Obstructing Government Administration in the Second Degree.

## VI.    NYPD Officers Interfered with the Right of Journalists, Legal Observers, and the Public to Observe and Report Upon Police Behavior.

399.    Members of the press and public have the right to gather, receive, record, and

disseminate information and observe and report upon police behavior under the federal and state

constitutions.

400.    Protesters also enjoy constitutionally protected rights to speech, expression, and

peaceful assembly.

401.    NYPD Officers intentionally interfered with the exercise of these rights by means

of excessive force, false arrest and unlawful detention, threats of force and arrest, and unlawful

dispersal of peaceful assemblies.

### Keith Boykin

402.    On the afternoon of May 30, 2020, Keith Boykin, a freelance reporter, was

covering a protest that began in Harlem. As the protest proceeded south and approached the West

Side Highway, Boykin, who had been following the marchers on his bicycle, pulled off to the

side of the highway at approximately West 96th Street to post some of his coverage to social

media.

403.    Boykin did not obstruct traffic, as the officers had already shutdown the roadway

to vehicular traffic, nor interfere with police duties and was not participating in the protest.

NYPD Officers approached Boykin and told him to move. Boykin replied that he was a member

of the press. Officers moved passed Boykin, but then, without issuing any further instructions,

approached Boykin to arrest him.

404.    Boykin again informed the Officers that he was a member of the press covering the protest and that he had press credentials. The Officers stated that his press affiliation did not matter and proceeded to place him in overly-tight zip-ties that bruised his wrists.

405.    At no time did the NYPD Officers explain why they were arresting Boykin. The Officers did not claim that his press coverage was interfering with Officers' duties nor ask him to take alternative actions to cover the protest and avoid arrest.

406.    Officers released Boykin after detaining him for approximately six hours with summonses for disorderly conduct and unauthorized use of a roadway.

407.    NYPD Officers lacked probable cause to detain and issue summonses to Boykin and the charges against him were later dropped.

**Jemell Cole**

408.    On July 15, 2020, Jemell "Mel" Cole, a freelance photojournalist, was on the Brooklyn Bridge pedestrian path taking photographs as several protesters and NYPD Officers clashed there and on the roadway below. After the clashes subsided and several protesters were arrested, an NYPD Officer walked up to Cole, pointed at him and said, "And this one!" Another NYPD Officer then placed Cole into handcuffs.

409.    Cole, who had three professional-grade cameras hanging from straps around his neck, told the officers that he was a photojournalist documenting the protests.

410.    Nevertheless, the Officers stated that he was being arrested because he did not have a press pass.

411.    Cole was not participating in the protests and was present solely in his capacity as a professional photojournalist documenting the events in a public place not requiring an NYPD-issued press pass.

412.     Prior to his arrest, Cole did not interfere with police activity or commit a criminal offense and the Officers did not issue any instruction to Cole before handcuffing him.

413.     Cole was detained for several hours at One Police Plaza and then transported to the Fifth Precinct stationhouse, where he was detained for several additional hours.

414.     Cole was then removed from his holding cell and brought to speak with a sergeant. The sergeant was not wearing a facemask and pulled down the facemask that Cole was wearing to protect himself and others from COVID-19 transmission.

415.     The sergeant then stated that after reviewing unspecified video footage, he was aware that Cole had not committed any crimes and should not have been arrested.

416.     The sergeant stated that Cole should be "grateful" to the NYPD that he would be released.

417.     Nevertheless, NYPD Officers transported Cole back to One Police Plaza and continued to unlawfully detain him for several additional hours before he was released.

418.     In total, Cole was wrongly detained for approximately seven hours.

419.     Cole was never charged with a crime and NYPD Officers lacked probable cause to restrain and/or detain him.

420.     This unlawful detention prevented Cole from being able to further photograph the protests that he intended to document that day.

