**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FRANCISCO JAVIER CASABLANCA-TORRES

*Plaintiff,*

v.

THE CITY OF NEW YORK., ET AL.,

*Defendants*

**21-cv-10832 (LAK)**

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

---

**GIDEON ORION OLIVER**
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682

**COHEN&GREEN P.L.L.C.**
Elena L. Cohen
J. Remy Green
Jessica Massimi
MK Kaishian
1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480

September 6, 2022

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................iv

PRELIMINARY STATEMENT .......................................................................................1

STANDARD OF REVIEW ..............................................................................................1

STATEMENT OF FACTS ...............................................................................................2

ARGUMENT ..................................................................................................................10

    I.    The FAC Plausibly Pleads Plaintiff's Claims for False Arrest, Malicious Prosecution under New York law, and First Amendment Retaliation..................................................10

        A.    Plaintiff's false arrest claim is well-pled...........................................................10

        B.    Plaintiff's malicious prosecution claim under New York law is well pled. .................22

        C.    Plaintiff's First Amendment retaliatory force, retaliatory arrest, and First Amendment retaliation-based *Monell* claims are well pled. ...................................................23

    II.    Plaintiff Has Plausibly Pled As-Applied Challenges To The Curfew Orders On First, Fourth, Fifth, And Fourteenth Amendment Due Process Grounds, As Well As New York Law.26

    III.    Plaintiff's Claim for Excessive Detention Has Been Sufficiently Pled. ...........................27

    IV.    The FAC Plausibly Pleads Plaintiff's Fair Trial Rights Claim. ...........................................30

    V.    The FAC Adequately Pleads Plaintiff's Due Process Claims, as Well as Plaintiff's Equal Protection-Based *Monell* Claims. ...........................................................................................34

    VII.    Plaintiff's *Monell* Claims are Sufficiently Pled. ...............................................................38

A.     Plaintiff's municipal liability claim based on Defendants' customs, practices and policies is sufficiently pled. ...................................................................................................39

B.     Plaintiff's Monell theory about Defendants' excessive force policy is well-pled. .......41

C.     Plaintiff's failure to train, supervise, and discipline claims are well-pled.....................42

VIII.     Defendants' Bifurcation Argument is Procedurally Improper and Meritless.............44

CONCLUSION.................................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acosta v. City of New York*,
    22-cv-676 (EDNY 2022) ................................................................................................................45

*Adams v. City of N.Y.*,
    2016 US. Dist. LEXIS 37330 (SDNY Mar. 22, 2016) .................................................16

*Adams v. City of New York*,
    993 F.Supp.2d 306. (EDNY 2014) ........................................................................................12

*Akindes v. City of Kenosha*,
    2021 U.S. Dist. LEXIS 187943 (E.D. Wis. Sep. 30, 2021) ........................................24, 25

*Akinnagbe v. City of N.Y.*,
    128 F.Supp.3d 539 (EDNY 2015) ......................................................................................20, 27

*Allen v. City of New York*,
    466 F. Supp. 2d 545 (S.D.N.Y. 2006) ....................................................................................41

*Am. Bankers Ins. Grp. v. United States*,
    408 F.3d 1328 (11th Cir. 2005) ...........................................................................................14

*Arab-American Defense Committee vs. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005) ...............................22

*Arbuckle v. City of N.Y., et al.*,
    2016 WL 5793741 (SDNY Sept. 30, 2016) ........................................................................16

*Ashcroft v. Iqbal*,
    556 US 662 (2008) ...................................................................................................................2

*Balcom v. City of Pittsburgh*,
    2020 U.S. Dist. LEXIS 75135 (W.D. Pa. Apr. 28, 2020) ....................................................25

*Barham v. Ramsey*,
    434 F.3d 565 (D.C. Cir. 2006) .............................................................................................20

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................2

*Black v Nunwood, Inc.*,
    No. 1:13-cv-7207 (GHW), 2015 US Dist LEXIS 56609 (SDNY Apr. 30, 2015) .........................14

*Bledsoe v. Ferry Cty.*,
    499 F. Supp. 3d 856 (E.D. Wash. 2020) .............................................................................25

*Blue Tree Hotels Inc. v. Starwood Hotels & Resorts,*
  369 F.3d 212 (2d Cir. 2004) ............................................................................................ 2

*Bray v. City of N.Y.,*
  2005 U.S. Dist. LEXIS 21748 (SDNY Sept. 30, 2005) ................................................ 35

*Brown v. Diaz,*
  2020 U.S. Dist. LEXIS 148067 (E.D. Cal. Aug. 14, 2020) .......................................... 24

*Bryant v. City of N.Y.,*
  404 F.3d 128 (2005) ....................................................................................................... 28

*Burley v. City of New York,*
  03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) ...................... 41

*Campbell v City of NY,*
  4 NY3d 200 (2005) ......................................................................................................... 14

*Caravalho v. City of N.Y.,*
  2016 U.S. Dist. LEXIS 104120 (SDNY Mar. 31, 2016) ............................................... 29

*Caravalho v. City of New York,*
  732 Fed. Appx. 18 (2d Cir. 2018) ............................................................................ 29, 34

*Case, et al. v. City of N.Y., et al.,*
  233 F.Supp.3d 372 (SDNY 2017) ............................................................................*passim*

*Case, et al. v. City of N.Y., et al.,*
  408 F.Supp.3d 313 (SDNY 2019) .................................................................. 3, 17, 37, 42

*City of Riverside v. McLaughlin,*
  500 U.S. 44 (1991) ......................................................................................................... 28

*City of Rome v. United States,*
  446 U.S. 156 (1980) ....................................................................................................... 14

*Crooks v. Harrelson,*
  282 U.S. 55 (1930) ......................................................................................................... 14

*CRP 88 E. 111th St. LLC v Guamarrigra,*
  66 Misc 3d 328 (Civ Ct, N.Y. Cty. 2019) ..................................................................... 13

*Cunningham v. City of New York,*
  et al., 22 CV 588 (LDH) (SJB) (EDNY 2022) .............................................................. 45

*Deegan v. City of Ithaca,*
  444 F.3d 135 (2d Cir. 2006) ........................................................................................... 19

*Dellums v. Powell,*
  566 F.2d 167 (D.C. Cir. 1977) ................................................................................20

*DeLuca v. City of New York,*
  21-cv-10777 (AJN) (KHP) (SDNY 2022) ..............................................................45

*Devenpeck v. Alford,*
  543 U.S. 146 (2004) ................................................................................................12

*DiFolco v. MSNBC Cable LLC,*
  622 F.3d 104 (2d Cir. 2010) ....................................................................................2

*Dinler v. City of New York,*
  2021 U.S. Dist. LEXIS 141851 (SDNY Sept. 30, 2012) .............................*passim*

*Edrei v. Maguire,*
  892 F.3d 525 (2d Cir. 2018) ..........................................................................20, 37

*Felix v. City of NY,*
  344 F.Supp.3d 644 (SDNY 2018) .............................................................................2

*Five Borough Bicycle Club v City of NY,*
  684 F Supp 2d 423 (SDNY 2010) ...........................................................................35

*Garnett v. Undercover Officer C0039,*
  838 F.3d 265 (2d Cir. 2016) ............................................................................30, 33

*Gavin v. City of N.Y.,*
  2021 U.S. Dist. LEXIS 159908 (SDNY Aug. 24, 2021)...................................3, 17

*Gianullo v. City of New York,*
  322 F.3d 139 (2d Cir. 2003) ....................................................................................12

*Gonzalez v. City of New York,*
  2016 U S Dist. LEXIS 177820 (SDNY December 2, 2015)......................................2

*Graham v. Long Island R.R.,*
  230 F. 3d 34 (2d Cir. 2000) .....................................................................................35

*Gray v. City of Denham Springs,*
  2021 U.S. Dist. LEXIS 63591 (M.D. La. Mar. 29, 2021) .....................................24

*Harris v City of NY,*
  222 F Supp 3d 341 (SDNY 2016) ............................................................................30

*Hartman v. Moore,*
  547 U.S. 250 (2006)..................................................................................................23

*Haus v. City of New York,*
    03-cv-4915 (RWS)(MHD) 2006 WL 1148680 (S.D.N.Y. April 24, 2006) ...................................... 41

*Higginbotham v. Brauer,*
    2020 U.S. Dist. LEXIS 141857 (D. Md. Aug. 7, 2020) ............................................................. 25, 26

*Higginbotham v. City of New York,*
    2015 WL 2212242 (SDNY May 12, 2015) ................................................................................... 36

*Higginbotham v City of NY,*
    105 F Supp 3d 369 (SDNY 2015) ............................................................................................... 36

*Jeanty v. County of Orange,*
    379 F. Supp. 2d 533 (SDNY 2005) ........................................................................................... 45

*Jones v. Parmley,*
    465 F.3d 46 (2nd Cir. 2006) ..................................................................................20, 21, 27, 37

*Kos Pharms., Inc. v. Barr Labs., Inc.,*
    218 F.R.D. 387 (SDNY 2003) .................................................................................................... 45

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir. 1991) ........................................................................................................2

*Lewis v. City of N.Y.,*
    689 F.Supp. 2d 417 (EDNY 2010) ............................................................................................ 45

*Lynch v. City of N.Y.,*
    952 F.3d 67 (2d Cir. 2020) ..........................................................................................................2

*MacNamara v. City of N.Y.,*
    275 F.R.D. 125 (S.D.N.Y. 2011) ......................................................................................... 28, 40

*Mandal v. City of New York,*
    2007 WL 3376897 (S.D.N.Y. Nov. 13, 2007) ........................................................................... 40

*Mandal v. City of New York,*
    No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537(WHP), 2006 WL 2950235 (S.D.N.Y.
    Oct. 17, 2006) ............................................................................................................................. 40

*Marchica v. Long Island R.R.,*
    31 F.3d 1197 (2d Cir. 1994) ...................................................................................................... 39

*Margoilies v. City of New York,*
    21-cv-10839 (PKC) (SDNY 2022) ............................................................................................. 45

*Marisol A. by Forbes v. Giuliani,*
    929 F. Supp. 662 (SDNY 1996) ................................................................................................ 45

*Marlin v City of NY*,
2016 US Dist. LEXIS 122426 (SDNY Sep. 7, 2016) ........................................................... 2

*Marom v Blanco (Marom III)*,
No. 15-cv-2017 (PKC), 2019 US Dist LEXIS 124343 (SDNY July 25, 2019) ....................... 30, 31

*Mitchell v. City of New York*,
841 D.3d 72 (2d Cir. 2016) ........................................................................................ 32

*Monell v. Department of Social Services*,
436 U.S. 658 (1978) ........................................................................................... *passim*

*Morse v. Fusto*,
804 F.3d 538 (2d Cir. 2015) ....................................................................................... 33

*Nieves v. Bartlett*,
587 U.S. ___, 139 S.Ct. 1715 (2019) ................................................................... 24, 25, 26

*In re NY City Policing During Summer 2020 Demonstrations*,
548 F.Supp.3d 383 (SDNY 2021) ............................................................................ *passim*

*Oregon v. Ausmus*,
336 Ore. 493, 501 (Oregon Supreme Court 2004) ........................................................... 16

*Osterhoudt v. City of New York*,
2012 WL 4481927 (SDNY Sept. 27, 2012) ................................................................. 2, 40

*Packard v. City of New York*,
2019 US Dist. Lexis 189470 (SDNY 2019) .................................................................... 42

*Palmer v. Richards*,
364 F.3d 60 (2nd Cir. 2004) ....................................................................................... 36

*People of the State of New York v. City of New York, et al.*,
21-cv-322 (CM)(GWG) .......................................................................................... 3, 43

*People v. Barrett*,
13 Misc.3d 929 (NY Crim. Ct. 2006) ........................................................................... 16

*People v. Beck*,
26 Misc. 3d 42 (1st Dept 2010), *cert den'd* ................................................................... 22

*People v Cohen*,
6 Misc 3d 1019[A], 2005 NY Slip Op 50128[U] (Crim Ct, New York County 2005) ............ 16, 22

*People v Donner*,
106 Misc 2d 779 (Town Ct 1980) ................................................................................ 14

*People v. Jennifer Bezjak,*
    11 Misc.3d 424 (NYC Crim. Ct.,2006)*, aff'd,* 26 Misc.3d 130(A) (App. Term, 1st Dept., 2010),
    *cert. den'd,* 15 N.Y.3d 747-750 (2010) ................................................................................21

*People v Munoz,*
    10 Misc 3d 1052[A], 2005 NY Slip Op 51916[U] (Crim Ct, New York County 2005)................23

*People v. Rothenberg,*
    15 NYS2d 447 (NY Magistrate Ct. 1939)................................................................................17

*People v Witthuhn,*
    172 Misc 2d 749 (Nassau County Ct 1997)................................................................................13

*Pesola v. City of N.Y.,*
    2016 U.S. Dist. LEXIS 42977 (S.D.N.Y. March 30, 2016)............................................27, 28, 29, 30

*Ramos v. Town of Vernon,*
    353 F.3d 171 (2d Cir. 2003) ................................................................................27

*Ricciuti v. N.Y.C. Transit Auth.,*
    124 F.3d 123, 130 (2d Cir. 1997) ................................................................................33

*Robinson v. Via,*
    821 F.2d 913 (2d Cir. 1987) ................................................................................36

*Rodriguez v. City of N.Y.,*
    21-cv-10815 (PKC) (SDNY 2022) ................................................................................45

*Rodriguez v. City of New York,*
    72 F.3d 1051 (2nd Cir. 1995)................................................................................ 37, 45

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S.Ct. 63 (2020*)*................................................................................27

*Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10,*
    605 F.2d 1228 (2d Cir. 1979), *cert. denied,* 446 U.S. 919 (1980) ........................................32

*Saeli v. Chautauqua Cty.,*
    36 F.4th 445 (2d Cir. 2022)................................................................................27

*Saks v Franklin Covey Co.,*
    316 F3d 337 (2d Cir 2003) ................................................................................13

*Schiller v. City of New York,*
    No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 (S.D.N.Y. Jan. 23, 2008)........................................40

*Shamir v. City of N.Y.,*
    804 F.3d 533 (2d Cir. 2015) ................................................................................1

*Shamir v. City of NY*,
    804 F.3d 555 (2d Cir. 2015) .................................................................................... 12

*Sharma v. City of New York*,
    Case No. 21-cv-10892 ............................................................................................ 45

*Shaw v. Nat'l Union Fire Ins. Co.*,
    605 F.3d 1250 (11th Cir. 2010) .............................................................................. 14

*Smalls v. Collins*,
    10 F.4th 117 (2d Cir. 2021) ..................................................................................... 30

*Soto v City of NY*,
    132 F Supp 3d 424 (EDNY 2015) ........................................................................... 22

*Sow, et al. v. City of New York, et al.*,
    20-cv-00533 (CM) ...................................................................................... 3, 4, 43, 45

*Spanski Enters. v. Telewizja Polska S.A.*,
    832 F. App'x 723 (2d Cir. 2020) ............................................................................. 14

