**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

FRANCISCO JAVIER CASABLANCA-TORRES,

                                        Plaintiff,

        - against -                                    **SECOND AMENDED**
                                                       **COMPLAINT**
THE CITY OF NEW YORK; MAYOR BILL DE
BLASIO; NEW YORK CITY POLICE                           **21-cv-10832 (LAK)**
DEPARTMENT ("NYPD") COMMISSIONER
DERMOT SHEA; NYPD CHIEF OF DEPARTMENT
TERENCE MONAHAN; NYPD OFFICER RYAN
COSTELLO, SHIELD NO. 03464; NYPD
LIEUTENANT LUIS COLUMBIE; NYPD
SERGEANT RICHARD WALL, and NYPD
MEMBERS JOHN and JANE DOES # 1 and 4,

                                        Defendants.

-------------------------------------------------------------------- X

        Plaintiff FRANCISCO JAVIER CASABLANCA-TORRES, by and through his

attorneys, Gideon Orion Oliver and Cohen & Green P.L.L.C., as and for his Second Amended

Complaint in this matter, alleges as follows:

## PRELIMINARY STATEMENT

        1.        On May 25, 2020, police killed George Floyd in Minneapolis, Minnesota. Protests

against police violence and in support of police accountability and the Black Lives Matter

movement spread across the United States and the world, including here in New York City,

where thousands protested beginning on May 25, 2020 and in the following weeks.

        2.        On the evening of June 3, 2020, Plaintiff FRANCISCO JAVIER

CASABLANCA-TORRES was participating in a Black Lives Matter protest seeking justice for

George Floyd in Manhattan when he was beaten and arrested at around 9:00 p.m. at around 3rd

Avenue and 50th Street in Manhattan. Twitter user @joshfoxfilm posted the statement: "People stuck in traffic are witnessing NYPD beat up folks on their way home" along with an 11-second video of NYPD members beating Plaintiff at that time and location (the "Moreno Video") on Twitter at around 10:10 p.m.: https://twitter.com/joshfoxfilm/status/1268366655047503969 (Last accessed August 30, 2021). As of August 30, 2021, the Twitter interface indicates that the Moreno Video embedded in the tweet has been viewed at least 15,500,000 times, and that the tweet has been retweeted 99.1K times, quote tweeted 13.7K times, and liked 189.1K times.



## JURISDICTION AND VENUE

3.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.

4.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

5.     Plaintiff also brings claims under New York law and the New York constitution.

6.     Petitioner initially commenced this matter as an action in New York County Supreme Court, where venue was proper, *inter alia,* because the causes of action all arose within New York County.

7.     Some of the Defendants then removed the proceeding to the Southern District of New York pursuant to 28 U.S.C. § 1441 because the Court has original jurisdiction over Plaintiff's 42 U.S.C. §§ 1983 and 1988 claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.     This Court has supplemental jurisdiction over Plaintiff's New York law-based claims under 28 U.S.C. § 1367.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

9.     Mr. Casablanca served a Notice of Claim upon the City of New York related to Plaintiff's state law claims on September 1, 2020.

10.     Mr. Casablanca served an additional, Supplemental Notice of Claim related to Plaintiff's state law claims on November 24, 2020.

11.     Mr. Casablanca attended a hearing pursuant to section 50-h of the New York General Municipal Law on December 8, 2020 related to Plaintiff's state law claims.

12.     More than thirty days have elapsed since Mr. Casablanca served the Notice of Claim on Defendant City, and Defendant City has not offered adjustment or payment thereof.

## DEMAND FOR A JURY TRIAL

13.    Plaintiff demands a trial by jury in this action on each and every one of Plaintiff's claims for which a jury trial is legally available.

## PARTIES

14.    At all times relevant herein, Plaintiff FRANCISCO JAVIER CASABLANCA-TORRES (Mr. Casablanca; he/him) has been a resident of the City of New York, County of New York, and State of New York.

15.    Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

16.    Defendant New York City Mayor BILL DE BLASIO was, at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner.

17.    Defendant NYPD Commissioner DERMOT SHEA was, at all times relevant to this Complaint, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times, had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect

4

to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable.

18.     Defendant NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint, the Chief of Department of the NYPD who has policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him.

19.     At all times relevant herein, Defendants NYPD OFFICER RYAN COSTELLO, SHIELD NO. 03464, NYPD SERGEANT RICHARD WALL, NYPD LIEUTENANT LUIS COLUMBIE and NYPD MEMBERS JOHN AND JANE DOES 1 and 4, were officers, employees, and agents of the NYPD who were personally involved in depriving Plaintiff of Plaintiff's rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

20.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

21.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

22.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

23.     Defendants were each and all responsible, in whole and/or in part, for the
planning for and/or creation, promulgation, implementation, and/or enforcement of the
unconstitutional policies, practices and/or customs complained of herein, and/or condoned,
acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as
set forth more fully below.

24.     At all times relevant herein, as set forth more fully below, Defendants' actions
and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference
to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

25.     Although they were aware of the conduct, present for it, and knew or should have
known it was unconstitutional, at no time did any of the Defendants, or any other member of the
NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct
engaged in by their fellow officers.

26.     Each individual Defendant is sued in their individual and official capacities.

## STATEMENT OF FACTS

### THE SUMMER 2020 PROTESTS IN SUPPORT OF BLACK LIVES

27.     In the days and weeks following George Floyd's killing, the New York City
Police Department ("NYPD") engaged in activities that violated the constitutional rights of
individuals who were protesting police misconduct, including, *inter alia,* corralling protestors
into spaces where they could not escape, beating protestors with batons and fists, throwing
protestors to the ground, using pepper spray indiscriminately, and ultimately arresting many of
the protestors without lawful justification and without fair warning. Protestors were physically
restrained with tight handcuffs - often, but not exclusively, with plastic flex-cuffs - for
excessively long period of time, in such a manner that caused them unnecessary pain and

suffering and, in some cases, possible serious and long-term nerve damage. They were also subjected to lengthy and unnecessary arrest processing that put them in dangerously close quarters, all at the height of the global COVID-19 pandemic.

28.     The unlawful policies and practices used by Defendants against protestors included a crowd-control tactic known as "kettling" to corral and detain individuals who were engaged in peaceful protest. Defendants used kettling and similar tactics in order to impede constitutionally protected First Amendment activities, to conduct mass arrests without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights in the future.

29.     In addition, NYPD officers also targeted and arrested legal observers, medics, and other workers performing essential services without probable cause.

30.     By contrast, these same Defendants have responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests) without using the same tactics employed against those who protested police conduct during the racial justice protests of 2020.

31.     The police actions in this case were part of overlapping policies and practices of the City of New York and the NYPD which were well known to Defendants New York City Mayor Bill de Blasio, New York City Police Commissioner Dermot Shea, and other City policymakers. These overlapping policies and practices include, *inter alia,* the use of excessive force, false arrests, and excessive and unreasonable detention at certain demonstrations— particularly those that focus on misconduct by the NYPD—but not others. These overlapping policies and practices have existed for years and have often resulted in litigation.

**THE COVID-19 PANDEMIC IN NEW YORK CITY**

32.     As protesters were taking to the streets in the summer of 2020 to speak out against police brutality and in support of Black lives, the COVID-19 virus raged across the country.

33.     In April 2020, then-New York State Governor Andrew Cuomo ordered people to wear protective face masks in public, to protect themselves and others from the spread of the virus.