421.     Below is a photograph of Cole shortly after he was handcuffed with several cameras visible, demonstrating his role as a photojournalist:



*Jason Donnelly*

422.    In addition to arresting members of the press who were attempting to observe and report without interfering with police functions, NYPD Officers also used unnecessary and/or excessive force against members of the press.

423.    For example, on the evening of June 2, freelance photojournalist Jason (Jae) Donnelly was on assignment for the Daily Mail covering a peaceful protest that began on the Upper West Side.

424.    Donnelly wore his press credentials openly around his neck.

425.    At approximately 9:30 p.m., Donnelly witnessed NYPD Officers chasing protesters near the intersection of West 53rd Street and 9th Avenue and began taking photographs as part of his official press duties. As Donnelly took photographs of NYPD Officers arresting protesters, another Officer with his baton drawn charged at Donnelly.

426.    The Officer struck Donnelly with his baton.

427.    Donnelly then held up his press credentials and told the Officer that he was a member of the media, but the Officer nevertheless shoved him to the ground.

428.    The shove scratched and bruised Donnelly's elbows, face, hands, and ankles, and knocked Donnelly's camera to the pavement, breaking it.

429.    No NYPD Officers sought or provided medical aid to Donnelly following the attack. Donnelly was not arrested or charged with a crime.

430.    Because of the NYPD Officer's actions, Donnelly was unable to document the subsequent protests that occurred that week, both because he did not have a functioning camera and because he did not feel safe doing so.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### 42 U.S.C. § 1983 for Violations of
### the Fourth and Fourteenth Amendments - Excessive Force against All Defendants

431.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

432.    The Fourth and Fourteenth Amendments protect individuals against the unreasonable use of police force, both before and during seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Edrei v. Maguire*, 892 F.3d 525, 540 (2d Cir. 2018). These amendments are binding on municipalities. *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010).

433.    The individual Defendants ordered and/or approved the use of kettling at the Protests with the knowledge that the tactic often results in the use of excessive force against the encircled civilians.

434.    Defendants have implemented, enforced, encouraged, sanctioned and/or ratified policies, practices and/or customs of using various forms of excessive force when policing the

Protests in violation of the Fourth and Fourteenth Amendments, including through (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properly and adequately monitor and discipline NYPD Officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify the NYPD's practice of using excessive force before and at the Protests.

435.   The aforementioned policies, practices, and customs include, but are not limited to, the following unconstitutional practices:

    a.   indiscriminately inflicting pepper spray and baton, bicycle, and body strikes as crowd control tactics;

    b.   using potentially deadly force, such as baton strikes to the head, to respond to peaceful protesters or non-lethal threats;

    c.   using kettling to corral, trap, and unlawfully arrest, detain, and using excessive force against perceived participants in peaceful assemblies without adequate notice or opportunity to disperse, and to unlawfully detain them without individualized determinations of probable cause or reasonable suspicion; and

    d.   using unreasonably tight plastic zip-ties to effect mass arrests without adequate monitoring of or response to complaints by detainees, resulting in the loss of circulation, nerve damage, and other injuries to detainees' wrists and arms, and failing to make readily available to NYPD Officers tools that can safely remove zip-ties.

436.   As a result of these policies, practices and customs, New York Residents were deprived of their liberty, property, and constitutional rights and experienced bodily injury, pain and suffering.

437.    Defendants have repeatedly had notice that NYPD Officers' training and supervision were inadequate and likely to result in constitutional violations based on hundreds of incidents of excessive force at large-scale protests within the last two decades, as documented in reports, lawsuits, and CCRB complaints.

438.    Defendants have acted with deliberate indifference to the Fourth and Fourteenth Amendment rights of New York Residents. Defendants' acts and omissions have directly and proximately violated the Fourth and Fourteenth Amendment Rights of New York Residents. By acting under the color of state law to deprive New York Residents of their rights under the Fourth Amendment, Defendants violated 42 U.S.C. § 1983.