*Stampf v. Long Island R.R. Co.*,
    761 F.3d 192 (2d Cir. 2014) ..................................................................................... 32

*Talmadge Adib Talib v. Guerrero*,
    2019 U.S. Dist. LEXIS 219889 (C.D. Cal. Oct. 17, 2019) ..................................... 24

*Tardif v. City of N.Y.*,
    991 F.3d 394 (2d Cir. 2021) ....................................................................................... 1

*Tellier v. Fields*,
    280 F.3d 69 (2nd Cir. 2000) .................................................................................... 36

*United States v. Bernacet*,
    724 F.3d 269 (2d Cir. 2013) ..................................................................................... 29

*United States v. Bleau*,
    930 F.3d 35 (2d Cir. 2019) ...................................................................................... 14

*United States v. Cruz*,
    834 F.3d 47 (2d Cir. 1987) ...................................................................................... 12

*United States v. Field*,
    255 U.S. 257 (1921) ................................................................................................. 14

*Vasquez v. City of NY*,
    2018 US Dist. LEXIS 78429 (SDNY May 9, 2018) ............................................... 44

*Vodak v. City of Chicago,*
    639 F.3d 738 (11th Cir. 2011) ....................................................................................... 19

*Washington Mobilization Committee v. Cullinane,*
    566 F.2d 107 (D.C. Cir. 1977) ....................................................................................... 20

*Weyant v. Okst,*
    101 F.3d 854 (2d Cir. 1996) ........................................................................................... 10

*Zahrey v. Coffey,*
    221 F.3d 342 (2d Cir. 2000) ........................................................................................... 33

*Zellner v. Summerlin,*
    494 F.3d 344 (2d Cir. 2007) ...................................................................... 2, 12, 16, 37

**Statutes**

42 U.S.C. § 1983 ....................................................................................................... 30, 36

N.Y. Civ. R. L. § 79-P .................................................................................................. 1, 38

N.Y. Crim. P. L. § 100.15 .................................................................................................. 22

N.Y. Pen. L. § 15.05 ..................................................................................................... 5, 12

N.Y. Pen. L. § 215.58 ........................................................................................................ 31

N.Y. Pen. L. § 240.20 ........................................................................................................ 16

N.Y. Pen. L. § 240.20(6) ............................................................................................ *passim*

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text* 116 (2012) ................ 14

C.P.L. § 150.20(1)(a) ................................................................................................... 29, 39

N.Y. Const. Art. I .............................................................................................................. 1

CPL § 100.05 ...................................................................................................................... 31

CPL § 150.10(1) .................................................................................................................. 32

CPL § 150.40 ...................................................................................................................... 31

CPL § 150.50 ...................................................................................................................... 31

CPL § 150.60 ...................................................................................................................... 31

CPL § 150.80(1) .................................................................................................................. 31

EO 119 ............................................................................................................................ 13, 19

Exec. Order No. 119 ................................................................................................5, 12, 13, 22

Fed. R. Civ. P. 8(a)(2) .......................................................................................................... 1

Fed. R. Civ. P. 12(b)(6).....................................................................................................1, 28

Fed. R. Civ. P. 42(b) ........................................................................................................... 45

Loc. Civ. R. 6.3 ................................................................................................................... 44

N.Y.C. Admin. C. § 3-108 ...........................................................................................*passim*

Norman J. Singer, <u>Statutes and Statutory Construction</u> § 21.14 (6th ed. 2002) ................... 14

U.S. Const. amend. I...................................................................................................*passim*

U.S. Const. amend. IV .................................................................................................*passim*

U.S. Const. amend. V ......................................................................................................... 26

U.S. Const. amend XIV ........................................................................................... 12, 26, 35

## PRELIMINARY STATEMENT

Plaintiff Francisco Javier Casablanca-Torres submits this Memorandum of Law and the accompanying August 31, 2022 Declaration of Gideon Orion Oliver ("Oliver Dec.") and exhibits in opposition to Defendants' June 13, 2022 partial motion to dismiss Plaintiff's First Amended Complaint (the "FAC", ECF 32) and Memorandum of Law in support thereof ("DMOL", ECF 44), in which Defendants ask the Court to dismiss all but Plaintiff's claims for excessive force pursuant to federal law, and assault, battery, and conversion under New York law and to bifurcate discovery. As set out in the Oliver Decl. (¶ 31), Plaintiff has withdrawn some of the claims at issue.

Notably, Defendants' briefing does not argue that the Court should dismiss Plaintiff's First Amendment-based claims, aside from those claims based on a retaliation-based theory; Plaintiff's claims under New York Civil Rights Law ("CRL") § 79-P (FAC ¶¶ 343-44); Plaintiff's *respondeat superior* claims under state law (FAC ¶ 342),[1] Plaintiff's claims under New York law for violations of the New York constitution (FAC ¶¶ 347-349); or Plaintiff's state law false imprisonment claims (FAC ¶ 351). Defendants have thus waived any issue that is raised for the first time in reply as to those claims. *See, e.g., Tardif v. City of N.Y.*, 991 F.3d 394, at 404 n.7 (2d Cir. 2021).

## STANDARD OF REVIEW

The applicable federal rules require only that a plaintiff plead "a short and plain statement of the claim" to entitle them to discovery. *See* Fed. R. Civ. P. 8(a)(2); *see, e.g., Shamir v. City of N.Y.*, 804 F.3d 533, 556 (2d Cir. 2015). Under the familiar standard of review applicable to Defendants' partial motion to dismiss under Rule 12(b)(6), the Court must accept as true all plausibly pleaded allegations in the FAC and draw all reasonable inferences therefrom in Plaintiff's favor. *See, e.g., See Case, et al. v. City of N.Y., et al.,* 233 F.Supp.3d 372, 382 (SDNY 2017) ("*Case I*") (citing cases). If the allegations in

---

[1] As noted below, Defendants ask the Court to dismiss the City as a party without even using the phrase respondeat superior — or for that matter, citing § 79-P (which provides for a direct municipal claim) — in their memo.

the pleadings sufficiently "raise the right to relief above the speculative level," dismissal is inappropriate. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In addition to the FAC's allegations, the Court "may consider … documents attached as exhibits, and documents incorporated by reference in the complaint," *DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010), as well as "matters of which judicial notice may be taken," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991), including, where appropriate, other "complaints filed in…court," *Blue Tree Hotels Inc. v. Starwood Hotels & Resorts*, 369 F.3d 212, 217 (2d Cir. 2004). As the Second Circuit, and this Court, have recognized, allegations in other complaints can provide sufficient evidence, for pleading purposes, to support a plaintiff's claims, including their municipal liability claims. *See, e.g., Lynch v. City of N.Y.*, 952 F.3d 67, 81–82 (2d Cir. 2020); *In re NY City Policing During Summer 2020 Demonstrations*, 548 F.Supp.3d 383, 401-404 (SDNY 2021).[2]

Finally, to the extent there are any disputed facts related to probable cause or any other material matter, they are for a jury to decide. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368, 371 (2d Cir. 2007) (citing cases). As long as there is enough factual matter to 'nudge[ plaintiffs'] claims…'across the line from conceivable to plausible,'" the case should proceed to discovery. *Ashcroft v. Iqbal,* 556 US 662, 680 (2008), quoting *Twombly*, 550 U.S. at 570.

## STATEMENT OF FACTS

In many cases—only some of which Plaintiff mentions below—Defendants' arguments depend on impermissibly ignoring facts in the FAC, drawing inferences against Plaintiff, and/or interpreting material, disputed facts in Defendants' favor. For a full statement of the relevant facts, Plaintiff respectfully refers the Court to the FAC and the documents referred to and/or incorporated by

---

[2] *See also, Felix v. City of NY*, 344 F.Supp.3d 644, 662–63 (SDNY 2018); *Case I*, 233 F.Supp.3d at 404-407; *Marlin v City of NY*, 2016 US Dist. LEXIS 122426, at *54, 56-63 (SDNY Sep. 7, 2016); *Gonzalez v. City of New York*, 2016 U S Dist. LEXIS 177820, at *21–25 (SDNY December 2, 2015); *Osterhoudt v. City of New York*, 2012 WL 4481927, at *2 (SDNY Sept. 27, 2012), *citing Colon v. City of New York*, 2009 WL 4264462, at *2 (EDNY Nov. 25, 2009).

reference therein, including the June 3, 2020 video taken by bystander Karla Moreno of Plaintiff's beating and arrest (the "Moreno Video"[3] and the "Moreno Statement," see FAC ¶¶ 2, 82-84, 96-98, 104, 107, 110, 120-126 and Oliver Dec. Exhs. 1 and 2). In support of Plaintiff's municipal liability claims brought under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the FAC cites and relies on three government reports (FAC ¶¶ 37-50; Oliver Dec. Exhs. 3-5) as well as a number of other pending federal civil rights lawsuits arising from the NYPD's treatment of protests during the same time period (FAC ¶¶ 51-56) and lawsuits and reports arising from past NYPD protest policing policies, practices, and customs, which the FAC connects to the development of the protest policies, practices, and customs Plaintiff challenges in this lawsuit. (FAC ¶ 187).

Relatedly, Exh. 6 to the Oliver Decl. is a copy of the Second Amended Complaint in *Benjamin Case, et al. v. City of N.Y., et al.,* (the "*Case* SAC"), which Plaintiffs also refer to in FAC ¶¶ 187(k). Many of Plaintiff's *Monell* claims in this case are pleaded through allegations similar (if not substantively identical) to the allegations supporting the *Monell* claims in *Case.* The *Case* Court held those *Monell* claims were well pleaded in the *Case* SAC. *See Case, et al. v. City of N.Y., et al.,* 233 F.Supp.3d 372 (SDNY 2017) ("*Case I*"). After extensive discovery, the Court denied Defendants' motion for summary judgment as to most of the *Case Monell* claims. *See Case, et al. v. City of N.Y., et al.,* 408 F.Supp.3d 313 ("*Case II*"). *Cf. also*, *Gavin v. City of N.Y.*, 2021 U.S. Dist. LEXIS 159908, at *13 (SDNY Aug. 24, 2021) (citation to *Case* and the other cases and government reports cited here adequately pled a *Monell* claim).

Additionally, an array of cases challenging the NYPD's response to the summer 2020 Black Lives Matter protests in New York city have been consolidated for pre-trial purposes[4] before Hon.

---

[3] Available online at https://twitter.com/joshfoxfilm/status/1268366550475603969.
[4] Including the putative class action in *Sow, et al. v. City of New York, et al.,* 20-cv-00533 (CM)(GWG) ("*Sow*") and *People of the State of New York v. City of New York, et al.,* 21-cv-322 (CM)(GWG) ("*People*"), an action being prosecuted by the New York State Attorney General.

Colleen McMahon and Hon. Gabriel W. Gorenstein under the *In re: NY City Policing During Summer 2020 Demonstrations* docket at 20-cv-8924 (CM)(GWG) (the "Consolidated Actions"). As noted in the FAC, Judge McMahon denied Defendants' motion to dismiss virtually all of the *Monell* claims in those cases. *See In re NY City Policing During Summer 2020 Demonstrations*, 548 F.Supp.3d 383 (SDNY 2021) ("*Summer 2020*"). Copies of three of the pleadings, which Judge McMahon considered in rendering *Summer 2020*, are attached as Exhs. 6-8 to the Oliver Dec. In *Summer 2020*, the Court took into consideration and noted that many of the plaintiffs in the Consolidated Actions had incorporated by reference in their pleadings the allegations in the pleadings in the other cases. *See, e.g.,* 548 F.Supp.3d at 405, n. 6, n. 8. The bulk of Plaintiff's *Monell* claims here are pled through allegations that are almost identical to—and in some cases go beyond—those supporting the *Monell* claims in the *Sow* putative class action, *compare* FAC ¶¶ 146-231 *with* Oliver Dec., Exh. 7, ¶¶ 421-509, which Judge McMahon found were sufficient to survive Defendants' motion to dismiss in the Consolidated Actions. *See Summer 2020*, 548 F.Supp.3d at 400-408. Discovery on the *Monell* claims in the Consolidated Actions is ongoing.

Finally, with respect to Defendants' application to bifurcate *Monell* discovery, the relevant procedural history is discussed in Point V below.

**The 2020 Black Lives Matter protests.** Soon after George Floyd's murder at the hands of Minneapolis police on May 25, 2020, protests communicating the message that Black Lives Matter and opposing police violence, among other things, began across New York City. FAC ¶¶ 57-60, 75, 78-79. Plaintiff Francisco Javier Casablanca-Torres participated in one such protest on June 3, 2020 in Manhattan when he was beaten and arrested by members of the New York City Police Department ("NYPD") at around 9:00 p.m. near the intersection of 3rd Avenue and 50th Street in Manhattan. FAC ¶¶ 1-2, 89-112.

**The Curfew Orders.** Beginning on June 1, 2020, Defendant de Blasio announced a series of

orders enacting a City-wide curfew (the "Curfew Orders"), citing the demonstrations in response to George Floyd's murder as a primary justification. (FAC ¶¶ 61-81). Under the Curfew Orders in effect on June 3, 2020, "no persons or vehicles" could "be in public" between 8:00 p.m. and 5:00 a.m. except some categories of "essential workers" going to or from or performing that work, "people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies." (FAC ¶¶ 63-65; Oliver Dec. Exh. 11 ("EO 119")). The Curfew Orders explicitly provided that any "[f]ailure to comply" with them "shall result in orders to disperse, and [that] any person who knowingly violates" them "shall be guilty of a class B misdemeanor" under New York City Administrative Code ("NYCAC") § 3-108. (FAC ¶¶ 64, 68; EO 119). Like the text of the Curfew Orders itself, NYCAC § 3-108 contains a "knowing" intent requirement. (FAC ¶¶ 69-70, quoting NYCAC ¶ 3-108[5] and New York Penal Law ("PL") § 15.05.[6]

After Defendant de Blasio enacted the Curfew Orders, the NYPD sent two official, Department-wide statements directing all officers on how to implement them. The first Department-wide statement, on June 1, 2020, instructed officers that "[e]nforcement will take place only after several warnings are issued and the violator is refusing to comply." (FAC ¶¶ 73-74). The second Department-wide message instructing NYPD members about how to enforce the Curfew Orders, issued on June 3, 2020—the day of Mr. Casablanca's arrest—omitted the instruction to issue a dispersal order prior to curfew enforcement and instead stated only that, for a "person violating the curfew, a C-summons may be issued." (FAC ¶¶ 76-77). That second, June 3, 2020 Department-wide statement was consistent with a subsequent admission by NYPD Deputy Commissioner for Legal Matters Ernest Hart that the NYPD had a policy of taking enforcement actions for violations

---

[5] "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both." NYCAC § 3-108.

[6] A "person acts knowingly with respect to conduct or to a circumstances described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists." PL § 15.05.

of the Curfew Orders upon observing "individuals" whom NYPD members believed "were not essential workers in public" after 8:00 p.m. and that neither a dispersal order nor a meaningful opportunity to disperse was required precede a lawful arrest for a Curfew Orders violation. (FAC ¶¶ 80-81).