34.     However, many police officers failed to abide by this directive to wear masks. And many officers who interacted with and arrested protesters in May and June of 2020 were not wearing face masks, even as the City continued to record hundreds of new coronavirus cases each week.

35.     By contrast, most protesters wore protective face masks—at least until their contacts with NYPD members. As described below, during their arrests, many arrestees' masks or other face coverings fell off or were removed.

36.     These protesters were transported in vans and/or buses and placed in holding cells in close indoor contact with other arrestees whose masks fell off or were removed, and police officers who were not wearing masks.

**STATE AND CITY OFFICIAL REPORTS ON THE SUMMER 2020 PROTESTS RELIED ON BY PLAINTIFF, IN PART, IN SUPPORT OF PLAINTIFF'S MUNICIPAL LIABILITY CLAIMS**

37.     In support of Plaintiff's municipal liability claims, in part, Plaintiff relies on the contents of certain reports referred to in this pleading, including the New York State and New York City agency reports below. including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[1]

---

[1] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at

38.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[2]

39.     The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

40.     The AG Report also found the pervasive failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

41.     In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").

42.     The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[3]

---

https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.
[2] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.
[3] DOI Report at 36.

43.     In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[4]

44.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

45.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

46.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

47.     According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[5]

48.     The DOI also found that Black arrestees were disproportionately charged with felonies.[6]

49.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[7]

50.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[8]

**OTHER LAWSUITS RELIED ON BY PLAINTIFF, IN PART, IN SUPPORT OF PLAINTIFF'S MUNICIPAL LIABILITY CLAIMS**

---

[4] *Id.* at 61.
[5] *Id.* at 26.
[6] *Id.* at 27.
[7] DOI Report at 56.
[8] *Id.* at 28.

51.     In support of Plaintiff's municipal liability claims, in part, Plaintiff also relies on the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the summer 2020 protests, including:

  a. *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

  b. *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

  c. *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

  d. *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

  e. *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

  f. *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

  g. *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG);

  h. *Hernandez, et al. v. City of New York, et al.,* 21 Civ. 7406  (CM)(GWG)

  i. *Minett v. City of New York, et al.,* 21-cv-8161 (CM)(GWG); and

  j. *Britvec, et al., v. City of New York, et al.,* 21-cv-10759 (LAK)(KNF).

52.     The allegations in this pleading with respect to Plaintiff's municipal liability claims repeat, and in some cases go beyond, the allegations supporting the *Sow* Plaintiffs' municipal liability claims.

53.     Plaintiff respectfully notes that, in ruling on a partial motion to dismiss brought by a number of Defendants in approximately ten cases, including several putative class actions mentioned above, arising from the summer 2020 protests, which are consolidated for pre-trial purposes before Hon. Colleen McMahon and Hon. Gabriel W. Gorenstein under the 20-cv-8924 docket (the "Consolidated Actions"), Judge McMahon denied Defendants' motion to dismiss

most of Plaintiffs' municipal liability claims. *See In re NY City Policing During Summer 2020 Demonstrations*, 548 F.Supp.3d 383 (SDNY 2021).

54.    In so doing, the Court took into consideration and noted that many of the Plaintiffs in the Consolidated Actions had incorporated by reference the allegations in the others' pleadings. *See, e.g.,* 548 F.Supp.3d at 405, n. 6, n. 8.

55.    Plaintiff further relies on, in part, the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the summer 2020 protests, including:

     a.   *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

     b.   *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

     c.   *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

     d.   *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

     e.   *Richardson and Myrie v. City of New York et al*., 21-cv-03609 (LDH)(SJB);

     f.   *Smith v. City of New York et al*., 21-cv-03096 (DG)(TAM); and

     g.   *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

56.    Additionally in this connection, Plaintiff specifically relies on the allegations in the *Britvec* Complaint at ¶¶ 51-97 regarding the *Britvec* Plaintiffs' experiences, including Mr. Britvec's experiences with Defendant Costello, arising from events at the same time and location as Mr. Casablanca's beating and arrest.

**Black Lives Matter Protests from May 28, 2020 to May 30, 2020**

57.    On May 28, 2020, days after George Floyd's death, protests began across New York City. One protest in Union Square saw a mobilization of hundreds of NYPD officers in

response who made several arrests. A group of protestors marched to City Hall where officers trapped them with bicycles, and arrested approximately 75 people.

58.     Protests continued on May 29th at Foley Square in Manhattan and Barclay's Center in Brooklyn. At Barclay's Center, NYPD officers peppered sprayed and struck protesters with batons and hundreds of protestors were arrested.

59.     On May 30, protests continued in New York City in all five boroughs. The protests were again met with NYPD shows of force including pepper spray, baton strikes, fist strikes and mass arrests. In the Flatbush area of Brooklyn, a police helicopter flew low overhead swirling debris, trash, and dust into the marchers' faces. Collectively, at least 321 protestors were arrested following encounters with the Defendants on May 30th.

60.     On May 31, the protests in New York City continued, with thousands marching from the Barclays Center over the Manhattan Bridge into Lower Manhattan, near the Williamsburg Bridge, and in Times Square and Midtown. At least 325 protestors were arrested.

**Defendant de Blasio's Curfew Orders and the NYPD's Subsequent Arrests**

61.     On June 1, 2020, in the midst of the protests in New York City, Governor Andrew Cuomo and Defendant de Blasio announced that New York City would be subject to an 11:00 p.m. to 5:00 a.m. curfew.[9]

62.     On the evening of June 1, 2020, Defendant de Blasio announced he would be extending the curfew to the evening of June 2, 2020 from 8:00 p.m. to 5 a.m.[10]

---

[9] *See* https://www.governor.ny.gov/news/governor-cuomo-and-mayor-de-blasio-announce-citywide-curfew-new-york-city-will-take-effect; Emergency Executive Order No. 117, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf.

[10] *See, e.g.,* https://twitter.com/NYCMayor/status/1267642422194057217?s=20; Emergency Executive Order No. 118, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf.

63.     On June 2, 2020, Defendant de Blasio issued Emergency Executive Order No.

119, ordering "a City-wide curfew to be in effect each day from 8:00 p.m. until 5:00 a.m.,

beginning at 8:00 p.m. on June 3, 2020 and ending at 5:00 a.m. on June 8, 2020" during which

"no persons or vehicles" could "be in public."[11]

64.     Under the Curfew Orders[12]: "Failure to comply with this Order shall result in

orders to disperse, and any person who knowingly violates the provisions in this Order shall be

guilty of a Class B misdemeanor."

65.     The Curfew Orders exempted certain categories of workers that were deemed

"essential", including "police officers, peace officers, firefighters, first responders and

emergency medical technicians, individuals travelling to and from essential work and performing

essential work, people experiencing homelessness and without access to a viable shelter, and

individuals seeking medical treatment or medical supplies."

66.     The first of the Curfew Orders explicitly cited escalating demonstrations in

response to the death of George Floyd as a primary justification for the need to ban the presence

of all non-essential workers in public at night while the Curfew Orders were in effect.

67.     In that respect, the Curfew Orders focused on demonstrations, which the Curfew

Orders said had "subsequently escalated, by some persons, to include actions of assault,

vandalism, property damage, and/or looting."

---

[11] *See* Emergency Executive Order No. 119, *available at*
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-
119.pdf.
[12] Hereinafter, we refer to Defendant de Blasio's Emergency Executive Orders related to the
curfew collectively as the "Curfew Orders."