439.    There is a real and immediate threat that the NYPD will continue to use excessive force against New York Residents in the future because the Protests continue, the NYPD has repeatedly used such force at the Protests, and large-scale protests in New York City are likely to re-occur in the future.

440.    New York Residents have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice, and/or custom of the unconstitutional use of excessive force and the policies, practices, and/or customs that have directly and proximately caused such abuses.

## SECOND CLAIM

### 42 U.S.C. § 1983 for Violations of
### the Fourth Amendment – Unlawful Seizure against All Defendants

441.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

442.    The Fourth Amendment protect individuals from unlawful detention and arrest. *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003).

443.    The individual Defendants ordered and/or approved the use of kettling at the Protests to effect mass arrests without individualized probable cause.

444.    Defendants have implemented, enforced, encouraged sanctioned, and/or ratified policies, practices, and/or customs of effectuating unlawful detentions and arrests against protest attendees in violation of the Fourth Amendment, including through (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properly and adequately monitor and discipline NYPD Officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the NYPD's practice of making unlawful detentions and arrests before and at the Protests and other prior demonstrations.

445.    The aforementioned policies, practices, and customs include, but are not limited to, the following unconstitutional practices:

   a.   failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with peaceful assemblies;

   b.   arresting people without ensuring that constitutionally sufficient notice and opportunity to disperse were given;

   c.   arresting groups of protesters without probable cause; and

   d.   using kettling to corral and trap perceived participants of peaceful assemblies, unlawfully detaining them in the absence of individualized probable cause or reasonable suspicion.

446.    As a result of these policies, practices and customs, New York Residents were deprived of their liberty, property, and constitutional rights and experienced bodily injury, pain and suffering.

447.    Defendants have repeatedly had notice that NYPD Officers' training and supervision were inadequate and likely to result in constitutional violations based on hundreds of incidents of false arrest at large-scale protests within the last two decades, as documented in reports, lawsuits, and CCRB complaints.

448.    Defendants have acted with deliberate indifference to the Fourth Amendment rights of New York Residents. Defendant's acts and omissions have directly and proximately violated the Fourth Amendment Rights of New York Residents. By acting under the color of state law to deprive New York Residents of their rights under the Fourth Amendment, Defendants violated 42 U.S.C. § 1983, which prohibits under color of state law the deprivation of rights secured by the United States Constitution.

449.    There is a real and immediate threat that the NYPD will continue to unlawfully detain and arrest New York Residents in the future because the Protests continue, the NYPD has repeatedly made such unlawful detentions and arrests at the Protests, and large-scale protests in New York City are likely to re-occur in the future.

450.    New York Residents have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice, and/or custom of unconstitutional and unlawful arrest and detention as well as the policies, practices and/or customs that have directly and proximately caused such abuses.

**THIRD CLAIM**

**42 U.S.C. § 1983 for Violations of
the First Amendment against All Defendants**

451.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

452.    The First Amendment protects the free expression of protected speech and the rights to peaceably assemble and associate. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006). It also protects the right of journalists and the public to gather information, including recording police activity. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 783 (1978); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015).

453.    The individual Defendants ratified the arrest of legal observers at the Protests, and the unconstitutional suppression of protected speech and activities.

454.    Defendants have implemented, enforced, encouraged, and sanctioned and/or ratified policies, practices, and/or customs of punishing conduct of Protest attendees protected by the First Amendment in retaliation for, and in order to prevent them from further, exercising those rights, including through: (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properly and adequately monitor and discipline NYPD Officers; and (c) the overt and tacit encouragement and sanctioning of and the failure to rectify, the NYPD's practice of chilling conduct protected by the First Amendment at the Protests.