Between June 1 and June 3, 2020, NYPD members arrested hundreds of protesters based on purported violations of the Curfew Orders, including Plaintiff, Mr. Britvec, and around 190 other protesters on June 3, 2020 itself. (FAC ¶¶ 75, 78-79, 85-94; *Britvec* Complaint ¶¶ 51-97). All told, in June of 2020, NYPD members arrested hundreds of people at protests for purported violations of the Curfew Orders, without first having given them meaningful dispersal orders, if any, or meaningful opportunities to disperse, if any. (FAC ¶¶ 71, 75, 238-243). Additionally, in enforcing the Curfew Orders in June of 2020, NYPD members arrested hundreds of people at protests, while allowing others who were not essential workers and who were in public to be free from arrest. (FAC ¶ 72). All told, NYPD members arrested over 2,000 people during demonstrations between May 27 and June 5, 2020. (FAC ¶ 47).

**Plaintiff's June 3, 2020 beating and arrest.** Just before his beating and arrest, Mr. Casablanca was lawfully participating in a June 3, 2020 protest in Manhattan, riding his bicycle, and protesters and police were moving southbound on 3rd Avenue, toward 50th Street. FAC ¶¶ 85-88. Without any warning or orders, NYPD members – including from its Strategic Response Group ("SRG") - surrounded and trapped protesters in the roadway of 3rd Avenue to the north as Mr. Casablanca was near the crosswalk on 3rd Avenue to the south of its intersection with 50th Street. FAC ¶¶ 89-92.

At first, Mr. Casablanca observed the mass arrest to his north on 3rd Avenue from outside the kettle, and tried to use his phone to document it. FAC ¶ 93. Then, Defendant NYPD member John Doe 1 approached Mr. Casablanca from behind and struck Mr. Casablanca suddenly and without warning, knocking his phone from his right hand. FAC ¶¶ 94-99; Moreno Video. As mentioned

above, that moment, and what transpired in the next few seconds, were captured by a bystander named Karla Moreno, who had been driving her car when police made her stop at the intersection where Defendant Doe 1 approached and attached Plaintiff. FAC ¶¶ 2, 82-84, 96-98, 104, 107, 110, 120-126; Moreno Video. Defendant Doe 1 stomped on and/or kicked Mr. Casablanca's phone, then advanced on, and continued to strike, him. FAC ¶¶ 100-101, 108-109. Defendants NYPD members John Does 2 and 3 then joined Doe 1 in striking Mr. Casablanca, repeatedly hitting him on his back, shoulders, arms, thighs, legs, and elsewhere. FAC ¶¶ 102-107, 167; Moreno Video. One or more of Defendants Does 1-3 eventually rear-cuffed Mr. Casablanca in metal handcuffs that were especially tight on his right wrist. FAC ¶ 111.

**Plaintiff's "turn-over" mass arrest processing.** NYPD members assaulted and arrested Mr. Casablanca and Mr. Britvec, and detained Ms. Moreno, as part of the NYPD kettle and mass arrest at the same location. *See, e.g.,* FAC ¶¶ 82-84, 90-92, 113-114, 120-125, 240-245; Moreno Video; Moreno Statement; Britvec Complaint ¶¶ 51-97. After beating, arresting, and cuffing Mr. Casablanca at around 9:00 p.m., one or more of Defendants 1-3 then picked him up and brought him over to a nearby sidewalk. FAC ¶ 112. There a NYPD member removed the shirt Mr. Casablanca had been using to cover his face and placed it in his backpack. FAC ¶¶ 118-119. Before he was loaded onto a bus around an hour later, a NYPD member eventually cut the straps off of his backpack and took it from him. FAC ¶ 136.

After Plaintiff remained rear-cuffed on the sidewalk for some time, a NYPD member asked words to the effect of, "Whose are these?" – referring to Mr. Casablanca and other arrestees. FAC ¶¶ 126, 160. NYPD members who were present were apparently unable to locate Defendants Does 1-3, the NYPD members who had beaten and initially arrested Mr. Casablanca. FAC ¶¶ 128, 130. A NYPD member said words to the effect of, "We need more bodies" to fill the bus into which NYPD members were loading arrestees. FAC ¶ 127. At around 9:15 p.m., as Plaintiff sat handcuffed

at the intersection of 3rd Avenue and 50th Streets, Defendant John or Jane Doe 4 – a NYPD supervisor –assigned Defendant NYPD Officer Ryan Costello to process the arrests of Plaintiff, Mr. Britvec, and several others. FAC ¶¶ 129, 160. Based on the allegations in the FAC, Defendant Costello had not seen Mr. Casablanca or Mr. Britvec before their arrests. FAC ¶¶ 128-131; Britvec Complaint ¶¶ 72-74. Under such circumstances – where no NYPD member who observed a person's pre-arrest conduct can be located - NYPD policies, practices, and procedures in effect on June 3, 2020 required that Defendants Costello and Doe 4 release Mr. Casablanca without charges. But they did not. *See, e.g.,* FAC ¶¶ 130-132.

Instead, Defendants Costello and Doe 4 subjected Plaintiff to NYPD large-scale arrest processing procedures and, ultimately, criminal prosecution. NYPD members loaded Mr. Casablanca onto a bus along with other arrestees. FAC ¶¶ 137-138. At around 10:00 p.m., NYPD members drove the bus all the way to Brooklyn Central Booking ("KBCB") at 120 Schermerhorn Street for mass arrest processing, although the arrests had occurred just blocks from the NYPD's 17th Precinct. FAC ¶¶ 86, 139. They eventually removed Plaintiff from the bus and reunited him with Defendant Costello. (140-142). For the next few hours, Defendant Costello waited with Mr. Casablanca and others whose arrests he had been assigned to process on a long line. (FAC ¶¶ 143, 156; Britvec Complaint ¶¶ 61-62). During that long wait, the tight, metal handcuffs Defendants Does 1-3 had applied on Plaintiff's wrists were causing Plaintiff serious pain, especially in his right wrist. (FAC ¶ 144). Although Plaintiff complained to Defendant Costello about the tight cuffing, and it was obvious to look at Plaintiff that the tight cuffing was injuring him, Defendant Costello refused to loosen or remove the cuffs until Plaintiff's right hand turned blue. (FAC ¶¶ 144-155).

Once inside BKCB at some point in the middle of the night, Plaintiff was again separated from Defendant Costello, searched, photographed, and moved among rooms and cells until he was eventually released from NYPD custody at around 5:00 a.m., having been under arrest a total of

around 8 hours. (FAC ¶ 157). During his time in custody, Defendant Costello and other NYPD members forced Plaintiff into close proximity with NYPD members and other arrestees who were not wearing masks, although a NYPD member had removed the shirt Plaintiff had been using as a mask after his arrest. (FAC ¶¶ 118-119, 158).

**Plaintiff's criminal charges.** At around 5:00 a.m. on June 4, 2020, Defendant Costello served Plaintiff with an appearance ticket, called a "C-Summons" in NYPD parlance, requiring him to appear in New York City Criminal Court on September 30, 2020 to answer a charge of having violated NYCAC § 3-108. FAC ¶¶ 160-161. In the related accusatory instrument that Defendant Costello filed, he falsely swore he had personally observed Plaintiff violating the curfew (because he had not observed Plaintiff at all). FAC ¶ 160. On September 8, 2020, the New York City Criminal Court dismissed the criminal proceeding against Plaintiff on grounds consistent with his innocence. FAC ¶ 163.

**Plaintiff's physical injuries.** As a result of Plaintiff's beating at the hands of Does 1-3, Plaintiff sustained pain, bruising, swelling, and other injuries. FAC ¶¶ 167, 170. Also, as a result of the overly tight handcuffs applied by Does 1-3, which Defendant Costello later refused to loosen or remove for an unreasonable amount of time, Plaintiff suffered pain, numbness, and swelling as well as long-lasting injuries including limitations in his ability to use certain fingers in his right hand, right wrist pain, numbness, and weakness. FAC ¶¶ 168-170.

**Plaintiff's disappeared bicycle.** While waiting on the sidewalk, Mr. Casablanca asked where his bike was, and NYPD members responded to the effect of, "Don't worry about it." NYPD members did not give him a property voucher or invoice or other paperwork related to the bike seizure. Although Plaintiff tried to retrieve the bike from the NYPD after he was released from custody, including by visiting the NYPD's 17th Precinct right near the location of his arrest, Plaintiff never saw his bike again. FAC ¶¶ 116-117, 165-166.

**Plaintiff's municipal liability claims.** For efficiency, the facts related to Plaintiff's *Monell* claims are described in Point **Error! Reference source not found.** below.

## ARGUMENT

### I. The FAC Plausibly Pleads Plaintiff's Claims for False Arrest, Malicious Prosecution under New York law, and First Amendment Retaliation.

Defendants argue there was probable cause to arrest Plaintiff, and therefore the Court must therefore dismiss Plaintiff's false arrest, state malicious prosecution, and First Amendment retaliation claims (DMOL pp. 20-24). However, the FAC establishes there was no probable cause to arrest or prosecute Plaintiff for violating the Curfew Orders—the only potential purported justification Defendants have raised for his arrest—or for any other reason. And beyond that, by miscasting some of Plaintiffs' claims, Defendants' arguments overlook that probable cause is not a sufficient basis to dismiss some of the claims.

#### A.  Plaintiff's false arrest claim is well-pled.

The FAC does not establish as a matter of law that probable cause existed for Mr. Casablanca's arrest at around 9:00 p.m. on June 3, 2020 by Defendants Does 1-3 or for his subsequent detention by Doe 4 and Costello. Rather, the FAC plausibly pleads that Defendants Costello and 1-4 confined Plaintiff without his consent and without lawful justification. *See, e.g., Weyant v. Okst,* 101 F.3d 854, 852 (2d Cir. 1996). For example, the FAC establishes that, after Plaintiff participated in a protest with police escort and/or facilitation for several hours, Defendants Does 1-3 beat and arrested him suddenly and without first having given him the dispersal orders required by the Curfew Orders, or any other warning. Then, although Defendants Doe 4 and Costello had no knowledge of the circumstances leading up to Plaintiff's arrest, rather than releasing Mr. Casablanca from custody without charges, as NYPD policies require under such circumstances, Defendants Doe 4 and Costello subjected him to the NYPD's large-scale arrest processing, prolonging his arrest for almost eight more hours, during which he was in substantial pain from overtight handcuffs and bruising.

Particularly considered along with the Moreno Video and Moreno Statement and the Britvec Complaint, those and other allegations in the FAC, plausibly and sufficiently plead Plaintiff's false arrest claims.

Since Plaintiff was arrested without a written warrant, the arrest is "presumptively 'unlawful'" and "[i]t is the defendant who bears the burden 'of proving that probable cause existed[…] as an affirmative defense.'" *Case I,* 233 F.Supp.3d at 384-85 (citations omitted). Defendants have not met that burden. Simply put, because the Curfew Orders required that a person knowingly refuse to comply with a dispersal order prior to arrest, and because police did not give any such order, and plaintiff did not refuse to comply with, any such order prior to Plaintiff's arrest, no Defendant observed Plaintiff in public knowingly violating a dispersal order, and there was no probable cause to arrest Plaintiff for violating the Curfew Orders objectively and as a matter of law. In their substantive arguments, Defendants argue just the opposite. First, they seize on Plaintiff's allegations he was "out participating in a protest at 9:00 pm on June 3, 2020" as purported "admissions" that he was "in clear violation of" the Curfew Orders, giving rise to probable cause for his arrest as a matter of law. DMOL p. 23, citing FAC ¶ 2. They also claim, without citing to the FAC, that Plaintiff "concedes that 'Doe 1 'observed Plaintiff riding a bicycle in this protest in violation of this curfew'" prior to his arrest. *Id.* However, Plaintiff makes no such admission(s) or concession(s). Although the FAC establishes Plaintiff was indeed "out participating in a protest at 9:00 pm on June 3, 2020," it does not admit, and instead affirmatively contests, that he violated the Curfew Orders, and that Defendants had probable cause to arrest, detain, or prosecute him for violating them. To the contrary, the FAC shows Does 1-3 had no probable cause to arrest Plaintiff in the first place, and that Doe 4 and Costello had no probable cause to continue to arrest and detain him after they came upon Plaintiff handcuffed on the sidewalk and could not find any NYPD member who had

11

observed him prior to his arrest.[7]

Much of Defendants' argument on this point hinges on their incorrect belief that the Curfew Orders did not require that an individual *both* remain in public after 8:00 p.m. *and* refuse to comply with a dispersal order in order for probable cause to exist to make an arrest for a curfew violation. On Defendants' view, any non-exempt individual outside past the curfew was subject to summary arrest.

However, Defendants' view is wrong. Such a reading of the Curfew Orders would remove two critical requirements from the text of the Curfew Orders– first, that "[f]ailure to comply" with the Curfew Orders "shall result in orders to disperse", FAC ¶¶ 64, 68-69; EO 119, and second, that only a person who *knowingly* violated the Curfew Orders by being out after the curfew and refusing to comply with a dispersal order could be subject to arrest or prosecution for violating them. *Id.*; NYCAC § 3-108; PL § 15.05. As seen below, the plain text of the Curfew Orders, as well as the First, Fourth, Fifth, and Fourteenth Amendment principles in play when police interfere with peaceful, orderly protests in the name of public safety, require that police give fair notice in the form of clearly communicated orders, as well as meaningful opportunity to comply with them, before interfering with, or ending, such expressive association.

By its plain text, for conduct to be criminal, it must violate all of the EO's "provisions" — that is, all three "Sections."[8] This is because Section 3 defines the relevant prohibited conduct as a

---

[7] The relevant consideration of whether probable cause existed at the moment of Plaintiff's arrest is limited to only "the facts known to the arresting officer at the time of the arrest" and cannot be based on events that occur, or facts that an officer learns about, post-arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see also Shamir v. City of NY*, 804 F.3d 555, 557 (2d Cir. 2015); *Adams v. City of New York*, 993 F.Supp.2d 306, 328. (EDNY 2014). Here, the FAC does not plead that any of the Defendant NYPD members who arrested Plaintiff had any information from, or communicated any information to, any fellow officer sufficient to establish probable cause to arrest or prosecute Plaintiff, so Defendants cannot invoke the so-called "collective or imputed knowledge doctrine" to establish that any of them had probable cause to arrest or charge Plaintiff. *See, e.g., Zellner*, 494 F.3d at 369; *Gianullo v. City of New York*, 322 F.3d 139, 142-43 (2d Cir. 2003); *United States v. Cruz*, 834 F.3d 47, 51 (2d Cir. 1987).