68.     Pursuant to the Curfew Orders, "any person who knowingly violate[d] the provisions in th[e] Order[s] [was] guilty of a Class B misdemeanor" under NYC Administrative Code § 3-108.

69.     NYC Administrative Code § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

70.     Under New York Penal Law § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

71.     In enforcing the Curfew Orders in June of 2020, NYPD members arrested hundreds of people at protests for purported violations of the Curfew Orders, without first having given them meaningful dispersal orders, if any, or meaningful opportunities to disperse, if any.

72.     In enforcing the Curfew Orders in June of 2020, NYPD members arrested hundreds of people at protests, while allowing others who were not essential workers and who were in public to be free from arrest.

73.     The NYPD issued two official statements directing officers how to implement the Curfew Orders, through the FINEST message system (which sends internal messages to NYPD members).

74.     On June 1, the NYPD Operations Division issued a FINEST message regarding the curfew orders, instructing officers that "[e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply." [13] (emphasis added).

---

[13] NYPD FINEST Message, *City-Wide Curfew* (June 1, 2020).

75.     On June 2, demonstrations again occurred at multiple locations throughout Manhattan. Protestors encountered NYPD officers in Lower Manhattan, the Upper West Side, Astor Place, Chelsea, and Midtown. More than 290 protesters were arrested at these locations. As occurred in many of the mass arrest locations at issue in the Consolidated Actions, these arrests were made without adequate notice to those engaged in protest and without permitting sufficient time for those who were notified to disperse.

76.     On June 3, another FINEST message omitted the instruction to issue a dispersal order prior to curfew enforcement stating that, for a "person violating the curfew, a C-summons may be issued . . . for violating the Mayoral emergency order."[14]

77.     The June 3, 2020 FINEST message omitting the instruction to issue a dispersal order prior to curfew enforcement reflected Defendant City's official policy regarding enforcement of the Curfew Orders on June 3, 2020, *i.e.,* without providing a dispersal order and meaningful opportunity to disperse prior to engaging in an arrest for a purported Curfew Order violation.

78.     On June 3, protests again occurred in Brooklyn, at Cadman Plaza and Maria Hernandez Park and in Manhattan, at Midtown East and the Upper East Side near Gracie Mansion.

79.     NYPD members arrested around 191 protesters on June 3,2020 – including Mr. Casablanca.

80.     In a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch

---

[14] NYPD FINEST Message, *Curfew Extension* (June 3, 2020).

("HRW"), related to a HRW[15] report on the June 4, 2020 mass arrest in the Mott Haven

neighborhood of the Bronx, Deputy Commissioner Hart stated:

> Upon 8PM on June 4, 2020 the demonstration that took place in Mott Haven was
> unlawful under the Mayor's Executive Order establishing a curfew. After 8PM,
> officers policing this demonstration observed individuals who were not essential
> workers in public. That observation provided officers with probable cause to take,
> at a minimum , enforcement for Administrative Code Section 3-109, Violating a
> Mayoral Executive Order, a "B" misdemeanor. Their detention was
> lawful….Officers policing this demonstration who observed individuals who were
> not essential workers in public, including legal observers, during the hours of
> 8PM to 5AM, had probable cause to take enforcement for Administrative Code
> Section 3-108.[16]

81.     Deputy Commissioner Hart's September 16, 2020 letter omitting the instruction

to issue a dispersal order prior to curfew enforcement reflected Defendant City's official policy

regarding enforcement of the Curfew Orders on June 3, 2020, *i.e.,* without providing a dispersal

order and meaningful opportunity to disperse prior to engaging in an arrest for a purported

Curfew Order violation.

### MR. CASABLANCA'S JUNE 3, 2020 BEATING AND ARREST

82.     Upon information and belief, on June 3, 2020, the videographer who recorded the

Moreno Video, Karla Moreno, posted a statement on Medium entitled "My Statement on the

Events of June 3rd, 2020" (the "Moreno Statement"), available at

https://medium.com/@kaprilmoreno/my-statement-on-the-events-of-june-3rd-2020-

2c62ef00756a (Last accessed August 30, 2021).

---

[15] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its
Costs In The United States ("HRW Report"), Sept. 30, 2020, *available at*
https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-
its-costs-united-states.
[16] *See* Annex II to the HRW Report, *available at*
https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

83.     According to the Moreno Statement, just prior to filing the Moreno Video, Ms. Moreno had been "driving to meet a friend" when she "encounter a police detour" so she "stopped while at the intersection of Third Avenue & 50th Street in Midtown Manhattan."

84.     Also according to the Moreno Statement, just prior to filing the Moreno Video:

> I saw a bicyclist in the crosswalk about 10-feet away from me, and waited for him to cross the street, when he suddenly paused, stood on his pedals, and looked over his shoulder. An armed police officer raised a baton and approached the cyclist. I felt uneasy. Without thinking, I picked up my cell phone and began recording their interaction.

85.     At about 9:00 p.m., Mr. Casablanca was lawfully present at around 3rd Avenue and 50th Street in the County, City, and State of New York, participating in a Black Lives Matter protest.

86.     The demonstrators and police had recently moved past a part of 3rd Avenue near NYPD's 17th Precinct, located at 167 East 51st Street.

87.     Just before 9:00 p.m., Mr. Casablanca and other protesters, along with NYPD members, were proceeding south down 3rd Avenue, from 51st Street.

88.     Mr. Casablanca had been riding his Bianchi street bicycle during the protest.

89.     At around 9:00 p.m., Mr. Casablanca was in the crosswalk to the south of 50th Street at its intersection of 3rd Avenue.

90.     NYPD members to the north on 3rd Avenue rushed toward protesters who were also to the north on 3rd Avenue.

91.     Without having provided any dispersal order or other warning, the NYPD members present were trapping, or "kettling", the protesters roughly in front of Mr. Casablanca.

92.     Upon information and belief, members of the NYPD's Strategic Response Group ("SRG") were present on and in the immediate vicinity of 3rd Avenue, participating in policing the protest and/or in creating the kettle and/or in effecting the mass arrest.

93.     Mr. Casablanca attempted to use his phone to document the NYPD members who were rushing the protesters to the north.

94.     Without warning, Defendant NYPD Member John Doe 1 approached Mr. Casablanca from behind – moving from west to east in the crosswalk - and struck Mr. Casablanca with his NYPD baton in Mr. Casablanca's right hand, knocking Mr. Casablanca's phone out of his hand.

95.     Defendant Doe 1 was a male NYPD Member wearing khaki pants, a dark-colored, long-sleeve jacket, and a dark-colored helmet.

96.     Defendant Doe 1 can be seen in the below still from 0:01 in the Moreno Video:



97.     According to the Moreno Statement, Defendant Doe 1, "[a]n armed police officer[,] raised a baton and approached the cyclist" – Mr. Casablanca – at which point Moreno "felt uneasy" and began recording "their interaction" on the Moreno Video.

98.     The first few seconds of the Moreno Video capture Defendant Doe 1 approaching Mr. Casablanca from behind and beginning to strike Mr. Casablanca's right hand with his baton.

99.     Defendant Doe 1's strikes knocked Mr. Casablanca's phone out of his hand and onto the ground.

100.    Defendant Doe 1 stepped on and/or kicked Mr. Casablanca's phone.

101.    Defendant Doe 1 advanced on Plaintiff and continued to strike Mr. Casablanca.

102.    Defendants Lieutenant Luis Columbie and Sergeant Richard Wall then joined Doe 1 striking Mr. Casablanca.

103.    Defendants Columbie, Wall, and Doe 1 repeatedly hit Mr. Casablanca with their batons and/or asps on his back, shoulders, arms, thighs, legs, and elsewhere.