455.    The aforementioned policies, practices, and customs include, but are not limited to, the following unconstitutional practices:

     a.    restricting peaceful assemblies and the expression of protected speech by protesters through the use of false arrests, excessive force, threats of arrest or other force, and the selective enforcement of laws and regulations;

     b.    retaliating against peaceful protesters for expressing their actual or perceived message against police violence and racial injustice;

c.  restricting the right of journalists, legal observers, and members of the public to monitor and report on police conduct through the use of false arrests, excessive force, threats of arrest or other force, and the selective enforcement of laws and regulations; and

d.  retaliating against journalists, legal observers, and members of the public lawfully for exercising their right to observe, record, and report upon police activity and misconduct.

456.   As a result of these policies, practices and customs, New York Residents were deprived of their liberty, property, and constitutional rights, including through chilling of their protected speech or other First Amendment-protected activity, and experienced bodily injury, pain and suffering.

457.   Defendants have repeatedly had notice that NYPD Officers' training and supervision were inadequate and likely to result in constitutional violations based on complaints of First Amendment violations at large-scale protests within the last two decades, as documented in reports, lawsuits, and CCRB complaints.

458.   Defendants have acted with deliberate indifference to the First Amendment rights of New York Residents. Defendant's acts and omissions have directly and proximately chilled and thus violated the First Amendment Rights of New York Residents. By acting under the color of state law to deprive New York Residents of their rights under the First Amendment, Defendants violated 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of those rights secured by the United States Constitution.

459.   There is a real and immediate threat that the NYPD will continue to chill the protected speech of New York Residents in the future because the Protests continue, the NYPD

has repeatedly used such tactics at the Protests, and large-scale protests in New York City are likely to re-occur in the future.

460.    New York Residents have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice, and/or custom of the unconstitutional chilling of protected speech; interference with the right to monitor and record police activity; and the policies, practices, and/or customs that have directly and proximately caused such abuses.

### FOURTH CLAIM

### New York State Constitution – Article I, § 12 (Excessive Force) against All Defendants

461.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

462.    NYPD Officers used unjustified and excessive force against New York Residents at the Protests, in violation of Section 12 of Article 1 of the New York State Constitution.

463.    The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and/or sanctioned by Defendant.

464.    As a result of these abuses, New York Residents were deprived of their liberty, property, and constitutional rights and also experienced bodily injury, pain, and suffering.

465.    In using excessive force against New York Residents at the Protests, NYPD Officers were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## FIFTH CLAIM

### New York State Constitution – Article I, § 12 (Unlawful Seizure)
### against All Defendants

466.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

467.    NYPD Officers seized New York Residents who were present at the Protests without the reasonable articulable suspicion of criminality required by Section 12 of Article 1 of the New York State Constitution.

468.    The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and/or sanctioned by Defendant.

469.    As a result of these abuses, New York Residents were deprived of their liberty, property, and constitutional rights.

470.    In unlawfully seizing New York Residents at the Protests, NYPD Officers were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## SIXTH CLAIM

### New York State Constitution – Article 1, § 8 (Freedom of Press)
### against All Defendants

471.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

472.    While New York Residents were engaged in speech, expressive conduct, or press reporting – all rights secured by the New York State Constitution – NYPD Officers infringed upon such constitutionally-protected activity and retaliated against those New York Residents engaged

in such conduct by assaulting, battering, and/or detaining them.

473.    Journalists, legal observers, and members of the public engaged in fact gathering during the Protests were not threatening public safety or interfering with lawful police action. Yet, without legal justification, NYPD Officers used physical force and detention to prevent and deter legal observers from monitoring, recording, and reporting on police activity at the Protests.

474.    NYPD Officers' acts would chill a reasonable person, and did in fact chill New York Residents, from continuing to participate in, observe, record, and report on the Protests.

475.    By attempting to prevent and retaliating against New York Residents for participating in, observing, recording, and reporting on the Protests, NYPD Officers deprived New York Residents of rights secured by Section 8 of Article 1 of the New York State Constitution.

476.    The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendant.

477.    In suppressing and retaliating against speech, expression, and press at the Protests, NYPD Officers were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## SEVENTH CLAIM

### Assault under the Laws of the State of New York
### against All Defendants

478.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

479.    As a result of the foregoing, New York Residents were placed in apprehension of imminent harmful and offensive bodily contact without privilege or consent.