[8] The plain text of the Curfew Orders is structured in three parts: Section 1 declares a curfew to be in effect such that "no persons or vehicles may be in public between the hours of 8:00pm and 5:00am.," Section 2 carves out essential workers and certain other categories of exempt people (but not protesters), and Section 3 provides the enforcement mechanism and criminalizes certain conduct. The provisions, logically, must be read together: if one does not read them

knowing violation of "the provision**s**" — plural — of "this Order." EO 119 (emphasis added). In other words, by using a clear, conjunctive "and," and the plural "provisions," the Curfew Orders allowed police to arrest or prosecute a non-exempt person who had remained in public after the curfew began *only after* they had refused to comply with a dispersal order. In other words, that plural "provisions" makes clear that to violate the Curfew Orders, an individual must — independently — violate **each** of the three Sections: "knowingly violates [all of] the provisions in this Order." EO 119. And without an order to disperse, it is impossible to violate Section 3. Defendants' arguments simply do not account for the Curfew Orders' use of the word "provisions" in Section 3.

Ordinary statutory interpretation methodology confirms Plaintiff's reading. "Every exercise in statutory construction must begin with the words of the text." *Saks v Franklin Covey Co.*, 316 F3d 337, 345 (2d Cir 2003). When – as here - "the statutory language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of the words used." *People v Witthuhn*, 172 Misc 2d 749, 751 (Nassau County Ct 1997) (cleaned up). A reviewing court must

> presume that each word used in a statute expresses a distinct and different idea, […] and that the legislature inserted every provision of a statute for some useful purpose. […] Conversely, the court cannot conclude that the legislature deliberately placed a phrase in the statute which was intended to serve no purpose.

*CRP 88 E. 111th St. LLC v Guamarrigra*, 66 Misc 3d 328, 332 (Civ Ct, N.Y. Cty. 2019) (citations omitted). In other words, "courts must avoid a construction rendering statutory language to be superfluous." *Id.* (citation omitted). Furthermore, "[i]t is a basic canon of statutory construction that

---

together, then all "persons [and] vehicles … in public" after the curfew – including the police officers *enforcing* the curfew – would automatically be violating the curfew, there would be no need for any dispersal orders, and no *mens rea* requirement. That is, Sections 2 and 3 must be read in concert with, and as modifying, Section 1 — if they do not, the Curfew Orders are incoherent. Importantly, Section 3 uses the conjunctive "and" to create two conditions that must both be satisfied in order to give rise to probable cause to arrest anyone who "violate … this Order": "Failure to comply with this Order **shall** result in orders to disperse, **and** any person who knowingly violates the provision**s** in this Order shall be guilty of a Class B misdemeanor." EO 119 (emphasis added). That is, a person who is out after curfew (Section 1), who is not an essential worker or otherwise exempt (Section 2), then (1) "shall" receive a clearly communicated dispersal order and a meaningful opportunity to comply; and (2) if they engage in that conduct knowingly — that is, intending to defy the Curfew Orders — following a clearly communicated dispersal order, and a real opportunity to leave, may then – and only then – be subject to arrest and/or prosecution.

the term 'and' joins a conjunctive list," *Black v Nunwood, Inc.*, No. 1:13-cv-7207 (GHW), 2015 US

Dist LEXIS 56609, at *10 (SDNY Apr. 30, 2015), and that "when the conjunctive 'and' connects

words, phrases or clauses of a statutory sentence, they are to be considered jointly." *People v Donner*,

106 Misc 2d 779, 781, n * (Town Ct 1980); *see also,* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Text* 116 (2012) ("With [a] conjunctive list, all [listed] things are

required…"); 1A Norman J. Singer, Statutes and Statutory Construction § 21.14 at 179-80 (6th ed.

2002). Generally, a reading of a law that "…is written in the conjunctive, that seeks to sever […one

provision…] from … other … express statutory requirements, fails to give effect to the entire

statute, in direct contravention to one of the most basic rules of statutory construction." *Campbell v*

*City of NY*, 4 NY3d 200, 207 (2005).[9]

As the only support for their reading of the Curfew Orders, which impermissibly reads the use

of the conjunction "and" and the plural "provisions" out entirely, without providing necessary

context, Defendants selectively cite parts of Judge McMahon's *Summer 2020* motion to dismiss

decision and Hon. Richard J. Sullivan's *Dinler* partial summary judgment decision in the weft of civil

litigation arising from the City's response to protests around 2004 RNC. Both of the cases

Defendants cite refute, rather than support, their position.

Defendants argue that the Curfew Orders prohibited "'being out in public between certain

hours – not failing to obey a dispersal order'" and that dispersal orders were not required prior to

arrests for Curfew Orders violations, partially quoting *Summer 2020*. But in the portion quoted, the

Court was considering a motion to dismiss claims related to enforcement of the Curfew Orders on

---

[9] For similar readings of "and," *see* (non-exhaustively): *City of Rome v. United States*, 446 U.S. 156, 172 (1980); *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930) ("and" means "not one or the other, but both"); *United States v. Field*, 255 U.S. 257, 262 (1921) ("These conditions are expressed conjunctively; and it would be inadmissible, in construing a taxing act, to read them as if prescribed disjunctively"); *Spanski Enters. v. Telewizja Polska S.A.*, 832 F. App'x 723, 725 (2d Cir. 2020) (contract that said party A "and" party B "may extend [an agreement's] term" required both parties to agree); *United States v. Bleau*, 930 F.3d 35, 39 (2d Cir. 2019); *Shaw v. Nat'l Union Fire Ins. Co.*, 605 F.3d 1250, 1252 (11th Cir. 2010); *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1332 (11th Cir. 2005).

qualified immunity grounds—and specifically, analyzing whether the text of the Curfew Orders encouraged arbitrary and discriminatory enforcement and therefore rendered them void for vagueness under due process principles. DMOL pp. 22-23, quoting 548 F.Supp.3d at 416. The Court found the orders gave fair notice that an arrest could eventually follow if a person went out past the curfew. But elsewhere, *Summer 2020* explicitly recognizes that the Curfew Orders provided that "[f]ailure to comply would result in orders to disperse" and that only "individuals who knowingly violated the orders could be charged" with a crime, 548 F.Supp.3d at 393, citing EO 119; that "*the text of the order says that dispersal orders should be given,*" 548 F.Supp.3d at 408; and that dispersal orders were "*mandatory*…before charging protesters with curfew violations," *id.* at 416 (emphasis added). Thus, *Summer 2020*, read as a whole, shows that Judge McMahon read the Curfew Orders to require police to give dispersal orders.[10] That is, *Summer 2020*'s supports Plaintiff's position reading of the Curfew Orders to require dispersal orders, and refusals to comply with them, prior to valid arrests or prosecutions.[11]

Next, Defendants argue that the Curfew Orders are "highly analogous" to New York Penal Law ("PL") § 240.20(6). *See* DMOL pp. 22-23. Plaintiff agrees they are. PL § 240.20(6) prohibits

---

[10] For example, the full passage ending with the sentence Defendants quoted reads:

> The aspect of the Executive Orders that required officers to give dispersal orders if they witnessed what appeared to be curfew violations governed the conduct of police officers, not the conduct of members of the public. If any officers who saw people out after curfew failed to give dispersal orders, they (the officers) failed to do their duty in the prescribed manner. […] But the fact that a police officer may have failed to comply with the officer's obligations *does not make it difficult for citizens to understand what conduct of theirs is prohibited by the curfew orders.* The conduct prohibited by the orders here challenged was being out in public between certain hours — not failing to obey a dispersal order.

548 F.Supp.3d at 416 (emphasis added). Thus, read in context (or for that matter, taken alone), that sentence does not show there was probable cause to arrest a perceived Curfew Orders violator who was merely out after curfew, but who had not knowingly violated the Curfew Orders and refused to comply with a dispersal order. It only says that, setting aside the mandatory dispersal orders police were required to give before taking enforcement action, the Court believed the text of the Curfew Orders gave protesters constitutionally adequate notice that they prohibited any non-exempt person from being in public after curfew to satisfy basic due process requirements.

[11] Indeed, the City may be estopped from even making this argument by the fact that, at the City's request, Judge McMahon dismissed *Monell* claims on the basis that as far as arrests without dispersal orders, "[t]he text of the order is the best evidence of the City's official policy, and the text of the curfew order says that dispersal orders should be given. *Id.* at 408.

disorderly conduct in the form of *both* congregating with two or more other people in public, *and* refusing lawful orders to disperse, *and* either intentionally creating, or recklessly creating the risk of, serious public ramifications. PL § 240.20(6); *see, e.g., Adams v. City of N.Y.*, 2016 US. Dist. LEXIS 37330, at *8 (SDNY Mar. 22, 2016) (PL § 240.20(6) "requires that, in addition to the requisite intent, an arrestee must refuse to comply with a lawful dispersal order"); *Oregon v. Ausmus,* 336 Ore. 493, 501 (Oregon Supreme Court 2004) (analyzing identical disorderly conduct statute and determining the proscribed conduct was "*both* the congregation with others in a public place *and* the refusal to obey a lawful order of the police to disperse") (emphasis in original).  New York courts have held the significance of the *mens rea*, or public harm, element of the disorderly conduct statute "'cannot be overstated.'" *Adams,* 2016 US. Dist. LEXIS 37330, at *8 (citing cases). Additionally, while any PL § 240.20 prosecution must be supported by "facts, either about the defendant's conduct or about the surrounding circumstances, to support an inference that defendant possessed the requisite intent," *People v. Barrett*, 13 Misc.3d 929, 944-46 (NY Crim. Ct. 2006), a PL § 240.20(6) prosecution requires that, after congregating with two or more others in public, *see, e.g., People v Cohen*, 6 Misc 3d 1019[A], 1019A, n 1, 2005 NY Slip Op 50128[U], *3 (Crim Ct, New York County 2005), a person refuses to comply with a lawful dispersal order. Such an order must have been clearly communicated and accompanied by a meaningful opportunity to comply. *See, e.g., Dinler*, 2012 US Dist. LEXIS 141851, at *34-36, quoted in *Case I,* 233 F.Supp.3d 372. Where there is no dispersal order, there can be no probable cause to arrest or prosecute for a PL § 240.20(6) violation. *See, e.g., Zellner,* 494 F.3d at 375 (no probable cause to arrest for a PL § 240.20(6) violation absent evidence that a dispersal order was given); *Arbuckle v. City of N.Y., et al.,* 2016 WL 5793741, at *7 (SDNY Sept. 30, 2016) (same). Likewise, there is no probable cause to arrest a person who does not have a meaningful opportunity to comply with a dispersal order, and refuse to disperse, for a PL § 240.20(6) violation. *See, e.g., Dinler*, 2012 US Dist. LEXIS 141851, at *34-36; *Case I,* 233 F.Supp.3d at 384-85, citing *Dinler*, 2012

US Dist. LEXIS 141851, at *34-36; accord, *Case II,* 408 F.Supp.3d at 322*; Gavin,* 2021 U.S. Dist. LEXIS 159908, at *10 (it is readily "apparent that rights violations will occur if NYPD officer order protesters to disperse, provide protesters with no opportunity to disperse, and then begin enforcing the dispersal order); *People v. Rothenberg,* 15 NYS2d 447, 449 (NY Magistrate Ct. 1939).

The requirement that a person refuse a lawful dispersal order flows from the text of PL § 240.20(6), under which refusing to comply with a lawful dispersal order is an element of the violation. In other words, under PL § 240.20(6), dispersal orders are not optional. Unless a person congregates with two or more others and refuses to comply with a lawful, clearly communicated dispersal order, after having been given a meaningful opportunity to do so, with the requisite *mens rea* (intentionally creating, or recklessly creating the risk of, serious public ramifications), there is no probable cause to arrest or prosecute for a PL § 240.20(6) violation. Likewise, under the text of the Curfew Orders, a refusal to comply with a dispersal order was not optional. There could be no probable cause to arrest a person for violating the Curfew Orders unless and until they remained in public in violation of the curfew and refused to comply with the dispersal order the Curfew Orders required police to give, with the required *mens rea* (*i.e.,* knowingly).

*Dinler* arose in the context of dozens of consolidated lawsuits arising from NYPD mass arrests during the 2004 Republican National Convention in New York City (the "2004 RNC"). *Dinler* considered partial summary judgment motions limited to, as is relevant here, whether NYPD members had probable cause to engage in "mass arrests" of protesters at two different arrest locations based on a theory of "'group probable cause'" under which police asserted they had authority "to arrest an entire group of individuals 'where it reasonably appears to the police that a large group is engaging in unlawful conduct.'"  2012 US Dist. LEXIS 141851, at *8-9, 14-15 (internal quotation omitted). The Court rejected Defendants' proposition there was any such thing as "group probable cause", ultimately reasoning:

17

> Dispersal orders play an important, though not essential, role in making such individualized determinations of probable cause. Although the Court declines to find that a dispersal order is an absolute prerequisite under the Fourth Amendment finding that all arrestees in a mass arrest were violating the law,[…] it nevertheless recognizes that police efforts to sort lawbreakers from bystanders, and to advise the latter that they should leave, are highly probative of whether it would be reasonable to conclude that every person arrested violated the law. […] Of course, efforts to disperse or sort the crowd both tend to ensure that innocent bystanders will not be included in the arrest and run the risk that some offenders will elude arrest. Nonetheless, that cost of the rule of individualized probable cause is clearly contemplated by the Fourth Amendment…

*Id.* at *21-23. Defendants quote from that part of *Dinler* to support their arguments that "dispersal orders are not a mandatory prerequisite for arrest." *See* DMOL p. 24. However, as *Dinler* demonstrates, the quote came in the context of analyzing – and rejecting – the concept of "group probable cause" to arrest in general, not whether probable cause existed to arrest protesters for an offense that requires refusal to comply with a dispersal order as an element. As seen below, however, the Court did engage in just that analysis with respect to the PL § 240.20(6) charges that were at issue in *Dinler*.

Before turning there, however, the Court reached another conclusion relevant to the analysis here: that police lacked probable cause to arrest all protesters at one location for violating the City's parade permitting scheme on Fourth Amendment grounds without fair warning, after having escorted and/or facilitated their protest for some time. Where police had "granted permission to the protesters…to conduct their march on the sidewalk, only to have that permission abruptly revoked […] 'the Fourth Amendment does not permit the police to say to a person go ahead and march and then, five minutes later, having revoked the permission for the march without notice to anyone, arrest the person for having marched without police permission." *Dinler,* 2012 US Dist. LEXIS 141851 at *33-34, quoting *Vodak v. City of Chicago*, 639 F.3d 738, 746-47 (11th Cir. 2011). In other words, the *Dinler* court made clear that, where police actually or apparently facilitate or otherwise allow a protest to continue that might otherwise be prohibited (for example, for lack of a permit, or because, as in this case, the protesters' presence in public violated a curfew), police must give fair

notice before taking enforcement actions, such as making arrest. Here, although the curfew began at 8:00 p.m. under EO 119, police escorted and/or facilitated the protest for an hour before suddenly engaging in mass arrests without warning. They could not do that under the Fourth Amendment without first providing fair notice even if the Curfew Orders did not explicitly require knowing refusal of a dispersal order (which, again they did).