104.    According to the Moreno Statement, Moreno "initially felt a sense of comfort when the two others join the scene, thinking they would deescalate the violence" but [t]hey then began to beat the cyclist with their batons, too."

105.    Defendant Columbie appeared to be a male and wore a white shirt NYPD uniform and riot helmet with a light blue band along the bottom.

106.    Defendant Wall  appeared to be a white man in a blue NYPD uniform and riot helmet with a light blue band across the bottom.

107.    Defendants Columbie and Wall appear in the below still from 0:09 in the Moreno Video:



108.    For brief moments after Defendant Doe 1 struck Mr. Casablanca's right hand, knocked the phone out of his hand and onto the ground, and kicked the phone away from him, Mr. Casablanca attempted to retrieve his phone from the ground where Defendant Doe 1 had kicked it.

109.    As Defendants Columbie, Wall and Doe 1 attacked Mr. Casablanca, he retrieved his phone from the ground and shielded it with his body.

110.    Upon seeing Defendants Columbie, Wall and Doe 1 – "all three men … wearing pistols…moving towards" Moreno, according to the Moreno Statement – she "stopped recording."

111.    One or more of Defendants Columbie, Wall, and Doe 1 then rear-cuffed Mr. Casablanca in metal handcuffs that were especially tight on his right wrist.

112.    One or more of Defendants Columbie, Wall, and Doe 1 then picked Mr. Casablanca up and brought him over to a nearby sidewalk.

113.    Defendants Columbie, Wall, and Doe 1 assaulted and arrested Mr. Casablanca as part of NYPD kettle created at the same location.

114.    Defendants Columbie, Wall, and Doe 1 assaulted and arrested Mr. Casablanca as part of NYPD mass arrest at the same location.

115.    While waiting on the sidewalk, Mr. Casablanca asked NYPD members where his bike was.

116.    NYPD members responded to the effect of "Don't worry about it" and "We'll take care of it."

117.    Mr. Casablanca never saw his bicycle again.

118.    While protesting, Mr. Casablanca had been covering his face with a shirt.

119.    A NYPD member or members removed the shirt that had been covering Mr. Casablanca's face and placed it in his backpack.

120.    During the same time Defendants Columbie, Wall, and Doe 1 were striking Mr. Casablanca with their batons prior to handcuffing him, the Moreno Video shows a NYPD vehicle with its lights on in the roadway on 3rd Avenue between 50th and 49th Streets, to the south of the vantage point from which Ms. Moreno was filming.

121.    According to the Moreno Statement, after she stopped recording, Moreno "was terrified and tried to turn left against traffic" but only "managed to drive about 30 feet away from

the scene when [she] was stopped by traffic jam of civilian and official vehicles parked in different directions."

122.    Also according to the Moreno Statement, Moreno "looked back to where [she] had just fled, and saw several dozens of people, with and without police uniforms."

123.    Also according to the Moreno Statement, Moreno then "made a final attempt to drive away" but "[a] man, not wearing a uniform, told [her] to park [her] car."

124.    Also according to the Moreno Statement, although Moreno "was in fear" and "asked if [she] could please leave as [she] was very afraid" that person "instructed [her] to not move."

125.    Also according to the Moreno Statement, there she "remained inside the car, alone, for approximately an hour" during which time a bus arrived and, some time later, she was eventually permitted to leave the scene.

126.    After Mr. Casablanca remained for some time rear-cuffed on the sidewalk, an NYPD member asked words to the effect of, "Whose are these?" - referring to Mr. Casablanca and other arrestees.

127.    As Mr. Casablanca waited on the sidewalk, an NYPD member said words to the effect of, "We need more bodies" to fill the bus.

128.    NYPD members who were present at that time with Mr. Casablanca and other arrestees who were handcuffed on the sidewalk were apparently unable to locate the NYPD members who had been involved in arresting Mr. Casablanca and those other arrestees.

129.    Defendant John or Jane Doe 4 - a NYPD supervisor - assigned Defendant Ryan Costello to process the arrests of Mr. Casablanca and three others.

130.    Pursuant to NYPD policies, practices, and procedures in such "turn-over" arrests – where the NYPD member to whom an arrestee is "turned over" did not observe the arrestee's pre-arrest conduct that led to the arrest, which might justify a subsequent prosecution – the NYPD member to whom the arrestee is turned over, as well as the supervisor who directs that the turn-over happen, must be able to identify and receive information from a fellow officer who observed the pre-arrest conduct.

131.    When, as was the case here, no NYPD member who made a pre-arrest observation of a "turn-over" arrestee can be identified, an arrestee is meant to be released.

132.    Rather than releasing Mr. Casablanca, however, Defendants Doe 4 and Costello continued to process Mr. Casablanca's arrest.

133.    Under NYPD policies related to the use of force and use of force reporting and supervision, and investigation, NYPD members who attacked and injured Mr. Casablanca were required to document facts such as their identities, the force used, the injuries caused, the justification(s) for using force, and other information, for example, in a Threat, Resistance, and Injury ("TRI") report.

134.    In violations of those obligations, Defendants Costello, Columbie, Wall and Does 1 and 4 failed to document and/or inquire about the uses of force against Mr. Casablanca or his injuries.

135.    As part of the NYPD's large-scale arrest processing procedures, which Defendants subjected Mr. Casablanca to because he was arrested at a protest, NYPD member eventually took Mr. Casablanca's photograph with Defendant Costello.

136.    A NYPD member cut the straps off of Mr. Casablanca's backpack and took it from him.

137.     NYPD members then loaded Mr. Casablanca onto a bus along with other arrestees.

138.     Plaintiff and other arrestees waited on the bus until NYPD members had loaded around 20 arrestees onto the bus.

139.     At around 10:00 p.m. or so, NYPD members drove the bus from the area around 3rd Avenue and 50th Street in Manhattan – located right near the NYPD's 17th Precinct - to Brooklyn Central Booking ("BKCB") at 120 Schermerhorn Street in Brooklyn, New York.

140.     The bus remained parked outside BKCB for around a half hour or more.

141.     NYPD members eventually removed Mr. Casablanca from the bus.

142.     NYPD members reunited Mr. Casablanca with Defendant Costello.

143.     For the next few hours, Mr. Casablanca and Defendant Costello waited in a long line of arrestees and NYPD members that stretched from inside BKCB, up through the sallyport, onto the sidewalk outside of BKCB.

144.     The metal handcuffs that Defendants Columbie, Wall, and Doe 1 had placed on Plaintiff were still too tight and causing Mr. Casablanca serious pain, particularly in his right wrist.

145.     As they waited on the sallyport, Mr. Casablanca told Defendant Costello that the cuffs were too tight and asked him to loosen them.

146.     Defendant Costello told Mr. Casablanca in substance that he could not remove the handcuffs and that Mr. Casablanca would "need to wait until we get inside."

147.     Defendant Costello did not loosen the handcuffs.

148.     The handcuffs on Mr. Casablanca's wrists got tighter as his wrists swelled up.

149.    Mr. Casablanca could not see his hands, so he asked another arrestee to look at them for him, and that arrestee told Mr. Casablanca in sum that his right hand was turning blue.

150.     Mr. Casablanca told Defendant Costello in sum that his hand was turning blue.

151.    Defendant Costello then tried to use the key to his metal handcuffs to unlock the handcuffs that were on Mr. Casablanca, but he could not remove the handcuffs.