480.   As a result of NYPD Officers' tortious conduct, New York Residents suffered physical injury and mental anguish.

481.   NYPD Officers assaulted New York Residents at the Protests while acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## EIGHTH CLAIM

### Battery under the Laws of the State of New York
### against All Defendants

482.   Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

483.   NYPD Officers made offensive contact with New York Residents at the Protests without privilege or consent.

484.   As a result of NYPD Officers' tortious contact, New York Residents suffered physical injury and mental anguish.

485.   NYPD Officers battered New York Residents at the Protests while acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## NINTH CLAIM

### False Arrest and Imprisonment under the Laws of the State of New York
### against All Defendants

486.   Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

487.   NYPD Officers unlawfully seized New York Residents at the Protests, wrongfully detaining and confining them without privilege or consent.

488.   NYPD Officers falsely imprisoned New York Residents. Defendants are

responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## TENTH CLAIM

### Negligence under the Laws of the State of New York
### against All Defendants

489.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

490.    In instances where NYPD Officers owed a special duty of care to New York Residents whom they injured or whom they witnessed being injured by other NYPD Officers, they violated this special duty by failing to intervene to prevent injury, and by failing to seek and/or provide medical aid.

491.    NYPD Officers' negligent failure to intervene and seek and/or provide medical aid to New York Residents injured at the Protests proximately caused those individuals further injury.

492.    NYPD Officers did not have discretion to deny medical aid to New York Residents injured by NYPD Officers at the Protests. The NYPD Patrol Guide Procedure Number 221-02 requires NYPD Officers to "ensure [that an injured or ill] subject receives proper medical attention" and to "[e]nsure subject receives immediate medical attention and provide first aid, if appropriate and properly trained, if subject is having difficulty breathing or demonstrates potentially life-threatening symptoms or injuries."

493.    Defendants are responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## ELEVENTH CLAIM

### Negligent Supervision, Retention and Training
### against All Defendants

494.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "430" as if fully set forth herein.

81

495.   Defendants failed to use reasonable care in the training and supervision of the NYPD Officers who assaulted, battered, falsely imprisoned, and/or negligently injured New York Residents during the Protests.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court:

A.   Issue an order holding unlawful, vacating, and setting aside the Defendants' policies or practices of employing excessive force and false arrests, suppressing free expression and press reporting, and retaliating against New York Residents who participate in the 2020 Racial Justice Protests;

B.   Declare that Defendants' acts and omissions are unconstitutional under the United States Constitution, the New York State Constitution, and New York state tort law;

C.   Enjoin Defendants and all their officers, employees, and agents, and anyone acting in concert with Defendants, from implementing, applying, or taking any action whatsoever under its unconstitutional policies or practices of employing excessive force, false arrests, and retaliatory tactics against New York Residents who participate in the 2020 Racial Justice Protests in the form of an order requiring Defendants to take all affirmative steps, including changing policies, conducting training, and undergoing monitoring, among others, to ensure that Defendants: (i) achieve compliance with the United State Constitution, New York State Constitution, and state tort law in policing protests; (ii) eliminate ongoing unlawful policing practices and their effects, and (iii) prevent this unlawful conduct in the future;

D.   Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees; and

E.   Grant such other and further relief as the Court deems just and proper.

DATED: March 5, 2021

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

Anisha Dasgupta
  *Deputy Solicitor General*
Philip Levitz
  *Assistant Solicitor General*

*Of Counsel*

By: *_/s/ Jessica Clarke_*
Jessica Clarke
  *Chief of Civil Rights Bureau*
Lillian Marquez, *Assistant Attorney General*
Morenike Fajana, *Special Counsel*
Travis England, *Assistant Attorney General*
Gregory Morril, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Phone: (212) 416-8250
Jessica.Clarke@ag.ny.gov

*Attorneys for the State of New York*