Analyzing whether probable cause existed to arrest under PL § 240.20(6), the text of which, like the text of the Curfew Orders, explicitly requires that a person refuse a dispersal order as an element of the offense, the *Dinler* Court reasoned that "…whether the police had probable cause to arrest the marchers for defying a police order turns on two factors. The first is whether, and to what extent, the police communicated their orders to the entire crowd. …The second is whether the demonstrators were given an opportunity to comply with those orders — that is, whether they indeed refused to do so." *Dinler*, 2012 US Dist LEXIS 141851, at *35, citing, *inter alia, Vodak*, 639 F.3d at 745; *see also Case I*, 233 F.Sup.3d at 384. Because the single police dispersal order at one location had not been "amplified and could not have been reasonably expected to be heard by all of the marchers" and because even those marchers who might have heard the order "had no opportunity to comply with it," the Court found there was no probable cause to arrest any of the marchers. *Id.* at *36. So, while Defendants claim *Dinler* supports their argument that "dispersal orders are not a mandatory prerequisite for arrest" under similar circumstances, *see* DMOL p. 24, it does the opposite.

*Dinler*'s treatment of the issue of dispersal orders and fair warning is consistent with, and recognizes, the core First Amendment, Fourth Amendment, and due process principles involved when police restrict peaceful expressive association and other, similar protected activities, under which the government's authority to regulate peaceful expressive conduct in a traditional public forum such as the New York City streets "is sharply circumscribed," *Deegan v. City of Ithaca*, 444 F.3d

135, 141 (2d Cir. 2006). For example, in rejecting the concept of group probable cause, the *Dinler* Court cited, *inter alia*, *Jones v. Parmley*, 465 F.3d 46 (2dCir. 2006). 2012 US Dist. LEXIS 141851, at *15-18. The police in *Jones* had assaulted and engaged in a mass arrest of protesters, some, but not all, of whom had stepped onto a New York State highway, and the Second Circuit was reviewing whether police should enjoy qualified immunity at the summary judgment stage. *Jones*, 465 F.3d at 52-53. First, the Court analyzed the First Amendment principles in play, noting, among other things, that the Supreme Court has "long applied the 'clear and present danger' test to protest cases to determine when police interference" police interreference to end or substantially limit a First Amendment assembly is constitutional may not withstand review unless there is an immediate, and substantial, public safety threat. *Id.* at 56-59 (internal citations omitted); *see also, e.g., Case I*, 233 F.Supp.3d at 383; *Akinnagbe v. City of N.Y.*, 128 F.Supp.3d 539, 548 (EDNY 2015) (discussing the "heightened scrutiny required by the First Amendment" in analyzing the lawfulness of a dispersal order at a protest); *see also, e.g., Edrei v. Maguire*, 892 F.3d 525, 540–42 (2d Cir. 2018) ("a wealth of cases inform government officials that protesters enjoy robust constitutional protections").

Thus, even where police interference with a protest is authorized, for example because of safety considerations, police must provide fair notice and warning – typically, in the form of clearly audible dispersal orders and a meaningful opportunity to disperse - before treating a perceived "group" as a "unit." *See, e.g., Jones,* 465 F.3d at 60-61; *Dellums v. Powell*, 566 F.2d 167, 181-82, n.31 (D.C. Cir. 1977) ("notice and an opportunity to disperse [required] before arrests of the crowd 'as a unit' would be constitutionally permissible") (cited favorably in *Jones*, 465 F.3d at 60-61); *Barham v. Ramsey*, 434 F.3d 565, 576 (D.C. Cir. 2006); *see also Washington Mobilization Committee v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977).

Relatedly, even where some members at a First Amendment assembly behave in a disorderly or even criminal manner, others whom the police perceived as associated with the assembly typically

enjoy "an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law. … and absent imminent harm," could not be subject to dispersal "without fair warning." *Jones,* 465. F.3d at 60-61. Under the circumstances present in *Jones,* the Second Circuit held, a dispersal order *was* required "as a matter of law." *Id.* ("the absence of a dispersal order violated First Amendment rights"). To the extent *Dinler* left open the question of whether the First Amendment might, under certain circumstances, require a dispersal order, *see Dinler,* 2012 US Dist. LEXIS 141851, at *2 n. 6, *Jones* gave one answer. In reaching that conclusion, the Second Circuit cited First Amendment *and* due process principles, recognizing that "'[t]he purpose of the fair notice requirement…is to enable the ordinary citizen to conform his or her conduct,'" *Jones,* 465 .3d at 60-61, *quoting City of Chicago v. Morales,* 527 U.S. 41, 58 (1999), and that, under the circumstances, "police could not simply disperse them without giving fair warning," *id.*

Finally on this point, of particular relevance to the *mens rea* issue, the First Amendment abhors vague, overbroad, strict liability restrictions and tolerates them only under the most limited circumstances, not present here. The use of governmental authority to curtail and/or punish the conduct of "any person who unknowingly participates in" or observes or stands by a First Amendment assembly – particularly one the police had previously been facilitating – without providing fair warning that police are about to disperse the gathering and/or make arrests, combined with an opportunity for those who wish to leave and avoid arrest to do so, would amount to a substantially overbroad use of government power, imposing strict liability to *de facto* criminalize innocent participation in, or even mere presence near, protest. The application of a law such as the Curfew Orders to impose what amounts to strict liability on even innocent participants in a peaceful First Amendment assembly would cast a chill on and "'constitute a burden on free expression that is more than the First Amendment can bear.'" *People v. Jennifer Bezjak,* 11 Misc.3d 424, 430-35 (NYC

21

Crim. Ct.,2006)*, aff'd*, 26 Misc.3d 130(A) (App. Term, 1st Dept., 2010), *cert. den'd*, 15 N.Y.3d 747-750,

752 (2010), citing, *inter alia, Arab-American Defense Committee vs. City of Dearborn*, 418 F.3d 600 (6th Cir.,

2005); *see also People v. Beck*, 26 Misc. 3d 42 (1st Dept 2010), *cert den'd* 15 NY.Y.3d 747, *et seq.* (2010).

Against that backdrop, Defendants lacked probable cause to arrest Plaintiff not only on Fourth

Amendment grounds, because the Curfew Orders required a dispersal order that was never given,

but also because the Curfew Orders – enforced as they were without fair warning or an opportunity

to disperse - violated Plaintiff's First Amendment and due process rights as applied.

### B.  Plaintiff's malicious prosecution claim under New York law is well pled.

> 'The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases.' […]. In the malicious prosecution context, probable cause is the totality of 'facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' […] This inquiry considers the 'facts known or reasonably believed at the time the prosecution was initiated, and not at the time of arrest.'

*Soto v City of NY*, 132 F Supp 3d 424, 452-453 (EDNY 2015) (citations omitted).[12] Defendants say

Plaintiff's state law malicious prosecution claim should be dismissed because there was probable

cause to prosecute Plaintiff for violating the Curfew Orders. DMOL pp. 21-22. However, the FAC

establishes there was none. Rather, as seen above, the Curfew Orders authorized an arrest or

prosecution only when a person who was not an essential worker knowingly remained in public and

knowingly refused a dispersal order. *See* EO 119; NYCAC § 3-108. Beyond that, New York Criminal

Procedure Law ("CPL") required that a misdemeanor prosecution, such as one for a NYCAC § 3-

108 violation, be supported by a legally sufficient accusatory instrument sworn out under penalties

of perjury by a person with personal knowledge of the facts alleged which, if true, would make out

each element of each charged crime. *See* CPL § 100.15(1) and (3); 100.40(1)(a) - (c); Oliver Decl. ¶¶

32-38; *see also, e.g., People v Cohen*, 6 Misc 3d 1019[A], 1019A, 2005 NY Slip Op 50128[U] (Crim Ct,

---

[12] When – and only when – probable cause exists for an arrest that leads to a prosecution, in order to make out a malicious prosecution claim, a "plaintiff must show that the defendants learned of some 'intervening facts' undermining probable cause 'between arrest and initiation of prosecution.'" *Id.* at 453 (citations omitted).

New York County 2005) (dismissing charged PL § 240.20(6) violation for facial insufficiency). A NYPD member who merely observes a protester another NYPD member has placed under arrest, but who has not observed the underlying violation, cannot prosecute that person based on those observations. *See, e.g., People v Munoz*, 10 Misc 3d 1052[A], 2005 NY Slip Op 51916[U], *4 (Crim Ct, New York County 2005) (allowing a prosecution to go forward based only observations of a protester after they were already in police custody would be "tantamount to asking this court to hold that because an individual is in police custody, he is guilty of the offenses charged" - a position that would "undermine and eviscerate the criminal justice system as we know it"). In other words, in order to prosecute Mr. Casablanca for a Curfew Orders violation, a NYPD member who had actually observed Mr. Casablanca prior to his arrest by Defendants Does 1-3, out in public past curfew and refusing to comply with a dispersal order, was required to so swear. As the FAC shows, Mr. Casablanca never received any dispersal order. No NYPD member ever observed him refusing to comply with one. No NYPD member could have sworn that they had – at least not truthfully. Since, contrary to Defendants' only argument on this point, there was no probable cause to prosecute Plaintiff for violating the Curfew Orders, Plaintiff's state law malicious prosecution claim is well pled.

### C.  Plaintiff's First Amendment retaliatory force, retaliatory arrest, and First Amendment retaliation-based *Monell* claims are well pled.[13]

With respect to Plaintiff's retaliation-based claims, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Defendants make two fundamental mistakes in their arguments related to these claims. Each is fatal to their motion to dismiss the

---

[13] While Defendants have challenged (only part of, as explained below) Mr. Casablanca's First Amendment-based claims based on a retaliation theory, *see, e.g.,* FAC ¶¶ 287-293 they have not challenged his First Amendment-based claims based on time/place/manner and strict liability theories, *see, e.g.,* FAC ¶¶ 294-299, which are distinct, *see, e.g., Case I,* 344 F.Supp.3d 391-94. Defendants cannot raise those challenges for the first time on reply, and have therefore waived them.

claims mentioned above. *First*, Defendants construe Plaintiff's claims as solely being about a

"retaliatory *arrest* claim." DMOL at 21 (emphasis added). Not so. One of Plaintiff's retaliation

claims is about his arrest, but the retaliation claims pled are explicitly based on all of the "acts and

omissions" pled in the FAC go beyond unlawful arrest — and include "subjecting Plaintiff to …

excessive force" — as well as lengthy and unsafe large-scale arrest processing and baseless criminal

prosecution, as well as the other policies and practices discussed in Point Error! Reference source

not found. below applied to Plaintiff and other protesters, according to the FAC, in retaliation for

the protesters' protected speech and/or conduct. FAC ¶¶ 292-93, *see also, e.g.,* ¶¶ 135, 246-247

(processing); 31, 42, 49, 58-60, 180, 190-197 (force); 251 (detention). Since the case Defendants

cite—*Nieves v. Bartlett*, 587 U.S. __, 139 S.Ct. 1715 (2019)—is on its face limited to "retaliatory *arrest*

cases" (139 S. Ct. at 1724 (emphasis added)), any argument to dismiss Plaintiff's non-arrest First

Amendment retaliation claims cannot be made for the first time on reply.[14]

   *Second*, even if Plaintiff's First Amendment-based retaliation claims were limited to his arrest

(again, they are not), Defendants' argument ignores the Supreme Court's holding in *Nieves* that a

"narrow" exception exists where "officers have probable cause to make arrests, but typically exercise

their discretion not to do so" such that "the no-probable-cause requirement should not apply when

a plaintiff presents objective evidence that he was arrested when otherwise similarly situated

individuals not engaged in the same sort of protected speech had not been." 139 S.Ct. at 1727. *See*

*also, e.g., Akindes v. City of Kenosha*, 2021 U.S. Dist. LEXIS 187943, at *36 (E.D. Wis. Sep. 30, 2021)

---

[14] To be clear, even without waiver, Plaintiff would prevail here: probable cause is *not* a defense to First Amendment
retaliation claims outside the "retaliatory arrest" context *Nieves* discusses, such as retaliatory use of force claims. *See, for
examples, Gray v. City of Denham Springs*, 2021 U.S. Dist. LEXIS 63591, at *25 (M.D. La. Mar. 29, 2021) ("*Nieves* is
distinguishable … it addresses a claim of retaliatory *arrest*. Here, by contrast, Jacob alleges retaliatory *excessive force*")
(emphasis in original); *Talmadge Adib Talib v. Guerrero*, 2019 U.S. Dist. LEXIS 219889, at *33-34 (C.D. Cal. Oct. 17, 2019)
("probable cause for his arrest would not bar" retaliatory force claim); *Brown v. Diaz*, 2020 U.S. Dist. LEXIS 148067, at
*43 (E.D. Cal. Aug. 14, 2020) ("Because this claim is not one for a retaliatory arrest, but rather for a retaliatory use of
force, the court declines to grant summary judgment on the basis that Officer Howard likely had probable cause for an
arrest").

(*Nieves* exception satisfied when "Plaintiffs alleged that KPD officers arrested the protesters for violating [an August] curfew [in Kenosha, WI], while the counter-protesters were left undisturbed").[15] That exception applies here.[16]

First, Plaintiff offers direct comparisons showing that throughout the summer of 2020, the NYPD has targeted anti-police protests for uniquely harsh enforcement. For example, the FAC pleads that, in enforcing the Curfew Orders in June of 2020, NYPD members arrested hundreds of people at protests, while allowing others who were not essential workers and who were in public to be free from arrest. *See, e.g.,* FAC ¶¶ 47, 72. Plaintiff also pleads many examples throughout 2020 of pro-police protesters who faced no arrests whatsoever. *See, e.g.,* FAC ¶¶ 171-177. An unambiguous comparison is available for what happened when summer 2020 protesters took to New York City's bridges: those protesting against police misconduct, NYPD arrested (FAC ¶ 60); those supporting Trump, police escorted and supported (FAC ¶ 176). Plaintiff pleads facts showing that pattern since the 1990s, providing further "direct comparison" evidence. *See, e.g.,* FAC ¶ 178.

Second, "commonsensically" (139 S. Ct. at 1734) speaking, based on the Moreno Video alone, in which Defendants Does 1-3 can be seen viciously beating Plaintiff, a reasonable juror could infer they were acting out of retaliatory malice. Indeed, as noted in the Moreno Statement, absent some malicious and/or retaliatory motivation, one would expect that "when the two others [officers] join[ed] the scene, … they would [have] deescalate[d] the violence." FAC ¶ 104. But instead of de-

---

[15] *See further, Bledsoe v. Ferry Cty.,* 499 F. Supp. 3d 856, 878 (E.D. Wash. 2020); *Balcom v. City of Pittsburgh,* 2020 U.S. Dist. LEXIS 75135, at *11 (W.D. Pa. Apr. 28, 2020) (probable cause not sufficient for dismissal where Plaintiff alleged one comparator, and noted that the police arrested her and not the other person — and asked her but not the other person about her view of President Trump); *Higginbotham v. Brauer,* 2020 U.S. Dist. LEXIS 141857, at *16 (D. Md. Aug. 7, 2020) (denying summary judgment, noting "this case falls squarely within *Nieves*'s 'narrow qualification'" when only plaintiff criticized an arrest by calling it racist, and only plaintiff was arrested among a crowd all alleged to have disobeyed orders to disperse).