152.    Another NYPD member then tried to remove the handcuffs with a different metal key, also without success.

153.    A third NYPD member then used needle-nose pliers and a key and was eventually able to remove the metal handcuffs.

154.    Defendant Costello then put plastic flex-cuffs on Mr. Casablanca.

155.    By that time, Mr. Casablanca's right hand and wrist were swollen.

156.    It was the middle of the night before Mr. Casablanca finally entered BKCB.

157.    Once inside, Mr. Casablanca was separated from Defendant Costello, searched, photographed again, and moved among rooms and cells until his eventual release at around 5:00 AM.

158.    During Mr. Casablanca's arrest processing, Defendant Costello and other NYPD members forced Mr. Casablanca into close proximity with NYPD members and other arrestees, many of whom were not wearing masks.

159.    Although a NYPD member returned Mr. Casablanca's backpack before releasing him from NYPD custody, the backpack was damaged upon return in that a NYPD member had cut the straps from Mr. Casablanca's backpack.

160.    Defendant Costello handed Mr. Casablanca a NYPD "C-Summons" bearing summons No. 4448946969 alleging he had allegedly observed Mr. Casablanca violating New

26

York City Administrative Code § 13-108 by failing to comply with Defendant de Blasio's June 2, 2020 Emergency Executive Order No. 119 at 9:15PM on June 3, 2020 at 50th Street and 3rd Avenue.

161.    The C-Summons directed that Mr. Casablanca appear in New York City Criminal Court on September 30, 2020.

162.    Upon information and belief, Defendant Costello included materially false factual allegations in the C-Summons, which he knew to be false when he swore them out.

163.    For example, as seen above, Mr. Casablanca neither received nor refused to comply with any order to disperse prior to Mr. Casablanca's arrest – a pre-requisite to an arrest or prosecution for a violation of the Curfew Orders.

164.    On September 8, 2020, prior to Mr. Casablanca's September 30, 2020 appearance date on the C-Summons, the criminal proceeding against Mr. Casablanca was dismissed on grounds consistent with Mr. Casablanca's innocence.

165.    Mr. Casablanca never received any NYPD property voucher or invoice or other paperwork related to his bicycle.

166.    Although Mr. Casablanca attempted to retrieve his bicycle from the NYPD after he was released from custody, including by visiting the NYPD's 17th Precinct, near the location of his arrest, Mr. Casablanca was unable to locate or retrieve his bicycle, and never saw his bicycle again.

167.    As a result of Mr. Casablanca's beating at the hands of Defendants Columbie, Wall, and Doe 1, Mr. Casablanca sustained – among other injuries - pain, bruising, and swelling on his back, shoulders, arms, and legs, some of which is depicted in these photographs:









168.     Additionally, while Mr. Casablanca was in custody, the excessively tight and lengthy cuffing caused Mr. Casablanca to experience pain, numbness, and swelling in his hands, and also caused Mr. Casablanca's right hand to turn blue.

169.     The excessively tight and lengthy cuffing has also caused Mr. Casablanca ongoing injuries, including, but not limited to, limitations in his ability to move and use certain fingers in his right hand, right wrist pain, numbness, and weakness.

170.     As a result of the pain from the beating and tight cuffing, Mr. Casablanca received medical treatment beginning with a visit to the Emergency Room on June 5, 2020 and continuing with further, outpatient treatment for ongoing injuries to his right wrist and hand caused by Defendants.

## THE NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS

171.     The NYPD's violent response to the protest against police brutality that Mr. Casablanca participated in dramatically different from their response to other kinds of protests and rallies.

172.     On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[17]

173.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police

---

[17] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[18]

174.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[19]

175.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[20]

176.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of

---

[18] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

[19] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[20] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[21]

177.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[22],[23]

178.    The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  By way of non-exhaustive example:

    *a.*   In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

    *b.*   In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[24],[25]

---

[21] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[22] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[23] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[24] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[25] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

c. More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[26] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[27]

**THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS**

179. The extensive deprivations of constitutional rights suffered by Mr. Casablanca here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

180. The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

---

[26] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video
[27] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

181.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[28]

182.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[29]

183.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[30]

184.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.[31]

185.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

186.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully assaulted, subjected to mass arrest, unreasonable and prolonger detentions

---

[28] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[29] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[30] *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[31] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

and violations of their First Amendment and other, related rights, much in the same manner as Plaintiff in this case.

187.    In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.    *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.    *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.    *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested

them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.  *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.  *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.  *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.  *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.   *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.   Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[32] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.   In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[33] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.   Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York*

---

[32] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

[33] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.  The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.  The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.  Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.  The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.  The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.  The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.      *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

## THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING

188.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

189.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

190.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

191.    Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

192.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

193.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

194.     These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of Plaintiff in this case.

195.     Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

196.     However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

197.     On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

198.     Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, *inter alia,* the following:

a.     The failure to make clear the need provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

b.     The failure to make clear the need for individualized probable cause to arrest or prosecute in a protest context;

c.     The failure to provide training on the requirements to use only reasonable and proportionate force in connecting with policing First Amendment assemblies;

d.      The failure to provide training on the requirements that NYPD members who use certain types of force and/or cause injuries in using force, as well as other NYPD members (including supervisors) who are or become aware of such uses of force, to document and investigate their fellow NYPD members' uses of force;

e.      The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters; and

f.      The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

199.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, Defendant City had, at all times relevant herein, and still has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members to police protests: the NYPD's Strategic Response Group ("SRG").

200.    The SRG, deployed around the City at protests in 2020 including those relevant to this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

201.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

202.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single-

fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[34]

203.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

204.    Many SRG members, including many of those deployed to the protests in 2020 that are relevant to this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[35]

205.    SRG members are meant to have additional DCU training.

206.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

207.    However, many of the officers deployed to respond to the protests in 2020 did not even receive *that* training, which was supposedly required of them.

208.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[36]

209.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the

---

[34] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.

[35] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories*, The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.

[36] OCC Report at 37.

subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board ("CCRB") and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

210.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors – including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

211.    For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[37]

212.    Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

---

[37] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

213.    After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004

RNC-related after-action reports were disclosed in the RNC litigations, and some of them were

made public as a result, upon information and belief, rather than continuing to create such reports

frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the

NYPD opted to stop creating such records.

214.    For example, according to the Corporation Counsel's report, NYPD records do

not show any protest-related after action reviews undertaken between the 2004 Republican

National Convention until the events of the George Floyd protests.

215.    Nevertheless, upon information and belief, at all times relevant herein,

Defendants de Blasio, Shea, Monahan, and other defendant City policymakers, routinely

received reports regarding arrests made in connection with First Amendment assemblies,

including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports

including data tracking arrestees, the length of time it took them to go through the system,

whether they were released with a summons or DAT, their proposed arrest charges, and other

information related to the status and/or dispositions of the cases; internal critiques from

supervisors and other officers involved in mass arrests related to police actions taken in relation

to an event; and/or other reports including information arrests, use of force protest arrest

processing, and/or related prosecutions.

216.    Despite the wealth of evidence of NYPD members' historical brutality against

protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including

information gleaned from reports and lawsuits, as well as other data points, to identify

deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

217.    For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training, the City did not review or make practice changes based on (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

218.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

219.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b)(6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

220.    Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[38]

221.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and

---

[38] OCC Report at 2, 30.

a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and

other, related rights of Plaintiff and other similarly injured protesters.