[16] There are two ways to meet the *Nieves* exception. First, a direct comparator suffices. *See, e.g., Akindes,* 2021 U.S. Dist. LEXIS 187943, at *36. Second, as Justice Gorsuch explained in his concurrence, *Nieves* "expressly left open the possibility that other kinds of evidence [than direct comparisons], such as admissions, might be enough to allow a claim to proceed" and that lower courts ought to apply the decision "commonsensically" to various contexts. 139 S. Ct. at 1734. Here, Plaintiff offers both direct comparison evidence as well as contextual, commonsense evidence showing objectively retaliatory motivation.

escalating, Does 2-3 joined Defendant Doe 1's vicious beating. Plaintiff has thus pled facts that "fall[] squarely within" (*Higginbotham,* 2020 U.S. Dist. LEXIS 141857, at *16) the *Nieves* exception.

**II.    Plaintiff Has Plausibly Pled As-Applied Challenges To The Curfew Orders On First, Fourth, Fifth, And Fourteenth Amendment Due Process Grounds, As Well As New York Law.**

As seen in the preceding points, and as argued below, Defendants' enforcement of the Curfew Orders against, and application of them to, Plaintiff, violated Plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments, as well as New York law. With respect to the federal claims, Plaintiff has plausibly pled as-applied challenges on First Amendment, Fourth Amendment, and due process grounds. Plaintiff's as-applied Fourth Amendment-based challenges are outlined in Point I above.

As to Plaintiff's as-applied First Amendment-based challenges, separate and aside from Plaintiff's *Monell* claims, and Plaintiff's non-*Monell* claims framed through a retaliation lens (discussed elsewhere), Plaintiff has separately pleaded as-applied time/place/manner challenges, and a challenge to the application of the Curfew Orders as a strict liability offense. *See, e.g.,* FAC ¶¶ 237-245, 293-299. Although Defendants say Plaintiffs' as-applied challenges should fail, the vast majority of their arguments are focused on facial challenges that Plaintiff has dropped. *See* DMOL pp. 4-7. Defendants had authority to declare an emergency and impose a curfew. But that authority was not absolute. When Defendants, and other NYPD members, enforced the Curfew Orders against Plaintiff and many others in a malicious and retaliatory manner, without first having given orders to disperse, they applied them unconstitutionally, including by enforcing the Curfew Orders in a manner that burdened substantially more protected conduct than was necessary to achieve those legitimate governmental objectives the Curfew Orders were meant to advance, and in a manner that rendered violating them, in effect, a strict liability offense. Defendants simply do not address these aspects of Plaintiff's as-applied First Amendment-based challenges to the Curfew Orders, and have

waived their chance to do so.

Finally, Defendants argue that, "in circumstances where temporary emergency measures are adopted to address civil unrest, judicial review is circumstanced," citing outdated authority, *see* DMOL p. 5, recent Supreme Court and Second Circuit authority have applied familiar constitutional scrutiny principles. *See, e.g., Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020*); see also Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003).

On Plaintiff's as-applied due process-based challenges to the Curfew Orders, Defendants' only argument is that "Plaintiff does not articulate what offense was rendered unconstitutionally vague by its enforcement, does not articulate what warning or notice was required of the law before its enforcement would be cured of this defect, or even whether this is related to the alleged need for dispersal orders before arrest." *See* DMOL pp. 19-20. However, the FAC certainly does so, for pleading purposes, in that it demonstrates police enforced the Curfew Orders without first giving the required dispersal orders, a meaningful opportunity to comply, and ensuring people subject to arrest had refused to leave, thereby implicating the same due process concerns that concerned the *Jones* Court when it invoked due process principles. *See, e.g., Jones*, 465 F.3d at 60-61; *Akkinagbe,* 128 F.Supp.3d at 547-48. Finally on this point, although Defendants accuse Plaintiff of advancing a due process claim when, they think, a Fourth Amendment claim would be more appropriate, when particular conduct violates more than one constitutional provision, a Plaintiff may plead the same conduct violated multiple constitutional provisions in separate claims. *See generally, Saeli v. Chautauqua Cty.*, 36 F.4th 445, 459-60 (2d Cir. 2022)

## III.  **Plaintiff's Claim for Excessive Detention Has Been Sufficiently Pled.**

Excessive detention claims are not, as Defendants claim, limited only to delay following an objectively unreasonable *initial* detention, nor must the detention necessarily exceed 24 or even 48 hours. *See, e.g., Pesola v. City of N.Y.*, 2016 U.S. Dist. LEXIS 42977 (S.D.N.Y. March 30, 2016)

(Denying Defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss excessive detention claims for 15 and 24-hour periods). Detention is also excessive when the delay is "for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *City of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *see also Pesola*, *supra* (finding that Plaintiffs sufficiently alleged "delay motivated by ill will against plaintiffs" to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss by merely alleging that delays were retaliation by police for Plaintiffs' refusal to submit to an iris scan); *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 150 (S.D.N.Y. 2011) (excessive detention claims may prevail where the termination of detention or a judicial determination as to probable cause was "unreasonably and deliberately delayed," including because of "a policy to detain [Plaintiff] longer than would otherwise be required.").  The mass arrest processing that Mr. Casablanca was subjected to here (discussed in Point V below) clearly amounts to a policy to detain Plaintiff than would otherwise be required in issuing a ticket on the street. Mr. Casablanca should have been released without charges when no NYPD member who observed his  pre-arrest conduct could be located. Instead, a supervisor assigned Defendant Costello to process his arrest, even though Costello did not see Plaintiff before his arrest, prolonging his arrest for almost eight more hours, during which he was in substantial pain from overtight handcuffs and bruising. FAC ¶¶ 127- 159. Ultimately, Mr. Casablanca was released with a Summons in which Defendant Costello falsely swore that he had observed him before his arrest. *FAC* ¶ 160. These facts sufficiently plead that Mr. Casablanca's detention was for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, and a delay for delay's sake.

Defendants' reliance on *Bryant v City of N.Y.* and related cases is also misplaced: the *Bryant* Court's decision was specifically predicated on the fact that Desk Appearance Tickets, at the time, were "not required under New York law." *Bryant v. City of N.Y.*, 404 F.3d 128, 138 (2005); *see also* DMOL pp. 28-

29, *citing Caravalho v. City of N.Y.,* 2016 U.S. Dist. LEXIS 104120 (SDNY Mar. 31, 2016) (likewise predicating the Court's finding on the fact that, at the time, that there was "no law" requiring the issuance of a summons). Defendants' position on this issue is wholly reliant on outdated law.  In January 2020, changes to New York's Criminal Procedure Law mandating that appearance tickets "***shall***" be issued on the street ***instead of*** custodial arrests for certain violations, misdemeanors, and low-level felony charges went into effect. C.P.L. § 150.20(1)(a). Critically, the statutory "shall" and "instead of" language makes clear that, absent truly extraordinary circumstances, police must issue an appearance ticket in lieu of custodial arrest, where eligible. It is therefore a clear violation of the law for an eligible individual to be subjected to arrest processing for a charge the law requires police to release them with an appearance ticket on. That is what happened here. Mr. Casablanca's sole charge, a B misdemeanor for violating New York City Administrative Code § 3-108, legally required police to issue him an appearance ticket on the street rather than initiate an arrest absent the existence a specific exception, which Defendants have not asserted. *See Pesola v. City of N.Y.* at *30 ("[J]ustifications for the delay that are not apparent on the face of the complaint are not appropriately considered on a motion to dismiss."). While Plaintiff was ultimately released with a ticket to appear in court, he was brought to a processing center and held in police custody for eight hours-- in violation of C.P.L. § 150.20(1)(a). This is not, as Defendants claim, a situation where police "could have, but did not" issue a ticket on the street, but one where, even if their false allegations were true, they were required to do so and instead violated the law.[17]

---

[17] Defendants do not cite to the 2018 *Caravalho* decision in the Second Circuit, but it bears addressing here. *See Caravalho v. City of New York*, 732 Fed. Appx. 18 (2d Cir. 2018). While the Court held that violation of New York's 24-hour reasonableness window did not create a *per se* Fourth Amendment violation, the Court nevertheless maintained that the reasonableness of an under-48-hour detention is rebuttable with a "showing that the probable cause determination was 'delayed unreasonably.'" *Id.*, *citing McLaughlin*, 500 U.S. at 56; *United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013), *citing Virginia v. Moore*, 553 U.S. 164, 166. Even if the constitutionality of Plaintiff's initial arrest does not hinge on state-level procedural rules, that Defendants illegally arrested and detained Plaintiff and detained him excessively because of "ill will" are relevant facts which have been sufficiently pled to rebut the reasonableness presumption at this stage.

Lastly, Plaintiff was falsely arrested. Where police withhold exonerative evidence—which, in the instance of a police-observed complaint, includes their accurate eyewitness testimony—for the purpose of detaining an individual under false pretenses, there is no requirement that the detention exceed 48 hours to be excessive, and this detention is not objectively reasonable. *See*, *e.g.*, *Pesola* at *30 (time in custody does not need to be "categorically unreasonable" to constitute excessive detention if the delay itself is unreasonable). It necessarily follows that all time wrongly in police custody was excessive.

## IV.  **The FAC Plausibly Pleads Plaintiff's Fair Trial Rights Claim.**

Plaintiff has plausibly pleaded a fair trial rights claim against Defendant Costello, and the Court should reject Defendants' arguments to the contrary (*see* DMOL pp. 26-27). To make out such a claim, "a plaintiff must demonstrate that 'an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result.'" *Smalls v. Collins,* 10 F.4th 117, 132-33 (2d Cir. 2021), quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 267 (2d Cir. 2016); *see also Marom v Blanco*, 2019 US Dist LEXIS 124343, at *19 (SDNY July 25, 2019) ("*Marom III*"). Unlike a federal malicious prosecution claim based in the Fourth Amendment's reasonableness standard, which requires a deprivation of liberty consistent with a seizure, a fabricated evidence-based fair trial rights claim "vindicates a different constitutional right" sounding in the Fifth, Sixth, and/or Fourteenth Amendments. *Smalls,* 10 F.4th at 132-33; *see also, e.g., Garnett*, 838 F.3d at 276, n. 6; *Harris v City of NY*, 222 F Supp 3d 341, 351-52 (SDNY 2016). However the rights are analyzed, "it is settled law that a plaintiff may bring a viable Section 1983 claim for damages based on fabrication of evidence where an officer's post-arrest fabrication of evidence results in a restraint on the plaintiffs liberty." *Harris*, 222 F Supp 3d at 351, citing *Zahrey v. Coffey*, 221 F.3d 442, 350 (2d Cir. 2000). "[T]he fabricated information" or evidence must "cause the plaintiff to suffer" a deprivation of life, liberty,

or property "that is not 'too remote a consequence' of the act of creating the false information'" or evidence. *Marom III*, 2019 US Dist LEXIS 124343 at *21, quoting *Garnett*, 84 F.3d at 297 and citing *Collins v. City of N.Y.*, 295 F.Supp.3d 350, 371 (SDNY 2018). And, "importantly, '[t]he fabricated evidence need not be the only cause of the deprivation of liberty'" or property. *Id.,* quoting *Collins v. City of N.Y.,* 2019 U.S. Dist. LEXIS 54130, at *2 (SDNY Mar. 29, 2019) (citing *Garnett*, 838 F.3d at 277).

NYPD members have discretion whether to charge certain violation and misdemeanor-level offenses using NYPD forms that are collectively called a "Criminal Court Summons" or a "C-Summons." Oliver Decl. ¶ 32.[18] Prosecutions by C-Summons are typically returnable in the New York City Criminal Court's Summons Appearance Part (the "SAP"). *Id.* ¶ 33. The form C-Summons used to create C-Summonses in June of 2020 generated several documents related to each C-Summons, including an appearance ticket to be served on the arrestee, and a separate, sworn accusatory instrument to be filed with the criminal court. *Id.* ¶ 34. A NYPD member who serves an appearance ticket must file a copy with the local criminal court within 24 hours. *See* CPL § 150.80(1). The return date must be 20 days after the ticket is issued, or at the court's next scheduled session, if that is more than 20 days later. *See* CPL § 150.40. If a person does not appear as required, the Court "may issue a summons or a warrant of arrest." CPL § 150.60. New York law also criminalizes failing to respond to an appearance ticket as required, allowing for arrest and prosecution for a violation. *See* PL § 215.58. In addition to filing an appearance ticket with the local criminal court in a C-Summons prosecution, the issuing officer must also file a sworn, facially sufficient accusatory instrument prior to the return date. CPL § 150.50. The filing of such an instrument technically commences the criminal proceeding under CPL § 100.05.

---

[18] To the extent the Court finds any of the facts elaborated on in the Oliver Declaration would — without that elaboration — not be well-pled in the FAC, Plaintiff respectfully requests that the Court grant permission to amend to add or re-plead the facts as elaborated upon.

At all relevant times, as a matter of policy, the Office of the District Attorney of New York County ("DANY") had no involvement in prosecuting cases heard in SAP, or other cases prosecuted by C-Summons. Oliver Decl. ¶ 36. As a result, no prosecutor interviewed a complainant NYPD member before deciding whether to lodge C-Summons charges (or not), and, if so, which. *Id.* ¶ 37. Rather, an individual NYPD member issuing an appearance ticket related to C-Summons initiated the related prosecution directly, without the involvement of any local prosecutor, by choosing the charge(s) and language to be included in the accusatory instrument, swearing out supporting factual allegations in the instrument sufficient to make out each element of each charged offense based on their own personal observations, and filing the accusatory instrument with the local criminal court. *Id.* ¶ 38.

Here, on releasing Mr. Casablanca from police custody on June 4, 2020, Defendant Costello served Plaintiff with an appearance ticket requiring him to appear in SAP on September 30, 2020. CPL § 150.10(1); FAC ¶ 62; Oliver Decl. Ex. 4.[19] At some time between then and before September 8, 2020, Defendant Costello filed an accusatory instrument with the NYC Criminal Court charging Plaintiff with violating NYCAC § 3-108. *See* Oliver Decl. Ex. 5. Plaintiff's entire criminal prosecution between June 4, 2020 and September 8, 2020 was therefore based solely on Defendant Costello's sworn allegations he had personally observed Plaintiff violate the Curfew Orders prior to his arrest. In fact, Defendant Costello had *not* seen Plaintiff violating the Curfew Orders, or doing anything else, prior to Plaintiff's arrest. Rather, the first time Defendant Costello saw Plaintiff, he was in metal handcuffs placed on him by Defendants Does 1-3. He had no personal knowledge of Plaintiff's pre-arrest conduct. Nor did he locate anyone who had such knowledge.