### DEFENDANT CITY'S POLICY AND/OR PRACTICE
### OF USING EXCESSIVE FORCE AGAINST SUMMER 2020 BLACK LIVES MATTER
### PROTESTORS

222.     Defendant City had a policy, practice, and/or custom in the summer of 2020 of

using excessive force against Black Lives Matter protesters.

223.     Defendant City further had a policy, practice, and/or custom of, in substance,

authorizing and/or ratifying those uses of excessive force by failing to follow or enforce NYPD

requirements to document and/or investigate and/or supervise uses of force and by failing to

supervise and/or discipline NYPD members who used force against summer 2020 Black Lives

Matter protesters.

224.     Defendants used types and levels of force that were excessive and unnecessary

force against Mr. Casablanca and other protesters.

225.     In many cases, those uses of force were in contravention of, or inconsistent with,

related, written NYPD policies and/or training.

226.     For example, Defendants Columbie, Wall, and Doe 1 struck Plaintiff with batons

and their fists and/or feet without warning and then subjected Plaintiff to tight and injurious

cuffing that caused him physical injuries, including bruising, swelling, and other injuries that

were, or should have been, plainly visible and obvious to Defendants Costello and Does 1-4.

227.     In "Police Use of Force in New York City: Findings and Recommendations on

NYPD's Policies and Practices," an October 1, 2015 report published by the New York City

Department of Investigation Office of the Inspector General for the NYPD ("OIG-NYPD")[39], the

OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies,

including, *inter alia*, that:

    a. NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

    b. NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

    c. NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

    d. NYPD training does not adequately focus on de-escalation; and

    e. In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force.

OIG-NYPD Report at pp. 3-5.

    228.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and

designed, created, and implemented training, to include "updated definitions concerning force,

new policies regarding de-escalation, responsibilities of witness officers in use of force incidents,

reporting obligations concerning force incidents, and data analysis on use of force incidents". *See*

OIG-NYPD Report at p. 2 *et seq.*; *see also* NYPD Patrol Guide Section 221-01[40] ("Force

Guidelines") and 221-02[41] ("Use of Force"), issued and effective June 27, 2016 (implementing

---

[39]    "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).
[40]    Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.
[41]    Available online via the New York City Civilian Complaint Review Board website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.

changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

229.     Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[42]

230.     In Mr. Casablanca's case, Defendants Columbie, Wall, and Doe 1 brutally attacked Mr. Casablanca using hand, foot, and/or baton strikes against Mr. Casablanca, and one or more of them put extremely tight handcuffs on Mr. Casablanca, under circumstances in which those uses of force were unwarranted and unreasonable.

231.     Defendants Costello, Columbie, Wall, and Does 1 and 4 then failed to document or investigate or supervise other NYPD members related to the use of hand, foot, and/or baton strikes on Mr. Casablanca, their forcible take-down of Mr. Casablanca, or the physical injuries Defendants caused to Mr. Casablanca, including such injuries caused as the result of his overly-tight handcuffing.

232.     In Plaintiff's case, and in the cases of many other protesters in the summer 2020 protest policing context, NYPD members used excessive force against protesters, including by

---

[42]     "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

using hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), including

such force that caused physical injuries to Plaintiff and other protesters.

233.    Also in Plaintiff's case, and many other cases in the summer 2020 protest policing

context, Defendants failed to document, and/or require that fellow Defendants and/or other

fellow NYPD members document, and failed to investigate and/or supervise fellow NYPD

members regarding, uses of force in accordance with related NYPD policies and/or training.

234.    The pleadings in the Consolidated Actions and the dozens of other cases filed

against Defendant City and other Defendants arising from the policing of the summer 2020

protests in the United States District Court for the Southern District of New York and the United

States District Court for the Eastern District of New York describe many incidents in which

NYPD members used excessive force against protesters, including by using hand strikes, foot

strikes, forcible take-downs, impact weapons (such as batons), including such force that caused

physical injuries to the protesters.

235.    Upon information and belief, the documents and information disclosed by

Defendant City and others to various State and City agencies, including the NY Attorney

General's Office, the OIG, the New York City Law Department, the New York City Council,

and the CCRB, in connection with their investigations into the summer 2020 protests, describe

many cases in which NYPD members used excessive force against protesters, including by using

hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), including such

force that caused physical injuries to the protesters.

236.    Additionally, the discovery in the Consolidated Actions and the dozens of other

cases filed against Defendant City and other Defendants arising from the policing of the summer

2020 protests in the United States District Court for the Southern District of New York and the

United States District Court for the Eastern District of New York has included a substantial amount of evidence showing that NYPD members used excessive force against the protesters, including by using hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), including such force that caused physical injuries to the protesters.

## DEFENDANT CITY'S POLICIES AND PRACTICES REGARDING ARRESTS—INCLUDING MASS ARRESTS—WITHOUT FAIR WARNING

237.    Defendant City had a policy, practice, and/or custom in the summer of 2020 of engaging in arrests, including mass arrests, without first providing fair warning.

238.    Defendant City had a policy, practice, and/or custom in the summer of 2020 in engaging in arrests, including mass arrests, for purported violations of the Curfew Orders, without first having provided a clearly communicated and lawful dispersal order, followed by a meaningful opportunity to disperse, and an actual refusal to disperse, prior to taking enforcement action.

239.    In many cases, where NYPD members did give dispersal orders, they did not then provide a means of egress or other meaningful opportunity to comply.

240.    In Mr. Casablanca's case,  NYPD members attacked and arrested Mr. Casablanca without warning.Then, Defendant Costello prosecuted Mr. Casablanca for an alleged knowing violation of the Curfew Orders, although Mr. Casablanca did not receive a dispersal order or opportunity to disperse before Defendants Columbie, Wall, and Doe 1 attacked and arrested him.

241.    In Mr. Casablanca's case, and many others, Defendants seized protesters based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the individual in question based on their own, individual conduct, as opposed to the perceived "group conduct."

50

242.     In Mr. Casablanca's case, and many others, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

243.     That enforcement was consistent with widespread NYPD policy, practice, and/or custom related to the summer 2020 protests, including the protest at which NYPD members attacked and arrested Mr. Casablanca.

244.     Also in Mr. Casablanca's case, and many others, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups of protesters, including by kettling, without first having given protesters so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

245.     Although Mr. Casablanca was not himself trapped behind the police lines the NYPD members who were present at the location he was attacked and arrested had formed to "kettle" protesters just to Mr. Casablanca's north, Mr. Casablanca was attacked and arrested a few feet away from one of the lines in the kettle while the NYPD members present were creating the kettle - based on their perception that Mr. Casablanca was also a protester who should have been arrested along with the other protesters.

### DEFENDANT CITY'S PROTEST ARREST PROCESSING POLICIES AND PRACTICES

246.     Because Defendants arrested Mr. Casablanca and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Mr. Casablanca and other arrestees in overly tight handcuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-

scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street, or a nearby local precinct, in accordance with NYPD policies and practices that are employed outside the large-scale or mass arrest processing context.

247.    Additionally, as a result, instead of detaining Mr. Casablanca and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiff to injurious and over-tight handcuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

248.    In some cases, NYPD members destroyed and/or damaged property belonging to arrestees.

249.    In other cases, NYPD members seized and retained property from arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

250.    In still other cases, NYPD members seized and retained property without providing them with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

251.    Beyond that, in some cases, Defendants arrested protesters for alleged offenses which New York Criminal Procedure Law § 150.20 required them to issue summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD

policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a C-Summons.