---

[19] The Second Circuit has held that, under New York law, the issuance of an appearance ticket "commences a prosecution for purposes of determining whether an action for malicious prosecution lies." *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10,* 605 F.2d 1228, 1250 (2d Cir. 1979), *cert. denied*, 446 U.S. 919 (1980); *see also Mitchell v. City of New York,* 841 D.3d 72 (2d Cir. 2016); *Stampf v. Long Island R.R. Co.,* 761 F.3d 192, 199 (2d Cir. 2014).

Against that backdrop, there can be no question the FAC pleads the first three elements of a fair trial rights claim, *i.e.,* that an investigating official – Defendant Costello – fabricated information that was likely to influence a jury's verdict – his own false account of his own purported pre-arrest observations of Plaintiff. As to the fourth element, many cases speak of the false information doing harm because police forwarded it to a prosecutor, who then relied on the information in initiating and/or prosecuting a criminal case. Here, however, because there was no prosecutor involved in making any charging or prosecutorial decisions, it was Defendant Costello himself, rather than a prosecutor, who used the false information to initiate criminal proceedings against Plaintiff. That act amounted to an "unacceptable 'corruption of the truth-seeking function of the trial process'", *Morse v. Fusto,* 804 F.3d 538, 548 (2d Cir. 2015) (quoting *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997)), just the same as a prosecutor's use of Defendant Costello's false information to charge Plaintiff would have. For example, the Second Circuit has cited assessing the strength of the case and deciding whether to pursue charges at all as two (typically prosecutorial) decisions that are critical to a fair trial process's truth-seeking function, which relying on false information provided by police can corrupt. *See, e.g., Garnett,* 838 F.3d at 277. The central question is "whether the deprivation of liberty may be considered a legally cognizable result of the initial misconduct," *Zahrey,* 221 F3d at 351-52. That it was Defendant Costello, and not a prosecutor, who evaluated the strength of the potential case, decided what to charge, and how to charge it, and swore out an accusatory instrument initiating Plaintiff's criminal prosecution, relying on his own false information, makes him even more directly responsible for "the harm occasioned by such […] unconscionable action[s]," *Ricciuti,* 124 F.3d at 130, than he would have been if he had only provided false information to a prosecutor, who then relied on it in making critical charging decisions. Whether or not a prosecutor is involved, "everyone possesses the […] 'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'" *Morse,* 804 F3d at 547,

quoting *Zahrey,* 221 F.3d at 349.

As to the fifth and final fair trial rights claim element, Defendant Costello detained Plaintiff for around 8 hours while he processed Plaintiff's arrest and created NYPD arrest processing paperwork, and an accusatory instrument, falsely charging Plaintiff. Beyond that, Defendant Costello made Plaintiff's appearance ticket returnable on September 30, 2020 - beyond 20 days after issuing it – during a time when SAP was closed as a result of the COVID-19 pandemic. Oliver Decl. ¶ 39. There was no means for Plaintiff to learn about the status of his case, or whether he was required to appear, short of engaging legal counsel, which he did. *Id.* ¶¶ 41-48. The court never communicated with him about whether, or when, he needed to appear to answer the appearance ticket. *Id.* Despite his attorneys' best efforts, Plaintiff did not learn until October 2, 2022 –after the September 30th return date - that the New York City Criminal Court had dismissed the case against him on September 8, 2022. *Id.* Therefore, the FAC sufficiently pleads that Defendant Costello's charging Plaintiff based on false information caused Plaintiff to suffer liberty and/or property deprivations. In this connection, at least for pleading purposes, "[c]ourts in this district have held that '[s]pending a number of hours in jail … constitute[s] a sufficient deprivation of liberty". *Id.*, quoting *Collins*, 295 F.Supp.3d at 371, citing *Harris v City of NY*, 222 F Supp 3d 341, 351-52 (SDNY 2016); *see also, e.g., Caravalho v. City of N.Y.*, 732 Fed.Appx. 18, 24 (2d Cir. 2018).

## V.   The FAC Adequately Pleads Plaintiff's Due Process Claims, as Well as Plaintiff's Equal Protection-Based *Monell* Claims.

Mr. Casablanca has adequately pleaded due process-based claims related to the seizure of his bicycle, which police took and never returned to him, as well as his arrest without fair notice, and related *Monell* claims. Plaintiff has addressed the due process principles and facts involved in his arrest without fair notice above. Briefly, however, because the Curfew Orders required that police give dispersal orders, and that a person refuse to comply with them, before police could make an arrest, a reasonable protester who was out after the curfew would have understood, and would have

been entitled to rely on, that requirement. When police enforced the Curfew Orders without first giving dispersal orders at all, they enforced the Curfew Orders in an overbroad manner that criminalized even innocent presence at a post-curfew protest, which rendered the Curfew Orders void for vagueness as applied. As to the seizure and retention of Plaintiff's bicycle, due process required either meaningful pre-deprivation or post-deprivation notice and opportunity to be heard. *See, e.g., Bray v. City of N.Y.*, 2005 U.S. Dist. LEXIS 21748, at *13-21 (SDNY Sept. 30, 2005). Police simply took Plaintiff's bicycle and he never saw it again.

To succeed on an Equal Protection claim, "a plaintiff must show that: (1) he was treated differently than others similarly situated and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Five Borough Bicycle Club v City of NY*, 684 F Supp 3d 423, 425 (SDNY 2010). Although Plaintiff is no longer pursuing a selective enforcement-based Equal Protection challenge, several of Plaintiff's *Monell* theories of liability, made out by Plaintiff's allegations that he and other protesters, and not others similarly situated, were subjected to municipal policies and practices such as – but not limited to - unreasonably long and unsafe detentions, sound in Equal Protection-based Fourteenth Amendment violations. For example, the FAC pleads that only protesters (or people perceived to be protesting) were subjected to the mass arrest processing centers, while others similarly situated[20] who were charged with violating the curfew orders in New York City were released after only short detentions, often on the street. *See, e.g.,* FAC ¶ 246. Additionally, the FAC adequately pleads that the policies and practices Plaintiff claims violated his Equal Protection rights were enacted, and carried out, with malice. For example, as mentioned elsewhere, the Moreno Video demonstrates Does 1-3 beat

---

[20] To show the relevant similar situation, there must be "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham v. Long Island R.R.*, 230 F. 3d 34, 40 (2d Cir. 2000).

Plaintiff maliciously. Beyond that, the FAC points to two similarly situated groups of protesters with different messages, engaged in the same conduct during the same time period, to whom Defendants responded by treating protests whose message they favor, such as "Blue Lives Matter" and other pro-police protests, supportively, while deploying the malicious tactics against Mr. Casablanca and others who were protesting police misconduct and brutality during the Summer 2020 racial justice protests. *See, e.g.,* FAC ¶¶ 171-178. That, and other, different treatment pleaded in the FAC, coupled with the plausible allegations of mass arrests without probable cause[21], sufficiently demonstrate, for pleading purposes, Defendants' intent to inhibit or punish the exercise of the summer 2020 Black Lives Matter protesters' exercise of their constitutional rights, or malicious or bad faith intent to injure them, in enacting and carrying out the policies and practices Plaintiff complaints of. As those arguments, and the further related arguments in the *Monell* point below, show, Plaintiff's Equal Protection-based *Monell* claims are adequately pleaded.

## VI. <u>Defendants are Not Entitled to Qualified Immunity.</u>[22]

On "a motion to dismiss, …a qualified immunity defense based on arguable probable cause 'faces a formidable hurdle…' and is usually not successful.'" *Higginbotham v. City of New York*, 2015 WL 2212242 at *4 (SDNY May 12, 2015) (internal citations omitted). And, "because qualified immunity is an affirmative defense…the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Tellier v. Fields*, 280 F.3d 69, 84 (2nd Cir. 2000) (internal citation and quotation omitted); *Palmer v. Richards*, 364 F.3d 60, 67 (2nd Cir. 2004) (same). Beyond that, "it has long been clearly established that an arrest without probable cause is a constitutional violation." *Robinson v. Via*, 821 F.2d 913, 921 (2d Cir. 1987).

---

[21] "'[A] lack of probable cause generally creates an inference of malice.'" *Higginbotham v City of NY*, 105 F Supp 3d 369, 375 (SDNY 2015) (citations omitted).

[22] As Defendants' arguments as to qualified immunity are limited to Plaintiff's federal false arrest, § 1983 malicious prosecution, and First Amendment retaliation claims, DMOL at 24-26, and Plaintiff is no longer pursuing a federal malicious prosecution claim, Plaintiff's arguments are limited to the false arrest and First Amendment retaliation points Defendants raise.

Relatedly, it was clearly established well before the summer of 2020 there is neither probable cause, nor arguable probable cause, to arrest a person for refusing to comply with a dispersal order when police never even gave such an order, *see, e.g., Zellner,* 494 F.3d at 375 (where there was no evidence in the record that a dispersal order had been given, there "no reasonably competent trooper could have concluded there was probable cause" to arrest for a PL § 240.20(6) violation); *Edrei v. Maguire,* 892 F.3d 525, 531 (2d Cir. 2018), citing *Jones v. Parmley,* 465 F.3d 46, 57, 60, 63 (2d Cir. 2006) (absent imminent harm, officials have an obligation to inform demonstrators they must disperse), or where "the dispersal orders given were neither sufficiently communicated nor followed by an opportunity to comply," *Case I,* 233 F.Supp.3d at 384-85, citing *Dinler,* 2012 US Dist. LEXIS 141851, at *34-36; *accord, Case II,* 408 F.Supp.3d at 322 (denying summary judgment where "[t]estimony regarding…whether orders to disperse were adequately communicated before" the arrest was made was "sharply disputed"). It is of no moment in terms of the relevant qualified immunity analysis that the dispersal order requirement in this case arises in the context of the Curfew Orders rather than enforcement of PL § 240.20(6). Adequate precedent, including the caselaw cited above, gave Defendants fair notice that arresting a person for violating an ordinance that required the person to have knowingly refused a dispersal order, when the person had not been given any order at all, would violate a protester's First, Fourth, Fifth, and/or Fourteenth Amendment rights. *See also, Jones,* 465. F.3d at 60-61

Here, none of the Defendants have shown, based on the allegations in the FAC and the facts in the documents attached and/or incorporated by reference and/or relied on therein alone, construing all inference in Plaintiff's favor, their entitlement to qualified immunity.[23] Defendants' only argument as to qualified immunity is their assertion that there was at least arguable probable cause to arrest

---

[23] Of course, qualified immunity cannot protect Defendant City from liability on *Monell* grounds. *See Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2nd Cir. 1995).

Plaintiff, as "a person out at 9:00pm on June 3, 2020," for a perceived violation of the Curfew

Orders "even in the absence of orders to disperse" because reasonable officers could disagree as to

whether such an arrest would be authorized under the circumstances. DMOL 24-26. However, as

seen in Point **Error! Reference source not found.** above, the Curfew Orders only authorized an

arrest or prosecution after a non-exempt person refused to comply with a post-curfew dispersal

order, and made clear that police were required to give a dispersal order before making an arrest for

a violation. *See, e.g., Summer 2020*, 548 F.Supp.3d at 393, 408, 415-16. It would not be reasonable for

an officer to ignore or read out the dispersal order requirement where, as here, the knowing refusal

of a dispersal order is a prerequisite to a valid arrest and/or prosecution. The Court should reject

Defendants' sole argument on qualified immunity grounds because there was no arguable probable

cause to arrest Plaintiff, and allow Plaintiffs' federal false arrest and First Amendment retaliation-

based claims to proceed to discovery.

## VII.   Plaintiff's *Monell* Claims are Sufficiently Pled.[24]

Plaintiff adequately pleads three theories of *Monell* liability, based upon (1) Defendants'

customs, practices, and policies; (2) Defendants' failure to train; and (3) Defendants' failure to

supervise, investigate, and discipline. The FAC describes a number of specific NYPD policies,

practices, and customs that were widespread during the summer of 2020, to which Plaintiff was

subjected, as well as related failures to train, investigate, supervise, and/or discipline NYPD

members, as a result of which Mr. Casablanca was deprived of his constitutional rights. In *Summer

2020*, Judge McMahon denied Defendants' motion to dismiss most of Plaintiffs' municipal liability

claims. *See Summer 2020*, 548 F.Supp.3d 383. Defendants do not offer a reason for the Court to

---

[24] Defendants ask for the City to be dismissed as a party, if Plaintiff's *Monell* claims are dismissed.  DMOL at 15.
However, since Plaintiff has pled respondeat superior state law liability (FAC ¶¶342) and Civ. R. L. § 79-P claims (FAC
¶¶347- 349), which Defendants have not moved to dismiss (or at the least, offered no argument in favor of dismissal as
to § 79-P), that request misunderstands the claims in play. Regardless of the outcome on this partial motion to dismiss,
the City will remain a proper party here.

depart from that decision, and do not even cite it to distinguish it.

### A.   Plaintiff's municipal liability claim based on Defendants' customs, practices and policies is sufficiently pled.

Plaintiff pleads multiple policies, practices, and customs that were the motivating force behind the violations of Plaintiff's constitutional rights, including: unjustified and retaliatory mass arrests and other restrictions on protesters' expressive conduct, including through the use of kettling tactics, often without fair warning, including for perceived Curfew Orders violations, excessive and retaliatory uses of force, and subjecting arrestees who are eligible for release with an appearance ticket on the street, and whom CPL § 150.20(1)(a) requires to be released from the street with such a ticket, to unreasonably lengthy and dangerous mass arrest processing. Contrary to Defendants' assertions (DMOL pp. 8-9), Plaintiff's constitutional violations were related to these customs. Mr. Casablanca was subject to arrest as part of NYPD kettling of protesters, and to subsequent mass arrest processing (FAC ¶¶ 92, 135-158, 245); Mr. Casablanca was injured by NYPD members' applying overly tight metal handcuffs,[25] which NYPD members then refused and/or were unable to loosen over the course of hours (FAC ¶¶ 111-114; 144-154); and Mr. Casablanca was brutally beaten with batons as part of a general policy of using excessive force ("whether by baton or bicycle is irrelevant," *Summer 2020*, 548 F. Supp. 3d at 402).[26] Considering almost identical allegations,

---

[25] From the face of the FAC, it is obvious that Plaintiff's *Monell* claim is explicitly broader than a policy just about FlexCuffs. FAC ¶ 336 (Defendants used "excessively tight and injurious handcuffs, including **– but not limited to –** FlexCuffs . . . [and] failing to loosen or remove over-tight cuffs." FAC ¶ 336 (emphasis added); see also, id. ¶ 27 ("Protestors were physically restrained with tight handcuffs - **often, but not exclusively, with plastic flex-cuffs** – for excessively long period of time, in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage.") (emphasis added).