252.    The conditions of Mr. Casablanca's and the other arrestees' confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

253.    With particular respect to the COVID-19 pandemic, during the arrestees' confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well as Defendants Shea, Monahan, and other NYPD members, enforced Executive Orders issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

254.    However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street and/or at a local precinct, issuing them summonses, and releasing them, Defendants transported arrestees to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

255.    Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining arrestees.

256.    Also relatedly, Defendants and other NYPD members removed masks many arrestees who had masks at one point prior to or during their arrests or detentions.

257.     Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public health and safety.

258.     Defendants knew or should have known that, as a result of subjecting arrestees to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive them of basic needs, including for example the need to stay safe from COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

259.     During arrestees' time in NYPD custody, Defendants deprived them of meaningful access to food, bathroom, soap and other hygiene products, and other basic necessities for an extended period of time, and subjected Plaintiff and other arrestees to filthy, crowded, and unsanitary conditions of confinement.

260.     Defendants acted intentionally to impose those conditions because they subjected other arrestees to Defendants' Protest Arrest Processing Policies and MAPP.

261.     Additionally, Defendants recklessly failed to act with reasonable care to mitigate the risks that the conditions posed even though they knew or should have known that they posed excessive risks to arrestees' physical and/or mental health or safety through potential exposure to COVID-19.

262.     Moreover, the risks were obvious and apparent, including based on the State and City policies and practices related to COVID-19 safety, and common sense.

**DEFENDANT CITY'S FAILURES TO MONITOR, SUPERVISE, INVESTIGATE, AND/OR DISCIPLINE DEFENDANTS DOES 1-4 AND OTHER NYPD MEMBERS RELATED TO THE SUMMER 2020 PROTEST POLICING**

263.     Although Defendants City, de Blasio, Shea, Monahan, and other policymakers actually knew, or should have known, that Defendants Costello and Does 1-4 and other NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, and although almost two years have now passed, they have failed, and continue to fail, to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

264.     For example, despite statements made by Defendants de Blasio and Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

265.     Defendant City and City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

266.     Upon information and belief, the NYPD's Internal Affairs Bureau ("IAB") received dozens or more complaints related to the NYPD's policing of the summer 2020 protests.

267.     The CCRB received hundreds of complaints related to the NYPD's policing of the summer 2020 protests.

268.    Notably, the CCRB has repeatedly described the NYPD's response to the CCRB's investigations into the summer 2020 protests as obstructive, stating, in six separate public "data snapshots":

> The CCRB has seen unprecedented challenges in investigating these complaints particularly around the identification of officers due to the failure to follow proper protocols, officers covering their names and shield, officers wearing protective equipment that did not belong to them, the lack of proper use of body worn cameras, as well as incomplete and severely delayed paperwork.[43]

269.    Violent NYPD conduct, and mass arrests, at the summer 2020 protests were on full display during and after the protests in the form of videos and accounts posted on social media and reported in other media.

270.    As one example, on July 17, 2020, the *New York Times* published that video, along with 63 other videos of NYPD violence against protesters, as part of an investigation into NYPD uses of force during the protest that were caught on video. *See* Alison McCann, Blacki Migliozzi, Andy Newman, Larry Buchanan, and Aaron Byrd. *NYPD Says It Used Restraint During Protests: Here's What Video Shows*. The New York Times. July 17, 2020. Available online at https://www.nytimes.com/interactive/2020/07/14/nyregion/nypd-george-floyd-protests.html (last accessed April 1, 2022).

271.    Confronted with the July 17, 2020 *New York Times* article and the videos in it, on July 24, 2020, then-New York City Mayor, Defendant de Blasio, reportedly said:

> We need to create a very consistent regular process where people can see updates on each and every one of those videos and know what the determination was, because I think people deserve it, [….] I think if there's a reason that an officer needs to be modified or suspended quickly, that should be clear. If they don't

---

[43] *See* CCRB March 16, 2021 Protest Cases Snapshot; June 21, 2021 Protest Cases Snapshot; September 13, 2021 Protest Cases Snapshot; October 18, 2021 Protest Cases Snapshot; and December 23, 2021 Protest Cases Snapshot, available online at https://www1.nyc.gov/site/ccrb/policy/issue-based-reports.page (last accessed April 1, 2022).

need to be, then that should be an answer and why. If there's follow up, a bigger discipline, that should be clear.[44]

272.    However, although almost two years have passed since the violence depicted in the videos, no such process exists, and Defendant City has dragged out – or failed to conduct – investigations, and/or taken virtually no disciplinary action, as a result of the weft of evidence, including evidence connected in connection with CCRB and IAB complaints and civil lawsuits, of NYPD mass arrests and uses of force, including such uses of force without appropriate supervision, documentation, or investigations.

273.    Defendants City, de Blasio, Shea, and Monahan have demonstrated a deliberate indifference to and/or substantially ratified that misconduct by failing to properly investigate and/or supervise Defendants Costello, Does 1-4, and other NYPD members who abused protesters during the summer 2020 protests.

### FIRST CLAIM FOR RELIEF

**Unlawful Seizure / False Arrest**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

**Against Defendants Costello, Columbie, Wall, and Does 1 and 4**

274.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

275.    Defendants did not have probable cause to seize, detain, or arrest Plaintiff.

276.    Defendants seized Plaintiff without a written judicial warrant authorizing them to do so.

---

[44] *See* Yoav Gonen and Gabriel Sandoval. *Just Five Cops Face Serious Penalties in De Blasio's Promised Accounting of NYPD Protest Misconduct Caught on Video.* The City. June 8, 2021. Available online at: https://www.thecity.nyc/2021/6/8/22525365/nypd-penalties-protest-misconduct (last accessed April 1, 2022).

277.     Defendants' seizure of Plaintiff was without privilege or lawful justification.

278.     Plaintiff did not consent and was conscious of the confinement by Defendants.

279.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

280.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

**Excessive Force**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the
Fourth and Fourteenth Amendments to the United States Constitution***

**Against Defendants Costello and Columbie, Wall, and Doe 1**

281.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

282.     Defendants' uses of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

283.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

284.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

**For Violations of Plaintiff's First Amendment Rights,
Including Under Retaliation and Time/Place/Manner Theories of Liability**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First
and Fourteenth Amendments to the United States Constitution*

**Against Defendants Costello, Columbie, Wall, and Does 1 and 4**

285.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

286.    Mr. Casablanca had a clearly established, First Amendment right to witness and attempt to document NYPD members as he was doing just prior to his arrest.

287.    Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

288.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

289.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

290.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

291.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of his First Amendment rights.

292.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

293.    Defendants imposed restrictions on Plaintiff's protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in unreasonably limiting Plaintiff's witnessing and recording their police actions in the public streets, in retaliating against Plaintiff for engaging in that protected conduct, in subjecting Plaintiff to excessive force, false arrest, excessive detention, malicious and false prosecution, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

294.    In addition to being retaliatory, the restrictions Plaintiff complained of herein that Defendants imposed on Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's ability to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.    Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

295.    For clarity's sake, Plaintiff is not challenging Defendant de Blasio's general authority to issue curfew orders altogether, or to issue the Curfew Orders in particular.

296.     However, Plaintiff is mounting both facial and as-applied challenges to the Curfew Orders, advancing theories that, on their face and as they were applied, the Curfew Orders violated First, Fourth, and Fourteenth Amendment principles.