[26] That Mr. Casablanca did not actually contract COVID-19 does not defeat his *Monell* claim. Like any similar tort claim, a plaintiff does not have to actually contract an illness for exposure (or even perceived exposure) to be actionable; such an action may be sustained so long as the person reasonably feared that they could have contracted the illness. *Marchica v. Long Island R.R.*, 31 F.3d 1197, 1204 (2d Cir. 1994) (fear of HIV/AIDS was actionable, even when plaintiff did not ultimately contract HIV/AIDS). The FAC describes many occasions under which COVID-19 could "physically impact" plaintiff, *see, e.g.,* FAC ¶¶ 32-36, and those happened "under circumstances that would cause a reasonable person to develop a fear of" COVID-19. *Marichica*, 31 F.3d at 1206. Under Second Circuit law, that is sufficient to survive a motion to dismiss.

explicitly including allegations about baton strikes, in *Summer 2020*, Judge McMahon found the

pleadings at issue stated claims for municipal liability based on the same allegations about the same

customs and practices:

> [The] complaints also plead specific instances of other practices — perfectly permissible police practices in the right context, such as the use of batons, bikes, and pepper spray — in an impermissible manner and/or for impermissible purposes during the BLM protests. Again drawing all  inferences in favor of the pleader, those allegations are sufficient as well.
>
> In short, Plaintiffs identify a number of police practices that were allegedly wrongfully used or abused during the BLM protests and pleads facts from which it could be inferred that this was not some "one off" instance of misuse of these practices, but had been part and parcel of the NYPD's "arsenal" for dealing with political protests for that past two decades. That sufficiently pleads a custom or policy of using excessive force and making false arrests at large protests throughout New York City.

*Summer 2020*, 548 F. Supp. 3d at 402; *see also, e.g.,* FAC ¶ 187 (citing cases). Many of the cases cited in

¶ 187 of the FAC involve claims challenging similar mass arrest, excessive force, and large-scale

arrest processing policies and practices applied to protests that survived the motion to dismiss stage.

In many cases, those policies and practices violate more than one constitutional provision. For

example, courts have found that subjecting protesters to unreasonably long mass arrest processing

can violate the First, Fourth, and/or Fourteenth amendments. *See, e.g.*, *Case I,* 233 F. Supp 3d at 381,

407 (declining to dismiss *Monell* claims based on Plaintiffs' allegation that "the City refined and

adopted a 'policy and practice related to the centralized processing of arrestees in a single mass arrest

processing center. . . all as part of an unreasonably lengthy and punitive mass arrest processing plan

(the 'MAPP'). . . [where] the No-Summons Policy and MAPP specifically targeted demonstrations");

*Dinler*, 2012 US Dist LEXIS 141851, at *51, et seq.; *Osterhoudt v. City of New York, et al.*, No. 10-

cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012); *MacNamara v. City of

New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011); *Schiller v. City of New York*, No. 04-cv-7922

(RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008); *Mandal v. City of New York*, 2007 WL

3376897, at *2 (S.D.N.Y. Nov. 13, 2007); *Mandal v. City of New York,* No. 02-cv-1234 (WHP), 02-cv-

1367 (WHP), 02-cv-6537(WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006); *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006); *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006); *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005). Against that backdrop, the FAC sufficiently pleads that Defendants injured Plaintiff by subjecting him to the various and related policies and practices described in the FAC, some of which are mentioned above.

### B.  Plaintiff's <u>Monell</u> theory about Defendants' excessive force policy is well-pled.

Defendants argue that Plaintiff's excessive force-related *Monell* claim must fail because Plaintiff did not iterate specific numbers of NYPD members using batons during other protests, thus (Defendants claim) failing to meet the "widespread usage" requirement. First, *Summer 2020* explicitly rejects this argument (and Defendants make no effort to distinguish it):

> [T]he NYPD had long had a widespread practice of employing excessive force to police large demonstrations throughout New York City — a practice so persistent and long-standing that Mayor de Blasio, Commissioner Shea and Chief Monahan can be imputed with constructive knowledge of its existence. . . The fact that the complaints allege that excessive force was perpetrated in multiple ways and at multiple protests does not alter the implications of the facts pleaded, which are that a variety of tactics were used to impede the Plaintiffs from exercising their right to protest or to punish them for doing so. . . Defendants do not cite a single case requiring this Court to narrow its view of the *Monell* claim to a single, individual tactic employed by police.

548 F. Supp. 3d at 401- 402. Second, Defendants do not cite any authority that Plaintiff's must plead exactly "how many persons were subject to misuse of batons on May 29th or 30th." DMOL at 11. No precise number is required — particularly because the number is undisputedly massive.[27] At this stage, the FAC plausibly pleads — and Defendants may not contest — that thousands of people participated in the Summer 2020 protests following the murder of George Floyd, and many of those

---

[27] Indeed, in *Summer 2020*, the City even tried to argue "the alleged use[s] of bikes, batons, tasers, and pepper spray to assault and subdue protesters, shoving and punching, ***are too numerous*** to give rise to a unified pattern of police misconduct." 548 F. Supp. 3d at 401 (emphasis added).

people were beaten with batons. *See, e.g.,* FAC ¶¶ 27; 58-59; 181; 229; 232-236.  Thus, just as in *Summer 2020*, "[e]ven if Plaintiff[] were required to plead a discrete custom or policy for each individual tactic, [his] allegations would still be sufficient to state a claim for municipal liability." *Id.* That is, the complaint here (along with those it references) "also plead[s] specific instances of … use of batons … in an impermissible manner and/or for impermissible purposes during the BLM protests." *Id.*; *referencing allegations identical to, or referenced by, inter alia,* FAC ¶¶ 27; 58-59; 181; 229; 232-236.

### C.  Plaintiff's failure to train, supervise, and discipline claims are well-pled.

The FAC pleads specific failures of the NYPD to train regard policing protesting, which led to Plaintiff's constitutional deprivations, including failures to train on constitutional principles applicable to demonstration policing, mass arrests and fair warning, and use of force and use of force reporting—going back to the 1990s. FAC ¶¶ 188-273. Further, the FAC pleads specific failures to investigate, supervise, and/or discipline related to protest policing generally and to Defendants Does 1-4 and Defendant Costello here, related to Plaintiff's unlawful and unreasonably long arrest and detention; excessive uses of force that caused him injury; violations of the NYPD's use of force reporting policies; violations of NYPD's policies related to "turn over" arrests. These are exactly the same failure to train and supervise claims the Court found viable in *Summer 2020.* 548 F.Supp.3d at 400-407. Additionally, trials involving Occupy Wall Street-related incidents are currently scheduled that involve *Monell* claims that overlap significantly with those pleaded here. *See Case I,* 233 F.Supp.3d at 403-408; *Case II,* 308 F.Supp.3d at 327-334 (denying Defendant City summary judgment on similar – and in many cases identical - claims related to failure to train); *Packard v. City of New York,* 2019 US Dist. Lexis 189470, at *8-13, 29-36 (SDNY 2019) (same).

As to Plaintiff's failure to supervise and discipline-based claims, the City knew of the use of excessive force, mass arrests, and retaliation against the Summer 2020 protesters, the violations of

their constitutional rights in general, and about the specific violations of Mr. Casablanca' rights, yet failed to investigate or discipline the NYPD members involved. For example, City policymakers "routinely received reports regarding arrests made in connection with First Amendment assemblies" as well as "internal critiques" and other reports regarding topics such as "arrests, use of force[ ]protest arrest processing, and . . . related prosecutions." FAC ¶ 215. And, those policymakers made statements in the media confirming they knew mass arrests were unfolding. FAC ¶ 264. In finding that all Plaintiffs in *Summer 2020* had sufficiently pled *Monell* liability on a failure to supervise and/or discipline theory, the Court noted that,

> [a]fter an NYPD truck drove into a crowd of protesters, Mayor de Blasio stated on May 30, 2020,  "I do believe the NYPD has acted appropriately."  (*Payne* A.C. ¶ 48.)  On May 31, 2020, Commissioner Shea tweeted, "In no small way, I want you to know that I'm extremely proud of the way you've comported yourselves in the face of such persistent danger."  (*Payne* A.C. ¶ 49.) And after the Mott Haven protest on June 4, 2020, Commissioner Shea publicly stated that the NYPD "had a plan which was executed nearly flawlessly" (*People* A.C. ¶ 387, *Wood* A.C. ¶ 7, *Sow* A.C. ¶ 187, *Payne* A.C. ¶ 69.)

*Summer 2020*, 548 F. Supp. 3d at 405. From a *Monell* perspective, given the failure to investigate Mr. Casablanca's beating and arrest and identify and discipline the involved NYPD members, what happened at the 2020 protests—including specifically what happened to Mr. Casablanca given the more than 15 million views of the video (FAC ¶ 2)—was ratified at the highest level of the City. Although two years have passed since the violence depicted in videos, including the viral video of Mr. Casablanca, Defendants have dragged out or failed to conduct investigations, and/or taken virtually no disciplinary action. FAC ¶ 272. So, just as in *Summer 2020*,

> The acts pleaded and discussed above easily admit of the following *Jenkins/Walker* inferences: (1) the police had encountered numerous similar protests in years past, (2) as a result, the policymaker defendants had to know to a moral certainty that the BLM protests would result in certain types of behavior by the protesters that were likely to lead to certain types of responses by the police; (3) there would be difficult policing decisions to make in trying to keep the protests under control without violating the protesters' First Amendment rights; (4) training police officers to deal with crowd control in these specific situations could make it easier for them to make the right decisions; and (5) making the wrong decision (***i.e., by employing too much force***) could result in depriving protesters of their constitutional rights. Indeed, the essence of the deliberate indifference allegations in the complaint is that these situations arise

repeatedly in New York City, *yet the NYPD — despite years of litigation and complaints involving police behavior at mass political protests — still has not come up with a way to train its officers to control crowds without violating constitutional rights*.

548 F. Supp. 3d at 403 (emphasis added); *see also, e.g., Vasquez v. City of NY*, 2018 US Dist. LEXIS

78429, at *27 (SDNY May 9, 2018) (the same deliberate indifference standards applicable to a failure

to train claim is applicable to a claim based on failure to discipline).

## VIII.   Defendants' Bifurcation Argument is Procedurally Improper and Meritless.

Defendants' application to bifurcate is untimely, meritless, and procedurally barred. To begin

with, the Court has already, in effect, rejected bifurcation. After considering the parties' arguments,

the Court consolidated this action and *Britvec* for limited purposes and ordered the parties "to

coordinate discovery in these actions with discovery in the" Consolidated Actions "to the extent that

such coordination would be helpful and appropriate and to do so without the need for judicial

intervention." ECF 21. After the Court ordered coordination, Defendants briefly seemed to intend

to ask for bifurcation. *See* ECF 22-25. But after that brief attempt, Defendants did not mention

bifurcation for several months, before asking for bifurcation in their memo. But at this point, the

parties have been conducting *Monell* discovery for nearly a year. Thus, to ask for bifurcation now is

essentially a long-since untimely motion for reconsideration. *See* Loc. Civ. R. 6.3. The time to raise

this issue was at the 26(f) conference — or at a minimum at the initial pretrial conference in January.

Thus, as a practical matter, to try to somehow bifurcate the already coordinated-with-the-

Consolidated Actions *Monell* discovery would require perhaps some of the most artful unmixing of

cement that could be done. Defendants make no attempt to explain how that could be done

consistent with the Court's Order at ECF 21. But assume arguendo the Court *does* order bifurcation:

What does that *mean*?[28] Defendants offer no answer that question, because they cannot.

---

[28] That is, since there is no *Monell* discovery on this docket in the first place, how would bifurcation work? Is Plaintiff no longer permitted to coordinate *Monell* discovery with the Consolidated Actions? Can Plaintiff ask questions at relevant depositions? If so, and there is a relevant question Plaintiff has for a high-ranking NYPD member being deposed in the

On the merits, bifurcation is an extraordinary remedy imposed by the Court pursuant to Fed. R. Civ. P. 42(b) reserved for "exceptional cases" with "particularly compelling" circumstances. *Kos Pharms., Inc. v. Barr Labs., Inc.*, 218 F.R.D. 387, 391 (SDNY 2003). Bifurcation is "the exception, not the rule, and the movant must justify bifurcation on the basis of the substantial benefits that it can expect to produce." *Lewis v. City of N.Y.*, 689 F.Supp. 2d 417, 428 (EDNY 2010); *see also Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 693 (SDNY 1996); *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 549 (SDNY 2005). Here, there is every reason to avoid the duplication of efforts ***by coordinating*** (as has been happening for months)—not bifurcating—*Monell* discovery.

In cases handled by Plaintiff's counsel alone, the City has argued for bifurcation in quite a few Summer 2020 cases. Every single judge of this Court and the Eastern District has rejected their arguments. *See, e.g., Rodriguez v. City of N.Y.*, 21-cv-10815 (PKC) (SDNY 2022).[29] The arguments the City has offered have been so meritless that, "[c]ontrary to [their] intended purpose, … [they] highlight[] the wisdom of coordination" with the Consolidated Actions — ***not*** bifurcation. *Rodriguez*, Slip Op. at *1 (rejecting bifurcation). That is because "[c]ircumstances unique to the overlap between this action and [the Consolidated Actions] make it efficient that *Monell* discovery in this action that overlaps *Monell* discovery in [the Consolidated Actions] go forward." *Id.* at 2.

In sum, not a single Court has granted any of the City's bevy of motions seeking identical relief in Summer 2020 cases. Even assuming it can figure out what shifting to bifurcation would mean after a year of coordinated *Monell* discovery, this Court should not be the first.

---

Consolidated Actions, does Plaintiff get to depose them later notwithstanding the coordination order? Can Plaintiff show witnesses in this case documents discovered in *Monell* discovery in the Consolidated Actions?

[29] See also, *Sharma v. City of New York*, Case No. 21-cv-10892; (SDNY 2022); *Margoilies v. City of New York*, 21-cv-10839 (PKC) (SDNY 2022); *DeLuca v. City of New York*, 21-cv-10777 (AJN) (KHP) (SDNY 2022); *Sukana, et al. v. City of New York*, et al., 21-cv-10899 (LJL)(BCM) (SDNY 2022) (in *Sukana,* the City technically only asked "that Monell discovery be limited" before describing what appeared to be bifurcation); *Cunningham v. City of New York*, et al., 22 CV 588 (LDH) (SJB) (EDNY 2022); *Acosta v. City of New York*, 22-cv-676 (EDNY 2022).  For each of these cases, the relevant Orders — along with the motions in which the City sought bifurcation, for context — are attached to the Oliver Decl. as Exs. 14-27.

## <u>CONCLUSION</u>

For all these reasons, and those discussed in the opening memorandum, Plaintiff respectfully

requests that the Court deny Defendants' motion, except insofar as Plaintiff as withdrew his claims.


Dated:     September 6, 2022
               Queens, New York


Respectfully Submitted,

/s/
_____

**GIDEON ORION OLIVER**
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682

**COHEN&GREEN P.L.L.C.**[30]
Elena L. Cohen
J. Remy Green
Jessica Massimi
MK Kaishian
1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480

---

[30] Law students Regina Yu, Hannah Bretz, and Alicia Loecker who are not yet members of any bar, has provided substantial legal research and writing in preparing this memorandum.

46