297.     For example, as to Plaintiff's First Amendment claims under a time/place/manner theory, Plaintiff advances a facial challenge to the Curfew Orders, to the extent the Curfew Orders:

    a.     Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

    b.     Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

    c.     Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's ability to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

    d.     Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

298.     Further, Plaintiff also advances an as-applied challenge based on the manner in which Defendants applied the Curfew Orders – for example, in failing to provide meaningful notice and opportunity to disperse prior to using force on or arresting Plaintiff – under those same general theories.

299.     And, with respect to Plaintiff's other core claims of constitutional violations, although Plaintiff does not challenge the Curfew Orders facially on Fourth Amendment, Due Process, or Equal Protection grounds, Plaintiff does advance an as-applied challenge based on the manner in which Defendants applied the Curfew Orders.

300.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

301.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

**Due Process**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

**Against Defendants Costello, Columbie, Wall, and Does 1 and 4**

302.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

303.     As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiff violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

304.     For example, in Mr. Casablanca's case, NYPD members attacked, arrested, and prosecuted Mr. Casablanca, purportedly for a violation of the Curfew Orders, although he had not been given and refused a dispersal order, and although he was not given a meaningful opportunity to disperse.

305.     Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiff's property and/or detaining Plaintiff in the conditions as described subjected Plaintiff to the violations of Plaintiff's Due Process rights described elsewhere herein.

306.     For example, in Mr. Casablanca's case, NYPD members seized Mr. Casablanca's bicycle, which he never saw again, without providing Mr. Casablanca any NYPD paperwork related to the seizure, or means of redressing the loss.

307.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

308.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FIFTH CLAIM FOR RELIEF

**Equal Protection and Selective Enforcement**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourteenth Amendment to the United States Constitution***

**Against Defendants Costello, Columbie, Wall, and Does 1 and 4**

309.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

310.     As described above, Defendants arrested Plaintiff for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiff receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies

and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

311.    However, because Defendants arrested Plaintiff and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, rather than issuing them summonses, and releasing them from custody, on the street, or at a local precinct, while Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

312.    Upon information and belief, at the relevant times in June of 2020, most people arrested in connection with perceived violations of the Curfew Orders were subjected to the NYPD's mass arrest policies and practices transported to and processed at a MAPC.

313.    Upon information and belief, at the relevant times in June of 2020, most people arrested in connection with perceived violations of the Curfew Orders were either released from the street or from a local precinct, pursuant to NYPD's usual arrest and arrest processing policies and practices.

314.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiff subjected Plaintiff to the above-described violations of Plaintiff's Equal Protection rights.

315.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and

expenses; and/or otherwise damaged and injured Plaintiff.

316.    The unlawful conduct of the Defendants was willful, malicious, oppressive,

and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SIXTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights

### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution*

### Against Defendant Costello

317.    Plaintiff incorporates by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

318.    According to NYPD policy, practice, and training, NYPD criminal summonses

or "C-Summonses" such as the one Defendant Costello issued to Mr. Casablanca must be

sworn under oath and supported by sworn allegations by a NYPD member who personally

observed the violation, or who identifies such an NYPD member, who then must also provide

a sworn supporting deposition.

319.    Under New York law, the factual allegations in such a C-Summons must be

facially sufficient and establish a *prima facie* case that each charged violation occurred.

320.    Under New York law, if a key element, such as the refusal to comply with a

required dispersal order, is lacking, the charging document is not facially sufficient, the

charging document is not valid, the court does not have jurisdiction over the matter, and the

case must be dismissed.

321.    In this case, in order to be facially sufficient, a C-Summons charging a

purported Curfew Orders violation would require support by sworn statements that either the

deponent, or an identifiable fellow NYPD member, observed Mr. Casablanca receive a dispersal order based on a perceived Curfew Orders violation, as well as a meaningful opportunity to disperse, and then observed Mr. Casablanca refuse to comply with the dispersal order, before taking enforcement action in the form of arresting and then prosecuting Mr. Casablanca for the perceived Curfew Orders violation.

322.    Defendant Costello fabricated evidence of a material nature – namely, his sworn allegations that he observed Mr. Casablanca violate the Curfew Orders - likely to influence a jury's decision and intentionally forwarded that evidence to the Court, as a result of which Plaintiff suffered deprivations of liberty and/or property.

323.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

324.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SEVENTH CLAIM FOR RELIEF

**Malicious Prosecution**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution***

**Against Defendant Costello**

325.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

326.     Upon information and belief, Defendant Costello misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

327.     Defendant Costello was directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

328.     Defendant Costello lacked probable cause to initiate and continue criminal proceedings against Plaintiff.

329.     Defendant Costello acted with malice in initiating criminal proceedings against Plaintiff.

330.     Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff were favorably terminated on the merits.

331.     The criminal proceedings against Plaintiff were pending between June 3, 2020 and September 8, 2020.

332.     At all times during the pendency of the criminal proceedings against Plaintiff, Plaintiff remained subject to the orders and processes of the Court.

333.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

334.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### EIGHTH CLAIM FOR RELIEF

**Municipal Liability**
***Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)
for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth
Amendments to the United States Constitution***

**Against Defendant City of New York**

335.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

336.     The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff and other protesters and witnesses to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the criminal laws against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning; using excessively tight and injurious handcuffs, including – but not limited to - flex-cuffs, for protest-related arrests; failing to loosen or remove over-tight cuffs; and subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

337.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

338.    Also, as outlined elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan failed to train, supervise, investigate, and/or discipline NYPD members in connection with Defendant City's policing of the summer 2020 protests.

339.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

340.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## NINTH CLAIM FOR RELIEF

**Violations of New York State Law**
***Pursuant to the New York State Constitution and New York State Law***

**Against All Defendants**

341.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

*Respondeat Superior* **Liability**

342.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

**Violations of the New York State Constitution**

343.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

344.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

**Assault**

345.    Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

**Battery**

346.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

**New York Civil Rights Law § 79-P**

347.     Prior to his assault, battery, and arrest, Mr. Casablanca had been exercising his rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity and to maintain custody and control over the phone on which he was doing so.

348.     Prior to his assault, battery, and arrest, Mr. Casablanca had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

349.     Defendants Columbie, Wall, and Doe 1 assaulted and battered and arrested Mr. Casablanca, causing him to cease recording and lose custody and control of the phone on which he had been recording, intentionally preventing him from further recording law enforcement activity.

**Conversion**

350.     Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiff's personal property in derogation of Plaintiff's property rights.

**False Imprisonment and Unreasonable Detention**

351.     By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiff was conscious of the confinement and it was without Plaintiff's consent.

**Negligent Training and Supervision**

352.    Upon information and belief, Defendant City negligently trained and supervised the police officials described above.

**Excessive Detention**

353.    Defendants deliberately detained Plaintiff for an excessive and unreasonably prolonged period of time.

**Malicious Prosecution**

354.    Defendants commenced criminal proceedings against Plaintiff maliciously and without probable cause.

355.    All charges were terminated in Plaintiff's favor.

356.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

357.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.      Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.     Actual damages in an amount to be determined at trial against the City of New York;

iii.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. § 1988, New York Civil Rights Law § 79-P(3)(d), and New York

common law; and

iv.      Such other relief as the Court deems just and proper.


Dated: Brooklyn, New York
         September 15, 2023

**GIDEON ORION OLIVER**


277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com


**COHEN&GREEN P.L.L.C.**


By:
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       jessica@femmelaw.com